**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| HILL v. STATE STREET CORPORATION | ) ) ) | |
|  | ) | |
|  | ) | Master Docket No. 1:09-cv-12146 |
| THIS DOCUMENT RELATES TO THE ERISA ACTION | ) ) | |
|  | ) | |
| Docket No. 10-CV-10184-NG | ) | |
|  | ) | |

**<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**
**(MOTION TO EXPAND PAGE LIMIT ALLOWED SEPT. 21, 2010)**

**ORAL ARGUMENT REQUESTED**

Jeffrey B. Rudman (BBO No. 433380)
William H. Paine (BBO No. 550506)
John J. Butts (BBO No. 643201)
Timothy Perla (BBO No. 660447)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
(617) 526-5000 (facsimile)

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................3

    A.    Plaintiff and the Plan..........................................................................3

    B.    State Street's Financial Health............................................................3

    C.    Plaintiff's Regurgitated FX Allegations ...............................................4

ARGUMENT................................................................................................................7

I.      THE ENTIRE COMPLAINT IS PREMISED ON FACTUALLY UNSUPPORTED
       ALLEGATIONS OF A WIDESPREAD FRAUD. ..........................................7

II.     PLAINTIFF HAS NOT PLEADED A PLAUSIBLE BASIS FOR HIS CLAIM
       THAT STATE STREET'S STOCK WAS AN IMPRUDENT INVESTMENT................8

    A.    Plaintiff's Claim Is Inconsistent with Public Policy and the Plan's Design. ...........9

    B.    Employer Stock Held in an ESOP Is Presumed To Be a Prudent Investment.......10

    C.    Plaintiff Cannot Overcome the Presumption of Prudence Because State Street
        Was (and Remains) a Strong, Viable Company. ....................................14

    D.    Even Without the Presumption of Prudence, Plaintiff's Prudence Claim Still Fails
        Under *Twombly* and *Iqbal*......................................................16

III.    PLAINTIFF'S DISCLOSURE CLAIMS FAIL ON MULTIPLE GROUNDS. ...............17

    A.    Plaintiff Has Not Alleged Detrimental Reliance. ..................................17

    B.    The Challenged SEC Filings Were Not Fiduciary Communications. ...................18

    C.    Plaintiff Has Not Identified Any Actionable Misstatements. ...............................21

IV.    PLAINTIFF HAS NOT PLEADED VIABLE PRUDENCE OR DISCLOSURE
       CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS. ...........................................23

    A.    State Street's Former CEO, Ronald Logue, Was Not a Fiduciary with Regard to
        Investment Selection or Plan Communications. ....................................23

    B.    Plaintiff Has Not Alleged Facts Plausibly Showing that the Other Individual
        Defendants Should Have Questioned the Prudence of State Street's Stock or the
        Accuracy of State Street's Annual Reports. .........................................24

V.      PLAINTIFF'S REMAINING CLAIMS ARE DEFICIENT. ............................................27

VI.     PLAINTIFF'S DEMAND FOR A JURY TRIAL SHOULD BE STRICKEN. ................28

CONCLUSION...........................................................................................................................28

# TABLE OF AUTHORITIES

Page

Federal Cases

*Airframe Sys., Inc. v. Raytheon Co.*,
    520 F. Supp. 2d 258 (D. Mass. 2007) ........................................................................................ 5

*American Catholic Educational Programming Found., Inc. v. Cardinale*,
    567 F.3d 8 (1st Cir. 2009) .......................................................................................................... 7

*Ashcroft v. Iqbal*,
    129 S.Ct. 1937 (2009) ............................................................................................................ 7, 8

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990) ...................................................................................................... 21

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988) .................................................................................................................. 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................................... 7

*Bell v. Pfizer, Inc.*,
    --- F.3d ---, 2010 WL 3385949 (2d Cir. Aug. 30, 2010) ........................................................ 18

*Bendaoud v. Hodgson*,
    578 F. Supp. 2d 257 (D. Mass. 2008) ...................................................................................... 20

*Benitez v. Humana, Inc.*,
    2009 WL 3166651 (W.D. Ky. Sept. 30, 2009) ........................................................................ 14

*Bunch v. W.R. Grace & Co.*,
    532 F. Supp. 2d 283 (D. Mass. 2008) ...................................................................................... 27

*Bunch v. W.R. Grace & Co.*,
    555 F.3d 1 (1st Cir. 2009) .................................................................................................. 12, 13

*Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.*,
    334 F.3d 365 (3d Cir. 2003) ............................................................................................... 23, 24

*Cafe La France, Inc. v. Schneider Sec., Inc.*,
    281 F. Supp. 2d 361 (D.R.I. 2003) ........................................................................................... 23

*Clearview Software Int'l, Inc. v. Ware*,
    2009 WL 2151017 (D.N.H. Jul. 15, 2009) ................................................................................ 7

*Crowley ex rel. Corning, Inc., Inv. Plan v. Corning, Inc.*,
    234 F. Supp. 2d 222 (W.D.N.Y. 2002) ................................................................. 25

*Davis v. First Union Corp. Long Term Disability Plan*,
    213 F. Supp. 2d 29 (D. Mass. 2002) ..................................................................... 18

*Edgar v. Avaya, Inc.*,
    503 F.3d 340 (3d Cir. 2007)................................................................................. 15

*Fischer v. JP Morgan Chase*,
    703 F. Supp. 2d 374 (S.D.N.Y. 2010)................................................................... 12

*Gannell v. Prudential Ins. Co. of Am.*,
    502 F. Supp. 2d 167 (D. Mass. 2007) ................................................................... 28

*Gearren v. McGraw Hill Cos., Inc.*,
    690 F. Supp. 2d 254 (S.D.N.Y. 2010).................................................................... 20

*Geinko v. Padda*,
    2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ............................................................. 8

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996)............................................................................... 3, 17

*Graden v. Conexant Sys., Inc.*,
    574 F. Supp. 2d 456 (D.N.J. 2008) ....................................................................... 11

*Guerra v. Teradyne Inc.*,
    2004 WL 1467065 (D. Mass. Jan. 16, 2004) ......................................................... 21

*Halaris v. Viacom, Inc.*,
    2008 WL 3855044 (N.D. Tex. Aug. 19, 2008)........................................................ 11

*Harris v. Amgen, Inc.*,
    2010 WL 744123 (C.D. Cal. Mar. 2, 2010) ........................................................... 17

*Howell v. Motorola, Inc.*,
    337 F. Supp. 2d 1079 (N.D. Ill. 2004) .................................................................. 28

*In re Avon Prods., Inc. Sec. Litig.*,
    2009 WL 848083 (S.D.N.Y. Mar. 3, 2009) ...................................................... 11, 20

*In re Bank of Am. Corp. Sec. Litig.*,
    2010 WL 3448197 (S.D.N.Y.  Aug. 27, 2010)......................................... 15, 16, 19, 20

*In re Bausch & Lomb Inc. ERISA Litig.*,
    2008 WL 5234281 (W.D.N.Y. Dec. 12, 2008)......................................... 11, 20, 21

*In re Citigroup ERISA Litig.*,
    2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009) ................................................. 11, 24

*In re Coca-Cola Enters. Inc., ERISA Litig.*,
    2007 WL 1810211 (N.D. Ga. June 20, 2007) .......................................................... 27

*In re Comp. Scis. Corp. ERISA Litig.*,
    635 F. Supp. 2d 1128 (C.D. Cal. 2009) .................................................................. 18

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................... 8

*In re Constellation Energy Grp., Inc. ERISA Litig.*,
    2010 WL 3221821 (D. Md. Aug. 13, 2010) ........................................................... 16

*In re Dell, Inc. ERISA Litig.*,
    563 F. Supp. 2d 681 (W.D. Tex. 2008) .................................................................. 11

*In re Dot Hill Sys. Corp. Sec. Litig.*,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) .................................................................. 23

*In re Duke Energy ERISA Litig*,
    281 F. Supp. 2d 786 (W.D.N.C. 2003) .................................................................. 27

*In re Dynegy, Inc. ERISA Litig.*,
    309 F. Supp. 2d 861 (S.D. Tex. 2004) ................................................................... 28

*In re Ford Motor Co. Sec. Litig.*,
    381 F.3d 563 (6th Cir. 2004) ................................................................................. 23

*In re Harley-Davidson, Inc., Sec. Litig.*,
    660 F. Supp. 2d 953 (E.D. Wis. 2009) ................................................................... 14

*In re Huntington Bancshares, Inc. ERISA Litig.*,
    620 F. Supp. 2d 842 (S.D. Ohio 2009) .......................................................... 16, 24, 25

*In re ING Groep N.V. ERISA Litig.*,
    2010 WL 1704402 .................................................................................................. 20

*In re Lehman Bros. Sec. and ERISA Litig.*,
    683 F. Supp. 2d 294 (S.D.N.Y. 2010) .................................................................... 12

*In re McKesson HBOC, Inc. ERISA Litig.*,
    391 F. Supp.2d 812 (N.D. Cal. 2005) .................................................................... 15

*In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*,
    2009 WL 331426 (D.N.J. Feb. 10, 2009) ............................................................... 18

*In re Morgan Stanley ERISA Litig.*,
   696 F. Supp. 2d 345 (S.D.N.Y. 2009)........................................................................................ 24

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   478 F. Supp. 2d 164 (D. Mass. 2007) ........................................................................................ 7

*In re Polaroid ERISA Litig.*,
   362 F. Supp. 2d 461 (S.D.N.Y. 2005)........................................................................................ 24

*In re RadioShack Corp. ERISA Litig.*,
   547 F. Supp. 2d 606 (N.D. Tex. 2008) ...................................................................................... 11

*In re Wachovia Corp. ERISA Litig.*,
   2010 WL 3081359 (W.D.N.C. Aug. 6, 2010)............................................................................ 20

*In re WorldCom, Inc. ERISA Litig.*,
   263 F. Supp. 2d 745 (S.D.N.Y. 2003)........................................................................................ 28

*Johnson v. Radian Group, Inc.*,
   2009 WL 2137241 (E.D. Pa. Jul. 16, 2009).............................................................................. 11

*Johnson v. Radian Group, Inc.*,
   2010 WL 2136562 (E.D. Pa. May 26, 2010) ............................................................................ 14

*Kenney v. State Street Corp.*,
   694 F. Supp. 2d 67 (D. Mass. 2010) ......................................................................................... 12

*Kirschbaum v. Reliant Energy, Inc.*,
   526 F.3d 243 (5th Cir. 2008) ............................................................................................. 13, 18

*Kuper v. Iovenko*,
   66 F.3d 1447 (6th Cir. 1995) .................................................................................................... 15

*Lalonde v. Textron, Inc.*,
   369 F.3d. 1 (1st Cir. 2004).......................................................................................................... 12

*London-Sire Records, Inc. v. Do*e
   1, 542 F. Supp. 2d 153 (D. Mass 2008) ...................................................................................... 5

*Martin v. Feilen*,
   965 F.2d 660 (8th Cir. 1992) ...................................................................................................... 9

*Mauser v. Raytheon Co. Pension Plan*,
   239 F.3d 51 (1st Cir. 2001) ....................................................................................................... 18

*Mellot v. ChoicePoint, Inc.*,
   561 F. Supp. 2d 1305 (N.D. Ga. 2007) ..................................................................................... 14

*Moench v. Robertson*,
    62 F.3d 553 (3d Cir. 1995).................................................................................... passim

*Morrison v. MoneyGram Int'l, Inc.*,
    607 F. Supp. 2d 1033 (D. Minn. 2009) ............................................................ 10, 11

*Nelson v. Ipalco Enters., Inc.*,
    480 F. Supp. 2d 1061 (S.D. Ind. 2007) .................................................................. 15

*Pedraza v. Coca-Cola Co.*,
    456 F. Supp. 2d 1262 (N.D. Ga. 2006) .................................................................. 13

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ...................................................................................... 18, 23

*Pfahler v. Nat'l Latex Prods. Co.*,
    517 F.3d 816 (6th Cir. 2007) .................................................................................. 18

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ............................................................ 15, 24, 25, 26

*Rodi v. S. New England School of Law*,
    389 F.3d 5 (1st Cir. 2004) ........................................................................................ 7

*Shaw v. Digital Equipment Corp.*,
    82 F.3d 1194 (1st Cir. 1996) .................................................................................... 7

*Shirk v. Fifth Third Bancorp*,
    2009 WL 692124 (S.D. Ohio Jan. 29, 2009) ......................................................... 18

*Smith v. Delta Air Lines, Inc.*,
    422 F. Supp. 2d 1310 (N.D. Ga. 2006) .................................................................. 15

*Summers v. State Street Bank & Trust Co.*,
    453 F.3d 404 (7th Cir. 2006) .................................................................................... 9

*Torchetti v. Int'l Bus. Mach. Corp.*,
    986 F. Supp. 49 (D. Mass. 1997) ............................................................................. 7

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ...................................................................................... 18, 19

*Wilson v. Venture Fin. Grp., Inc.*,
    2010 WL 2028088 (W.D. Wash. May 18, 2010) .................................................... 18

*Wright v. Medtronic, Inc.*,
    2010 WL 1027808 (D. Minn. Mar. 17, 2010) ....................................................... 12

*Wright v. Oregon Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) .......................................................................... 14, 15

Federal Statutes

15 U.S.C. § 77j ................................................................................................................ 21

29 U.S.C. § 1104(a)(2) ................................................................................................... 10

29 U.S.C. § 1104(c) ......................................................................................................... 3

90 Stat. 1590 (1976) .................................................................................................... 9, 10

Federal Regulations

17 C.F.R. §§ 239.16(b) .................................................................................................. 21

29 C.F.R. § 2509.75-8 .................................................................................................... 28

## PRELIMINARY STATEMENT

Plaintiff, a former State Street employee, tries in vain to state a claim under ERISA with recycled allegations about State Street's foreign currency exchange ("FX") business.  He in essence claims that State Street's stock was an imprudent investment for an indefinite period ending on October 20, 2009, and, accordingly, that no State Street employee should have been permitted to hold State Street stock in their ERISA plan accounts for an indefinite period prior to that date.

Two unrelated news events occurred on October 20, 2009.  The California Attorney General (the "AG") announced that he had intervened in a *qui tam* lawsuit filed in California state court over the rates at which State Street executed a certain type of FX for two California pension plans.  Separately, State Street reduced its earnings expectations for the following year.  The market price of State Street's stock declined on that day.  Plaintiff claims that the AG's announcement revealed a purported "scheme" by State Street to overcharge FX customers and that the Company's financial results were materially inflated as a result.  The existence of this so-called "scheme" supposedly rendered State Street's stock an imprudent investment.  Plaintiff's claims fail at the outset because he has no factual basis to allege that State Street engaged in any fraud relating to its FX business.  Indeed, the complaints from which Plaintiff copied his FX allegations have been superseded, and the allegations here are inconsistent with the operative complaint in the California action—the AG's complaint in intervention—which rejects the fraud theory Plaintiff advances.

Even if one were to assume that the AG's lawsuit caused State Street's stock price to decline, the notion that the AG's allegation that State Street overcharged two public pension systems for FX could render State Street's stock an imprudent investment makes no sense.  The Complaint acknowledges that State Street made *billions* of dollars in profit in recent years.  It has

also consistently paid shareholders dividends, and provided them cumulative returns that are well in excess of the S&P's financial index.  The $3 drop in State Street's stock price that followed the AG's announcement pales in comparison to the $35 increase over the nine months that preceded the announcement—a *221% gain*.  *See* App. A (comparing State Street's growth between Jan. 20, 2009 and Oct. 20, 2009 against growth in the S&P 500).  ERISA does not impose upon plan fiduciaries a duty to push participants in and out of their employer's stock so that they (unlike all other shareholders) can take perfect advantage of expected ebbs and flows in market prices.  Retirement plans permit employees to save for the long-term, not to maximize their opportunities for short-term advantage.

Plaintiff (and the people he seeks to represent) invested in State Street's stock through an employee stock ownership plan ("ESOP") that was one of many investment options in State Street's 401(k) plan (the State Street Salary Savings Program (the "Plan")).  In order to plead imprudence, Plaintiff bears the burden of pleading extraordinary circumstances calling into question State Street's ability to continue as a going concern.  The Complaint contains nothing of the sort.

Plaintiff's other claims suffer from similar and obvious pleading defects.  His negligent misrepresentation claim fails because he makes no attempt to plead reliance, which is a required element of his claim.  In addition, the statements at issue were not fiduciary communications that can be challenged under ERISA.  And, even if they were, none of those statements were false or misleading.  Plaintiff's remaining claims fail for other reasons, including that they are all derivative of his deficient prudence and disclosure claims.  As a result, the Complaint should be dismissed with prejudice.

# BACKGROUND[1]

## A.      Plaintiff and the Plan

The Plan is an ERISA plan that State Street established for the benefit of its employees.

Compl. ¶ 12.  Each of the Plan participants has an individual Plan account; and each participant

decides how to invest the assets in his or her own account.[2]  Affidavit of John J. Butts ("Aff.")

Ex. 40 at 17 (Summary Plan Description dated June 10, 2008 (quoted in Compl. ¶ 43)).  One of

the Plan's many investment options was the ESOP.[3]  Participants could invest up to 25% of their

Plan account in State Street stock but were cautioned that:

> The value of the [ESOP] Fund will fluctuate depending on State Street's performance,
> stock market fluctuations and general economic conditions.  Because the Fund invests in
> the common stock of only one company, it is the most risky of the Funds offered through
> the [Plan].

*Id.* at last page.

## B.      State Street's Financial Health

Notwithstanding the severity of the recent global recession, State Street has remained a

thriving, multi-billion dollar company.  As the Complaint acknowledges, State Street's revenue

grew dramatically from $4.4 billion in 2002 to nearly $10.7 billion 2008.  Compl. ¶ 92.  It was

also highly profitable, with net income well in excess of $1 billion in each year between 2006

---

[1]      Defendants accept Plaintiff's well-pleaded factual allegations for purposes of this motion only.
Unsupported allegations and conclusions of law are not accepted.  *See Glassman v. Computervision Corp.*, 90 F.3d
617, 628 (1st Cir. 1996) (although courts must accept a complaint's factual allegations as true, they need not accept
"bald assertions" or "legal conclusions").

[2]      The Plan was designed as an individual account plan pursuant to ERISA § 404(c), which means that
participants were allowed to make their own investment decisions from a diverse menu of investment alternatives.
*See, e.g.,* Aff. Ex. 41 at § 1.1 (Plan Document) ("[T]he Plan is intended to be a 'Section 404(c)' Plan . . . .").  To
comply with the rules relating to such plans, Defendants were required to honor participants' choices.  *See* 29 U.S.C.
§ 1104(c); 29 C.F.R. § 2550.404c-1(b)(1).  Defendants are not responsible under ERISA for losses resulting from
participants' choices.  *See* 29 U.S.C. § 1104(c)(1)(A)(ii).

[3]      In addition to the ESOP, the Plan offered participants the opportunity to invest directly in twenty different
mutual funds as well as a self-directed brokerage option which provided access to hundreds more investment
options.  *See* Aff. Ex. 40 at 20 (Summary Plan Description dated June 10, 2008).

and 2008. *Id.* ¶ 99; Aff. Ex. 38 at 31 (10-K filed Feb. 22, 2010).[4]  State Street's shareholders

have also enjoyed cumulative returns (dividends combined with capital appreciation) that

substantially outperformed the S&P Financial Index and were consistent with the S&P 500.  *See*

Aff. Ex. 29 at 66 (10-K filed Feb. 27, 2009) (reflecting dividend payments); Aff. Ex. 38 at 30

(10-K filed Feb. 22, 2010) (graph comparing five-year cumulative returns).

Further showing State Street's financial strength is the fact that it remained "well-

capitalized" throughout the recession, and has had consistently strong banking regulatory ratios.[5]

In May 2009, State Street passed the Federal Reserve's so-called "stress test" which assessed

selected banks' abilities to withstand a more severe recession than the Federal Reserve

anticipates without having to raise additional capital.  *See* Aff. Ex. 33 at 26-27 (8-K filed May

18, 2009) (reporting the Federal Reserve's findings); Aff. Ex. 56 at 2 (Supervisory Capital

Assessment Program Report) (characterizing the test as "deliberately stringent" to ensure that

bank holding company's "will have adequate capital" even "[i]n the event that the economy

weakens more than expected").

### C.    Plaintiff's Regurgitated FX Allegations

The alleged FX pricing "scheme" on which Plaintiff attempts to build his claims is the

same as the FX theory in the related securities case before the Court, *Hill v. State Street*

---

[4]      In 2009, State Street reported a net income before extraordinary losses of $1.64 billion, but a net loss of $2.04 billion.  *See* Aff. Ex. 38 at 35 (10-K filed Feb. 22, 2010).  The loss was the result of State Street's decision to consolidate the asset-backed commercial paper conduits it sponsored onto the company's balance sheet, which in turn required State Street to recognize the $3.68 billion in previously announced unrealized losses.  *See id.*  Because that loss was largely a function of mark-to-market accounting (which requires assets to be valued based on their current market price even if an owner of a debt security intends to hold them to maturity, as State Street does), State Street reported that, to the extent future cash flows exceed the market value of these debt securities as they are held to maturity, the difference will be recognized as interest revenue.  *See id.* at 44.  Since the consolidation, State Street has recorded over $1 billion in such recoupment.  Aff. Ex. 39 at 17 (10-Q filed Aug. 6, 2010) (total "discount accretion" post-consolidation of $1.01 billion at the end of the second fiscal quarter 2010).

[5]      For example, State Street's tier 1 risk-based capital ratio (the key measure of a bank's liquidity used by the Federal Reserve—the ratio of certain types of highly liquid assets to total assets) remained well in excess of the Federal Reserve's 4% minimum.  *See* Aff. Ex. 38 at 31 (10-K filed Feb. 22, 2010) (showing ratios over the last four years which ranged from 11.2% to 20.03%); *id.* at 65 (identifying regulatory guidelines).

*Corporation, et al.,* Civil Action No. 09-12146-NG ("*Hill*").[6]  To avoid repetition, Defendants

highlight Plaintiff's key allegations below, and refer the Court to pages 4-6 of State Street's

opening brief in support of its motion to dismiss (the "*Hill* Br.") for further background and

detail on the FX allegations that are also at issue here.[7]  The discussion below is intended to

show the Court that the core of each complaint is the same, and to provide citations to parallel

allegations.

 Like the *Hill* Complaint, Plaintiff alleges a long-running "fraudulent scheme."  Compl. ¶

69; *Hill* Compl. ¶ 49.[8]  He too lifts the mechanics of the purported scheme from the California

Relator's initial complaint, alleging that early each day, State Street executed a certain type of

FX trade for custody clients—"indirect" FX—at the Interbank rate and later fraudulently altered

the trading records it submitted to clients to reflect more advantageous rates.  Compl. ¶¶ 76-78;

*Hill* Compl. ¶¶ 51-52; Aff. Ex. 42 at ¶ 18 (Rel. Compl.).[9]

 According to Plaintiff, the "scheme" described in the Relator's complaint was "first

revealed by" the AG when he publicly announced his lawsuit against State Street in October

2009.  Compl. ¶ 69; *Hill* Compl. ¶ 50 n.3.  The AG, however, did not adopt the Relator's theory.

The AG's theory is different—that State Street agreed to execute FX transactions for CalPERS

and CalSTRS "*based on* the Interbank Rates at the time that the trade is executed," and breached

---

[6] Unlike the *Hill* Complaint, this Complaint does not assert claims about State Street's investment portfolio or conduit program.

[7] Defendants incorporate and adopt the *Hill* brief in its entirety.

[8] These complaints, as well as the AG's complaint and the Relator's complaints, are properly before this Court both as documents incorporated by reference into the Complaint and as public records.  *See London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 179 n.36 (D. Mass 2008) (Gertner, J.) ("The Court may take judicial notice of related proceedings."); *Airframe Sys., Inc. v. Raytheon Co.*, 520 F. Supp. 2d 258, 263 (D. Mass. 2007) (permitting review of complaint from related case because it "[is a] public document[] whose authenticity is not disputed by the parties").  They are attached as Aff. Exs. 40-44.

[9] Plaintiff likewise asserts, based again on the Relator's initial complaint, that State Street disparaged clients who placed these indirect trades as "dumb"—as distinguished from the "smart" clients who executed direct trades at specifically negotiated rates.  Compl. ¶ 79; *Hill* Compl. ¶ 53; Aff. Ex. 42 at ¶¶ 28-33 (Rel. Compl.).

that agreement by adding a markup or markdown to the Interbank rate "*at the time it executed*

*Custody FX trades . . . .*" Aff. Ex. 44 at ¶¶ 23, 35 (AG Compl.) (emphasis added).  Thus, the

AG's theory is not based on fraudulent alteration of records.[10]  It is instead based on a flawed

(and hotly disputed) interpretation of a contract.  *See Hill* Br. at Part II.A.1.  In any event, a

disputed interpretation of a contract is not the making of fraud.  *See id.*

Plaintiff also lifts from the *Hill* Complaint the theory that the supposedly fraudulent FX

pricing materially inflated State Street's revenues by $832 million and its earnings by 11.7%.

Compl. ¶¶ 98-99; *Hill* Compl. ¶¶ 74-75.  He does so without adding any additional detail to the

*Hill* Complaint's allegations, which rest entirely on the Relator's naked assertion that one-third

of State Street's FX trading revenue was attributable to fraud (Aff. Ex. 42 at ¶ 11 (Rel. Compl.)),

and the Lead Plaintiff's purported validation of that assertion through an apples-to-oranges

comparison of FX revenues in the fourth quarters of 2008 and 2009.  Compl. ¶ 96; *Hill* Compl.

¶¶ 72, 74-75.  Since revenue in the fourth quarter of 2009 was down 56% as compared to the

same quarter in 2008, Lead Plaintiff (and Plaintiff) concludes that State Street must have

changed its pricing method once the AG filed suit.  Compl. ¶ 96; *Hill* Compl. ¶¶ 72.  That

conclusion, however, is the result of cherry-picked data, flawed logic, and unsupported

assumptions.  *See infra* at Part III.C.  In fact, both the Lead Plaintiff (and Plaintiff) admit that it

would be impossible to quantify the impact of the challenged FX business practice without

access to State Street's records.  Compl. ¶ 98; *Hill* Compl. ¶ 74.

---

[10]     According to the AG Complaint, for indirect trades, the funds or their investment managers routed trade requests electronically to State Street's order management system, and State Street determined the price.  Aff. Ex. 44 at ¶ 26 (AG Compl.).  State Street executed the trades by entering the trade information, including the rate charged, into the order management system.  *Id.* ¶ 27.  Thus, according to the AG—and contrary to Plaintiffs' allegations (and those of the Relator)—it was not the case that trades were executed and then altered.  They were executed at the price reported to the customer, which included a markup on the Interbank rate.

**ARGUMENT**

Plaintiff's transplanted allegations about a supposed "fraudulent [FX] scheme" sound in fraud.  Compl. ¶ 69; *see, e.g., id.* ¶ 99 (chart identifying the supposed amounts of State Street's net income and FX revenue "without fraud").  They are therefore subject to the heightened pleading standard of Fed. R. Civ. P. 9(b).  *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996) (a complaint asserting allegations that "sound in fraud" must satisfy the pleading requirements of Rule 9(b)); *Torchetti v. Int'l Bus. Mach. Corp.*, 986 F. Supp. 49, 51 (D. Mass. 1997) (applying Rule 9(b) to ERISA fiduciary duty claim that sounded in fraud). Accordingly, Plaintiff must plead in detail the "who, what, where and when" of the alleged fraud, *Rodi v. S. New England School of Law*, 389 F.3d 5, 15 (1st Cir. 2004); *In re Pharm. Indus. Average Wholesale Price Litig.,* 478 F. Supp. 2d 164, 171 (D. Mass. 2007), and also scienter. *See N. American Catholic Educational Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009) ("Rule 9(b) requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter."); *Clearview Software Int'l, Inc. v. Ware*, 2009 WL 2151017, at *1 (D.N.H. Jul. 15, 2009) (same).

As to any allegations not predicated on fraud, Plaintiff must comply with Fed. R. Civ. P. 8(a).  To do so, he must plead a factual basis for a "plausible" entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("'naked assertions' devoid of 'further factual enhancement'" do not suffice).  Because Plaintiff meets neither standard, the Complaint must be dismissed.

**I.  THE ENTIRE COMPLAINT IS PREMISED ON UNSUPPORTED ALLEGATIONS OF A WIDESPREAD FRAUD.**

The Complaint should be dismissed in its entirety because it relies on the same shaky foundation as the FX allegations in *Hill*.  As shown in State Street Defendants' opening brief in

*Hill*, there is no factual support for the conclusion that State Street fraudulently exploited its FX business and overstated its earnings. *See Hill* Br. at II.A. To avoid repetition, Defendants refer the Court to that discussion, and offer this abbreviated summary of Plaintiff's theory here, which is flawed in all the same respects as the *Hill* theory.

As in *Hill*, Plaintiff's thesis is adopted wholesale from the California Relator. *Compare Hill* Br. at 4-6 *with supra* at 4-6. The people upon whom the Relator apparently relies for its information are not identified anywhere. The Relator itself has abandoned its claim that the so-called FX fraud was perpetrated on "dumb" clients. *Hill* Br. at 6 n.7. The AG (after investigation) rejected the Relator's claim that State Street executed FX transactions early in the day and later re-priced them. *Id.* at Part II.A.1. The AG's own, contract-based theory of liability, which only goes to State Street's dealings with two public pension systems, makes no sense. *Id.* None of this is sufficient to state a plausible claim of institutional fraud. It simply was improper for Plaintiff to file a complaint based on nothing more than pleadings filed by others. *See, e.g., In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (a plaintiff may not "rely entirely on another complaint as the sole basis for his or her allegations"); *Geinko v. Padda*, 2002 WL 276236, at \*5-6 (N.D. Ill. Feb. 27, 2002) (another plaintiff's investigation is not adequate support for an allegation). For these reasons, all of Plaintiff's claims should be dismissed.

## II.   PLAINTIFF HAS NOT PLEADED A PLAUSIBLE BASIS FOR HIS CLAIM THAT STATE STREET'S STOCK WAS AN IMPRUDENT INVESTMENT.

Plaintiff's claim that Defendants breached their duty of prudent plan management by maintaining State Street's ESOP as one of the Plan's investment options (Count I) attempts to overturn the entire concept of "participant direction" upon which the Plan was established. According to the Complaint, by some date that Plaintiff has not specified, Defendants should

- 8 -

have ignored participants' directions, unilaterally liquidated the ESOP and barred further contributions notwithstanding the fact that the Plan's governing document states that the Plan shall include a "stock bonus feature consisting of an employee stock ownership plan" which "will be invested primarily in State Street stock."  Aff. Ex. 41 at § 1.1 (Plan Document).

That claim fails for a variety of reasons.  To begin with, stock held in an ESOP is presumed to be a prudent investment, and Plaintiff cannot overcome that presumption given State Street's financial health.  Moreover, even without the presumption, Plaintiff's claim fails because it is balanced on a house of cards:  the factually unsupported assertion that State Street's FX business was built on fraud.

### A.    Plaintiff's Claim Is Inconsistent with Public Policy and the Plan's Design.

Congress created ESOPs, in part, "to give employees . . . a larger stake in the company's fortunes, in hopes of broadening ownership of capital within a capitalist system."  *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 410 (7th Cir. 2006); *see* Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1590 (1976) (ESOPs are intended to "strengthen[] the free private enterprise system [and] . . .  solve the dual problems of securing capital funds for necessary capital growth and of bringing about stock ownership by all corporate employees").  To advance that goal, and thereby better align employees' interests with their employer and its shareholders, Congress enacted a series of laws "designed to encourage employers to set up ESOPs."  *Moench v. Robertson,* 62 F.3d 553, 568 (3d Cir. 1995) ("the concept of employee ownership constitute[s] a goal in and of itself"); *see Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir. 1992) (highlighting provisions in ERISA and the Internal Revenue Code intended to promote and subsidize ESOPs).  State Street accepted Congress's invitation, and created its ESOP to "provide[] participants the opportunity to become an owner in the Corporation and share directly in its financial performance."  Aff. Ex. 40 at last page (Summary Plan Description).

One of the measures Congress took to encourage employers to create ESOPs was to expressly exempt fiduciaries from the duty to diversify plan assets: "[T]he diversification requirement . . . and the prudence requirement (only to the extent it requires diversification) . . . is not violated by acquisition or holding of . . . qualifying employer securities." 29 U.S.C. § 1104(a)(2), ERISA § 404(a)(2).[11]  This exemption means that a prudence claim is only tenable if a plaintiff satisfactorily alleges that the employer's stock "was such an imprudent investment that no Plan assets—*not one cent*—should have been invested in it."  *Morrison v. MoneyGram Int'l, Inc.*, 607 F. Supp. 2d 1033, 1051 (D. Minn. 2009) (emphasis added).  A claim alleging anything less (*e.g.,* that fiduciaries should have reduced the Plan's employer stock holdings) would be a diversification claim and barred by ERISA § 404(a)(2).  *See id.* at 1050-51.

### B. Employer Stock Held in an ESOP Is Presumed To Be a Prudent Investment.

To give effect to Congress's policy goal of encouraging employers to offer ESOPs, courts have adopted a presumption that employer stock held in an ESOP is a prudent investment.  In *Moench*, the most frequently cited case in this regard, the Third Circuit held that "an ESOP fiduciary who invests the [plan's] assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision."  62 F.3d at 571.  The court further held that this presumption can only be overcome by facts showing the fiduciary's knowledge of

---

[11]   When Congress created ESOPs it recognized that there are trade-offs to encouraging employers to offer them.  For example, "by its very nature, 'an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan.'"  *Moench v. Robertson*, 62 F.3d 555, 568 (3d Cir. 1995) (quoting *Martin v Feilen*, 965 F.2d 660, 664 (8th Cir. 1992)); *see also* Aff. Ex. 40 at last page (Summary Plan Description) (informing Plan participants that "[b]ecause the [ESOP] invests in the common stock of only one company, it is the most risky of the Funds offered through the [Plan]").  Yet Congress has made it clear that these trade-offs are well worth the greater goal of encouraging employee ownership and that courts should not erect barriers that would make employers less likely to offer ESOPs:

> The Congress is deeply concerned that the objectives sought by [the laws encouraging ESOPs] will be made unattainable by regulations and rulings which treat employee stock ownership plans as conventional retirement trusts, which reduce the freedom of employers to take the necessary steps to implement the plans, and which otherwise block the establishment and success of these plans.

Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1590 (1976).

some set of dire circumstances, like the company's "impending collapse," such that the fiduciary's decision to allow participants to continue investing in the ESOP was an abuse of the fiduciary's discretion.  *Id.*

Over time, this presumption has become widely accepted by courts across the country, and—especially after *Twombly*—it has been "regularly applied . . . at the motion-to-dismiss stage."  *In re Citigroup ERISA Litig.*, 2009 WL 2762708, at *16 (S.D.N.Y. Aug. 31, 2009); *see Morrison*, 607 F. Supp. 2d at 1051 (citing *Twombly* and explaining, "[t]o say that the presumption of prudence 'applies' at the pleading stage is just another way of saying that plaintiffs must allege . . . that they have a non-speculative claim that the fiduciary . . . acted in a manner that would overcome the *Moench* presumption").[12]  Courts have also interpreted the *Moench* standard to require factual allegations that call the employer's viability into question. *See, e.g., In re Dell, Inc. ERISA Litig.*, 563 F. Supp. 2d 681, 694 (W.D. Tex. 2008) (plaintiff must allege "persuasive and analytically rigorous facts" indicating that company's "survival" was threatened or its "stock was in danger of becoming worthless"); *In re Bausch & Lomb Inc. ERISA Litig.*, 2008 WL 5234281, at *6 (W.D.N.Y. Dec. 12, 2008) ("*Moench* and its progeny have established that the presumption of prudence is rebutted only when a company's overall viability appears to be in jeopardy.").[13]

---

[12]     Other decisions that have applied the *Moench* presumption at the pleading stage include, for example, *Pugh v. Tribune Co.*, 521 F.3d 686, 701-02 (7th Cir. 2008); *Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007); *Johnson v. Radian Group, Inc.*, 2009 WL 2137241, at *17 (E.D. Pa. Jul. 16, 2009); *In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848083, at *10 (S.D.N.Y. Mar. 3, 2009); *In re Bausch & Lomb Inc. ERISA Litig.*, 2008 WL 5234281, at *6 (W.D.N.Y. Dec. 12, 2008); *Graden v. Conexant Sys., Inc.*, 574 F. Supp. 2d 456, 463 (D.N.J. 2008); *Halaris v. Viacom, Inc.*, 2008 WL 3855044, at *2 (N.D. Tex. Aug. 19, 2008); *In re Dell, Inc. ERISA Litig.*, 563 F. Supp. 2d 681, 693 (W.D. Tex. 2008); *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 614 (N.D. Tex. 2008); and *In re Coca-Cola Enters. Inc., ERISA Litig.*, 2007 WL 1810211, at *10 (N.D. Ga. June 20, 2007).

[13]     *See also In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003) (plaintiffs did not overcome presumption where company was "a solid, viable company, far from 'impending collapse,' and not in 'dire circumstances'"); *Coca-Cola Enters.*, 2007 WL 1810211, at *10 (*Moench* standard can be overcome "only where a company is on the verge of financial collapse").

When the *Moench* presumption was still in its relative infancy and gaining acceptance, the First Circuit commented on it and declined to decide whether to adopt the presumption. *Lalonde v. Textron, Inc.*, 369 F.3d. 1, 6 (1st Cir. 2004). The court explained that it was declining to rule because, in 2004, the law was neither "mature nor uniform." *Id.* Over the last six years, however, the law has matured and the presumption of prudence (especially after *Twombly*) is now widely accepted and applied at the pleading stage.

In fact, the First Circuit recently indicated its support for the *Moench* presumption, albeit in the context of an appeal from summary judgment. *See Bunch v. W.R. Grace & Co.*, 555 F.3d 1 (1st Cir. 2009). In that case, the plaintiff referred to the presumption as a basis for challenging a fiduciary's decision to liquidate an ESOP, rather than the case law's use of the presumption to—consistent with public policy—favor an ESOP's continuation. *Id.* at 10. The court did not apply the presumption in the manner sought by the plaintiff, but indicated its support for applying it in cases like this. *Id.* (describing the presumption as a "shield" against liability, but not a "sword" to create liability). Specifically, the court described the presumption as something that "*is* afforded fiduciaries when they decide to retain an employer's stock in falling markets." *Id.* (also noting that the presumption is "*applicable*" when a fiduciary retains an ESOP) (emphasis added).[14]

---

[14]     This issue was recently presented to Judge Saris, who dismissed a company stock prudence claim against State Street, albeit without prejudice, on *Twombly* and *Iqbal* grounds. *Kenney v. State Street Corp.*, 694 F. Supp. 2d 67, 74-75 (D. Mass. 2010). That case was based on the January 2009 announcement that unrealized losses associated with State Street's investment portfolio and conduit program (neither of which are at issue here) had grown by approximately $3.7 billion. Judge Saris declined to apply the *Moench* presumption because the First Circuit had not done so. We believe that the language from *Bunch* that is cited above shows the First Circuit's support for the *Moench* presumption and that it is appropriate to apply it on a motion to dismiss. Moreover, since the argument in *Kenney*, a flood of courts have added to the overwhelming majority of courts that apply the *Moench* presumption applies at the pleading stage. And, many of those recent decisions involved far more significant stock drops than the $3 drop in this case (which represented 12% of State Street's stock price). *See, e.g., In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, 2010 WL 3448197, *19-20 (S.D.N.Y. Aug. 27, 2010) (83% price decline); *In re Wachovia Corp. ERISA Litig.*, 2010 WL 3081359, *13-14 & n.9 (W.D.N.C. Aug. 6, 2010) (87% decline); *Fischer v. JP Morgan Chase*, 703 F. Supp. 2d 374, 384-85 (S.D.N.Y. 2010) (55% decline); *Wright v. Medtronic, Inc.*, 2010 WL 1027808, *6-8 (D. Minn. Mar. 17, 2010) (13% drop); *In re Lehman Bros. Sec. and ERISA Litig.*, 683 F. Supp. 2d 294, 302 (S.D.N.Y. 2010) (bankruptcy).

Applying the *Moench* presumption at the pleading stage also furthers Congress's policy goal of encouraging employers to offer ESOPs.  Without that protection against being second-guessed in hindsight, fiduciaries are left in "the untenable position of having to predict the future of the company stock's performance," in which case a fiduciary "could not only be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if [he sold and then] the stock rebounded."  *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008); *see, e.g., Bunch*, 555 F.3d at 3 (fiduciaries liquidated ESOP in bankruptcy and were later sued for imprudently selling too low after the stock price rebounded following employer's emergence from bankruptcy); *Pedraza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1276 (N.D. Ga. 2006) (a "fiduciary who decides to scrap the ESOP is just as apt to be sued as he would be if he enforced the plan provisions").

The effect of denying fiduciaries this protection is clear:  "[W]hy would an employer establish an ESOP if its compliance with the purpose and terms of the plan could subject it to strict judicial second-guessing?"  *Moench*, 62 F.3d at 570.  Indeed, the circumstances leading to the filing of this lawsuit clearly illustrate the unfair burden that Plaintiff seeks to impose.  In the nine months before the AG brought his FX-related claims, State Street's stock price dramatically outperformed the S&P 500, increasing by 221% in comparison to the 35% growth in the S&P 500.  *See* App. A.  That increase (about $35 per share) dwarfed the approximate $3 decline that followed the disclosure of the AG's claims and State Street's lower earnings expectations.  If Defendants had liquidated the ESOP and prevented further contributions as of January 2009, it is a virtual certainty that the plaintiffs' bar would have followed the tack taken in *Bunch* and filed suit claiming that Defendants were not following the Plan's direction to offer an ESOP which shall be invested "primarily in State Street stock."  Aff. Ex. 41 at § 1.1 (Plan Document).

### C.   Plaintiff Cannot Overcome the Presumption of Prudence Because State Street Was (and Remains) a Strong, Viable Company.

Plaintiff has not alleged nearly enough to overcome the *Moench* presumption, and he cannot do so because there is no plausible basis to conclude that the FX issues alleged in the California matter have called State Street's viability into question, or that State Street's stock has ceased to be a prudent investment option for Plan participants.  It is undeniable that State Street was (and still is) a healthy company:  (i) it made *billions* of dollars in profits; (ii) it consistently paid shareholders dividends; (iii) shareholder returns outpaced the S&P's financial index and were consistent with the S&P 500; and (iv) State Street has always been a "well-capitalized" financial institution under the Federal Reserve's regulations and it passed the Federal Reserve's stress test.  *See supra* at 4.  In situations like this, courts have not hesitated to dismiss prudence claims.  *See, e.g.*, *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1098-99 (9th Cir. 2004) (no prudence claim where company was "profitable and paying substantial dividends throughout [the putative class] period"); *Johnson v. Radian Group, Inc.*, 2010 WL 2136562, at *10-11 (E.D. Pa. May 26, 2010) (company was profitable and was not facing a "monumental liquidity crisis").[15]

Plaintiff's claim ignores these objective measures of State Street's overall soundness and financial strength, and instead focuses in isolation on one aspect (indirect FX trades) of one part of a massive, diversified, global financial services operation.  Indeed, the only long-term impact

---

[15]       *See also In re Harley-Davidson, Inc., Sec. Litig.*, 660 F. Supp. 2d 953, 967 (E.D. Wis. 2009) (company had "record revenue and earnings" for the years included in the class period); *Mellot v. ChoicePoint, Inc.*, 561 F. Supp. 2d 1305, 1315 (N.D. Ga. 2007) (company "had substantial revenue over the Class Period"), *vacated pursuant to settlement*; *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003) (company was "a solid, viable company, far from 'impending collapse,' and not in 'dire circumstances'"); *Benitez v. Humana, Inc.*, 2009 WL 3166651, at *8 (W.D. Ky. Sept. 30, 2009) (event at issue "would not have led a reasonable fiduciary to conclude that the investment itself was so risky as to be improvident because it did not disguise an underlying weakness in the [employer's] business or its future viability"); *Coca-Cola Enters.*, 2007 WL 1810211, at *10 (company's "financial information evidences that the company is a robust and viable investment option").

he has alleged is that future FX revenues may decline based on State Street's decision to be more transparent with clients about FX pricing. Compl. ¶ 97. History has shown, however, that any causal decline (and Defendants deny that there has been one[16]) has been small. For example, in the fourth quarter of 2009 (when the AG filed suit), State Street's total FX revenue (not just the revenue associated with the specific type of FX transaction at issue in the California matter) declined by $8 million from the prior quarter. That dip represented less than *one tenth of one percent* of the company's $8.6 billion of annual revenue in 2009. *See* Aff. Ex. 38 at 31 (10-K filed Feb. 22, 2010).

The allegation that State Street's stock price dropped 12% due to the AG's lawsuit is also insufficient to overcome the presumption of prudence. To begin with, even if the drop was caused by the AG's announcement (which Defendants deny[17]), stock price fluctuations, "even those that trend downward significantly," are by themselves never enough to rebut the presumption of prudence. *Wright*, 360 F.3d at 1099; *see Pugh v. Tribune Co.*, 521 F.3d 686, 702 (7th Cir. 2008) (finding stock drop decline to be insufficient to allege imprudence); *Edgar v. Avaya, Inc.*, 503 F.3d 340, 348-49 (3d Cir. 2007) (same). In fact, courts have dismissed numerous prudence claims involving substantially more significant declines. *See, e.g., Kuper v. Iovenko*, 66 F.3d 1447, 1451, 1459-60 (6th Cir. 1995) (80% drop); *Wright*, 360 F.3d at 1096, 1099 (75%); *Nelson v. Ipalco Enters., Inc.*, 480 F. Supp. 2d 1061, 1064 (S.D. Ind. 2007) (90%); *Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1314 (N.D. Ga. 2006) (92%); *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 830-33 (N.D. Cal. 2005) (75%); *In re*

---

[16]     Plaintiff has no basis to assert that this decline was caused by a reaction to the AG's claim. Indeed, FX revenue was down year-over-year in the quarters prior to the AG's announcement. *See Hill* Br. at Part II.A.2.

[17]     A far more likely cause is State Street's announcement on the same day that earnings would be lower in 2010 than previously announced. Compl. ¶ 73; *see* Beth Healy, "Calif. Contends State Street Fees Hid Fraud," *The Boston Globe* (Oct. 21, 2009) ("It wasn't the lawsuit that shook investors but rather the company's earnings outlook."), 2009 WLNR 20769587.

*Bank of Am. Corp. Sec. Litig.*, 2010 WL 3448197, at *20-21 (S.D.N.Y.  Aug. 27, 2010) (83%).

Moreover, although State Street's stock price declined on October 20, 2009, over the five-year

period from 2004 through the end of 2009, State Street's shareholders received cumulative

returns (dividends and capital appreciation) of almost $40 more than the S&P Financial Index.

Aff. Ex. 38 at 30 (10-K filed Feb. 22, 2010).

> **D.     Even Without the Presumption of Prudence, Plaintiff's Prudence Claim Still
> Fails Under *Twombly* and *Iqbal*.**

Plaintiff's prudence claim should be dismissed regardless of whether the Court decides

that the presumption of prudence is applicable at the motion to dismiss stage.  That is because

there are no credible allegations to support Plaintiff's conclusion that State Street's FX business

was built on fraud.  *See supra* at Part I.  At most, Plaintiff has pled the existence of a contract

dispute between State Street and two public pension systems over $56.6 million of FX trading

charges spread over eight years.  *Hill* Br. at Part II.A.1; Aff. Ex. 44 at ¶ 28 (AG Compl.).  That

translates to, at most, an alleged revenue overstatement of $7 million per year—a facially

immaterial portion of State Street's annual revenues in the range of one tenth of one percent.[18]

These allegations cannot plausibly support a claim that State Street's stock was such an

imprudent investment that no reasonable fiduciary would have invested even one cent of the

Plan's assets in it.  *See, e.g., In re Huntington Bancshares, Inc. ERISA Litig.*, 620 F. Supp. 2d

842 (S.D. Ohio 2009) (dismissing claim premised on company's subprime mortgage exposure,

which represented 3.9% of its loans and 2.8% of its total assets); *In re Constellation Energy

Grp., Inc. ERISA Litig.*, 2010 WL 3221821, at *5 (D. Md. Aug. 13, 2010) (dismissing prudence

claim, and noting that the law will not deem investments "prudent when they succeed and

---

[18]     State Street's total revenue in the eight-year period was nearly $49 billion.  Its annual revenue during that
time ranged from approximately $3.8 billion to nearly $10.7 billion.  *See* Aff. Ex. 38 at 36 (10-K filed Feb. 22,
2010); Ex. 1 at 15 (10-K filed Feb. 21, 2003).

imprudent when they fail"); *Harris v. Amgen, Inc.*, 2010 WL 744123, at *12-13 (C.D. Cal. Mar.

2, 2010) (noting that continuing to offer the ESOP was not imprudent even without the *Moench*

presumption, as defendants would have been subject to a lawsuit if the stock price later rose after

the elimination of the investment option).

## III.   PLAINTIFF'S DISCLOSURE CLAIMS FAIL ON MULTIPLE GROUNDS.

Plaintiff's allegation that State Street's annual reports were false and misleading (Count

III) fails for a variety of reasons.  He has not alleged that he ever *relied* on the supposed

misstatements, which is an essential element of his claim.  Also, the statements he challenges are

not actionable under ERISA because they were not fiduciary communications.  Moreover, the

Complaint fails to plead that the statements Plaintiff challenges were false or misleading, much

less materially so.

### A.   Plaintiff Has Not Alleged Detrimental Reliance.

Count III fails at the outset because Plaintiff nowhere alleges that he read, much less that

he *relied* on, the alleged misrepresentations.  Indeed, it is not even clear that Plaintiff would have

acted any differently if he had known about the supposed truth.  For example, in discussing the

consequence of Defendants' purported failings, Plaintiff alleges that absent the supposed

misrepresentations, Plan participants "*could have* divested . . . [or] diversified" their holdings of

State Street stock, not that the Plaintiff *would* have done so.  Compl. ¶ 184 (emphasis added).

Plaintiff cannot sidestep his apparent non-reliance by alleging that he and other

participants are "presumed as a matter of law" to have relied on the challenged statements.[19]  *Id.*

¶ 186.  Unlike securities fraud cases, where courts sometimes presume reliance under a "fraud on

the market" theory (*e.g.*, *Basic, Inc. v. Levinson*, 485 U.S. 224, 241-47 (1988)), ERISA plaintiffs

---

[19]     Allegations consisting of legal conclusions should not be afforded weight on a motion to dismiss.  *See Glassman*, 90 F.3d at 628 (courts need not accept "bald assertions" or "legal conclusions").

must always allege individual reliance.  *See Mauser v. Raytheon Co. Pension Plan*, 239 F.3d 51,

54-55 (1st Cir. 2001) ("[R]elief is only appropriate if the participant demonstrates significant or

reasonable reliance on the [alleged misstatement]."); *Davis v. First Union Corp. Long Term*

*Disability Plan*, 213 F. Supp. 2d 29, 35 (D. Mass. 2002) ("Plaintiff does not allege that she

would have acted differently had she known that the Plan granted defendant discretionary

authority, and thus cannot rely on the SPD for relief.").[20]

### B.    The Challenged SEC Filings Were Not Fiduciary Communications.

Plaintiff's disclosure claims also fail because the statements he challenges were not

statements made by a Plan fiduciary speaking in a fiduciary capacity.  *See Pegram v. Herdrich*,

530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty . . . the

threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was

performing a fiduciary function) when taking the action subject to complaint."); *see also Varity*

*Corp. v. Howe*, 516 U.S. 489, 504-05 (1996).  All of those statements were made in SEC

filings—which are corporate, not fiduciary, communications.  *See Kirschbaum*, 526 F.3d at 257

("Those who prepare and sign SEC filings do not become ERISA fiduciaries through those acts,

and consequently, do not violate ERISA if the filings contain misrepresentations.") (internal

quotations omitted); *Shirk v. Fifth Third Bancorp*, 2009 WL 692124, at *17 (S.D. Ohio Jan. 29,

---

[20]    *See also Bell v. Pfizer, Inc.*, --- F.3d ---, 2010 WL 3385949, at *8 (2d Cir. Aug. 30, 2010) ("[W]here a plaintiff asserts a breach of fiduciary [duty] claim based on a material misrepresentation or omission, the plaintiff must establish detrimental reliance."); *Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 830 (6th Cir. 2007) (to establish a breach of fiduciary duty based upon misrepresentations, a plaintiff must show "that the plaintiff relied on those misrepresentations to [his] detriment") (internal quotation marks omitted); *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 387 (3d Cir. 2003) ("[I]n order to state a claim for misrepresentation by an ERISA fiduciary, [a plaintiff] must allege . . . detrimental reliance."); *Brant v. Principal Life and Disability Ins. Co.*, 50 F. App'x 330, 332 (8th Cir. 2002) ("An ERISA breach-of-fiduciary-duty claim . . . requires proof of reasonable and detrimental reliance . . . ."); *Wilson v. Venture Fin. Grp., Inc.*, 2010 WL 2028088, at *10 (W.D. Wash. May 18, 2010) (dismissing ERISA breach of fiduciary duty claim based on misrepresentation where plaintiff had failed to plead "any facts that would establish detrimental reliance"); *In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, 2009 WL 331426, at *5 (D.N.J. Feb. 10, 2009) ("It is clear that claims for breach of fiduciary duty by misrepresentation under § 502(a)(3) require proof of detrimental reliance."); *In re Comp. Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1143 (C.D. Cal. 2009) (granting summary judgment to defendants because, "for claims of misrepresentation, reliance is required").

2009) ("Following *Varity*, courts have dismissed ERISA claims alleging breaches of fiduciary duty to disclose in the employer stock context where the challenged statements consisted of SEC filings and statements made to the market.").

Plaintiff cannot circumvent that principle by alleging that Defendants "provided" Plan participants a copy of the SEC filings he challenges. Compl. ¶ 87. That ministerial act does not transform these corporate communications into fiduciary communications. As the Supreme Court held in *Varity*, 516 U.S. at 505, statements that are not "intentionally connected" to the future of plan benefits are not fiduciary communications. Indeed, the Court rejected the suggestion (made by Justice Thomas in dissent) that the company could be said to have "acted as a fiduciary simply because it made statements about its expected financial condition or because 'an ordinary business decision turn[ed] out to have an adverse impact on the plan.'" *Id.* (quoting *id.* at 539 (Thomas, J., dissenting)). Rather, "the undisputed facts found, and factual inferences drawn, by the District Court" were that "Varity intentionally connected its statements about . . . financial health to statements it made about the future of benefits, so that its intended communication about the security of benefits was rendered materially misleading." *Id.*

Relying on *Varity*, one court recently rejected the same allegation Plaintiff makes here, holding that providing plan participants copies of SEC filings does not transform those filings into fiduciary communications. *In re Bank of Am. Corp.*, 2010 WL 3448197, at *23-24. The court explained:

> The Complaint does not plausibly allege facts that support the conclusory assertion that the statements, which were contained in corporate SEC filings, were made in an ERISA fiduciary capacity. There is no allegation that the statements were directed to the future of plan benefits, nor do plaintiffs plausibly allege that the statements were intentionally connected to communications about the future of plan benefits. The allegation that the statements about the company's financial condition contained information about the "likely future of the Plans' benefits, in particular the value and prudence of the 401(k) Plans' largest single investment,

[BofA] stock" is insufficient because any holding otherwise would render all communications regarding a company's financial status as ERISA fiduciary communications.

*Id.* at *24.  The Complaint in this case contains even less factual support for Plaintiff's conclusion than the complaint in *Bank of America*.

The fact that State Street's summary plan description incorporated certain of the company's SEC filings by reference (Aff. Ex. 40 at 46) does not change the analysis.  Although some courts have ruled differently,[21] there is a growing consensus that incorporation by reference does not satisfy *Varity's* intentional connection standard.  *See, e.g., Bank of Am.*, 2010 WL 3441897, at * 23 (addressing an SPD that "incorporate[d] certain SEC filings"); *In re Wachovia Corp. ERISA Litig.*, 2010 WL 3081359, at *16 (W.D.N.C. Aug. 6, 2010) ("[B]y incorporating its SEC filings into the Plan documents, Wachovia was discharging its corporate duties under the securities laws, and was not acting as an ERISA fiduciary.") (internal punctuation and citation omitted); *Bausch & Lomb*, 2008 WL 5234281, at *8 (that an SEC filing was "incorporat[ed] by reference" into an SPD "does not alter the . . . conclusion[]" that the filing was a corporate communication).[22]

The rationale for these decisions is that incorporating SEC filings by reference into an SPD no more "intentionally connect[s] the content of those SEC filings to statements about plan benefits" than the act of providing participants actual copies.  *Gearren v. McGraw Hill Cos., Inc.*, 690 F. Supp. 2d 254, 273 (S.D.N.Y. 2010).  Moreover, incorporating SEC filings is not a

---

[21]     The Court touched on this issue in *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 277 (D. Mass. 2008), and stated that incorporated SEC filings can be challenged under ERISA.  The Court did not address the argument advanced above, which has been endorsed by numerous courts since the Court's decision.  Defendants respectfully request that the Court revisit this aspect of *Bendaoud*.

[22]     *See also In re ING Groep N.V. ERISA Litig.*, 2010 WL 1704402, 48 Empl. Benefits Cas. 2594, 2601 (N.D. Ga. Mar. 31, 2010) ("[I]ncorporation by reference does not give rise to liability under ERISA . . . ."); *Avon Prods.*, 2009 WL 848083, at *13 ("[T]he disclosure obligations imposed by ERISA are generally limited to the types of information specified by that statute, and thus do not encompass the information contained in such corporate filings and announcements, even if those filings are alluded to in plan documents.").

discretionary act, but rather a ministerial one done to comply with securities laws. *See* 17 C.F.R.

§§ 239.16(b), 230.428 (where an employer's securities are offered to employees pursuant to a

Form S-8, the employer *may* designate portions of a document, such as a summary plan

description, as constituting part of the section 10(a) prospectus); *Bausch & Lomb*, 2008 WL

5234281, at *8 (same) (citing 15 U.S.C. § 77j).  As the Department of Labor has recognized, an

SPD acts in such instances as a "pass-through" to provide the required filings.  57 Fed. Reg.

46,906, 46,911, 46,927 (Oct. 13, 1992).

### C.    Plaintiff Has Not Identified Any Actionable Misstatements.

Plaintiff's disclosure claim also fails because the Complaint does not identify any

statements that were false or misleading.  With few exceptions (which are addressed below), the

Complaint excerpts a series of general statements about State Street's FX business, and then

broadly claims that they were misleading because State Street did not also disclose the purported

fraud.  Compl. ¶¶ 87-121.  Putting aside the absence of factual allegations to plausibly support

Plaintiff's conclusion that there was a fraud, *see supra* at Part I, the excerpted statements were

not misleading.  None of them discussed State Street's FX pricing or its compliance with

customer contracts, let alone said or implied that State Street was somehow immune from

customer disputes about pricing.  *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.

1990) (by voluntarily speaking, a company is not obligated to provide additional information that

would be "interesting, market-wise," but rather only that which is necessary so that the statement

is not "so incomplete as to mislead"); *Guerra v. Teradyne Inc.*, 2004 WL 1467065, at *11 (D.

Mass. Jan. 16, 2004) (no duty to disclose information relating to company's pricing and payment

terms when disclosure at issue contained "no mention of price or terms").

The somewhat more specific challenges reflected in the Complaint fail for additional

reasons.  First, Plaintiff's challenge to State Street's reported financial results fails because he

has not pled a plausible basis for his conclusion that State Street's revenue and earnings were materially overstated.  His adoption of *Hill*'s allegation that State Street's revenue was overstated by $832 million, and its earnings by 11.7%, does nothing.  Compl. ¶ 98; *Hill* Compl. ¶ 74.  As explained in greater detail in Part III.C of the *Hill* brief, that allegation is sheer speculation, and it is premised largely on a naked statement from the Relator Complaint that one third of State Street's FX revenue was attributable to fraud.  Compl. ¶ 98; *Hill* Compl. ¶ 74; Aff. Ex. 42 at ¶ 11 (Rel. Compl.).  The only "support" *Hill* (and by extension, Plaintiff) offers for this statement is that State Street's FX revenue was lower in the fourth quarter of 2009 (when the AG complaint was announced) than it was in the fourth quarter of 2008.  Compl. ¶ 96; *Hill* Compl. ¶ 72.  Of course, this allegation wholly ignores the fact that FX revenue was lower than the prior  year in each of the three quarters before the AG complaint was announced.[23]

Second, Plaintiff's challenge to the statement that State Street "'optimized [its] customers' returns' in foreign exchange transactions" is itself misleading.  Compl. ¶ 121(a).  What State Street actually said was that it had software and consulting services that could *help* customers to optimize their returns:

> We have exclusive ownership of FX Connect®, the world's first foreign exchange trading platform, and we provide quantitatively-based research into investor behavior, as well as consultative services that use quantitative tools *designed* to optimize our customers' returns.

Compl. ¶¶ 107, 112, 117 (emphasis added).  This statement simply does not promise that State Street would optimize its customers' returns when it acted as an FX dealer.

---

[23]       State Street recorded percentage declines in FX revenue compared to the same quarter of the prior year for the first three quarters of 2009 of 22%, 21% and 19%—all prior to the disclosure of the AG Complaint in October 2009.  *See* Aff. Ex. 31 at 5 (10-Q filed May 4, 2009), Ex. 34 at 8 (10-Q filed Aug. 10, 2009), and Ex. 36 at 6 (10-Q filed Nov. 6, 2009).

Third, Plaintiff's challenges to statements about State Street's "reputation as a trusted, experienced partner" and its "long-standing relationships with customers" (*e.g.*, Compl. ¶¶ 121(d), 101) fail because (in addition to being true) those statements are non-actionable corporate puffing.  *See, e.g., In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (dismissing challenge to statement that defendant's "greatest asset is the trust and confidence" it has earned from its customers); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1159-60 (S.D. Cal. 2008) (statements about an "excellent relationship" and "highly positive and mutually beneficial" interactions were non-actionable puffing); *Cafe La France, Inc. v. Schneider Sec., Inc.*, 281 F. Supp. 2d 361, 373 (D.R.I. 2003) (to the extent defendant used the "siren song of 'trust us,' that song consisted of no more than corporate puffery").

## IV.   PLAINTIFF HAS NOT PLEADED VIABLE PRUDENCE OR DISCLOSURE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.

### A.   State Street's Former CEO, Ronald Logue, Was Not a Fiduciary with Regard to Investment Selection or Plan Communications.

Alleging that a defendant had *some* fiduciary responsibility is not enough to state a claim because "fiduciary status is not an all or nothing concept."  *Moench*, 62 F.3d at 561.  Thus, the threshold question for any claim for breach of an ERISA fiduciary duty is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Pegram*, 530 U.S. at 226; *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 374 (3d Cir. 2003) (breach of fiduciary claims cannot stand against a defendant who is not a fiduciary "for the purposes of events identified [in the claims]").

Plaintiff's prudence and disclosure claims focus on two functions:  (i) the selection of investment options; and (ii) communications with Plan participants.  The Plan's governing document makes clear that both were the province of the committee that State Street designated

to administer the Plan (*i.e.*, the North American Regional Benefits Committee (the "NARBC")).

*See* Compl. ¶¶ 15-16; Aff. Ex. 41 at §§ 10.2, 10.8 (Plan Document).  Plaintiff's claims against

State Street's former CEO, Mr. Logue, therefore fail because he was not a member of the

NARBC.  Compl. ¶¶ 32-33.  The only discretionary authority Plaintiff claims that Mr. Logue had

was that, as a member of the Executive Committee of the Board of Directors, he had the ability

to appoint and remove members of the NARBC.  *See id.* ¶ 32.  That authority, however, does not

create fiduciary responsibility to make decisions about the Plan's investment options or to

communicate with the Plan's participants.  *See In re Morgan Stanley ERISA Litig.*, 696 F. Supp.

2d 345, 356 (S.D.N.Y. 2009) ("The right to appoint and remove fiduciaries is insufficient to

constitute fiduciary status."); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 473 (S.D.N.Y.

2005) ("ERISA does not attach liability for investment decisions to fiduciaries whose roles were

limited to appointing, retaining and removing other fiduciaries.").[24]

> **B.**   **Plaintiff Has Not Alleged Facts Plausibly Showing that the Other Individual Defendants Should Have Questioned the Prudence of State Street's Stock or the Accuracy of State Street's Annual Reports.**

Plan fiduciaries are not obligated to continuously audit a company to confirm that its

stock remains a prudent investment, or that the company's SEC filings are accurate.  *See Pugh*,

521 F.3d at 700 ("ERISA imposes no duty on plan fiduciaries to continuously audit operational

affairs."); *In re Huntington Bancshares*, 620 F. Supp. 2d at 852 (same).  A duty to investigate

arises only after the appearance of a "red flag." *See Pugh*, 521 F.3d at 700; *In re Huntington*

*Bancshares*, 620 F. Supp. 2d at 852.

---

[24]      Mr. Logue did not take on fiduciary responsibility for Plan communications by virtue of executing his corporate duty as State Street's CEO to sign the company's SEC filings.  *See In re Citigroup ERISA Litig.*, 2009 WL 2762708, at \*23 (S.D.N.Y. Aug. 31, 2009) "[E]merging caselaw makes clear that those who prepare SEC filings do not become ERISA fiduciaries through those acts and, consequently, do not violate ERISA if the filings contain misrepresentations.").

Moreover, a plaintiff must offer individualized allegations plausibly showing that each defendant was, or should have been aware, of the "red flag."  *See Pugh*, 521 F.3d at 701 ("A conclusory statement that all defendants should have known specific facts about a company is generally insufficient to state a claim; it must be alleged that each defendant was in a position to know or learn of the information."); *Crowley ex rel. Corning, Inc., Inv. Plan v. Corning, Inc.*, 234 F. Supp. 2d 222, 230 (W.D.N.Y. 2002) (the complaint must allege that individual defendants possessed actual knowledge of the adverse information).  Thus, the Complaint's non-specific allegations about the purported knowledge or awareness of State Street's "senior management" (Compl. ¶¶ 124, 127, 134) or its "executives" (*id.* ¶¶ 129, 132) does not satisfy Plaintiff's pleading burden.

Of the fourteen remaining individuals named as defendants, nine are not even mentioned aside from being listed as a party.  Specifically, the Complaint is silent as to any purported basis of knowledge about the alleged FX issues for defendants Cutrell, DeSalvo, Gutschenritter, Horgan, Jones, Longerstay, McLellan, Rigby, or Tangen.  The claims against them must be dismissed.

Plaintiff's claims against the remaining individuals should also be dismissed because the few individualized allegations about them do not even approach a "red flag" that might serve as a plausible basis for Plaintiff's conclusion that these individuals knew or should have known about the supposed FX pricing issues.  O'Leary's and Quirk's alleged basis for knowledge is that they "were in charge of human resources and had oversight over compensation," and therefore must have been aware that State Street's FX traders allegedly received annual bonuses equal to one to three times their base salary.  Compl. ¶ 126.

That allegation is insufficient to carry Plaintiff's burden. To begin with, allegations that a defendant must have known because she was in a leadership position are not enough to support a claim for individual liability. *See Pugh*, 521 F.3d at 700 (rejecting argument that defendants, "by virtue of their positions alone, should have possessed information that disclosed the misconduct"). Moreover, in 2009, State Street had more than 27,000 employees around the world. *See* Aff. Ex. 38 at 1 (10-K filed Feb. 22, 2010). Nothing in the complaint remotely suggests that FX traders should have stood out among those thousands of employees due to the size of their bonuses, let alone that their bonuses should have set off alarm bells. It is common knowledge that bonuses make up a large part of overall compensation in the financial services industry, and there is no basis in the Complaint to infer that the FX traders' bonuses were out of the ordinary in the industry or at State Street.

Plaintiff's allegations about Donahue, Gormley, and Malerba fail for similar reasons. They are also premised on the fact that these individuals held leadership positions, specifically oversight of State Street's accounting or internal auditing. Compl. ¶ 128. The complaint does not allege that any of them had actual knowledge of the supposed FX issues. Rather it claims that by virtue of their positions, the three should have known that State Street "virtually never" suffered a loss on an FX transaction for clients "such as CalPERS or CalSTRS."[25] *Id.* Plaintiff, of course, pleads no factual basis for the notion that State Street never lost money on a trade with CalPERS or CalSTRS, and he offers no explanation as to what that might mean. State Street is an FX dealer. It buys and sells currency, and manages the risks inherent in that activity. Every purchase of currency exposes State Street to the risk that the currency purchased will decline in

---

[25] This allegation stems purely from the original Relator Complaint. *See* Aff. Ex. 42 at ¶ 27. It is not part of the AG Complaint.

value.  There is no reason to believe that State Street tracks the margin obtained on particular

transactions at the moment of execution, as opposed to the overall impact of market forces on the

currency State Street holds, and Plaintiff surely never pleads one.

In any event, the notion that those in charge of global accounting and auditing for a

multi-national company with more than $10 billion in annual revenue either reviewed, or should

have reviewed, individual FX transactions for two of State Street's clients is absurd.  Moreover,

even if they did and State Street had "virtually never" suffered a loss, this would not be

inconsistent with State Street's contract with CalPERS and CalSTRS.  *See Hill* Br at Part IV.B.[26]

## V.    PLAINTIFF'S REMAINING CLAIMS ARE DEFICIENT.

As a threshold matter, Plaintiff's claims against State Street and Mr. Logue for breaching

the duty to monitor (Count II) and against the individual defendants for failing to avoid conflicts

of interest (Count IV) should be dismissed because they are derivative of Plaintiff's deficient

prudence and/or disclosure claims.  *See In re Duke Energy ERISA Litig*, 281 F. Supp. 2d 786,

795 (W.D.N.C. 2003) (dismissing monitoring and conflict of interest claims as derivative of

deficient prudence claim); *In re Coca-Cola Enters. Inc., ERISA Litig*., 2007 WL 1810211, at *11

(N.D. Ga. June 20, 2007) (duty to monitor claims can only lie against an appointing fiduciary

when there is a primary breach of fiduciary duties).

These claims also fail independently.  To state a conflict of interest claim, a plaintiff must

plead *facts* plausibly showing that the defendants (1) had a conflict of interest, and (2) harmed an

ERISA plan through some form of self-dealing.  *See, e.g., In re Dynegy, Inc. ERISA Litig.*, 309

F. Supp. 2d 861, 896-98 (S.D. Tex. 2004) (conflict of interest claim failed where plaintiff

---

[26]      To the extent that Plaintiff intends to assert a theory of co-fiduciary liability (Compl. ¶ 139), his claim fails because he has not alleged any primary violation, or individualized facts which plausibly suggest that any defendant could be held liable under one of ERISA § 405(a)'s subsections which govern co-fiduciary liability. *See Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 292 (D. Mass. 2008).

neglected to allege an identifiable source of conflict); *In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 768 (S.D.N.Y. 2003) (dismissing claim where plaintiff identified the source of conflict, but failed to allege that defendant took any action based on personal interest while wearing a "fiduciary hat").  The Complaint is silent with respect to both elements.

Plaintiff's claim that State Street and Mr. Logue breached their duty to monitor is also defective.  The duty to monitor is a narrow one that is satisfied when a defendant appoints well-qualified people to positions of fiduciary responsibility, and then periodically conducts reasonable performance reviews and takes appropriate actions if necessary.  *See* 29 C.F.R. § 2509.75-8, FR-17 Q&A ("At reasonable intervals the performance of trustees and other fiduciaries should be reviewed . . . to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."); *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1096-97 (N.D. Ill. 2004) (noting plaintiff's failure to allege facts indicating that appointees were ill-qualified).  The Complaint does not allege any basis to question the committee members' qualifications, or to suggest that State Street or Mr. Logue either failed to review their performance or acted inappropriately after such a review.

## VI.     PLAINTIFF'S DEMAND FOR A JURY TRIAL SHOULD BE STRICKEN.

Plaintiff's demand for a jury trial should be stricken pursuant to Fed. R. Civ. P. 12(f) because ERISA does not afford a right to a jury trial.  *See Gannell v. Prudential Ins. Co. of Am.*, 502 F. Supp. 2d 167, 172 (D. Mass. 2007) (noting that the "overwhelming weight of authority"—including "[e]very Circuit Court to have considered the issue" and "a majority of District Courts" in the First Circuit—have held that there is no right to a jury trial under ERISA).

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

DEFENDANTS

By their attorneys,

*/s/ Jeffrey B. Rudman*      
Jeffrey B. Rudman (BBO No. 433380)
William H. Paine (BBO No. 550506)
John J. Butts (BBO No. 643201)
Timothy Perla (BBO No. 660447)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts, 02109
(617) 526-6000

Dated:  September 24, 2010        jeffrey.rudman@wilmerhale.com

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey Rudman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) dated September 24, 2010.

*/s/ Jeffrey B. Rudman* _____
Jeffrey Rudman

US1DOCS 7666655v2

# APPENDIX A

## Comparative Returns 1/20/2009-10/20/2009

