**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| HILL v. STATE STREET CORPORATION | ) ) ) | |
| | ) | Master Docket No. 1:09-cv-12146 |
| THIS DOCUMENT RELATES TO THE SECURITIES ACTIONS | ) ) ) | |
| Docket No. 09-cv-12146 | ) ) | |

**STATE STREET AND UNDERWRITER DEFENDANTS' (CORRECTED)
MEMORANDUM IN SUPPORT OF THEIR MOTIONS TO DISMISS**

**(LEAVE TO FILE EXCESS PAGES GRANTED SEPT. 21, 2010)**

**ORAL ARGUMENT REQUESTED**

Jeffrey B. Rudman (BBO No. 433380)
William H. Paine (BBO No. 550506)
John J. Butts (BBO No. 643201)
Timothy Perla (BBO No. 660447)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, Massachusetts, 02109

Stephen D. Poss (BBO No. 551760)
Daniel P. Roeser (BBO No. 675223)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts, 02109

## Table of Contents

Page

INTRODUCTION ........................................................................................................1

ALLEGATIONS OF THE CONSOLIDATED COMPLAINT.......................................4

    A.     Foreign Currency Exchange Trading.......................................................4

    B.     The Asset-Backed Commercial Paper Conduits And Investment Portfolio............6

         1.     The Conduits .......................................................................7

             a)     The Conduits' High Quality Assets. ...................................8

             b)     State Street's Accounting For the Conduits. ...................13

         2.     The High Quality Investment Portfolio Assets. ..........................16

         3.     The January 20, 2009 Announcement Was Consistent with Prior Disclosures. ...............................................................20

ARGUMENT ...........................................................................................................21

I.    PLAINTIFFS DO NOT PLEAD FACTS SUFFICIENT TO ALLEGE A MATERIAL MISSTATEMENT OR SCIENTER.................................................21

II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT...................22

    A.     The FX Allegations Do Not State A Claim. .........................................22

         1.     The Complaint Does Not Identify a False Statement Concerning FX.........22

             a)     The Complaint Lacks Sufficient Facts to Support Plaintiffs' Conclusion of FX Pricing Fraud. ...................................23

         2.     The Complaint's FX Materiality Allegations Are Fatally Speculative. ...............................................................27

    B.     Challenged Statements Concerning Internal Controls Are Not Actionable. .........29

    C.     The Complaint Fails to State a Claim Concerning State Street's Conduits and Investment Portfolio.......................................................30

         1.     State Street Did Not Assert that the Conduits "Posed Little Risk" or that Consolidation "Would Not Be Required"............................31

         2.     State Street's Opinion Concerning the "High Quality" of Conduit and Portfolio Holdings Does Not State a Claim .........................32

a)      State Street Made Ample Disclosures Concerning the Quality of Conduit and Portfolio Holdings ......................................32

b)      State Street Did Not Imply That No Further Market Value Declines Would Occur. ....................................................................34

c)      The Asset Quality Opinion Is Inactionable Because it Was Honestly Held and Reasonably Based. ...........................................36

D.      The Complaint Fails to Plead any Securities Claims Based on a GAAP Violation. ........................................................................................42

     1.      Plaintiffs Do Not Plead Loss Causation .......................................42

     2.      Plaintiffs Plead No GAAP Violation ...........................................42

E.      Plaintiffs' Exchange Act Claims Fail Because They Have Not Pleaded the Factual Basis for a Strong Inference of Scienter. ...................................45

     1.      The Complaint Fails to Establish the Individual Defendants' Scienter...........................................................................................45

     2.      Plaintiffs Fail to Plead State Street's Scienter..............................50

     3.      Plaintiffs May Not Utilize Fraud by Hindsight. ..........................51

III.      THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF UNDER THE SECURITIES ACT OF 1933. ................................................................53

A.      Plaintiffs' Claims Are Time-Barred...............................................54

     1.      MPERS Did Not Bring Its Claims Within the Limitations Period. ...........54

     2.      MPERS' Claims Were Not "Tolled." ...........................................55

B.      Plaintiffs Did Not Timely Serve the Underwriters. ................................57

C.      Plaintiffs Do Not Allege an Actionable Misstatement or Omission.....................59

     1.      The FX Transaction Allegations Do Not State a Claim..............................60

     2.      The Internal Control Allegations Do Not State a Claim. ............................62

     3.      The Conduit and Investment Portfolio Allegations Do Not State a Claim. ...........64

D.      The Complaint Does Not Allege Scienter, As Required Because Plaintiffs' Claims Sound in Fraud..............................................................66

E.      Plaintiffs Lack Standing to Bring a Section 12(a)(2) Claim against State
        Street or the Underwriters. .......................................................................68

IV.  THE COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL PERSON
     LIABILITY ....................................................................................................70

CONCLUSION ....................................................................................................70

# Table of Authorities

**Page**

<u>Cases</u>

*380544 Can., Inc. v. Aspen Tech., Inc.*,
 544 F. Supp. 2d 199 (S.D.N.Y. 2008) ....................................................................23

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
 2010 WL 2593948 (S.D.N.Y. Jan. 15, 2010) ...........................................................40

*Acito v. Imcera Grp., Inc.*,
 47 F.3d 47 (2d Cir. 1995) ........................................................................................49

*Acquisition Partners LP v. Blackwell*,
 440 F.3d 278 (5th Cir. 2006) ............................................................................29, 30

*Airframe Sys., Inc. v. Raytheon Co.*,
 520 F. Supp. 2d 258 (D. Mass. 2007) ......................................................................4

*Aldridge v. A.T. Cross Corp.*,
 284 F.3d 72 (1st Cir. 2002) ................................................................................49, 70

*American Pipe & Construction Co. v. Utah*,
 414 U.S. 538 (1974) ...........................................................................................54, 56

*Arneil v. Ramsey*,
 550 F.2d 774 (2d Cir. 1977) .....................................................................................55

*Ballard v. Tyco Int'l, Ltd.*,
 2005 WL 928537 (D.N.H. Apr. 22, 2005) ...............................................................55

*Baron v. Smith*,
 285 F. Supp. 2d 96 (D. Mass. 2003) .......................................................................47

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2008) ...................................................................................21, 24, 28

*Berliner v. Lotus Dev. Corp.*,
 783 F. Supp. 708 (D. Mass. 1992) ..........................................................................59

*Bos. Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*,
 545 N.E.2d 1156 (Mass. 1989) ...............................................................................25

*Caifa v. Sea Containers, Ltd.*,
 525 F. Supp. 2d 398 (S.D.N.Y. 2007) .....................................................................23

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp*,
 394 F.3d 126 (3d Cir. 2004) ....................................................................................26

*Carney v. Cambridge Tech. Partners, Inc.*,
    135 F. Supp. 2d 235 (D. Mass 2001) .................................................................46

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
    388 F. Supp. 2d 932 (S.D. Ind. 2005) .........................................................28, 30

*Commodity Futures Trading Comm'n v. Baragosh*,
    278 F.3d 319 (4th Cir. 2002) ..........................................................................5

*Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*,
    785 F. Supp. 411 (S.D.N.Y. 1992)………………………………………………25

*Cooperman v. Individual, Inc.*,
    171 F.3d 43 (1st Cir. 1999) ................................................................... passim

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) ..................................................................30

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983) ........................................................................................56

*Dartley v. Ergobilt, Inc.*,
    2001 WL 313964 (N.D. Tex. Mar. 29, 2001) ...................................................70

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978)...............................................................................51

*Dent v. U.S. Tennis Ass'n, Inc.*,
    2008 WL 2483288 (E.D.N.Y. June 17, 2008) .................................................23

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).........................................................................................42

*EAC & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).............................................................................49

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
    466 F.3d 1 (1st Cir. 2006).................................................................................51

*Fatakia v. Hanna*,
    716 F. Supp. 235 (E.D. La. 1989) ...................................................................20

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)...............................................................................20

*Fleming v. Bank of Boston Corp.*,
    127 F.R.D. 30 (D. Mass. 1989)..................................................................55, 56

*Geffon v. Micrion Corp.*,
　249 F.3d 29 (1st Cir. 2001)...............................................................................48

*Giarraputo v. UNUMProivdent Corp.*,
　2000 WL 1701294 (D. Me. Nov. 8, 2000)..........................................................49

*Glassman v. Computervision Corp.*,
　90 F.3d 617 (1st Cir. 1996)....................................................................27, 33, 36

*Greebel v. FTP Software, Inc.*,
　194 F.3d 185 (1st Cir. 1999)..........................................................22, 23, 27, 48

*Gross v. Summa Four, Inc.*,
　93 F.3d 987 (1st Cir. 1996)...............................................................................51

*Hagood v. Sonoma County Water Agency*,
　81 F.3d 1465 (9th Cir. 1996)............................................................................25

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
　693 F. Supp. 2d 241 (S.D.N.Y. 2010)..............................................................50

*In re Amdocs Ltd. Sec. Litig.*,
　390 F.3d 542 (8th Cir. 2004)............................................................................35

*In re Bos. Tech., Inc. Sec. Litig.*,
　8 F. Supp. 2d 43 (D. Mass. 1998)....................................................................48

*In re Brooks Automation, Inc. Sec. Litig.*,
　2007 WL 4754051 (D. Mass. Nov. 6, 2007) ......................................45, 46, 66, 67

*In re Caere Corp. Sec. Litig.*,
　837 F. Supp. 1054 (N.D. Cal. 1999) ................................................................31

*In re Centennial Techs. Litig.*,
　52 F. Supp. 2d 178 (D. Mass. 1999) ................................................................51

*In re Cerner Corp. Sec. Litig.*,
　425 F.3d 1079 (8th Cir. 2005) .........................................................................49

*In re CIENA Corp. Sec. Litig.*,
　99 F. Supp. 2d 650 (D. Md. 2000) ...................................................................48

*In re CitiGroup Inc. Bond Litig.*,
　2010 WL 2772439 (S.D.N.Y. July 12, 2010) ...............................................10, 70

*In re Colonial Ltd. P'ship Litig.*,
　854 F. Supp. 64 (D. Conn. 1994)......................................................................56

*In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.*,
    467 F. Supp. 227 (W.D. Tex. 1979)...................................................................55

*In re Computervision Corp. Sec. Litig.*,
    869 F. Supp. 56 (D. Mass. 1994) ...................................................................59

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................23

*In re Cosi, Inc. Sec. Litig.*,
    379 F. Supp. 2d 580 (S.D.N.Y. 2005)...................................................................68

*In re Crazy Eddie Sec. Litig.*,
    747 F. Supp. 850 (E.D.N.Y. 1990) ...................................................................56

*In re Credit Suisse First Bos. Corp.*,
    2005 WL 852455 (D. Mass. Mar. 31, 2005)...................................................................36

*In re Credit Suisse First Bos. Corp.*,
    431 F. 3d 36 (1st Cir. 2005)...................................................................36, 37

*In re Criimi Mae, Inc. Sec. Litig.*,
    94 F. Supp. 2d 652 (D. Md. 2000) ...................................................................48

*In re Cytyc Corp.*,
    2005 WL 3801468 (D. Mass. Mar. 2, 2005)...................................................................46

*In re Duke Energy Corp. Sec. Litig.*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................27

*In re Elscint, Ltd. Sec. Litig.*,
    674 F. Supp. 374 (D. Mass. 1987) ...................................................................55, 56

*In re Galileo Corp. S'holders Litig.*,
    127 F. Supp. 2d 251 (D. Mass. 2001) ...................................................................48

*In re Glenayre Techs. Inc. Sec. Litig.*,
    1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) ...................................................................48

*In re Healthco Int'l, Inc. Sec. Litig.*,
    777 F. Supp. 109 (D. Mass. 1991) ...................................................................32

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)...................................................................23

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)...................................................................67

*In re Karagianis*,
2009 WL 4738188 (Bkrtcy. D.N.H. Dec. 4, 2009)...................................................................23

*In re Lernout & Hauspie Sec. Litig.*,
208 F. Supp. 2d 74 (D. Mass. 2002) ......................................................................................51

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
289 F. Supp. 2d 416 (S.D.N.Y. 2003)....................................................................................21

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) .............................................................................................23

*In re Mexico Money Transfer Litig.*,
267 F.3d 743 (7th Cir. 2001) ......................................................................................... passim

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)........................................................................67

*In re Peritus Software Servs., Inc. Sec. Litig.*,
52 F. Supp. 2d 211 (D. Mass. 1999) ......................................................................................47

*In re PXRE Group, Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009).....................................................................................47

*In re Salomon Analyst Level 3 Litig.*,
350 F. Supp. 2d 477 (S.D.N.Y. 2004).....................................................................................36

*In re Segue Software, Inc. Sec. Litig.*,
106 F. Supp. 2d 161 (D. Mass. 2000) .....................................................................................27

*In re Sonus Networks, Inc. Sec. Litig.*,
2006 WL 1308165 (D. Mass. May 10, 2006) ............................................................48, 66, 67

*In re St. Paul Travelers Sec. Litig. II*,
2007 WL 1589524 (D. Minn. June 1, 2007)...........................................................................42

*In re Sterling Foster & Co. Sec. Litig.*,
222 F. Supp. 2d 216 (E.D.N.Y. 2002) ....................................................................................68

*In re Stone & Webster, Inc. Sec. Litig.*,
253 F. Supp. 2d 102 (D. Mass. 2003) .....................................................................................48

*In re The First Marblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass. 2009) .....................................................................................29

*In re Vertex Pharms., Inc., Sec. Litig.*,
357 F. Supp. 2d 343 (D. Mass. 2005) .....................................................................................26

*In re WebSecure, Inc. Sec. Litig.*,
182 F.R.D. 364 (D. Mass. 1998) ...................................................................................69

*In re Wells Fargo Mortgage-backed Certificates Litig.*,
2010 WL 1661534 (N.D. Cal. Apr. 22, 2010) .........................................................68

*In re WRT Energy Sec. Litig.*,
1997 WL 576023 (S.D.N.Y. Sept. 15, 1997).............................................................68

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
146 F.3d 66, 70 (2d Cir. 1998).....................................................................................23

*Isham v. Perini Corp.*,
665 F. Supp. 2d 28 (D. Mass. 2009) ...........................................................................51

*Joffee v. Lehman Bros., Inc.*,
410 F. Supp. 2d 187 (S.D.N.Y. 2006).........................................................................36

*Kushner v. Beverly Enters., Inc.*,
317 F.3d 820 (8th Cir. 2003) ................................................................................45, 51

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)...........................................................66

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
501 U.S. 350 (1991)........................................................................................................57

*Lindner Dividend Fund, Inc. v. Ernst & Young*,
880 F. Supp. 49 (D. Mass. 1995) ................................................................................55

*Lirette v. Shiva Corp.*,
27 F. Supp. 2d 268 (D. Mass. 1998) .....................................................................46, 47

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
2010 WL 2834226 (S.D.N.Y. Jul. 19, 2010) .............................................................26

*London-Sire Records, Inc. v. Doe 1*,
542 F. Supp. 2d 153 (D. Mass 2008) ............................................................................4

*Lovelace v. Acme Markets, Inc.*,
820 F.2d 81 (3d Cir. 1987)............................................................................................58

*Maldonado v. Dominguez*,
137 F.3d 1 (1st Cir. 1998)........................................................................................47, 68

*McIsaac v. Ford*,
193 F. Supp. 2d 382 (D. Mass. 2002) .........................................................................58

*Meeks v. Murphy Auto Grp., Inc.*,
   2009 WL 3669638 (M.D. Fla. Oct. 30, 2009) .........................................................30

*Meyer v. Biopure Corp.*,
   221 F. Supp. 2d 195 (D. Mass. 2002) ...................................................................51

*Muth v. Dechert, Price & Rhoads*,
   391 F. Supp. 935 (E.D. Pa. 1975) .........................................................................23

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
   2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) .......................................................68

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
   537 F.3d 35 (1st Cir. 2008) ..............................................................................22, 24

*Nashville v. Impac Ltd., Inc.*,
   432 U.S. 312 (1977)...............................................................................................21

*Parnes v. Gateway 2000, Inc.*,
   122 F.3d 539 (8th Cir. 1997) .................................................................................27

*Petrucelli v. Bohringer and Ratzinger, GMBH*,
   46 F.3d 1298 (3d Cir. 1995)...................................................................................59

*Phillips v. LCI Int'l, Inc.*,
   190 F.3d 609 (4th Cir. 1999) .................................................................................48

*Phillips v. Scientific-Atlanta, Inc.*,
   374 F.3d 1015 (11th Cir. 2004) .............................................................................45

*Pinter v. Dahl*,
   486 U.S. 622 (1988)...............................................................................................67

*Plumbers' Union Local No.12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   658 F. Supp. 2d 299 (D. Mass. 2009) .........................................................10, 68, 69

*Procacci v. Drexel Burnham Lambert, Inc.*,
   1989 WL 121984 (E.D. Pa. Oct. 16, 1989)............................................................20

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   2010 WL 2202295 (S.D.N.Y. June 1, 2010) ...................................................56, 68

*Romani v. Shearson Lehman Hutton*,
   929 F.2d 875 (1st Cir. 1991) .................................................................................35

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)...................................................................................66

*RSM Prod. Corp. v. Friedman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009)..................................................................23

*S. Cherry St. LLC v. Hennessee Grp.*, LLC,
   573 F.3d 98 (2d Cir. 2009)...............................................................................49

*Salomon Forex, Inc. v. Tauber*,
   8 F.3d 966 (4th Cir. 1993) .................................................................................5

*SEC v. Durgarian*,
   477 F. Supp. 2d 342 (D. Mass. 2007) ..........................................................45, 51

*SEC v. Patel*,
   2008 WL 782483 (D.N.H. Mar. 24, 2008) ........................................................67

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,
   167 F. Supp. 2d 639 (S.D.N.Y. 2001)...............................................................32

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000).............................................................................42

*Serabian v. Amoskeag Bank Shares, Inc.*,
   24 F.3d 357 (1st Cir. 1994)..........................................................................32, 48

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996).....................................................35, 59, 66, 67, 68, 69

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) ............................................................................50

*Steiner v. Unitrode Corp.*,
   834 F. Supp. 40 (D. Mass. 1993) ......................................................................59

*Stumpf v. Garvey*,
   2005 WL 2127674 (D.N.H. Sept. 2, 2005) ........................................................36

*Suna v. Bailey Corp.*,
   107 F.3d 64 (1st Cir. 1997)...............................................................................32

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)..............................................................................49

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)....................................................................................22, 45

*Third Nat'l Bank in Nashville v. Impac Ltd., Inc.*,
   432 U.S. 312 (1977)..........................................................................................20

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)..........................................................................................33

*Tuchman v. DSC Commc'ns Corp.*,
14 F.3d 1061 (5th Cir. 1994) ...........................................................................49

*U.S. ex. Rel. Englund v. L.A. Cnty.*,
2006 WL 3097941 (E.D. Cal. 2006).................................................................25

*Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*,
785 F. Supp. 411 (S.D.N.Y. 1992).....................................................................26

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991)................................................................................... passim

*Yu v. State Street Corp.*,
686 F. Supp. 2d 369 (S.D.N.Y. 2010)................................................................64

*Zirn v. VLI Corp.*,
1995 WL 362616 (Del. Ch. Jun. 12, 1995)......................................................33

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...........................................................................49

<u>Federal Statutes</u>

15 U.S.C. § 77k(a) ...............................................................................................54

15 U.S.C. § 77l(a)(2)...........................................................................................54

15 U.S.C. § 77m..................................................................................................54

15 U.S.C. § 78u-4(b)(1) ......................................................................................23

15 U.S.C. §§ 77k(a) ............................................................................................56

State Street. 15 U.S.C. § 78u-4(b)(2)..........................................................45, 66

<u>State Statutes</u>

Rel. Compl. ¶ 5 with Cal. Gov't Code § 12652 ....................................................5

<u>State Rules</u>

Federal Rule of Civil Procedure 4(m)................................................................58

Other Authorities

*Self Regulatory Organizations, S.E.C. Release No.*
   34-36225, 1995 WL 555395 (Sept. 13, 1995) ............................................................................9

**INTRODUCTION**

Plaintiffs—two sophisticated institutional investors (Public Employees' Retirement System of Mississippi ("MPERS") and Union Asset Management Holding Company)—bring claims under the Securities Act and Exchange Act against State Street Corporation, various individuals affiliated with State Street, its auditors, and the underwriters of a June 2008 public offering of State Street stock.  Plaintiffs challenge as misstatements essentially the same disclosures made by State Street in public filings and included in the offering materials for a single public offering.  They do not state a claim against any defendant because they advance no plausible or particular factual basis to conclude that any defendant made an actionable statement or had scienter.[1]  Moreover, their claims suffer from numerous other fatal deficiencies.

Plaintiffs first assert that a material amount of the revenue that State Street reported from its foreign currency exchange ("FX") trading business "was generated not through legitimate business practices, but through intentional fraud."  Consolidated Amended Class Action Complaint ("Compl.") ¶ 7.  The short answer to this claim is that Plaintiffs have no basis to assert either an FX fraud or that the challenged FX business practices had a material impact on State Street's revenues.  Plaintiffs' fraud claims are derived exclusively from superseded allegations filed by others in a California state court, and inadequate confidential witness statements.  Thus Plaintiffs do not plead an adequate factual basis for their claim.  In addition, the amount of revenue at issue in the California action from which Plaintiffs' allegations are

---

[1] This brief is submitted jointly by State Street, the individual defendants, and the underwriters, although they are not all subject to the same claims.  Plaintiffs do not sue the individual defendants under Section 12 of the Securities Act, and do not sue the underwriters under the Exchange Act.  Nonetheless, because certain claims and arguments do pertain to all defendants, in the interest of avoiding duplicative briefing and undue burden on the Court, defendants have submitted a joint brief, recognizing that each joins in the submission to the extent that the arguments and discussions apply to the claims against such defendant.

derived is obviously immaterial—representing about 0.11% of State Street's revenue during the period at issue.  Plaintiffs' strained attempt to contrive a higher number is obvious guesswork.

Plaintiffs next contend that State Street's October 15, 2008 opinion that the debt securities contained in its investment portfolio and in asset-backed commercial paper conduits were "of high quality" was revealed to be fraudulent when the market value of the assets continued to decline through year-end 2008.  *Id.* ¶ 3.  This does not state a claim because the opinion had a reasonable, disclosed factual basis, and because Plaintiffs do not claim that it was not genuinely held.  Nor was the opinion misleading: the assets were of high quality.  For example, of the over 10,000 securities held in the conduits and portfolio, *none* defaulted during the relevant period.  That is, they paid timely all of the principal and interest due.

Plaintiffs' claim in this regard reduces to the allegation that these assets (all debt securities) could not be of high quality because they included some highly rated debt securities backed by US residential mortgages—many of which were "Alt A" residential mortgages, and some of which were underwritten by lenders who allegedly made bad loans—and because (as State Street repeatedly disclosed) the market value of these assets declined consistently within the class period, and continued to decline in the fourth quarter of 2008.  In advancing this implausible claim, Plaintiffs ignore State Street's regular disclosures to investors about these assets, their declining market value, and the risks inherent in holding them.

These disclosures included: (i) that State Street had many times expressed its opinion that the assets were of high quality, each time while disclosing that due to unprecedented market conditions (the global credit crisis) the market value of these debt securities had declined significantly in the prior quarter; (ii) that, as a result, its opinion about asset quality could not imply that there would be no future declines in market value; (iii) that State Street in fact warned

of future market declines; (iv) that the changes in market value of these assets did not cause cash flow problems for the conduits or portfolio because there were no payment defaults on them during the relevant period; (v) that it was well disclosed that the US residential mortgage backed securities ("US RMBS") in the conduits were mostly backed by Alt-A mortgages; (vi) that there were significant protections against default on such securities, all described in great detail in the challenged disclosures; and (vii) therefore, that these assets were—consistent with State Street's disclosures—of high credit quality.

Plaintiffs' next claim, that State Street was late in consolidating the conduits' financial statements with its own, misapprehends the relevant accounting rules. Plaintiffs claim that the size of the conduits' unrealized losses (*i.e.*, changes in market value of portfolio assets) mandated consolidation earlier. This is incorrect because the accounting rules make clear that the determination of the "primary beneficiary" of an entity like the conduits (*i.e.*, the party required to consolidate the entity's financial statements) turns on an allocation of "expected losses" (a term defined under the accounting rules), *not* unrealized losses. In addition, Plaintiffs allege no loss caused by any delay in consolidation.

Plaintiffs' Exchange Act claims fail because defendants made no false or misleading statements; because Plaintiffs fail to plead a factual basis for a strong inference of scienter; and because the opinions Plaintiffs challenge were genuinely held and had a reasonable basis. Plaintiffs' generic challenge to State Street's controls does not state a claim as a matter of law.

Plaintiffs' Securities Act claims—tacked onto the back of their Complaint as an abridged but wholly deficient version of the Exchange Act claims—also fail. The Securities Act claims, which are the only claims asserted against the underwriters, impose liability in distinctly limited circumstances. Plaintiffs' Securities Act claims must be dismissed as to all defendants because:

(i) Plaintiffs' claims are time-barred; (ii) Plaintiffs' did not timely serve the underwriters; (iii)

Plaintiffs do not allege an actionable misstatement; (iv) Plaintiffs do not allege scienter (which is

required because their claims sound in fraud); and (v) Plaintiffs lack statutory standing to bring

their claims under Section 12(a)(2).

## ALLEGATIONS OF THE CONSOLIDATED COMPLAINT

### A.    Foreign Currency Exchange Trading

Plaintiffs' claim regarding State Street's FX business rests on three principal sources: (i)

two *qui tam* complaints filed against State Street in a California state court by a general

partnership comprised of anonymous partners (the "Relator"); (ii) a complaint in intervention

filed in the same case by the office of the California Attorney General (the "AG"); and (iii)

intemperate rhetoric by the AG that finds no plausible support even in the AG complaint. *See,*

*e.g.*, Compl. ¶¶ 51-58, 62, 67.  Plaintiffs also rely on anonymous "witnesses" that add little to the

allegations otherwise copied from the Relator.[2]

According to the Complaint, State Street serves as custodian for public pension funds

including the California Public Employees Retirement System ("CalPERS") and the California

State Teacher's Retirement System ("CalSTRS").  Compl. ¶ 42; AG Compl. ¶¶ 1, 19.

Custodians provide a range of administrative services to institutional investors, including holding

assets, collecting income and interest, paying out money and processing proxy materials.  *See,*

*e.g.,* Aff. Ex. 46 at 3-22 (CalPERS Contract).[3]

---

[2]    The Relator's initial complaint ("Relator Compl."), the Relator's amended complaint ("Relator Am. Compl."), and the AG's complaint ("AG Compl.") are properly before this Court both as documents incorporated by reference into the Complaint and as public records. *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 179 n.36 (D. Mass 2008) (Gertner, J.) ("The Court may take judicial notice of related proceedings."); *Airframe Sys., Inc. v. Raytheon Co.*, 520 F. Supp. 2d 258, 263 (D. Mass. 2007) (permitting review of complaint from related case because it "[is a] public document[] whose authenticity is not disputed by the parties").  These three documents are attached to the Affidavit of John J. Butts ("Aff.") as Exhibits 42-44 respectively.
[3]    The CalPERS and CalSTRS contracts and the RFP responses incorporated into them also are incorporated by reference in the Complaint.  *See* Compl. ¶ 38.  They are Exhibits 45-48 to the Aff.

Separately, State Street also is an FX dealer, meaning it buys and sells non-US currency. *See* Aff. Ex. 47 at 99 (CalSTRS RFP); Compl. ¶ 41; *see* AG Compl. ¶¶ 25-26.  As an FX dealer, State Street takes proprietary positions in the currency market and manages the risks associated with doing so.  *See* Aff. Ex. 47 at 98 (CalSTRS RFP).  An FX transaction is a trade of one kind of currency for another, and an "FX rate" is the amount of one kind of currency that can be exchanged for another.[4]  An "interbank" FX rate is a wholesale rate charged by or to a large financial institution that deals in the interbank currency market.[5]  AG Compl. ¶ 2; *compare In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001).  FX rates for any given currency pair fluctuate throughout the day depending on market conditions.  AG Compl. ¶ 2.

The Complaint relies heavily on factually unsupported allegations from the initial California *qui tam* complaint that the Relator abandoned or that the AG's own complaint rebuts.[6] The Relator's original and amended complaints do not identify any person allegedly having personal knowledge of any of Relator's allegations, nor the capacity in which anyone obtained such knowledge, nor the dates upon which any such knowledge was obtained.  Parroting allegations culled from the Relator's complaints, Plaintiffs allege a "long-running fraudulent scheme" (Compl. ¶ 49) whereby State Street early each day executed so-called indirect or custody FX trades for custody clients at an interbank rate and then later in the day fraudulently modified its records to reflect rates more advantageous to State Street.  *Id.* ¶¶ 51-53.  According to Plaintiffs, this "scheme" was first revealed by the California AG in October 2009.  *Id.* ¶ 50,

---

[4]     *See* Sam Y. Cross, *All About . . . the Foreign Exchange Market in the United States*, 9 Fed. Reserve Bank of N.Y. (1998).  The relevant pages of this official publication are attached to the Aff. as Ex. 49.

[5]     The interbank market is not a centralized exchange.  Aff. Ex. 49 at 21 (Cross).  It is an informal network of banks and dealers with no consolidated record of prices or volumes.  *See Commodity Futures Trading Comm'n v. Baragosh*, 278 F.3d 319, 328 (4th Cir. 2002); *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 977 (4th Cir. 1993).  Only the two participants to an interbank trade need know the details of the trade (including its price).

[6]     The Relator allegedly is a general partnership dubbed the "Associates Against FX Insider Trading."  The partnership apparently was formed to obscure the identities of the real people seeking to obtain, pursuant to the False Claims Act of California and other jurisdictions, a percentage of any recovery obtained from prosecuting these actions.  *Compare, e.g.*, Rel. Compl. ¶ 5 *with* Cal. Gov't Code § 12652.

n.3.  In fact, the AG did not adopt this theory of liability.  Only the Relator (and now Plaintiffs) assert that State Street altered records to re-price previously executed trades.  Rel. Compl. ¶¶ 18-26; Rel. Am. Compl. ¶¶ 34-42.  For his part, the AG alleges that State Street agreed to execute FX transactions for CalPERS and CalSTRS "*based on* the Interbank Rates at the time that the trade is executed," and breached that agreement by adding a markup or markdown to the interbank rate "*at the time it executed* Custody FX trades . . . ."  AG Compl. ¶¶ 23, 35 (emphasis added).  Thus, the AG's theory is not based on fraudulent alteration of records.[7]  It is instead based on a flawed (and hotly disputed) interpretation of a contract.  *See infra* at II.A.1(a).

Plaintiffs speculate that State Street's FX pricing practices materially inflated State Street's revenues and earnings.  Compl. ¶ 7.  The Relator's complaint concludes without factual support or explanation that fully *one-third* of State Street's FX trading revenues were due to this pricing method.  *Id.* ¶ 74.  To do so, the Complaint relies on a specious and attenuated chain of logic—including at least four factually unsupported or obviously speculative assertions—to guess that State Street overstated revenue by $832 million.  *Compare id.* ¶¶ 74-75 *with infra* at II.A.2.  In the process, Plaintiffs ignore their own admission that quantification of this number would be impossible without access to State Street records.  *See id.* ¶ 74.

## B.    The Asset-Backed Commercial Paper Conduits And Investment Portfolio

Plaintiffs also claim that State Street misled investors about the quality of certain securities held by asset-backed commercial paper programs it sponsored, and in its own investment portfolio.  *Id.* ¶¶ 3, 83-219.  Plaintiffs principally challenge statements made during

---

[7]      Plaintiffs' allegations also are inconsistent with the AG's in adopting the assertion of the initial Relator complaint that State Street disparaged custody clients who placed these trades as "dumb"—as distinguished from "smart" custody clients who executed trades directly at negotiated rates.  *Id.* ¶ 53.  The AG's Complaint does not assert that there were "smart" or "dumb" clients who each used only one execution method.  To the contrary, the AG alleged that CalPERS and CalSTRS used both methods.  AG Compl. ¶¶ 24-26.  Even the Relator dropped its "smart" vs. "dumb" allegations in its amended complaint.  *See generally* Rel. Am. Compl. (deleting allegations).

October and November 2008 regarding the high quality of these securities, as well as more general prospectus disclosures characterizing the conduits as having "strong overall asset quality" and "strong credit quality." *Id.*; *see also id.* ¶¶ 441-42. Plaintiffs' thesis is that these statements about quality were false because—as State Street repeatedly disclosed—the conduits and investment portfolio held some US RMBS. *See id.* ¶ 3. Plaintiffs also incorrectly allege that State Street's accounting for the conduits violated generally accepted accounting principles ("GAAP"). *Id.* ¶¶ 208-19.

### 1.    The Conduits

State Street sponsored four "asset-backed commercial paper programs," or "conduits." *See, e.g.*, Compl. ¶ 85; Aff. Ex. 11 at 31 (10-Q filed Nov. 2, 2007); Ex. 13 at 4, 8-12 (Oct. 16, 2007 Earnings Conf. Call) (describing conduit program and asset quality in detail). These conduits are legal entities separate from State Street, established to issue asset-backed commercial paper sought by State Street's customers. Compl. ¶ 85; Ex. 13 at 10 (Oct. 16, 2007 Earnings Conf. Call). The conduits buy debt securities with the money obtained from selling commercial paper (a short term debt instrument). Compl. ¶ 85. That is, they are the lender (receiving principal and interest) on their debt security assets, and the borrower (paying principal and interest) as to the commercial paper. Their debt security assets generally have a longer term than commercial paper (*i.e.*, the payment obligation is spread over a longer time), and so the assets generally pay a higher rate of interest than the conduits pay to commercial paper holders. *See, e.g.*, Aff. Ex. 11 at 31-33 (10-Q filed Nov. 2, 2007); Aff. Ex. 14 at 11, 71 (10-K filed Feb. 15, 2008).

As State Street disclosed, the conduits sought to hold their debt security assets to maturity, not to trade them. *See, e.g.*, Aff. Ex. 14 at 48 (10-K filed Feb. 15, 2008); Aff. Ex. 29 at 58 (10-K filed Feb. 27, 2009) ("conduit assets are purchased with the intent to hold them to their

maturities.").  That is, the conduits bought their assets to obtain cash flow (principal and interest payments) from them until they matured.  This is because the conduits were structured so that the cash flow from the assets would be sufficient to pay what was owed to the holders of the commercial paper and to pay State Street's management fee.  *See* Aff. Ex. 14 at 11 (10-K filed Feb. 15, 2008).[8]  The conduits' ability to make these payments from asset cash flow would not be impacted by a decline in the assets' market value.

In the event of default in payment on the debt security assets, State Street was obliged to provide liquidity support to the conduits.  Aff. Ex. 13 at 11 (Oct. 16, 2007 Earnings Conf. Call). As set forth below, no such default occurred prior to January 20, 2009, when Plaintiffs claim that the market reacted to the "truth" about the conduits' asset quality.  Compl. ¶¶ 133-44, 148. Indeed, no material default occurred at any time during the class period.  *See infra* at 9.

<strong>a)      The Conduits' High Quality Assets.</strong>

Throughout the class period, State Street made extensive disclosures concerning the conduits and the risks associated with them.  *See, e.g.*, Aff. Ex. 10 at 40 (10-Q filed Aug. 3, 2007); Aff. Ex. 22 at 32-39 (10-Q filed Aug. 1, 2008).  Beginning with the third quarter of 2007, State Street made detailed quarterly presentations concerning the conduits and their assets.  *See, e.g.*, Aff. Exs. 12, 18, 23 (quarterly slides providing detailed information); *see, e.g.,* Ex. 13 at 8-12 (Oct. 16, 2007 Earnings Conf. Call).  Among other things, these presentations disclosed that: (i) the number (700) and principal amount of the medium- or long-term debt securities owned by the conduits; (ii) the third-party credit ratings of the debt securities held, (iii) the geographic origin of the assets backing the securities by country (around the world) by percentage, (iv) the

---

[8]      The conduits paid State Street a management fee from the difference between the cash flow streams paid to the conduits (on the assets) and from the conduits (to the holders of commercial paper).  *See, e.g.*, Aff. Ex. 29 at 105 (10-K filed Feb. 27, 2009).

kinds of assets backing the securities held (*e.g.*, pools of credit card receivables, auto/equipment

loans, student loans, domestic mortgages, foreign mortgages, trade receivables, business loans,

and other loans); and (v) the absence of any payment defaults.[9]

| Period Ended | Conduit Value | % of Securities AAA/Aaa or AA/Aa Rated | Defaults | Source |
|---|---|---|---|---|
| 9/30/2007 | $29.21B | 77% | 0 | 10-Q at 31-35, Aff. Ex. 11 |
| 12/31/2007 | $28.76B | 77% | 0 | 10-K at 71-75, Aff. Ex. 14 |
| 3/31/2008 | $28.34B | 72% | 0 | 10-Q at 29-36, Aff. Ex. 17 |
| 6/30/2008 | $28.36B | 72% | 0 | 10-Q at 32-38, Aff. Ex. 22 |
| 9/30/2008 | $25.50B | 70% | 0 | 10-Q at 40-46, Aff. Ex. 25 |
| 12/31/2008 | $23.89B | 69% | 0 | 10-K at 105-09, Aff. Ex. 29 |
| 3/31/2009 | $22.51B | 53% | 0[10] | 10-Q at 50-54, Aff. Ex. 31 |

State Street's quarterly disclosures also included a great deal of additional detail about

each kind of debt security held by the conduits.  The Complaint focuses to a high degree on one

kind—US RMBS.  For example, the October 15, 2008 quarterly presentation that Plaintiffs claim

misled investors about conduit assets disclosed at least nine different categories of information

about each asset class (including abundant disclosure about US RMBS):

(i)        the type of debt obligations backing the security (for US RMBS, mostly floating

rate Alt-A loans and home equity lines of credit);

(ii)       the credit quality of the assets underlying the security (US RMBS were backed by

mortgages having at origination favorable weighted average FICO scores and loan-to-value

ratios);[11]

---

[9]        Credit ratings assess the ability of the rated entity to meet its financial commitments.  *See*, *e.g.,* Standard & Poor's, *Credit Rating Definitions*, at http://www.standardandpoors.com/ratings/articles/en/us/?assetID= 1245219848760 (AAA and AA ratings connote that an issuer has a "very strong capacity to meet its financial commitments"); *Self Regulatory Organizations*, S.E.C. Release No. 34-36225, 1995 WL 555395, at *2 n.8 (Sept. 13, 1995) (debt rated "AAA" has the highest rating "because the capacity to pay interest and repay principal is extremely strong"); BLACK'S LAW DICTIONARY (8th ed. 2004) at 1441 ("Standard & Poor's rates the financial strength of businesses from AAA (strongest) to AA, A, BBB, and so on to CCC."); *id.* at 1029 ("Moody's rates the financial strength of businesses from Aaa (strongest) to Aa, A, Baa, and so on to C."); *id.* at 845 ("[I]nvestment-grade rating" is "[a]ny of the top four symbols (AAA, AA, A, or BAA) given to a bond after an appraisal of its quality by a securities-evaluation agency such as Moody's").

[10]        On April 27, 2009, two securities defaulted due to the restructuring of an insurance company that insured them.  State Street made prompt disclosure.  Aff. Ex. 31 at 20 (10-Q filed May 4, 2009).

(iii)    current market value (for US RMBS $3.6 billion);

(iv)    decline in market value from the prior quarter and same quarter of the prior year (for US RMBS $200 million and $600 million respectively);

(v)    third party credit rating of the security (for US RMBS 72%, 6%, 4% and 11% rated AAA, AA, A or BBB, respectively), and the extent of any changes in such ratings from the last quarter and year;

(vi)    structural protections (for US RMBS, all loans were senior status, 60% having super-senior status with 2-5 times the credit enhancement necessary to qualify for AAA rating);

(vii)    other credit enhancement (*e.g.*, insurance);

(viii)   default history; and

(ix)    potential for increased default experience in times of stress.

*See* Aff. Ex. 26 at Ex. 99.4 at 12, 15, 20-21 (8-K filed Oct. 15, 2008).

State Street as part of these quarterly presentations also compared the asset quality (based on third party credit ratings) of the assets held by the conduits to those of a peer group of 30 other bank sponsors. *See, e.g.*, *id.* at 2. For example, as of September 30, 2007, State Street's conduits held *over 300% more* assets rated AA/Aa or higher than those of the peer group. *See* Aff. Ex. 12 at Ex. 99.2 at 2 (8-K filed Oct. 16, 2007). By March 2009, despite the dramatic and unexpected downturn in the market for debt securities, State Street still had 300% more of such

---

[11]    A 'FICO score'—or a credit score—is a measure used by credit grantors to determine how much, if any, credit to grant an applicant. *In re CitiGroup Inc. Bond Litig.*, ---- F. Supp. 2d ----, 2010 WL 2772439, at *4 n.2 (S.D.N.Y. July 12, 2010) (citing John Downes & Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms* 153-54 (7th ed. 2006)). The scores range between 300 – 850. Board of Governors of the Fed. Reserve Sys., Report to Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit, Aug. 2007, at 24. A loan-to-value ("LTV") ratio is the ratio of money borrowed to fair market value. John Downes & Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms*, 395 (7th ed. 2006). If a borrower seeks to borrow $90,000 for a house worth $100,000, the LTV ratio is 90 percent. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 308 n.11 (D. Mass. 2009).

highly rated assets than the peer group (53% versus 17%).  Aff. Ex. 32 at Ex. 99.2 at 2 (8-K filed

Apr. 21, 2009).[12]

State Street also made quarterly disclosures of its process for purchasing and evaluating

conduit assets.  The conduits were "subject to significant internal controls," including "prudential

limits and diversification requirements" designed to mitigate risk.  *See, e.g.,* Aff. Ex. 12 at Ex.

99.2 at 6-7 (8-K filed Oct. 16, 2007).  All conduit assets were approved by State Street's

Enterprise Risk Management ("ERM"), a dedicated corporate group responsible for monitoring

key risks, and formulating and maintaining risk management policies and guidelines across State

Street's business units.  *See, e.g*., Aff. Ex. 12 at Ex. 99.2 at 6 (8-K filed Oct. 16, 2007); Aff. Ex.

3 at 44 (10-K filed Feb. 21, 2006).  Based on the parameters set by ERM, the conduits provided

"no material concentration risk among issuers or servicers" and "no exposure to subprime

mortgages."  Aff. Ex. 12 at Ex. 99.2 at 7 (8-K filed Oct. 16, 2007); Aff. Ex. 32 at Ex. 99.2 at 14

(8-K filed Apr. 21, 2009) (same).

The quarterly disclosures also included an update on the size of the unrealized losses in

the conduits due to the ongoing credit crisis.[13]  *See, e.g.*, Aff. Ex. 11 at 35 (10-Q filed Nov. 2,

2007).  Specifically, as market disruptions continued, State Street disclosed each quarter that the

market value of the conduit assets had declined from par by the following amounts: $215 million

---

[12]     One reason why the conduits' assets were more highly rated than those held by peer banks is that State
Street did not sell the conduits debt securities backed by loans originated by State Street (which did not exist
because State Street does not make mortgage, student, or other consumer loans).  *See, e.g.*, Aff. Ex. 14 at 46 (10-K
filed Feb. 15, 2008).  Whereas other banks sold their conduits asset-backed securities issued largely by the sponsor
bank, State Street's conduits purchased the highest-quality debt securities available, regardless of originator.
[13]     As further described below, accounting rules require a holder of a debt security to "mark to market,"
meaning to determine the security's value based on the price at which it could be immediately sold.  When that
market price falls below the value at which the asset is carried on the holder's balance sheet, unrealized losses result.
However, the holder of the debt security (still entitled to the exact same principal and interest payments irrespective
of market price) experiences no economic loss unless the issuer defaults or the holder of the security sells it at a
depressed price prior to maturity.  *See infra* at 13.

(Q3 2007), $530 million (Q4 2007), $1.49 billion (Q1 2008), $1.63 billion (Q2 2008), $2.14 billion (Q3 2008), $3.56 billion (Q4 2008), $3.60 billion (Q1 2009).[14]

In the context of all of these disclosures, State Street stated its opinion more than once that the quality of the assets held by the conduits was high.  These opinions plainly addressed the *credit quality* of the assets (*i.e.*, the likelihood of payment default).  *See, e.g.*, Aff. Ex. 19 at 10 (Apr. 15, 2008 Earnings Conf. Call) ("We firmly believe these are high-quality assets and, like the other securities in our investment portfolio, we expect them to mature at par."); *id.* at 26 ("The credit quality in both of those portfolios is very strong, evidenced by the few downgrades vis-à-vis the other downgrades in the industry.  So we and our accounting firm and others feel very strong that the quality in those portfolios are very high."); Aff. Ex. 27 at 3 (Oct. 15, 2008 Earnings Conf. Call) ("the assets in our investment portfolio and asset-backed commercial paper program are of high quality.  Very few have been downgraded and none are in default.").

State Street also repeatedly warned investors about the many risks associated with the conduits.  As early as 2003, State Street warned investors that it might have to consolidate the conduits' assets and liabilities onto its balance sheet.  *See* Aff. Ex. 1 at 59 (10-K filed Feb. 21, 2003).  The annual report preceding the class period warned that domestic financial deterioration could adversely impact conduits, as well as State Street's earnings.[15]  State Street's first quarterly report issued during the class period warned of "[p]otential losses" resulting from "[a]sset performance deterioration or certain other factors" that might shift risks from the conduits to State Street.  Aff. Ex. 7 at 34 (10-Q filed Nov. 3, 2006).

---

[14]    *See* Aff. Ex. 11 at 35 (10-Q filed Nov. 2, 2007); Aff. Ex. 14 at 74 (10-K filed Feb. 15, 2008); Aff. Ex. 17 at 34 (10-Q filed May 9, 2008); Aff. Ex. 22 at 38 (10-Q filed Aug. 1, 2008); Aff. Ex. 25 at 45 (10-Q filed Nov. 5, 2008); Aff. Ex. 29 at 11 (10-K filed Feb. 27, 2009); Aff. Ex. 31 at 20 (10-Q filed May 4, 2009).
[15]    It stated: "In the event of poor economic conditions in a particular country or region…there is a greater likelihood…that the special purpose entities we administer could experience deterioration in asset performance. This could result in higher levels of credit-related losses, which could adversely affect our earnings."  Aff. Ex. 3 at 9-10 (10-K filed Feb. 21, 2006) (emphasis added); *see also* Aff. Ex. 4 at 13 (S-3 filed Mar. 21, 2006) (same).

Commencing with its disclosure of a small unrealized loss in the conduits on October 16, 2007, State Street's quarterly and annual reports also warned investors about the potential impact of market conditions, the possibility of conduit consolidation, the loss State Street would have recorded if consolidation had been necessary, and the impact that such a consolidation would have had on its financial ratios.  Aff. Ex. 12 at Ex. 99.2 at 4-5 (8-K filed Oct. 16, 2007); *see e.g.,* Aff. Ex. 29 at 105-08 (10-K filed Feb. 27, 2009).  These risk disclosures only became more detailed over time.  *See* App. A.

### b)      State Street's Accounting For the Conduits.

For most of the class period, the conduits' financial statements were not consolidated with State Street's because State Street had determined that the accounting rules did not require consolidation.  *See* Compl. ¶¶ 214-15.  Nevertheless, State Street repeatedly warned that the accounting rules might in the future cause it to consolidate the conduits' financial statements with its own and record a loss equal to the conduits' reported unrealized losses (i.e., the amount of the decline in market value of the conduits' assets).  *See, e.g.*, Aff. Ex. 11 at 35 (10-Q filed Nov. 2, 2007).  State Street also repeatedly explained that, if it did so and continued to hold the securities to maturity as intended, absent defaults "[t]his loss would accrete back into income over the remaining lives of the assets."  *Id.*  In other words, any accounting loss recorded upon consolidation would be recouped over time if the securities were held to maturity without default.

State Street consolidated the conduits' financial statements effective May 15, 2009. Plaintiffs conclude that State Street should have taken this step by September 2008, but do not explain why they chose that date.  Compl. ¶ 215.  At all times, FASB Interpretation No. 46(R) ("FIN 46R") governed whether the conduits' financial statements were required to be consolidated with State Street's own.  Compl. ¶ 211; Aff. Ex. 1 at 59 (10-K filed Feb. 21, 2003).

Under FIN 46R, the "primary beneficiary" of a "variable interest entity" (a "VIE") is required to

consolidate the VIE's financial statements with its own.  Aff. Ex. 50 at 6 (FIN 46R).  The

conduits were VIEs.  *See*, *e.g.,* Aff. Ex. 1 at 42, 59 (10-K filed Feb. 21, 2003).  A primary

beneficiary is an entity that would "absorb the majority of the expected losses" of the VIE, or

receive a majority of its expected residual returns.  Aff. Ex. 50 at 15-16 (FIN 46R); *see also, e.g.*,

Aff. Ex. 1 at 42 (10-K filed Feb. 21, 2003).

"Expected losses" is a specially defined term.  Aff. Ex. 50 at 9, 27-28 (FIN 46R).[16]  It

refers "to amounts derived from expected cash flows" that are "discounted and otherwise

adjusted for market factors and assumptions . . . ."[17]  *Id.* at 9.  To calculate "expected losses,"

*estimated* cash flows from operating the VIE that are *possible* (possible outcomes) are compared

with *expected* cash flows (on a probability weighted basis), and discounted to present value.  *Id.*

at 27-28.  To the extent that possible outcomes are less than those expected, the differences

contribute to "expected losses."  Thus, "expected losses" are not actual losses (they are

hypothetical), and they are not unrealized losses (which do not affect cash flow).[18]

Consistent with FIN 46R, in order to determine whether it was the primary beneficiary of

the conduits, State Street disclosed that it used a financial model—its "expected loss model"—to

simulate hundreds of thousands of probability-weighted loss scenarios, and performed stress tests

and sensitivity analyses, in order to predict "expected losses" (as defined by FIN 46R).  *See* Aff.

Ex. 14 at 47, 86 (10-K filed Feb. 15, 2008).  As part of its audit of State Street's consolidated

---

[16]     Appendix A to FIN 46R is an "illustration of a computation of expected losses, expected residual returns, and expected variability" that "is intended to explain the meaning of those terms." Aff. Ex. 50 at 27 (FIN 46R).

[17]     In particular, these projections must be calculated in conformity with FASB Concepts Statement No. 7, Using Cash Flow Information and Present Value in Accounting Measurements, which requires calculations of discounted expected cash flows adjusted for market factors and other assumptions, and derived by identifying possible outcomes and assigning each possible outcome a probability weight.  See Aff. Ex. 50 at 9, 27-29 (FIN 46R); see generally Aff. Ex. 51 (FASB Concepts Statement No. 7).

[18]     Paragraph 8 of FIN 46R provides that expected losses are the "expected negative variability in the fair value of" a VIE's "assets exclusive of variable interests."  Aff. Ex 50 at 13.  Consistent with paragraph 2.b. of FIN 46R, expected losses are derived from the discounted cash flow method described above.

financial statements, Ernst & Young LLP, State Street's independent auditor, assessed State Street's process and conclusions with respect to determining the primary beneficiary of the conduits.[19]  *See, e.g.*, Aff. Ex. 14 at 44-48 (10-K filed Feb. 15, 2008).

Plaintiffs assume incorrectly that the unrealized, mark-to-market losses of the conduits (disclosed quarterly by State Street) are the same thing as "expected losses" under FIN 46R.  *See* Compl. ¶ 217.  Plaintiffs are incorrect because expected losses depend upon expected and possible cash flows and possible variations from expected cash flows (as derived and discounted by application of a model).  Unrealized losses due to changes in market value, however, would not cause any change in cash flows.  Absent default, the conduits would continue to receive the principal and interest due on their assets even as market values changed.

For all but the last five months of the class period, State Street reported its conclusion that it was not the primary beneficiary of the conduits under FIN 46R, and that it was not required to consolidate the conduits.  *See, e.g.*, Aff. Ex. 33 at 26 (8-K filed May 18, 2009).  It reached this conclusion because its "expected loss" analysis showed that holders of the "first loss notes" issued by the conduits (that were not held by State Street and that would absorb losses before State Street absorbed any) were exposed to a majority of the conduits' expected losses. *See, e.g.,* Aff. Ex. 25 at 60 (10-Q filed Nov. 5, 2008).

Nevertheless, in each quarter, State Street warned that consolidation *might* become necessary, and disclosed what would have been the impact of consolidation on its balance sheet and on its financial ratios, had consolidation occurred in that quarter.  *See, e.g.*, Aff. Ex. 31 at 19-

---

[19]     State Street disclosed its accounting for the conduits as one of its significant accounting estimates, which "by their nature, require management to make judgments, involving significant estimates or assumptions, about the effect of matters that are inherently uncertain."  *See* Aff. Ex. 14 at 44, 46-48 (10-K filed Feb. 15, 2008).  Ernst & Young assesses "the significant estimates made by management" in opining that State Street's financial statements fairly presented State Street's consolidated financial position.  *See id.* at 76 (also opining that State Street's financial statements were in conformity with GAAP).

20 (10-Q at May 4, 2009).  Effective May 15, 2009, State Street consolidated the conduits and recorded a loss of approximately $3.7 billion after-tax (roughly 2% of State Street's $153.42 billion in assets).  *See, e.g.*, Aff. Ex. 33 at 26 (8-K filed May 18, 2009).  As noted, if the assets are held to maturity as intended, State Street will recoup this accounting loss.  *See id.* at 5.[20]

## 2.     The High Quality Investment Portfolio Assets.

State Street maintains an investment portfolio composed of treasury bills and other government securities, asset-backed debt securities, mortgage-backed debt securities, corporate bonds, and municipal bonds.  *See, e.g.*, Aff. Ex. 14 at 51-53 (10-K filed Feb. 15, 2008).  State Street regularly disclosed detailed information concerning the size, risks, and composition of this portfolio.  Beginning with the first quarter of 2008, State Street made quarterly presentations about the asset portfolio.  *See e.g.*, Aff. Exs. 12, 18, 23  (quarterly slides).  These presentations included information concerning: (i) the size of the portfolio, (ii) the types of securities held, (iii) a breakdown of the securities by credit rating and type, (iv) the number of defaults, and (v) the number of credit downgrades.  These disclosures showed, among other things, that for the great majority of the class period, 93% or more of the securities held in the portfolio were rated AAA or AA (the number never fell below 79%), that there were no defaults until well into 2009 (at which time there were only seven), and that the percentage of securities held that were rated below investment grade never exceeded 8%.  *Id.*

State Street repeatedly disclosed that the investment portfolio's holdings included US RMBS, including some backed by subprime mortgages.  For example, the Form 10-Q filed on November 5, 2008 disclosed, among other things, that:

---

[20]     Since the consolidation, State Street has recorded over $1 billion in such recoupment.  Aff. Ex. 39 at 17 (10-Q filed Aug. 6, 2010) (total "discount accretion" post-consolidation of $1.01 billion at the end of the second fiscal quarter 2010).

(i)      the portfolio held approximately 9,350 securities and that a "majority of the portfolio is concentrated in high-grade asset-backed and mortgage-backed securities;"

(ii)      approximately 93% of the carrying value of the portfolio was rated AAA or AA;

(iii)      the mortgage-backed portfolio (US and foreign) constituted approximately 29.8% of the total portfolio asset value, and "98% of the mortgage-backed portfolio was rated AAA;"

(iv)      the portfolio included $5.5 billion of securities collateralized by first-lien sub-prime mortgages, compared to $6.2 billion on December 31, 2007;

(v)      of the approximately 250 securities backed by sub-prime mortgages, 57% were rated AAA and 34% were rated AA;

(vi)      credit enhancement on the sub-prime holdings averaged 44.5%; and

(vii)      the size of the portfolio's aggregate after-tax net unrealized loss ($3.28 billion), the extent to which it was associated with asset-backed securities ($2.09 billion), and (within the asset-backed category) the extent to which it related to sub-prime ($801 million) and student loan ($653 million) backed securities.  Aff. Ex. 25 at 26-29 (10-Q filed Nov. 5, 2008).[21]

As set forth below, State Street calculated and disclosed quarterly the extent of such "mark-to-market" unrealized losses, derived by comparing the market values of the portfolio securities to their purchase prices (par):

| Period Ended | Portfolio Size | Unrealized Loss (after tax) | % AAA or AA Rated | % of MBS Rated AAA or AA | Defaults | Sub-prime Exposure | Source |
|---|---|---|---|---|---|---|---|
| 12/31/2005 | $59.9B | $285M | 95% | -- | 0 | -- | 10-K at 35, Aff. 3 |
| 3/31/2006 | $60.7B | $429M | 94% | -- | 0 | -- | 10-Q at 7, 26, 30, Aff. 5 |
| 6/30/2006 | $60.4B | $498M | 95% | -- | 0 | -- | 10-Q at 8, 29, 33, Aff. 6 |
| 9/30/2006 | $66.4B | $246M | 95% | -- | 0 | -- | 10-Q at 8, 31, 35, Aff. 7 |
| 12/31/2006 | $65.4B | $227M | 94% | -- | 0 | -- | 10-K at 31, 43, 79, Aff. 8 |

---

[21]      State Street disclosed similar detail for other quarters. *See, e.g.*, Aff. Ex. 14 at 51-52 (10-K filed Feb. 15, 2008); Aff. Ex. 22 at 20-21 (10-Q filed Aug. 1, 2008); Aff. Ex. 29 at 61 (10-K filed Feb. 27, 2009); Aff. Ex. 31 at 24 (10-Q filed May 4, 2009).

| 3/31/2007 | $68.2B | $159M | 94% | -- | 0 | -- | 10-Q at 12, 32, 37, Aff. 9 |
|---|---|---|---|---|---|---|---|
| 6/30/2007 | $67.6B | $324M | 94% | -- | 0 | -- | 10-Q at 18, 35, 41, Aff. 10 |
| 9/30/2007 | $77.9B | $474M | 95% | -- | 0 | 8.50% | 10-Q at 15, 46, 52, Aff. Ex. 11 |
| 12/31/2007 | $75.7B | $678M | 95% | -- | 0 | 8.20% | 10-K at 36, 51-52, 92, Aff. Ex. 14 |
| 3/31/2008 | $75.4B | $1.94B | 94% | 100% | 0 | 7.80% | 10-Q at 18, 19, 42, Aff.17; 8-K filed June 2, 2008 at Ex. 99.1 at 1-2, Aff. 20 |
| 6/30/2008 | $75.0B | $2.01B | 93% | 100% | 0 | 7.60% | 10-Q at 12, 21, 45, Aff. 22; 8-K filed July 15, 2008 at Ex. 99.2 at 5-6, Aff. Ex. 23 |
| 9/30/2008 | $78.0B | $3.28B | 93% | 99% | 0 | 7.10% | 10-Q at 27-28, 54, Aff. 25; 8-K filed Oct. 15, 2008 at Ex. 99.3 at 5-6, Aff. Ex. 26 |
| 12/31/2008 | $76.6B | $6.32B | 89% | 92% | 0 | 7.60% | 10-K at 61, 94, Aff. 29; 8-K filed Jan. 20, 2009 at Ex. 99.3 at 5-6, Aff. Ex. 30 |
| 3/31/2009 | $77.5B | $5.85B | 84% | 82% | 0 | 7.40% | 10-Q at 24, Aff. 31; 8-K filed Apr. 21, 2009 at Ex. 99.3 at 4-5, Aff. Ex. 32 |
| 6/30/2009 | $86.7B | $4.75B | 79% | 71% | 7[22] | 6.30% | 10-Q at 27, Aff. Ex. 34; 8-K filed July 21, 2009 at Ex. 99.2 at 4-5, Aff. Ex. 35 |
| 9/30/2009 | $97.6B | $2.98B | 80% | 75% | 0 | 5.30% | 10-Q at 28, Aff. Ex. 36; 8-K filed Oct. 20, 2009 at Ex. 99.2 at 4-5, Aff. Ex. 37 |

In addition to these quantitative and qualitative disclosures, State Street also made numerous warnings about the risks associated with the portfolio. In every quarterly and annual filing during the class period, State Street warned investors that external market factors could impact the value of the portfolio. For example, State Street warned in early 2008 that the company's business is "affected by global economic conditions, . . . volatility and other developments in the financial markets," and that the current *market downturn could be accompanied by a widening of credit spreads or deterioration, which could reduce the value of*

---

[22]     As stated *supra* note 10, the payment obligations on seven securities held in State Street's conduits and investment portfolio were guaranteed by a financial guaranty insurance company that defaulted on its obligation. Throughout the class period, the only defaults that State Street suffered were a direct result of that company's restructuring. *See, e.g.*, Aff. Ex. 35 at Ex. 99.2 at 4 n.4 (8-K filed July 21, 2009). No other securities held by the portfolio defaulted. These defaults (all occurring after January 20, 2009) totaled about $100 million of the total asset value of $86.7 billion (about 0.1%). *Compare id. with* Aff. Ex. 30 at Ex. 99.2 at 4, Ex. 99.3 at 5 (8-K filed Jan. 20, 2009) (no defaults).

*the securities we hold in our investment portfolio.*"  Aff. Ex. 17 at 64 (10-Q filed May 9, 2008)

(emphasis added).

In June 2008, as the global economy worsened, State Street warned that deterioration in

credit quality or credit ratings of securities in the portfolio could cause other-than-temporary

impairment of the value of portfolio securities, "recognition of an impairment loss," or "other

adverse accounting consequences" if continuing "financial disruption" caused State Street to

"dispose of a portion of our investment portfolio."  *See* Aff. Ex. 20 at 2-4, 7-8 (8-K filed June 2,

2008) ("Our efforts to monitor and manage liquidity risk may not be successful or sufficient to

deal with dramatic or unanticipated changes in the global securities markets or other State Street

or market event-driven reductions in liquidity.").  On October 15, 2008, State Street warned that

market turmoil had reached "unprecedented levels in September and October 2008" and that this

turmoil presented risks to all "market participants, including State Street."  Aff. Ex. 26 at 3 (8-K

filed Oct. 15, 2008).  State Street made numerous other warnings about risks associated with its

portfolio at that time and thereafter.  *See, e.g., id.* at 3, 9-10; *see also* App. A.

In some of these same disclosures, State Street opined that the portfolio assets were of

high quality.  Just as with its similar conduit disclosures, these opinions were made coincident

with disclosures of consistent declines in the market value of portfolio securities.  Like the

similar conduit disclosures, these opinions addressed credit quality (not immunity from future

market value declines).  *See, e.g.*, Aff. Ex. 19 at 7 (Apr. 15, 2008 Earnings Conf. Call) ("Despite

the high credit quality of the investment portfolio, the illiquidity in the marketplace and resulting

prices affecting fixed income securities have caused the unrealized pretax loss on our portfolio to

increase. . .").; Aff. Ex. 27 at 3 (Oct. 15, 2008 Earnings Conf. Call) ("the assets in our investment

portfolio and asset-backed commercial paper program are of high quality.  Very few have been

downgraded and none are in default."); *id.* at 5 ("You will note that our entire portfolio remains

rated as it was in June, 84.4% AAA-rated and 8.7% AA-rated. We have had only minimal

downgrades, no defaults and all securities are current as to principal and interest.").

### 3.    The January 20, 2009 Announcement Was Consistent with Prior Disclosures.

On January 20, 2009, State Street reported that as of the end of the fourth quarter (on

December 31, 2008), unrealized portfolio and conduit losses had increased to $6.3 billion and

$3.6 billion respectively, up from $3.3 billion and $2.2 billion respectively at the end of the prior

quarter, and up from $474 million and $215 million in mid-2007.  *Compare* Aff. Ex. 11 at 35, 52

(10-Q filed Nov. 2, 2007) *with* Ex. 30 at Ex. 99.1 (8-K filed Jan. 20, 2009).

The decline over time in the market values of the conduit and portfolio securities (all or

mostly privately issued debt securities, respectively) was consistent with State Street's repeated

disclosures and warnings described above (and in App. A).  It also was well-correlated to an

array of systemic market disruptions, including the government takeover of Fannie Mae and

Freddie Mac, the failures of Bear Stearns and Lehman Brothers, and the government rescue of

Citigroup and AIG.  *See* Aff. Ex. 30 at Ex. 99.3 at 2 (8-K filed Jan. 20, 2009).[23]  As even the

truncated chronology of crisis events included in the Complaint makes clear, the credit crisis

accelerated in September and October 2008 (¶¶ 126-33).  The government's biggest response—

the Troubled Asset Relief Program—was not authorized until October 14, 2008 (¶ 133), and that

response hardly would have been made if the credit crisis was over.

---

[23]      The Court may judicially notice market events.  *See, e.g., Third Nat'l Bank in Nashville v. Impac Ltd., Inc.*, 432 U.S. 312, 317 (1977) (judicial notice of economic conditions, including downturns appropriate); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (judicial notice of "the [I]nternet bubble and its subsequent crash"); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (real estate market downturn); *Procacci v. Drexel Burnham Lambert, Inc.*, 1989 WL 121984 (E.D. Pa. Oct. 16, 1989) (market crash of October 1987); *Fatakia v. Hanna*, 716 F. Supp. 235, 236 n.1 (E.D. La. 1989) (same).

The Complaint contains no facts plausibly supporting its implicit conclusion that the decrease in market value of the portfolio or conduit assets during the fourth quarter of 2008 was caused by relative asset quality (as opposed to market forces generally applicable to privately issued debt securities of high quality). To the contrary, market data show that even short-term private debt of very high quality was highly volatile after October 15 and throughout the fourth quarter. *See* Aff. Ex. 61.A.[24]

Although the market value of debt securities held by the conduits and portfolio declined during this period (creating unrealized losses), the credit quality of these assets remained high, and State Street's basis for believing that it remained high was disclosed quarterly in elaborate detail. It bears repeating in this regard that these portfolios held over 10,000 securities, and that *none had defaulted as of January 2009. See supra* at 17-18. That is, virtually all of the securities held (99.9%) have paid all of the principal and interest due. *Id.*

## ARGUMENT

I.  **PLAINTIFFS DO NOT PLEAD FACTS SUFFICIENT TO ALLEGE A MATERIAL MISSTATEMENT OR SCIENTER**

Plaintiffs do not comply with Rules 8 or 9(b) of the Federal Rules of Civil Procedure, or with the Private Securities Litigation Reform Act of 1995 ("Reform Act"). Rule 8 requires Plaintiffs to plead facts sufficient to make their alleged conclusions "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008). Rule 9(b) and the Reform Act require that Plaintiffs: (i) identify the statements challenged; (ii) explain why each is materially false or misleading; (iii) provide a particular *factual* basis for their allegations of falsity and *scienter*; and (iv) show that,

---

[24]     This chart illustrates the difference over time between the yield of the highest-rated 30-day asset-backed domestic commercial paper as compared to the yield on 30-day U.S. treasuries. The commercial paper in question received the highest rating from at least two of S&P, Moody's, or Fitch (A1+, P1, F1+). The chart shows that investors continued to shy away from even the highest-rated short-term private debt well after State Street's October 15, 2008 announcement.

based on all of the facts in the record, the proposed inference of scienter is both cogent and at

least as compelling as any opposing inferences that may be drawn. Fed. R. Civ. P. 9(b); 15

U.S.C. § 78u-4(b)(1); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007);

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008).

Plaintiffs' Exchange Act claims are subject to the heightened pleading requirements of

the Reform Act and Rule 9(b) of the Federal Rules of Civil Procedure. *Greebel v. FTP Software,*

*Inc.*, 194 F.3d 185, 193 (1st Cir. 1999).  The Securities Act claims sound in fraud, and also are

subject to Rule 9(b).  *See infra* at III.D.

## II.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT.

### A.  The FX Allegations Do Not State A Claim.

#### 1.  The Complaint Does Not Identify a False Statement Concerning FX.

Plaintiffs challenge a series of bland and nearly identical statements: (a) disclosing

trading services revenues and FX revenues during particular periods; (b) reflecting that three

factors influence FX revenues (volume and type of customer transactions, rate volatility and risk

management); and (c) stating that State Street's management reviews its responsibilities to

custody clients and "considers the results in preparing" its financial statements.  *See, e.g.*, Compl.

¶¶ 245-47.  They claim these statements were misleading because State Street's FX business

practices as described in the Relator's complaints (and as adopted by Plaintiffs) led to material

inflation of State Street's financial statements, and because State Street allegedly lacked

adequate internal controls.  *See, e.g., id.* ¶ 251.  The viability of these claims depends upon the

adequacy of Plaintiffs' allegations that (i) State Street indeed had a fraudulent business practice;

and (ii) the alleged fraud materially affected State Street's financial results.  Because the

Plaintiffs have not pleaded particular or plausible allegations in either respect, they fail to state

claim.

a)      **The Complaint Lacks Sufficient Facts to Support Plaintiffs'**
        **Conclusion of FX Pricing Fraud.**

To state a fraud claim, Plaintiffs must plead factual allegations, including the sources for

allegations that obviously are pleaded on information and belief (*i.e.,* all of the FX allegations

other than those expressly attributed to confidential witnesses).  *Greebel*, 194 F.3d at 194.

Plaintiffs must do more than parrot allegations from other complaints.  Allegations in complaints

in other matters—even complaints filed by regulators—are accorded no weight.  *See RSM Prod.*

*Corp. v. Friedman,* 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (such allegations immaterial as a

matter of law); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008)

(dismissing claims that relied on complaint filed by SEC); *Caifa v. Sea Containers, Ltd.*, 525 F.

Supp. 2d 398, 411 (S.D.N.Y. 2007); *In re Merrill Lynch & Co., Inc. Research Reports Sec.*

*Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (striking references to SEC and NASD complaints).[25]

Plaintiffs plead nothing of consequence beyond recycled allegations of others.  *See supra* at 4-5.

This alone mandates dismissal.

The complaint must "describe[] the documentary or personal sources on which it relies

with enough detail for a court to determine whether the plaintiff has 'an adequate basis for

believing that defendants' statements were false.'"  *In re IAC/InterActiveCorp Sec. Litig.*, 478 F.

Supp. 2d 574, 592 (S.D.N.Y. 2007) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.

---

[25]     *See also Muth v. Dechert, Price & Rhoads*, 391 F. Supp. 935, 938 (E.D. Pa. 1975) (granting motion to dismiss third-party complaints for failure to state a claim, where complaints improperly incorporated by reference pleadings in another case, even though cases were related); *In re Karagianis*, 2009 WL 4738188, at *5 (Bkrtcy. D.N.H. Dec. 4, 2009) (dismissing claim pursuant to Rule 12(b)(6) because plaintiff's "[a]ggregating summaries of several third party complaints and incorporating them by reference is simply insufficient"); *Dent v. U.S. Tennis Ass'n, Inc.*, 2008 WL 2483288, at *3 (E.D.N.Y. June 17, 2008) (Pohorelsky, M.J.) ("[C]ourts have stricken allegations in complaints referring to investigations of allegations of wrongdoing, even when conducted by governmental agencies." (citing *In re Merrill Lynch*, 218 F.R.D. at 79); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (court may take judicial notice of a document filed in another court only to establish "the fact of such litigation," and "not for the truth of the matters asserted in the other litigation") (internal quotation marks omitted); *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 222 n.13 (S.D.N.Y. 2008) (In deciding a Rule 12(b)(6) motion, "a court may not take judicial notice of proceedings in another case for the truth of the matters asserted in the other litigation." (internal quotation marks omitted)).

2000)).  Whether information attributed to confidential witnesses is adequately pleaded depends

upon the "level of detail provided by the confidential sources, the corroborative nature of the

other facts alleged (including from other sources), the coherence and plausibility of the

allegations, the number of sources, the reliability of the sources, and similar indicia." *N.J.*

*Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008)

(internal quotation marks omitted).  Plaintiffs' reference to the Relator's complaints violates

these principles because neither the Relator nor the Relator's sources are identified by name,

title, or capacity, leaving the Court without any basis to determine how, whether, when, or with

respect to what period the sources obtained personal knowledge of the information pleaded.

    In addition to being not particular, the Relator's fraud theory also is implausible.  *See*

*Twombly*, 550 U.S. at 570.  Plaintiffs ignore that the AG (who conducted an investigation before

intervening with his own complaint (*e.g.,* Compl. ¶¶ 7, 50 n.3)) *did not adopt the Relator's*

*theory* and instead pleaded a contract-based theory that is inconsistent with the Relator's (or

Plaintiffs') theory, and inconsistent with fraud.  *See supra* at 4-5.  The AG has alleged that RFP-

response language incorporated by reference into custody contracts with CalPERS and CalSTRS

in 2001 required State Street to price FX transactions *at or equal to* an "Interbank Rate."  AG

Compl. ¶ 30.  This misinterprets the RFP responses, which state that State Street priced FX

transactions "based on" an interbank rate, not "at or equal to" that rate.  Compl. ¶ 42; AG Compl.

¶ 23.  The AG admits that State Street "derived" the FX rates it charged (and accurately reported

to clients) "by taking the Interbank Rate at the times the trades were executed" and adding a

markup.  AG Comp. ¶¶ 28, 35.  This states no claim even for breach of contract because such

rates—admittedly "derived" from interbank rates—in fact *are* "based on" interbank rates.[26]

Where A + B = C, then C is based on A.

A quarrel over a contract—like the AG complaint—is no basis to assert fraud.  *See, e.g., Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1477 (9th Cir. 1996) (disputed interpretation of imprecise language not false under federal False Claims Act); *U.S. ex. Rel. Englund v. L.A. Cnty.*, 2006 WL 3097941, at *10-11 (E.D. Cal. 2006); *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.,* 785 F. Supp. 411, 423 (S.D.N.Y. 1992) ("failing to disclose a breach of promise" to price FX at interbank rate "does not transform a contract action into one for fraud").[27]

In any event, the AG's contract theory is so strained that State Street should not reasonably have anticipated it.  Neither should State Street have concluded that it was improper to price FX transactions in the manner alleged by the AG.  There generally is no duty to disclose the extent of any markup on an FX transaction. "Money is just a commodity in an international market."  *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001) ("Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars.  This is true in financial markets no less than markets for physical goods." )  Thus, where a customer "was told how many dollars . . . would result in how many pesos," nothing "in this transaction smacks of fraud . . . ."[28]  *Id.*

---

[26]      A "base" is the primary *part* of a larger whole or the starting point of a calculation.  *See The American Heritage College Dictionary*, 117 (4th ed. 2004) (a "base" is "a fundamental ingredient" or "the fact, observation or premise from which a reasoning process is *begun*") (emphasis added); *Merriam Webster's Collegiate Dictionary*, 94 (10th ed. 2000) ("a main *ingredient*," "the fundamental *part* of something," "the starting point or line for an action or undertaking") (emphasis added); *Webster's Third New Int'l Dictionary (Unabridged)*, 180 (1993) ("the fundamental *part* of something," "the point or line from which a *start* is made in an action or undertaking") (emphasis added).

[27]      *See also Bos. Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 545 N.E.2d 1156, 1160 (Mass. 1989) (incorrect interpretation of an insurance contract did not amount to deceptive act).

[28]      Accordingly, Plaintiffs' citation to an email in which a State Street employee speculates that others at State Street would hesitate to reveal State Street's profit margins (Compl. ¶ 60) does not admit fraud or impropriety.

Plaintiffs' so-called "confidential witnesses" ("CWs") add no consequential facts to the Complaint. *See* Compl. ¶¶ 62-66. Some of them (CW2 and CW5) did not work at State Street during the class period. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, --- F. Supp. 2d ----, 2010 WL 2834226, at *11 (S.D.N.Y. Jul. 19, 2010) (CWs irrelevant unless in a position to know of challenged conduct). CW1 is claimed to have said nothing of consequence (alleging that State Street held off-site management conferences including discussion of FX strategy, and that unidentified colleagues spoke "openly" about how easy it was to profit from indirect FX transactions).[29] Compl. ¶¶ 62, 64. The same is true of CW3, whose knowledge appears limited to rumor and water cooler hearsay. *Compare id.* ¶ 64 (CW3 "heard talk of shady practices" and "controversy" that "managers tried to keep 'hushed'") *with Cal. Pub. Emps. Ret. Sys. v. Chubb Corp*, 394 F.3d 126, 148 (3d Cir. 2004) (rejecting reliance on rumor) *and In re Vertex Pharms., Inc., Sec. Litig.*, 357 F. Supp. 2d 343, 353-54 (D. Mass. 2005) (rejecting allegations generally attributed to some or all employees, or based on generalized knowledge attributed to all employees). CW4 (who claims to have fielded inquiries about discrepancies between the rates charged and what the client's portfolio manager said it was expecting) cannot be talking about indirect FX trading (the only kind of FX challenged as fraudulent) because a fundamental premise of Plaintiffs' challenge to State Street's indirect FX pricing is that the portfolio manager does not know the price to begin with.[30]

---

Instead, it is unremarkable that a business would hesitate to reveal information about its internal pricing structure that it has no obligation to reveal.

[29] Tellingly, although CW1 by title is the most senior person alleged to have provided any information to plaintiffs, he is *not* alleged to have corroborated Plaintiffs' theory of FX pricing fraud.

[30] The Complaint also refers to an "AG source" (¶ 50, n.3), alleged to have been "involved" somehow in the California AG's investigation, but provides no information about who that person is, in what capacity or manner he or she was 'involved' in the investigation, or any reason to believe that the AG source is anyone other than the Relator's counsel. If the Relator's counsel is the AG source, it is no more sufficient for Plaintiffs to rely upon a conversation with him than it is to rely on his superseded complaint. *See supra* at n.25. It is worth noting, in this regard, that the allegations attributed to the AG source are very similar to those of the Relator's amended complaint, *compare* Compl. ¶ 56 *with* Rel. Am. Compl. ¶¶ 39-42, and markedly different from those advanced by the AG after investigation. *Compare* AG Compl. at ¶ 35 (alleging that State Street applied markups to the Interbank Rate "at the

2.      **The Complaint's FX Materiality Allegations Are Fatally Speculative.**

The amount State Street allegedly overcharged CalPERS and CalSTRS is obviously immaterial.  The AG alleged that State Street overcharged CalSTRS and CalPERS by $56 million over eight years (*i.e.*, an average of $7 million per year).  During this period, State Street had revenue of nearly $49 *billion.*  Annual revenue during the period ranged from approximately $3.8 billion to nearly $10.7 billion.  *See* Aff. Ex. 38 at 31 (10-K filed Feb. 22, 2010); Aff. Ex. 2 at 10 (10-K filed Feb. 18, 2005).  This alleged overcharge—of about 0.11%—is immaterial as a matter of law.  *Compare Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206, 206 n.18 (1st Cir. 1999) (possible overstatement of between 1.1-4.2% inactionable); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir. 1996) (omitted information was "a minor drop" of between 3% and 9% of actual revenue and thus immaterial as a matter of law); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997) (overstatement of total assets of 2% was immaterial as a matter of law); *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 170-71 (D. Mass. 2000) (overstatement of revenues by 2.6% immaterial as a matter of law); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161-62 (S.D.N.Y. 2003) (overstatement of total revenues of approximately 0.3% immaterial as a matter of law).

Apparently recognizing that this amount is immaterial, Plaintiffs posit that *all of* State Street's FX revenue was overstated by at least 30% in every quarter during the class period.  Compl. ¶¶ 71-75.  This is pure speculation.  Plaintiffs rely on at least four factually unsupported conclusions: (i) that all of State Street's custody contracts are like the contracts with CalPERS and CalSTRS; (ii) that State Street changed its pricing methodology for indirect FX in response

---

time" of execution).  Plaintiffs do not allege that the basis for the information "confirmed" to them and set forth in paragraph 56 was State Street, as opposed to the Relator's counsel or some other source rejected by the AG after investigation.

to the AG Complaint; (iii) that a significant part of the decline in reported FX revenue for the fourth quarter of 2009 was caused by this change in pricing; and (iv) that State Street FX revenue in prior quarters must have been inflated at least by a percentage equal to about half of the percentage decline in the fourth quarter.  Plaintiffs string of unsupported speculation is *per se* insufficient.  *See Twombly*, 550 U.S. at 570.

*First,* there is nothing in the Complaint to suggest that all, most or how many State Street custody clients had the same FX-related contract language as CalPERS and CalSTRS.  Thus, Plaintiffs have no factual basis to claim that State Street improperly recorded FX revenue relating to any of its other customers.  *See, e.g., City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 946 (S.D. Ind. 2005) ( "The existence of the CAG investigation alone does not establish systemic nationwide misconduct any more than plaintiff's insufficient allegations based on confidential witnesses").[31]  *Second,* there is no pleaded (or logical) basis to conclude that State Street priced FX transactions differently in response to the AG Complaint, or that the decline in FX revenue in the fourth quarter of 2009 was caused by such a change.[32]  *See* Compl. ¶ 71.  To the contrary, reported FX revenue in every quarter of 2009 (compared to the same quarter in the prior year) declined markedly, including in the three quarters prior to the filing of the AG Complaint (*e.g.*, by 41% in the third quarter).[33]  Moreover, Plaintiffs concede

---

[31]     The conclusion that State Street's contracts with customers are not all the same is consistent with the AG's decision *not to intervene* to pursue claims on behalf of California public pension funds other than CalPERS and CalSTRS.  The Relator's Amended Complaint sought to bring the same claims on behalf of twelve other state pension funds. Rel. Am. Compl. ¶¶ 15-28.  The AG did not intervene to assert those claims.  *See generally* AG Compl.  Plaintiffs also ignore the decision of the District of Columbia's AG not to intervene to pursue similar claims.  *D.C. ex rel. v. State St. Corp.*, 2009 CA 000176 A (D.C. Super. Ct. June 21-22, 2010) (order voluntarily dismissing claims).

[32]     State Street's warning that increased disclosures concerning FX pricing and alternatives *might* over time have an adverse revenue impact (¶ 73), did not suggest that any change had been made or any impact had already been felt.

[33]     State Street recorded percentage declines compared to the same quarter of the prior year for the first three quarters of 2009 of 28%, 16% and 41%—all prior to the disclosure of the AG Complaint in October 2009.  Aff. Ex. 31 at 10 (10-Q filed May 4, 2009); Aff. Ex. 34 at 13 (10-Q filed Aug. 10, 2009); Aff. Ex. 36 at 11 (10-Q filed Nov. 6, 2009).

that they have no way of knowing how indirect FX pricing impacted State Street's revenues at any time. *Id.* ¶ 74. Thus, this part of Plaintiffs' theory is both implausible and *admittedly* speculative. *Third*, Plaintiffs' arithmetic makes no sense. The claim that a fourth quarter 2009 decline in FX revenue of 56% necessarily means that FX revenue in all prior quarters must have been overstated by at least 30% is obviously a wild guess.

### B.    Challenged Statements Concerning Internal Controls Are Not Actionable.

Plaintiffs' related challenge to State Street's statements about its disclosure controls and internal controls over financial reporting (*id.* ¶¶ 235-37, 249-51, 258-60, 268-70, 278-80, 291-93, 301-303, 311-13, 327-29, 340-42, 347-49, 355-57) also fails. *First*, Plaintiffs' assertion that the alleged FX fraud rendered State Street's certifications about adequate internal controls false (¶¶ 76-82) states no claim because the Complaint does not adequately plead a fraudulent FX business practice or any material impact from one. *See supra* at II.A. *Second*, generalized allegations about the adequacy of internal controls—such as those advanced here—simply do not state a claim. *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19-20 (D. Mass. 2004) (Young, J.) ("Internal controls allegations are frequently dismissed, even when a corporation's executives knew that internal controls were inadequate.").[34] Plaintiffs' attack on unidentified "risk controls" —based on the assertion that they lagged "widely accepted" industry practices—fails for this reason. *Compare id. with* Compl. ¶¶ 76-77. *Third*, Plaintiffs' citation to a vague "expert" opinion is no substitute for a *factual* basis for a claim.[35] *Compare* Compl. ¶¶ 79-82 (opinion that State Street "did not conform to minimal acceptable standards for custody foreign exchange trades") *with Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006)

---

[34]        *See also In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 161 (D. Mass. 2009) (Tauro, J.) (generalized statements regarding integrity, risk management, and fiscal discipline are not actionable).
[35]        The opinion that State Street failed to meet "acceptable standards *for custody foreign exchange trades*" is irrelevant (in addition to being vague and context free) because Plaintiffs do not challenge any disclosures concerning controls over FX trading. It also assumes the truth of baseless allegations about State Street's practices.

("opinions cannot substitute for facts under" the Reform Act).[36] *Fourth*, Plaintiffs' two

anonymous witnesses are no more specific (or persuasive) than the so-called expert. *See* Compl.

¶¶ 77-78.

### C. The Complaint Fails to State a Claim Concerning State Street's Conduits and Investment Portfolio.

Plaintiffs claim that State Street misled investors by opining that the securities held in the

conduits and portfolio were of high quality. Compl. ¶¶ 3, 14-20, 84, 92-106, 134-42, 151, 159,

180-81, 320, 323, 457-48. In this regard, they focus principally on statements made in an

October 15, 2008 Form 8-K and conference call, ¶¶ 136, 318 ("the asset quality of both our

investment portfolio and the conduits remains high"); ¶¶ 137, 320 (holdings "are of high quality"

as a result of "strong credit discipline"), and in a November 10, 2008 Form 8-K. ¶¶ 142, 322

(conduits have "strong overall asset quality" and that the portfolio "remains of high quality and

well diversified"). Plaintiffs also challenge statements that State Street *never made*, such as that

the conduit and portfolio holdings "posed little risk" to State Street (¶¶ 134, 138) or that

consolidation of the conduits "would not be required" (¶ 139).

Plaintiffs claim that all of the challenged statements were false because the conduit and

portfolio holdings "were not high quality" and were suffering losses. *Id.* ¶ 323. They fail to

state a claim because State Street had a well disclosed and reasonable basis for the opinions it did

express, and Plaintiffs have no basis to allege that those opinions were not genuinely believed.

Declines in market value within the conduits and portfolio were well disclosed, and the risk of

---

[36]     "[A]llowing plaintiffs to rely on an expert's opinion in order to state securities claims requires a court to confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage. In addition, considering such opinions might require ruling on the expert's qualifications. This would be inappropriate at the pleading stage." *Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) (internal quotation marks and citations omitted)); *see also Meeks v. Murphy Auto Grp., Inc.*, 2009 WL 3669638, at *1 (M.D. Fla. Oct. 30, 2009) (McCoun III, M.J.) (unnecessary and inappropriate to consider expert affidavits in deciding motion to dismiss). The court's concern in *Blackwell* that consideration of expert opinions "might require ruling on the expert's qualifications" is well-founded. For instance, while Plaintiffs suggest that their "expert" has a Ph.D., his web site confirms that he holds only an *honorary* doctoral degree.

future losses as a result of the continuing global credit crisis was both obvious to all investors and well disclosed.  *See, e.g.*, App. A.

### 1.    State Street Did Not Assert that the Conduits "Posed Little Risk" or that Consolidation "Would Not Be Required."

Plaintiffs claim incorrectly that State Street's CFO said on October 15, 2008 that "State Street would not be required to consolidate the conduits."  *See* Compl. ¶ 139.  Indeed, Plaintiffs' purported quotation *in the same paragraph of the Complaint* makes clear that he said nothing of the sort.  *Id.* ("We do not *currently believe* we need to consolidate the conduits.") (emphasis added).  Moreover, State Street's 8-K filed the same day, far from assuring that consolidation would not occur, set forth the impact on State Street's capital ratios that would have occurred at the end of the third quarter if consolidation had occurred, and warned that consolidation might become necessary.  Aff. Ex. 26 at 11, Ex. 99.4 at 10 (8-K filed Oct. 15, 2008).

Plaintiffs also assert that State Street's CEO "assured investors that the market disruptions … posed little risk to State Street."  *See* Compl. ¶ 138.  But the actual challenged statement makes no reference to "risk," much less an assurance about the absence of risks.  *See id.* (quoting statement).  Instead, State Street said that despite the financial turmoil the company had achieved strong financial results in the first three quarters of the year, and reaffirmed its expectation that it would meet its previously disclosed financial goals for the year.  *Id.*  This is not a warranty that State Street was not subject to market risk;[37] and Plaintiffs' implausible reading is flatly contradicted by State Street's warning, made that same day, that market turmoil

---

[37]        An accurate statement about past results implies nothing about future results.  *In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054 (N.D. Cal. 1999); *see Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) ("[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy, . . . and optimistic predictions about the future that prove to be off the mark are immunized unless plaintiffs meet their burden of demonstrating intentional deception . . . ."  (quoting *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir. 1994)).

had reached "unprecedented levels in September and October 2008," presenting risks to all

"market participants, including State Street."  *See* Aff. Ex. 26 at 3 (8-K filed Oct. 15, 2008).

> **2.     State Street's Opinion Concerning the "High Quality" of Conduit and
> Portfolio Holdings Does Not State a Claim.**

Plaintiffs' claim that they were misled by State Street's opinion about the high quality of

the conduit and portfolio assets fails to state a claim because they ignore the extensive

disclosures that State Street made about asset quality, and because the opinion is inactionable

under *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083 (1991).

> **a)     State Street Made Ample Disclosures Concerning the Quality
> of Conduit and Portfolio Holdings.**

Plaintiffs' challenge to State Street's opinion about asset quality ignores the wealth of

information State Street provided to investors on that subject.  Statements must be considered not

in isolation, but rather in the context of all of the relevant disclosures.  *See, e.g., In re Healthco

Int'l, Inc. Sec. Litig.*, 777 F. Supp. 109, 115-16 (D. Mass. 1991) (reviewing challenged statement

in light of the entire record).[38]  Thus, Plaintiffs do not state a claim.

In context, State Street's disclosures about the portfolios' assets addressed their credit

quality (*i.e.*, the risk of non-payment or default), and explained in great detail why the company

believed that these assets were of high quality.  With respect to US RMBS and all other asset

categories, State Street provided a breakdown of the portfolios' assets by type, third party credit

rating (which addresses likelihood of repayment as opposed to market risk), type of security

(*e.g.,* RMBS), the credit characteristics of the obligation underlying the asset (*e.g.,* FICO scores),

actual default experience (essentially none), the extent of default experience considered possible

during times of market stress, and a variety of other information that was more than adequate to

---

[38]     *See also Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 649 (S.D.N.Y. 2001)
(dismissing securities fraud claim because, "[w]hen read in connection with the rest of the [filing]," challenged
statements "could not have misled a reasonable shareholder").

permit investors to evaluate the likelihood of credit defaults (which virtually never occurred). *See supra* at 16-21.

Plaintiffs nevertheless claim that State Street's opinion about asset quality, even in light of all of the information supporting it, was misleading because State Street did not disclose a list of the 10,000 securities held in the portfolios. *See, e.g.*, Compl. ¶ 135. This makes no sense. Plaintiffs cite no rule that required State Street to supply a list. Nor could they. Disclosing some information on a subject does not create a duty to disclose all information on that subject. *See Cooperman v. Individual, Inc.*, 171 F.3d 43, 51 (1st Cir. 1999) (citing *Backman v. Polaroid Corp.*, 910 F.2d 10 16 (1st Cir. 1990) (en banc)). Moreover, Plaintiffs acknowledge that they do not know what would have been on the list. Thus, at best, they can only speculate that disclosing a list would have made any difference to investors.

In contrast, courts have repeatedly emphasized that more information is not always better (or required), and that companies should not bury investors in an avalanche of detail. *See, e.g., TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 448-49 (1976) ("[I]f the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information, a result that is hardly conducive to informed decision-making."); *Glassman*, 90 F.3d at 633 (management must make judgments about how to convey important facts and risks without obscuring them in an avalanche of detail).[39]

---

[39]     *See also Zirn v. VLI Corp.*, 1995 WL 362616, at *4 (Del. Ch. Jun. 12, 1995) (noting "the fallacy that increasingly detailed disclosure is always material and beneficial disclosure"), *aff'd* 681 A.2d 1050 (Del. 1996).

      **b)**       **State Street Did Not Imply That No Further Market Value Declines Would Occur.**

State Street's disclosures concerning asset quality did not suggest that the market value of the assets were immune to further decline. These opinions were—at the same time or in the same breath—accompanied by disclosures detailing the extent to which the market value of the assets had already decreased during the prior quarter and year. Thus, a reasonable investor would have understood that the quality of the assets had not prevented (and, thus, would not prevent) further declines.

The context immediately surrounding the portion of the October 15, 2008 statement that Plaintiffs challenge makes this point clearly. State Street said:

> Due to unprecedented market illiquidity in the third quarter, the unrealized after-tax mark-to-market losses at quarter-end on State Street's investment portfolio have increased to $3.3 billion and in the asset-backed commercial paper conduits to $2.1 billion. However, as we have said in the past, the asset quality of both our investment portfolio and the conduit program remains high.

Aff. Ex. 26 at Ex. 99.1 at 2 (8-K filed Oct. 15, 2008). In opining that asset quality "remains high" (*i.e.,* that it was and is high), State Street made clear that the quality of the assets had not prevented billions of dollars of market value declines. Thus, the opinion cannot reasonably be seen as any assurance that there would be no further market declines.

Of course, this was not the first time that State Street addressed asset quality in the context of increasing unrealized losses in the portfolio and conduits. By October 2008, State Street had been opining that these assets were of high quality for at least a year—during which conduit unrealized losses were disclosed to have increased *tenfold* from $215 million to $2.14 billion, and portfolio unrealized losses had increased more than *six times*, from $513 million to

as high as $3.28 billion.[40]  *See supra* at 9, 17-18.  Accordingly, these repeated comments regarding credit quality did not suggest that there would be no further changes in market value during the credit crisis—a time of "unprecedented market illiquidity" (*i.e.,* a time when investors generally were unwilling to buy securities of this sort).

In addition, although it was obvious, State Street warned in October 2008 that market volatility (*i.e.*, changes in market prices) had been severe in the recent past, and that State Street and all market participants were subject to the risk that such volatility would continue.  *See* Aff. Ex. 26 at 3 (8-K filed Oct. 15, 2008).  Over time, State Street also made a variety of other warnings about the conduits and portfolio.  *See* App A.  Because these warnings "relate directly" to what Plaintiffs claim misled them, they render State Street's statements about asset quality inactionable as a matter of law.  *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir. 1996), *abrogated on other grounds by* 15 U.S.C. § 78u-4(b)(2) ("bespeaks caution" doctrine applies to projections "accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference"); *accord Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 979 (1st Cir. 1991); *Glassman*, 90 F.3d at 635; *In re Amdocs Ltd. Sec. Litig.*, 390 F.3d 542, 548 (8th Cir. 2004) (per curiam).

---

[40]      *Compare* Charts *supra* at 9, 17-18 *with* Aff. Ex. 13 at 4, 10, 11 (Oct. 16, 2007 Earnings Conf. Call) (referring to "high quality assets," "high asset quality" and "high quality of our assets versus the peer group"); Aff. Ex. 16 at 3 (Jan. 15, 2008 Earnings Conf. Call) (referring to "high quality assets"); Aff. Ex. 19 at 7, 10 (Apr. 15, 2008 Earnings Conf. Call) (referring to "high credit quality of the investment portfolio," and stating, "We firmly believe these [assets held by the conduits] are high-quality assets and . . . expect them to mature at par."); Aff. Ex. 24 at 8 (July 15, 2008 Earnings Conf. Call) (referring to "high quality of the assets" held by the conduits).  State Street also regularly provided data comparing the asset quality of its conduits to that of its peers, each time showing that the State Street conduit asset quality was much superior, *see, e.g.*, Aff. Ex. 12 at Ex. 99.2 at 1 (8-K filed Oct. 16, 2007); Aff. Ex. 15 at Ex. 99.2 at 2 (8-K filed Jan. 15, 2008); Aff. Ex. 18 at Ex. 99.2 at 2 (8-K filed Apr. 15, 2008); Aff. Ex. 23 at Ex. 99.2 at 2 (8-K filed Jul. 15, 2008); Aff. Ex. 26 at Ex. 99.4 at 2 (8-K filed Oct. 15, 2008), and disclosing the high proportion of portfolio assets that had high credit ratings.  *See* Chart *supra* at 17-18.  Mr. Logue's challenged statement ("as we have said in the past . . .") referred back to these prior statements.

### c) The Asset Quality Opinion Is Inactionable Because it Was Honestly Held and Reasonably Based.

State Street's opinion about the asset quality of the conduits and portfolio is inactionable as a matter of law. Its opinions that the portfolios' assets were of "high quality" were statements of "reasons, opinion, or belief." *Virginia Bankshares*, 501 U.S. at 1088 (descriptions of merger proposal as opportunity to achieve "high" value and "fair" price were statements of "reasons, opinion, or belief"). Under *Virginia Bankshares*, such statements are actionable only when they are not genuinely held *and* lack a reasonable basis. *Id.* at 1095-96; *In re Credit Suisse First Bos. Corp.*, 431 F. 3d 36, 47 (1st Cir. 2005) (overruled on other grounds); *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 193 (S.D.N.Y. 2006) (under *Virginia Bankshares*, "statements of opinion are actionable only to the extent that they are not honestly held"). "The stated opinion must not only be *subjectively false*—the speaker did not believe it—but also *objectively false* as well—that is, there existed provable facts that conflicted with or contradicted the opinion." *In re Credit Suisse First Bos. Corp.*, 2005 WL 852455, at *5 (D. Mass. Mar. 31, 2005) (emphasis added).

Plaintiffs do not even allege that the challenged opinions about asset quality were not genuinely held. *Compare* Compl. ¶ 84. Thus, Plaintiffs do not state a claim.[41] *See, e.g.*, *Stumpf v. Garvey*, 2005 WL 2127674, at *15 (D.N.H. Sept. 2, 2005) ("[F]atal flaw . . . is that plaintiffs have failed to plead facts showing that either [executive] did not believe the recommendations and other statements in the reports at the time they were made."); *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004) (plaintiffs may not challenge opinions on the grounds that they are "unreasonable, irrational, excessively optimistic, not borne out by

---

[41]     This is the plain import of *Virginia Bankshares*. 501 U.S. at 1108-09 (Scalia, J., concurring) ("As I understand the Court's opinion, the statement, 'In the opinion of the directors, this is a high value for the shares' . . . would not produce liability if in fact it was not a high value but the directors honestly believed otherwise . . . . I agree with all of this.").

subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held").

Plaintiffs have also failed to plead facts showing that the opinions at issue were objectively false (*i.e.*, that they lacked a reasonable basis in fact).[42]  *See Virginia Bankshares*, 501 U.S. at 1095-96.  It is plain that State Street *disclosed* a reasonable basis for its opinions that the securities were of high quality, including: (i) that a significant majority of the securities held in State Street's conduits and portfolio received the highest ratings issued by Standard & Poor's and Moody's; (ii) that through the first quarter of 2009, none of the conduits' securities (698 securities) nor the investment portfolio's securities (about 9,260 securities) were in default (*see* Aff. Ex. 32 at Ex. 99.2 at 4-5 (8-K filed Apr. 21, 2009); Aff. Ex. 31 at 23-24 (10-Q filed May 4, 2009)); (iii) that the US RMBS holdings were backed by mortgages issued to borrowers with FICO scores in the 700s, loan-to-value ratios below 80%, extensive mortgage insurance, and other disclosed and favorable qualities,[43] and (iv) that the conduits' ratings were much higher than those of conduits sponsored by peer banks.  *See supra* at 8-13.[44]

Plaintiffs' references to confidential witnesses (Compl. ¶¶ 161-67) do not show objective falsity.  CW8 supposedly "raised issues concerning State Street's Conduits," specifically about holdings of "subprime loans."  *Id.* ¶ 162-63.  But, according to State Street's disclosures Plaintiffs do not challenge, the conduits did not have material exposure to subprime loans.  *See, e.g.*, Aff. Ex. 30 at Ex. 99.2 at 14 (8-K filed Jan. 20, 2009).  Moreover, whatever "issues" CW8

---

[42]    For starters, a statement of opinion cannot become misleading just because it may later turn out to be wrong.  *In re Credit Suisse First Bos. Corp.*, 431 F.3d 36, 52-53 (1st Cir. 2005).  For this reason, Plaintiffs' citations to events months after the challenged statements (*e.g.*, Compl. ¶¶ 360-61) are probative of nothing.

[43]    Plaintiffs attempt to cast aspersion on securities backed by "Alt-A" loans because "such loans typically have high loan-to-value ratios."  Compl. ¶ 87.  They ignore that State Street disclosed that the conduits held Alt-A loans and that those loans had weighted average loan-to-value ratios of well below 80%.

[44]    Plaintiffs' assertion that credit ratings are unreliable (Compl. ¶¶ 182-86) does not alter the result.  Credit ratings were just one of the many data points indicative of asset quality.  In any event, although Plaintiffs generally attack credit ratings and credit rating agencies, they do not allege that any of the credit ratings applicable to any actual conduit or portfolio holdings were incorrect.

raised (and their supposed severity) are left to the imagination.  CW8 also allegedly believed that "many" conduit assets were of poor quality, but *how many* of the $28 billion of such assets also is left unsaid.  This too does not advance Plaintiffs' claim.[45]

Plaintiffs' inconsistent speculation about the portfolios' US RMBS holdings, and about the cause of the decrease in the market value of the portfolios' assets in the fourth quarter of 2008, also is insufficient to cast any doubt upon the *disclosed* reasonable basis for State Street's asset quality opinion.  On the one hand, Plaintiffs express doubt about the extent to which the decrease in the market value of the portfolios' securities was caused by the impact of the market on US RMBS.  Compl. ¶¶ 154-56.  On the other, a central and inconsistent theme of the Complaint is the assertion that undisclosed facts about the portfolios' US RMBS holdings concealed the extent to which their market value might decline in that quarter.  *See, e.g., id.* ¶¶ 134-42.  Neither thrust draws blood.

Plaintiffs can base no plausible inference concerning these portfolios on the Bloomberg/Bear Stearns AAA Home Equity Adjustables Index ("B/B Index"), which is not fairly comparable to the conduit or portfolio assets.  *Compare id.* ¶¶ 154-56.  That index includes only AAA-rated US RMBS.  App. Ex. 61.B (ratings of index members).  The US RMBS holdings of the conduits at that time, however, were only 72% rated AAA at the end of the third quarter 2008; US RMBS comprised only 14% of the conduit portfolio value; and US RMBS made up only 27.6% of the total RMBS in the conduit portfolio (the rest was from outside the US).  *See* Aff. Ex. 26 at Ex. 99.4 at 8, 12 (8-K filed Oct. 15, 2008).

---

[45]     CW1 claims only to have "heard" (i.e., unreliable hearsay) about unidentified "problems" with the conduits, and that State Street had focused on what would happen if the conduits were consolidated. *Id.* ¶ 164.  This is meaningless, and consistent with State Street's disclosure each quarter that consolidation might be necessary in the future and of the impact that conduit disclosure would have had on its balance sheet and financial ratios if consolidation had occurred in the current quarter.  CW6's similar assertion adds nothing probative, for the same reasons.  *Id.* ¶ 165.

Moreover, Plaintiffs used a version of the B/B Index said to be comprised of securities with weighted average maturity of 3.5 to 4.5 years.[46] They did so because the *conduit* assets "have a reported weighted average maturity of 4 years." *Compare* Compl. ¶ 155 n.8 *with* Aff. Ex. 30 at 8 (8-K filed Jan. 20, 2009). Use of such an index makes no sense because the US RMBS portion of the conduit portfolio need not have the same weighted average maturity as the portfolio as a whole (which included securities backed by many other kinds of assets) and there is no basis to conclude that the conduits' and investment portfolio's weighted average maturities were the same. Aff. Ex. 26 at Exs. 99.3, 99.4 (8-K filed Oct. 15, 2008).

Plaintiffs' guess about the extent to which conduit assets were backed by US residential mortgages originated by so-called "troubled" lenders also takes them nowhere. Plaintiffs assert that State Street's conduit program "was heavily invested"—whatever that means—in mortgage-backed products issued by Washington Mutual, Inc., Countrywide Financial Corp., IndyMac Mortgage Services, and New Century Financial Corp.[47] Compl. ¶ 167. This, of course, is revealed to be an overstatement by the following paragraphs, in which the alleged basis for this assertion appears. For example, Plaintiffs assert that as of early 2007, one of the conduits had invested $100 million in securities backed by mortgages originated by New Century. *Id.* at ¶ 172. Near that time, the conduits held $4.4 billion in US RMBS, "all of which" was "rated AAA" and total conduit assets were $29.2 billion  *See* Aff. Ex. 12 at Ex. 99.2 at 2, 8 (8-K filed Oct. 16, 2007).

---

[46]     It is not clear that this is correct. *See, e.g.*, Aff. Exs. 61.C, 61.D (showing average maturity generally about 2-3 years).

[47]     Plaintiffs assert imprecisely that State Street's conduits and investment portfolio held "MBS investments *in* troubled or impaired subprime and Alt-A lenders." Compl. ¶ 166. This apparently refers to debt securities (MBS) backed by mortgages originated by such lenders, and not to investments in the lenders themselves. In fact, these portfolios did not hold any equity securities. *See, e.g.*, Aff. Ex. 14 at 71 (10-K filed Feb. 15, 2008) (100% of conduit assets consist of mortgage-backed securities, and other loans and receivables). Accordingly, events such as the bankruptcy of WaMu—which is alleged to have originated loans backing US RMBS held by the portfolios—would have no impact on the portfolios. *Compare* Compl. ¶ 169.

Moreover, originator identity says nothing material about the credit quality of the RMBS

held by the conduits.  There was no default on any conduit or portfolio asset during the relevant

period.  Aff. Ex. 30 at 8 (8-K filed Jan. 20, 2009).  Thus, it would have been of no moment that

certain securities backed by mortgages originated by Washington Mutual or New Century were

"defaulting at a record pace."  *Id.* at ¶¶ 168, 172.  Originator identity also is irrelevant because

even mortgage defaults within the same mortgage pool would impact holders of RMBS backed

by the pool differently.  By design, the RMBS backed by a mortgage pool differ in quality,

because they are created in tiers or tranches having different credit qualities and payment

priorities.  *See, e.g.*, *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2010 WL

2593948, at *4-5 (S.D.N.Y. Jan. 15, 2010).  As State Street disclosed, all of the conduit US

RMBS had the highest payment priority in the capital structure from which they were issued.

Moreover, the mortgages backing the conduit securities had favorable FICO and loan-to-value

ratios at origination; and most had additional credit enhancement.  Aff. Ex. 18 at Ex. 99.2 at 7-8,

10 (8-K filed Apr. 15, 2008).  In this context, originator names would have made no difference.[48]

Plaintiffs also cannot show that State Street's opinion concerning asset quality was

objectively false by referring to the experience of other banks who administered other conduits.

Compl. ¶¶ 19, 174-87.  State Street's quarterly presentations expressly addressed this point,

disclosing that the assets in its conduits were much more highly rated than those of peer banks.

---

[48]     Analysis of Plaintiffs' flawed allegations concerning WaMu-related RMBS proves the point.  See Compl. ¶ 169.  Plaintiffs cite to a press release by the Fitch rating service concerning a March 2008 downgrade of the credit ratings of certain securities that Plaintiffs do not allege were even owned by the conduits.  *Id.*  These securities were not issued by WaMu (they were RMBS backed by WaMu-originated mortgages).  *See, e.g.*, Aff. Ex. 52 (offering document for one of species of RMBS referred to in the release).  According to the release, many of the securities remained highly rated, even after the downgrade.  Aff. Ex. 55 (Fitch Release).  At least $288 million of WaMu Series 2007-HE2 certificates downgraded only from AAA to AA, and many others retained investment grade ratings.  *Id.*  Even if State Street or the conduits held some of these securities, there is no basis in the Complaint to infer that they were not of high quality.  Disclosure of the originator of the loans underlying the security would have added nothing important to State Street's disclosures.  State Street disclosed every quarter the credit ratings of the conduits' RMBS, and noted any changes from the prior period.  Thus, if a security held by a conduit was one of the WaMu securities to which the release refers, the fact of the downgrade would have been disclosed.

For instance, State Street's conduits had 300% more AAA rated assets. *See supra* at 8-13.

Plaintiffs' naked conclusion that the holdings of conduits administered by State Street and other

banks were "similar" (¶ 174) withers before these data.

Plaintiffs' reference to State Street Global Advisors' ("SSgA") securities lending

business and fixed income bond funds also is insufficient to show objective falsity.[49]  Compl. ¶¶

188-207.  Plaintiffs claim that in connection with these businesses SSgA invested heavily in

RMBS, and that declines in the value of those securities and other problems made State Street

aware by the late in 2008 of undisclosed risks about the conduits and portfolio.  Compl. ¶¶ 188,

190, 201.  In fact, nothing about SSgA's experience with these businesses warranted different

disclosure by State Street about the conduits and portfolio.

State Street clearly disclosed quarterly the extent of conduit and portfolio losses

associated with RMBS.[50]  It also warned that further losses might occur.  *See supra* at 8-13, 16-

21; App. A.  Moreover, the "problem" that the bond funds and the collateral pools came to

face—actual realization of economic losses—was caused by the fact that customers had the right

to redeem their investments.[51]  This does not compare to the conduits and portfolio, because

State Street reasonably could expect that those assets would be held to maturity, yielding no

economic loss.[52]

---

[49]     Securities lending involves a loan of securities, the return of which is secured by a pledge of cash collateral. Acting as agent for its customers, State Street facilitated loans of the customers' securities and managed the investment of the cash collateral.  Compl. § 198; Aff. Ex. 8 at 29-39 (10-K filed Feb. 20, 2007).

[50]     *See, e.g.,* Aff. Ex. 30 at Ex. 99.2 at 8 (8-K filed Jan. 20, 2009) (disclosing unrealized loss on MBS in the conduits at year-end 2008); *id.* at Ex. 99.3 at 10 (8-K filed Jan. 20, 2009) (disclosing unrealized loss on MBS in the portfolio at year-end 2008).

[51]     In August 2007, SSgA allegedly had to sell assets prior to maturity in order to meet redemption requests by bond fund investors, yielding a significant economic loss.  Aff. Ex. 53 at ¶¶ 19-22 (Feb. 4, 2010 SEC Order). Similarly, securities lending customers could recall their securities on loan, thus triggering a return of collateral and a corresponding withdrawal of cash from the collateral investment pools.  In sufficiently adverse market conditions, this also could lead to the sale of assets prior to maturity at depressed market values.

[52]     In addition, the conduit and portfolio assets were not in fact "remarkably similar" to those held by the bond funds.  *Compare* Compl. ¶ 194.  The conduits held little or no subprime MBS, and a small percentage of US RMBS (15% at year-end 2008).  *See* Aff. Ex. 30 at Ex. 99.2 at 12, 14 (8-K filed Jan. 20, 2009).  According to Plaintiffs, the bond funds managed by SSgA were "almost entirely" invested in or exposed to subprime RMBS.  *Id.* ¶ 190.

**D.      The Complaint Fails to Plead any Securities Claims Based on a GAAP Violation.**

**1.      Plaintiffs Do Not Plead Loss Causation.**

Plaintiffs allege that State Street violated GAAP by failing to consolidate the conduits until May 18, 2009.  (Compl. ¶¶ 134, 322).  This claims fails because Plaintiffs have not pleaded loss causation.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005).  Loss causation arising from a financial misstatement requires allegations that plaintiff purchased stock at an inflated price, and that the stock price thereafter dropped when the challenged misstatement was corrected.  *Id.; Semerenko v. Cendant Corp*., 223 F.3d 165, 185 (3d Cir. 2000); *In re St. Paul Travelers Sec. Litig. II*, 2007 WL 1589524, at *2 (D. Minn. June 1, 2007) ("Under *Dura*, a plaintiff must allege a corrective disclosure followed by a drop in the stock price during the time plaintiffs owned the securities.").  The Loss Causation section of the Complaint does not address the consolidation of the conduits.  *See id.* ¶¶ 358-61.  The Complaint does not allege a market price drop due to the consolidation.  In fact, State Street stock *traded up by almost five dollars* in the two days following May 18.[53]  Thus, Plaintiffs have not pleaded loss causation.

**2.      Plaintiffs Plead No GAAP Violation.**

Plaintiffs claim that State Street was required by GAAP to consolidate the conduits' financial statements by at least September 2008, and that failing to do so until May 2009 made the intervening financial disclosures misleading.  *See* Compl.  ¶¶ 214-19, 458.  To do so, they

---

Plaintiffs say little about the asset composition of the asset pools, other than to assert that one of them had invested 28% of its assets in MBS that had declined in book value.

[53]      State Street's stock opened at $38.14 on May 18, closed at $41.79 that day, opened at $42.39 on May 19, and closed at $43.21.  According to Plaintiffs' own allegations, the market for State Street's stock was efficient, so any causally related stock drop would have occurred by that time.  Compl. ¶ 363 ("State Street's securities promptly digested current information with respect to State Street from all publicly available sources and reflected such information in the price of the Company's securities.").

ignore the economic structure of the conduits, the accounting rules, and the appropriate legal framework in which these claims arise.

Plaintiffs do not explain how the accounting rules mandated consolidation at any time— they just conclude that they did.  *Compare* Compl. ¶¶ 215-17.  According to Plaintiffs, the consolidation was required when "losses"—which Plaintiffs implicitly equate with the conduits' *unrealized* losses disclosed during the class period — exceeded the principal amount of first loss notes payable to the conduits.  *Id.*  Under the applicable accounting rules, this is incorrect because: (i) consolidation was not required until "expected losses"—a specially defined term— exceeded the first loss notes; and (ii) unrealized mark-to-market losses on the conduit assets were not "expected losses."  *See* Aff. Ex. 50 (FIN 46R); Aff. Ex. 25 at 41-45, 60 (10-Q filed Nov. 5, 2008).

Specifically, Plaintiffs correctly note that under FIN 46R the "primary beneficiary" of a variable interest entity (such as a conduit) must consolidate the entity's financial statements with its own, and that the "primary beneficiary" is that entity which is expected to absorb a majority of the conduit's "expected losses."  Compl. ¶ 213.  "Expected losses," however, are not unrealized losses measured by changes in market values of the assets in the conduit's portfolio. Instead, "expected losses"—which are required to be determined using mathematical models that project, weigh, and discount the possibility that the conduits' *expected cash flows* might not be achieved—arise when the model shows that probability-weighted *possible* cash flows from the conduits' operations are less than expected cash flows.  *See supra* at 13-16 (describing conduit accounting).  These hypothetical "expected losses" are different from unrealized losses, in part,

because "expected losses" turn on expected cash flow, and unrealized losses need not have any effect on cash flow.[54]

Consistent with this framework, State Street disclosed during the class period that its determination whether to consolidate the conduits turned on an "expected loss analysis" based on a "financial model." Aff. Ex. 25 at 60 (10-Q filed Nov. 5, 2008). Under the accounting rules, State Street said that consolidation would be required only when "expected losses" calculated using the model exceeded the principal amount of the first loss notes. *Id.* at 41-42, 60. These notes reduced State Street's exposure to conduit losses by requiring their holders to provide liquidity to the conduits before State Street was required to do so. *See id.*; Aff. Ex. 50 at 12 (per FIN 46R, no obligation to absorb "expected losses" if "directly or indirectly protected" from them "by other parties involved with the entity"). Plaintiffs have alleged no facts to show that this disclosure was incorrect.[55]

In addition to ignoring the definition of the accounting terms, the Complaint's allegations do not square with the appropriate legal framework for evaluating this kind of complex accounting judgment. Conclusions concerning the amount of "expected losses"—as defined in the literature and projected by computer models—are opinions that are not actionable unless they

---

[54]   The conclusion that unrealized changes in market value do not necessarily impact conduit cash flow is implicit in the conduits' economic structure. Conduits buy debt securities and sell commercial paper (a short term debt instrument). By design, the principal payments in these two cash flow streams offset, but the interest received from the debt securities exceeds the interest paid on the commercial paper. This makes clear an important but obvious point that Plaintiffs overlook: the conduits buy their debt security assets in order to hold them and obtain cash flow in the form of their relatively high interest payments. They do not buy them to capture changes in market value. Accordingly, unrealized depreciation in market value does not affect conduit cash flow, and need not cause any problem (including any realized loss) for the conduits. State Street addressed this economic reality expressly when it disclosed its opinion that it firmly believed that the conduit assets were "high-quality assets" it expected "to mature at par." Aff. Ex. 19 at 10 (Apr. 15, 2008 Earnings Conf. Call).

[55]   Plaintiffs' reference to a newspaper article purporting to quote an accountant adds nothing to this analysis. Compl. ¶ 218. The article addressed Citibank's accounting for conduits for which it voluntarily had provided liquidity support. According to the article, such voluntary support might be deemed an implicit guarantee that should be accounted for in the same way as an express agreement to provide liquidity. Aff. Ex. 54 (Jonathan Weil, *Citigroup SIV Accounting Looks Tough to Defend*, Bloomberg, Oct. 24, 2007). This says nothing about whether an express or implied obligation to provide liquidity requires consolidation. Such a requirement arises only where the consolidating party will absorb a majority of the conduits' expected losses (as defined by FIN 46R). Whether this has occurred depends on the application of FIN 46R to the output of a financial model, as described above.

are not actually believed and not the product of a reasonable methodology.  *See supra* at

II.C.2(c).[56]

> ### E.     Plaintiffs' Exchange Act Claims Fail Because They Have Not Pleaded the Factual Basis for a Strong Inference of Scienter.

Plaintiffs fail to plead a factual basis for a strong inference of scienter as to either the

individual defendants or State Street. 15 U.S.C. § 78u-4(b)(2).  Such an inference "must be more

than merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

U.S. 308, 314 (2007).  To plead such an inference, Plaintiffs must do more than pepper their

Complaint with conclusions to the effect that "everyone" (Compl. ¶ 63) at State Street knew of

the alleged fraud or that it "could only have occurred" (*id.* ¶ 82) with the direct knowledge of

State Street's CEO and CFO.  Neither general conclusions, inferences premised on a defendant's

position at State Street (*id.* ¶ 222), nor defendants' alleged access to unspecified "internal

reports" (*id.* ¶ 165), are sufficient to state a claim against any defendant.

> #### 1.     The Complaint Fails to Establish the Individual Defendants' Scienter.

"[T]o proceed beyond the pleading state, [a plaintiff] must allege facts sufficiently

demonstrating each defendant's state of mind regarding his or her alleged violations."  *Phillips v.*

*Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004); *Kushner v. Beverly Enters., Inc.*,

---

[56]      For example, Plaintiffs suggestion that the conduits' purchase of additional first loss notes shows that the conduits should have been consolidated by September 2008 ignores that State Street disclosed that "the expected loss analysis was re-performed … and it was determined that our model assumptions continued to be appropriate and were reflective of market participant assumptions. Accordingly, management concluded … that consolidation of each of the conduits was not required."  *Compare* Compl. ¶ 215 *with* Aff. Ex. 25 at 61 (10-Q filed Nov. 5, 2008). Absent factual support contained nowhere in the Complaint for the conclusion that State Street did not believe in the results of the model, the Complaint does not state a claim for accounting fraud.  Plaintiffs' suggestion that State Street was required to consolidate its conduits "no later than the third quarter 2008" also is inconsistent with an October 15, 2008 investor conference call in which Mr. Resch explained that the first loss notes provided a "cushion" over the expected loss of "well-above 100%" on the largest conduit, "just over 40%" on the second-largest conduit, and cushions of "40%" and "about 30%" for the smaller conduits.  *Compare* Compl. ¶ 215 *with* Aff. Ex. 27 at 10 (Oct. 15, 2008 Earnings Conf. Call).  Plaintiffs advance no basis to assert that State Street's model did not yield these results or that State Street management did not believe them.

317 F.3d 820, 827 (8th Cir. 2003) (similar);  *SEC v. Durgarian*, 477 F. Supp. 2d 342, 353 (D.

Mass. 2007) (plaintiff "must allege facts that *each* defendant acted with a mental state embracing

intent to deceive, manipulate, or defraud") (quotation omitted) (emphasis supplied); *In re Brooks*

*Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *9 (D. Mass. Nov. 6, 2007) ("Plaintiffs must

also meet their obligation to plead specific factual allegations regarding *each* defendant's

knowledge of or participation in the [alleged fraud].") (emphasis supplied). Instead of pleading

specific allegations showing each Individual Defendant's knowledge, Plaintiffs rely

overwhelmingly on blanket allegations about "Defendants," "State Street," or the "Company."

These are insufficient to establish anyone's scienter.

Plaintiffs plead no particular facts (such as meetings, conversations, or the contents of

particular documents) showing that Mr. Logue (State Street's CEO) or Mr. Resch (its CFO) had

any knowledge about the pricing of indirect FX trades or that either knew that the conduit or

portfolio assets were not of high quality.  Instead, they assume improperly that they—or

unspecified other executives—must have had such knowledge by virtue of their positions.  *See*

*Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 35-36 (D. Mass. 2009) (dismissing as "routinely …

deficient" claims that defendants "as senior executive officers and/or directors … were privy to

confidential and proprietary information … had access to unspecified corporate documents [and]

attended unspecified management and/or board of directors meetings").[57]

---

[57]     *See also Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 255 (D. Mass 2001) (allegations "attributing knowledge to a defendant merely because of the defendant's status in a corporation [] generally fail[] as a method of meeting the rigorous requirements for pleading scienter"); *Baron v. Smith*, 285 F. Supp. 2d 96, 108 (D. Mass. 2003) (allegations that defendants "were in a position to know the allegedly omitted facts and that they were in a position to approve of any financial statements issued by the company" do not provide a strong inference of scienter); *In re Brooks Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *10 (D. Mass. Nov. 6, 2007) ("A vague assertion that a defendant must have known about the fraud by virtue of her position of authority does not permit a strong inference of scienter."); *In re Cytyc Corp.*, 2005 WL 3801468, at *28 (D. Mass. Mar. 2, 2005) ("Defendants' . . . positions in the company . . . are equally unconvincing" as to of scienter); *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (dismissing claims where plaintiff's "allegations of scienter consist solely of general inferences that the defendants, by virtue of their position within the company, 'must have known' about the company's problems when they undertook the allegedly fraudulent actions"); *In re Bos. Tech., Inc. Sec. Litig.*, 8 F.

Plaintiffs allege that State Street's CEO and CFO attended State Street conferences held three times a year and "that these conferences would include a discussion of foreign exchange strategy."  Compl. ¶ 62.  But "a discussion of foreign exchange strategy" in the context of a broader discussion of State Street's overall performance does not support an inference that either of them was familiar with how State Street priced one of its several FX execution methods, or whether that pricing method was consistent with its obligations to any State Street client.

Plaintiffs also weakly attempt to allege "recklessness" through a variety of conclusory allegations based on "access" to unspecified information.[58]  *See id.* ¶ 152 ("Defendants . . . *had access to information* regarding the true condition of the assets in the" conduits and investment portfolio during the class period.).[59]  Such allegations are inadequate.  *Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (1st Cir. 1998) (recklessness requires allegations of full knowledge); *In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 261 (D. Mass. 2001) (scienter not pleaded sufficiently by allegation that defendant "must have had knowledge of the facts.") (quoting *Maldonado*, 137 F.3d at 9-10); *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (dismissing claims where plaintiff "has not directed the Court to any particular documents drafted by, or available to, the defendants that would have indicated the defendants' knowledge of [the alleged] problems").[60]  Plaintiffs' similar assertion—that the CEO and CFO must have

---

Supp. 2d 43, 59 (D. Mass. 1998) (allegations that defendants "must have known of the severity of their problems" do not satisfy requirements of Rule 9(b) where "[n]ot a single report, memorandum, meeting minute, or like item is referred to or specified in the Complaint").

[58]     This does not relieve Plaintiffs of their burden to plead, "with *sufficient particularity*, that defendants had full knowledge of the dangers of their action *and* chose not to disclose those dangers to investors."  *Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (1st Cir. 1998) (emphasis added).

[59]     *See also* Compl. ¶ 173 ("Defendants were, *or should have been*, aware of State Street's exposure to MBS issued by these troubled companies. . . ."); ¶ 84 ("[D]efendants knowingly or recklessly ignored a host of red flags that did or *should have alerted them* to the fact the MBS assets in the conduit and investment [portfolio] were not 'high quality,' but were in fact experiencing significant losses."); ¶ 167 ("The fact that the conduits held investments from these companies *should have alerted* defendants to the problems in the conduits and investment [portfolio].") (emphasis added).

[60]     *Accord In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 223 (D. Mass. 1999) ("[T]he particularity requirement cannot be avoided simply through a general averment that defendants 'knew' earlier what later turned out badly.") (quotation omitted); *Bausch & Lomb*, 592 F. Supp. 2d at 342 (finding no inference of

known that State Street's conduits would suffer problems in the future because other banks'

conduits had—fails for the same reasons (not to mention the significantly high credit quality of

the State Street conduits' assets relative to those of other banks).[61]  *See supra* at 8-13.  The act of

signing a periodic filing does not establish scienter.[62]

Having failed to establish scienter through direct allegations, Plaintiffs retreat

unpersuasively to "motive and opportunity."[63]  At the outset, there is no allegation that either the

CEO or CFO sold a single share of stock during the class period.  *See In re Glenayre Techs. Inc.*

*Sec. Litig.*, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) ("[T]he inference of scienter is

undermined by the fact that [the CEO] and [other executives] did not sell any stock."); *In re*

*CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 662 (D. Md. 2000) ("[Defendant] did not sell a

single share of his stock during the class period.  Thus, his motive could not have been to inflate

the value of [the company's] stock."); *In re Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d

---

scienter when two confidential sources did not 'specifically state that any Individual Defendant had direct information or access to information of [defendants'] illegal practices"; *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (finding no strong inference of recklessness when plaintiff failed to "allege that Defendants had access to information that specifically evidenced them of the alleged flaws" in loss estimate reports).

[61]      *Compare* Compl. ¶¶ 167-187 (struggles of various banks and special investment vehicles "did or should have alerted defendants ot the fact that State Street's assets were overvalued . . . .") *with In re Galileo S'holders Litig.*, 127 F. Supp. 2d 251, 265-66 (D. Mass. 2001) (such a contention—even where plaintiffs refer to specific, publicly available documents—is an unacceptable "version of a 'must have known' formulation").  Moreover, State Street had (and disclosed) information showing that its conduits were better situated than those of other banks.  *See supra* at 8-13.

[62]      *Compare* Compl. ¶¶ 32-33, 233, 236, 244, 250, 256, 259, 265, 269, 276, 279, 286, 292, 298, 302, 307, 312, 324, 328, 335, 341, 345, 348, 352, 356 *with Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367-68 (1st Cir. 1994), *superseded by statute on other grounds*, (plaintiffs must also plead "*specific allegations* that [the defendants] knew of conflicting conditions," *e.g.,* that defendants "received copies of the internal auditor's report concluding that additions to the reserves were required as soon as possible").

[63]      "[A]n allegation that defendants had the motive and opportunity to make false or misleading statements is insufficient to support the 'strong inference' of scienter required after the [Reform Act]." *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999) ("[C]atch-all allegations that defendant stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are not sufficient.").  "In other words, a plaintiff must allege some additional misconduct from which a jury can draw a reasonable inference of intentional deception."  *Geffon*, 249 F.2d at 36.  General allegations of defendants' financial incentive will not factor into this "mix," however, as plaintiffs must allege "concrete and personal benefits" that would result from the alleged fraud.  *Sonus*, 2006 WL 1308165, at *14-15 (strong inference of scienter absent where "Plaintiff does not plead any facts showing that [Defendant] realized any 'concrete benefits'" from the allegedly fraudulent acts).

102, 128 (D. Mass. 2003) ("[M]ost cases in which courts have found motive and opportunity to be present involve the sale of stock by defendants at artificially inflated prices.").[64]

Plaintiffs' claim that the CEO and CFO were driven to participate in the fraud due to "incentive-based pay . . . based largely on achieving certain financial performance measures," "substantial bonuses," and "extremely high" "overall compensation" (Compl. ¶¶ 220-21) is insufficient.  "Incentive compensation can hardly be the basis on which an allegation of fraud is predicated."  *Acito v. Imcera Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (quotations omitted); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (plaintiffs must allege financial incentives that "go far beyond the usual arrangements of compensation based on the company's earnings").  Thus, Plaintiffs' allegations to the effect "that defendants were motivated to defraud the public because an inflated stock price would increase their compensation [are] without merit."  *Acito*, 47 F.3d at 54.[65]  If scienter could be pleaded on that basis, "virtually every company in the United States that experiences a downtown in stock price could be forced to defend securities fraud actions."  *EAC & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009); *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994).

---

[64]    *See also Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 620 (4th Cir. 1999) ("To support a claim of motive based on the benefit a defendant derives from an increase in the value of his holdings, a plaintiff must demonstrate some sale of 'personally-held stock' or 'insider trading' by the defendant."); *In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 660 (D. Md. 2000) ("Plaintiffs have not pled any facts regarding Defendants' trading activities during the class period . . . .  Plaintiffs have therefore failed to adequately allege facts that raise a strong inference that Defendants had a motive to commit fraud.").

[65]    *See also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) ("bare assertion that executive-level bonuses were '*based in part*' on [Company's] financial performance" that does not "provide specifically, with comparisons to prior years bonuses, the correlation between [executives'] compensation and [the Company's] bottom line" fails to meet pleading standard) (emphasis added); *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005) (unless complaint shows that benefit to individual defendant is unusual, "a desire to increase executive compensation is also insufficient"); *Giarraputo v. UNUMProivdent Corp.*, 2000 WL 1701294, at *18 (D. Me. Nov. 8, 2000) ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.") (quotation omitted).

The same logic supports the rejection of Plaintiffs' equally generic theory that the CEO

and CFO were motivated to commit fraud in order to maintain State Street's viability in the

aftermath of the collapse of Lehman Brothers.  *Compare* Compl. ¶ 157 *with S. Cherry St. LLC v.*

*Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (motives "possessed by virtually all

corporate insiders, such as the desire to maintain a high credit rating . . . or otherwise sustain the

appearance of corporate profitability" are insufficient); *Teamsters Local 445 Freight Div.*

*Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (may not plead scienter

based on motives possessed by all corporate insiders, such as to "sustain the appearance of

corporate profitability, or the success of an investment"); *In re Ambac Fin. Grp., Inc. Sec. Litig.*,

693 F. Supp. 2d 241, 266 (S.D.N.Y. 2010) (desire to maintain high corporate credit rating not

enough "even though . . . fundamental to its business model.").[66]  Nor do Plaintiffs plead a

factual basis to conclude that the Lehman bankruptcy threatened State Street's viability.

### 2.    Plaintiffs Fail to Plead State Street's Scienter.

Besides the CEO and CFO—as to whom they fail to allege scienter—Plaintiffs have not

identified a single person affiliated with State Street who even allegedly participated in the

supposed fraud.  Instead they rely on vague allegations against the company ("State Street

deliberately designed its systems . . . .," Compl. ¶ 54); ("State Street would then fraudulently

---

[66]    Although unclear from the Complaint, this claim appears to be based on the potential impact on a capital ratio (Tangible Common Equity ("TCE")) that would be caused by consolidating the conduits.  Compl. ¶¶ 157-59. This theory of liability makes little sense because the impact on TCE resulting from conduit consolidation was disclosed, allowing investors to make up their own minds.  Aff. Ex. 26 at Ex. 99.4 at 10 (8-K filed Oct. 15, 2008) ("Estimated pro-forma impact to State Street Corporation's and State Street Bank and Trust's capital ratios had State Street Bank and Trust consolidated onto its balance sheet on September 30, 2008, all of the assets of the State Street-sponsored conduits at fair value: . . . Tangible Common Equity . . . State Street Corporation: Preliminary 9/30/2008: 4.80%; Pro-forma as of 9/30/2008: 3.05%."); Aff. Ex. 28 at Ex.99.4 at 10 (8-K filed Nov. 10, 2008) (same); Aff. Ex. 30 at 7 (8-K filed Jan. 20, 2009) ("[I]ncreases in … unrealized losses adversely impact our tangible common equity ratio, which may adversely impact credit rating agency and investor sentiment towards us.").  Further, State Street passed the Federal Reserve's stress test in May 2009—a time when the unrealized conduit and portfolio losses had grown much higher than they were in October 2008.  *See* Aff. Ex. 56 at 34 (Bd. of Govs. of the Fed. Reserve System, *The Supervisory Capital Assessment Program: Overview of Results*, May 7, 2009) (State Street has "no need" for SCAP buffer, even under "more adverse" scenario).

apply . . . .," *id.* ¶ 56); ("State Street deliberately falsified its internal and external reports . . . .," *id.* ¶ 58), and open speculation ("fraud of this length and magnitude . . . was not a plan devised and kept hidden by low-level employees," *id.* ¶ 59).

Such allegations, apparently intended to embrace the collective knowledge of all of State Street's officers and employees, cannot establish scienter.  *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (to plead fraud claim against a corporation, plaintiffs must support scienter inference as to "the individual corporate official or officials who make or issue the statement . . . rather than generally to the collectively knowledge of all the corporation's officers and employees acquired during the course of their employment"); *Dynex Capital*, 531 F.3d at 195 ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that *someone* whose intent could be imputed to the corporation acted with the requisite scienter.") (emphasis added); *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003) (dismissing claim against corporation where individual defendants' scienter not established).[67]  Because the Complaint fails to establish scienter of any individual it does not plead scienter against State Street.

### 3.     Plaintiffs May Not Utilize Fraud by Hindsight.

Plaintiffs' premise for their claim that statements of opinion about the "high quality" of the conduit and portfolio assets were fraudulent requires them to impute to State Street and its officers an unnatural ability to foresee the future.  Such "fraud by hindsight" —the implication that defendants must have known what only later became clear, *see, e.g., Denny v. Barber*, 576

---

[67]     This Court's decisions are consistent with the cases cited above.  *See, e.g., Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 36 (D. Mass. 2009) ("The scienter of corporate entities is ascertained through the mental state of their management.") (quotations omitted); *S.E.C. v. Durgarian*, 477 F. Supp. 2d 342, 357 (D. Mass. 2007) (same), *aff'd on other grounds*, *S.E.C. v. Papa*, 555 F.3d 31 (1st Cir. 2009); *see also In re Centennial Techs. Litig.*, 52 F. Supp. 2d 178, 185 (D. Mass. 1999) ("Entities can act only through their officers and employees."); *In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 84 (D. Mass. 2002) (group pleading doctrine "does not . . . obviate the requirement that a court evaluate separately the allegations concerning the scienter of *each* of the individual defendants") (emphasis added).

F.2d 465, 470 (2d Cir. 1978)—does not state a claim.  *See Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 6 (1st Cir. 2006); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 991 (1st Cir. 1996), *rev'd on other grounds*; *Meyer v. Biopure Corp.*, 221 F. Supp. 2d 195, 206 n.1 (D. Mass. 2002).

As set forth above, State Street's disclosures concerning credit quality made no promises or predictions (explicit or implicit) concerning the future market value of the conduit or portfolio assets.  *See supra* at II.C.2(b).  Plaintiffs assert incorrectly that they did, and compound the error by assuming without basis that the subsequent decline in the market value of these assets shows prior knowledge that they were of poor quality.  This does not state a claim because the Complaint does not (and cannot) plead that State Street had material knowledge about future market conditions that it did not disclose, or that the change in the market value of the conduit and portfolio assets in the fourth quarter of 2008 was due to asset quality (as opposed to market forces applicable to high quality assets).

There can be no doubt, of course, that over the Class Period the change in asset value was closely correlated to the unprecedented market events that occurred before and during the fourth quarter of 2008—a highly volatile period for markets about which State Street warned investors. *See, e.g., supra* at II.C.2(b); Aff. Ex. 30 at Ex. 99.3 at 2 (8-K filed Jan. 20, 2009) (chart correlating credit crisis events with decline in asset market value and market volatility). Plaintiffs acknowledge that extraordinary events drove market declines through mid-October 2008 (Compl. ¶¶ 107-33), but for obvious reasons end their chronology in this regard before the fourth quarter ended.  *Id.*  Of course, the markets continued to roil through the end of 2008, and that ongoing volatility  impacted the value of the conduit and portfolio assets.  Nowhere, however, do Plaintiffs support a plausible inference that State Street promised otherwise or knew what the future would hold.

### III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF UNDER THE SECURITIES ACT OF 1933

In addition to their claims under the Exchange Act, Plaintiffs bring claims under the

Securities Act with respect to a single offering of State Street common stock in June 2008.

Plaintiffs assert one or more such claims against State Street, the individual defendants, the

defendant Underwriters of that offering,[68] and State Street's independent auditor, Ernst & Young

LLP ("E&Y").  Plaintiffs' claims under the Securities Act are the *only* claims asserted against the

Underwriters, E&Y, and the individual defendants other than Mr. Logue and Mr. Resch.  All of

these claims must be dismissed

The Securities Act contains numerous requirements that courts apply strictly to maintain

the balance struck by Congress between investor protection and the efficient operation of the

securities markets.  For example, the Securities Act governs disclosures only in connection with

securities offerings.  It creates liability only for specific disclosures: those contained in the

offering materials when they became effective.  It imposes liability only on specific parties:

those who issued, underwrote, or sold securities in the offerings.  It limits claims only to specific

investors: those who can trace their securities purchases to the offering materials (under Section

11) or who purchased securities directly in the public offering (under Section 12).

Plaintiffs plead their Securities Act claims as an afterthought, attempting to extend their

unsupported Exchange Act allegations to the June 2008 offering documents.  These claims must

be dismissed for five independently sufficient reasons: (1) Plaintiffs' claims are time-barred; (2)

Plaintiffs did not timely serve the Underwriters; (3) Plaintiffs do not allege an actionable

---

[68]     The defendant Underwriters are Credit Suisse Securities (USA) LLC ("Credit Suisse"), Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co. Incorporated ("Morgan Stanley"), and UBS Securities LLC ("UBS").

misstatement or omission; (4) Plaintiffs do not allege scienter, as required because their claims

sound in fraud; and (5) Plaintiffs lack statutory standing to bring their Section 12(a)(2) claim.

### A.    Plaintiffs' Claims Are Time-Barred.

Plaintiffs' Securities Act claims as to all defendants are barred by the statute of

limitations.  Under Sections 11 and 12(a)(2), a plaintiff must bring a claim "within one year after

the discovery of the [allegedly] untrue statement" upon which that claim is premised.  15 U.S.C.

§ 77m.  MPERS is the *only* named Plaintiff even alleged to have purchased stock pursuant or

traceable to the June 2008 offering.  Compl. ¶¶ 27, 400.  Thus, only MPERS could possibly

claim to have statutory standing to assert claims under the Securities Act with respect to that

offering.  *See* 15 U.S.C. § 77k(a) (standing under Section 11 limited to "any person acquiring

such security"); 15 U.S.C. § 77*l*(a)(2) (standing under Section 12(a)(2) limited to "the person

purchasing such security").  In fact, MPERS has no such standing.  *See infra* at III.E.

### 1.    MPERS Did Not Bring Its Claims Within the Limitations Period.

As the following chronology makes clear, MPERS did not bring its Securities Act claims

within one year after the discovery of the purported Securities Act violation:

- On January 16, 2009, according to MPERS, the "truth" about purported misstatements in the offering materials was revealed.  Compl. ¶ 143.

- On December 18, 2009, Timothy Hill filed a putative class action that did not bring claims based on the June 2008 offering.  *See Hill v. State Street Corporation, et al.*, No. 09-cv-12146 (D. Mass. filed Dec. 18, 2009) ("*Hill*").

- On January 15, 2010, Marilyn Demory filed another putative class action purporting to asset Securities Act claims as to the June 2008 offering (even though she lacked standing to do so).  *See Demory v. Logue, et al.*, No. 10-cv-10064 (D. Mass. filed Jan. 15, 2010) ("*Demory*").

- On June 25, 2010, MPERS filed the Consolidated Class Action Complaint.  For the first time, a named plaintiff alleged to have standing (*i.e.,* MPERS) asserted Securities Act claims relating to the June 2008 offering.

Accordingly, MPERS' Securities Act claims—brought more than 17 months after it alleges the "truth" emerged—are time-barred and must be dismissed.

### 2.      MPERS' Claims Were Not "Tolled."

MPERS cannot rely on *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), to toll the statute of limitations and save its claims.  Under *American Pipe*, a putative class action brought by a plaintiff with standing tolls running of the statute of limitations for the members of the putative class.  414 U.S. at 554-55; *Fleming v. Bank of Boston Corp.*, 127 F.R.D. 30, 36-37 (D. Mass. 1989); *but see In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 378 (D. Mass. 1987) (tolling limitations period improper where class action filed "by nominal plaintiffs who are wholly inadequate to represent the asserted class").  *American Pipe* tolling does not save MPERS's Securities Act claims, because the *Hill* plaintiff did not bring such a claim and the *Demory* plaintiff had no standing to bring one.

The *Hill* complaint provides no basis for *American Pipe* tolling because that case applies only where a previously-filed class action names the same defendants, asserts the same claims, and makes the same allegations as the subsequent suit.  *See Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 54-55 (D. Mass. 1995).  The *Hill* complaint did not name the Underwriters as defendants, did not assert Securities Act claims, and did not make allegations about the June 2008 offering.  Consequently, it provides no basis for tolling as to any defendant. *Lindner*, 880 F. Supp. at 54 ("limitations period tolled only as to defendants named in the [prior] class action");[69] *id.* at 54-55 (pendency of a Section 10(b) class action did not toll the statute of limitations for a subsequent Section 18 claim).[70]

---

[69]      *Accord Arneil v. Ramsey*, 550 F.2d 774, 782 n.10 (2d Cir. 1977); *Ballard v. Tyco Int'l, Ltd.*, 2005 WL 928537, at *3 (D.N.H. Apr. 22, 2005) (collecting cases).
[70]      *Accord In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.*, 467 F. Supp. 227, 259-60 (W.D. Tex. 1979) (a Section 10(b) class action did not toll the statute of limitations for a subsequent Section 11 claim).

The *Demory* complaint also provides no basis for *American Pipe* tolling because, although that complaint purported to assert Securities Act claims arising out of the June 2008 offering, the named plaintiff lacked clearly standing to bring such claims as a matter of law. According to the PSLRA certification filed with her complaint, she purchased her State Street stock in 2007—*eleven months before* the June 2008 offering.  Aff. Ex. 60 at 2 (PSLRA Certification).  Thus, she did not purchase in the offering and cannot trace her purchase to the offering, as is required to have statutory standing under the Securities Act.  *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2).  As a result, the *Demory* complaint did not toll the limitations period.  *See Am. Pipe*, 414 U.S. at 554-55 (balancing "[t]he policies of ensuring essential fairness to defendants and of barring a plaintiff who 'has slept on his rights,'" by permitting tolling only where "a named plaintiff who is found to be representative of a class commences a suit" within the statutory period) (citation omitted); *Fleming*, 127 F.R.D. at 36 ("[I]t would be improper to allow the filing of a class action by nominal plaintiffs who are wholly inadequate to represent the asserted class to have the effect of tolling limitation to permit the otherwise untimely intervention of proper class representatives."); *In re Elscint*, 674 F. Supp. at 378 (same).[71]

The first complaint to assert Securities Act claims arising from the June 2008 offering was filed on *the very last day* that a complaint could have been filed within the one-year limitations period.  It was obviously a placeholder, filed by a plaintiff who had not even

---

[71]     *Accord Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, ---- F. Supp. 2d ----, 2010 WL 2202295, at *3 (S.D.N.Y. June 1, 2010) (dismissing claims arising out of sixty-five offerings for lack of standing and denying leave "for plaintiffs to add additional, as yet unnamed plaintiffs who purchased certificates related to the additional sixty-five offerings; this addition would at this point be futile, since plaintiffs themselves concede that the one-year limitations period began to run at some point in 2008 (i.e., more than a year ago) and so the claims of any such new plaintiffs would be time-barred" (citation omitted)); *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994) ("if the original plaintiffs lacked standing to bring their claims in the first place, the filing of a class action complaint does not toll the statute of limitations for other members of the purported class" (citing *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 382 (D. Mass. 1987)); *In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 855-56 (E.D.N.Y. 1990) (*American Pipe* tolling does not apply to claims where a class action has been dismissed for lack of standing because "[t]here appears to be no good reason to encourage bringing of a suit merely to extend the period in which to find a class representative") (citing *Elscint*, 674 F. Supp. at 382).

purchased stock in the June 2008 offering and had no standing to bring those claims.  Permitting

such a claim to toll the statute would be the very abuse about which Supreme Court justices

expressly have warned.  *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983)

(Powell, J. concurring) (*American Pipe* tolling "must not be regarded as encouragement to

lawyers in a case of this kind to frame their pleadings as a class action, intentionally, to attract

and save members of the purported class who have slept on their rights") (quoting *Am. Pipe*, 414

U.S. at 555 (Blackmun, J. concurring)).[72]

### B.    Plaintiffs Did Not Timely Serve the Underwriters.

The claims against the Underwriters first asserted in the *Demory* complaint must also be

dismissed for lack of timely service.  Plaintiffs filed the *Demory* complaint on January 15, 2010,

but did not serve it on the Underwriters for *more than six months* (and *more than 60 days* after

the 120-day deadline imposed by Federal Rule of Civil Procedure 4(m)).  One underwriter was

never served.  Indeed, the 120-day period for service ran *before* the Court consolidated the *Hill*

and *Demory* actions and set the pleading and briefing schedule for the Consolidated Class Action

Complaint, leaving absolutely no doubt that Plaintiffs were required to serve the Underwriters

with the *Demory* complaint to avoid dismissal.  Nevertheless, Plaintiffs did not even attempt to

serve the Underwriters with the *Demory* complaint until late July 2010.

Plaintiffs' failure to serve timely the Underwriters demonstrates that the claims against

them are nothing more than an afterthought.  On June 25, 2010, Plaintiffs filed the Consolidated

Class Action Complaint, which they served on Credit Suisse, Morgan Stanley, and UBS in July.

*See* Aff. Ex. 62 (Underwriters declarations).  Plaintiffs served Goldman Sachs with the wrong

---

[72]       Nor can MPERS rely on equitable tolling to extend the limitations period.  The Supreme Court has made clear that "the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year structure." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991).  "The 1-year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary." *Id.*

complaint (*i.e.*, the First Amended Complaint in the *Richard* ERISA action, which does not even

name Goldman Sachs as a defendant). *Id.* After Underwriters' counsel informed Plaintiffs'

counsel of the service error, Plaintiffs finally began serving the Underwriters with the *Demory*

complaint (albeit, too late)—presumably because they recognized that their efforts to file and

serve the Consolidated Class Action Complaint could not save the claims asserted in the *Demory*

complaint from dismissal for lack of timely service. Plaintiffs served Credit Suisse, Morgan

Stanley, and UBS with the *Demory* complaint on July 23, 2010, more than six months after it

was filed. *Id.* Plaintiffs have never served Goldman Sachs with the *Demory* complaint, instead

serving the wrong entity (*i.e.*, The Goldman Sachs Group, Inc., which was not named as a

defendant and did not underwrite the June 2008 offering). *Id.*[73]

Plaintiffs cannot show good cause for their failure to serve timely the Underwriters with

the *Demory* complaint, and the Court should not exercise its discretion to grant an extension of

time. *See* Fed. R. Civ. P. 4(m) & Advisory Committee Notes (1993 Amendments); *McIsaac v.*

*Ford*, 193 F. Supp. 2d 382, 383-84 (D. Mass. 2002). Plaintiffs cannot show good cause because,

although they were aware of their service obligations and timely obtained State Street's

agreement to accept service of the *Demory* complaint, they did not act diligently in attempting to

effect service on the Underwriters. *See McIsaac*, 193 F. Supp. 2d at 383-84 (finding no good

cause where the plaintiff "made no effort to effect service until the last possible day" and "failed

to offer any explanation, much less a credible one, for his terminal procrastination" because

---

[73]     Plaintiffs served Credit Suisse, Morgan Stanley, and UBS with the Complaint on August 3, 2010. Aff. Ex.
62. Once again, Plaintiffs never served Goldman Sachs but instead served the wrong entity, The Goldman Sachs
Group, Inc. *Id.*

"[l]ast minute attempts at service, absent some explanatory justification, do not establish good cause").[74]

Nor should this Court grant an extension where, as here, Plaintiffs never sought an extension of time. *See id.* at 384 (dismissing the plaintiff's claims for lack of timely service where the statute of limitations had run because "[t]he risk of a dismissal with prejudice is one that he assumed by waiting until two days before the expiration of the statute of limitations to file his Complaint and then doing nothing until the last minute to have it served"). Accordingly, Plaintiffs' claims should be dismissed. *Petrucelli v. Bohringer and Ratzinger, GMBH*, 46 F.3d 1298, 1307 (3d Cir. 1995) (the "lesson to the federal plaintiff's lawyer is not to take any chances" and to "treat the 120 days with the respect reserved for a time bomb") (quotation omitted).

## C.       Plaintiffs Do Not Allege an Actionable Misstatement or Omission.

The Securities Act imposes liability if a registration statement, as of its effective date: (1) contained an untrue statement of material fact, (2) omitted to state a material fact required to be stated therein, or (3) omitted to state a material fact necessary to make the statements therein not misleading. *Shaw*, 82 F.3d at 1204. A statement is actionable only if it is materially false or misleading when made. *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 43 (D. Mass. 1993) ("Plaintiff must identify facts or circumstances showing that the alleged misrepresentations were false when made, and not merely proven wrong in hindsight."); *Berliner v. Lotus Dev. Corp.*, 783 F. Supp. 708, 710 (D. Mass. 1992) ("The complaint identifies no facts or circumstances that suggest that this projection was false when made.").

---

[74]      *Accord Lovelace v. Acme Markets, Inc.*, 820 F.2d 81, 84 (3d Cir. 1987) (affirming the dismissal of a complaint served 55 days after the Rule 4 deadline even though the plaintiff's claims might thereafter be time-barred because "'[h]alf-hearted' efforts by counsel to effect service of process prior to the deadline do not necessarily excuse a delay, even when dismissal results in the plaintiff's case being time-barred due to the fact that the statute of limitations on the plaintiff's cause of action has run").

In assessing whether a statement is misleading, context is important.  The "central inquiry" in determining whether the offering materials were materially misleading is whether the disclosures "*taken together and in context*" would mislead "a reasonable investor about the nature of the investment."  *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 60 (D. Mass. 1994) (emphasis in original; internal quotation marks omitted); If the disclosure as a whole is not misleading, plaintiff has not stated a claim.  *See Cooperman*, 171 F.3d at 51.

Plaintiffs allege that the June 2008 offering materials made misrepresentations concerning State Street's (1) FX transactions, (2) internal controls, and (3) conduits and investment portfolio.  Compl. ¶¶ 433-61.  None of the Complaint's allegations demonstrates that any of these statements was false when made.  Indeed a review of the offering materials, incorporated in the Complaint, reveals that they disclose the very information claim was misstated.  Therefore, the Complaint fails to state a Securities Act claim.

**1.      The FX Transaction Allegations Do Not State a Claim.**

Plaintiffs do not allege facts showing that FX disclosures in the June 2008 offering materials were false or misleading.  As discussed above, the Complaint lacks any factual support for Plaintiffs' assertions that any of State Street's statements about FX transactions were materially misleading, that there was anything fraudulent about State Street's FX business, or that the FX transactions materially affected State Street's financials.  *See supra* at II.A.  As it relates to the June 2008 offering, the Complaint makes no factual allegations that State Street materially misstated its revenue from FX transactions in the FY 2007 and Q1 2008 period covered by the financial statements incorporated into the offering materials.

Plaintiffs base their FX allegations on those of the AG Complaint, which alleges that State Street breached its contracts with two clients when it priced certain types of FX transactions for their investment managers.  Plaintiffs cannot state a claim by reference to

allegations from others.  *See supra* at II.A.1(a).  Moreover, none of these allegations specifically address the FY 2007 or Q1 2008 period.  Plaintiffs also base their allegations on the statements of confidential witnesses, but none of the confidential witnesses allege that State Street overcharged clients in FY 2007 and Q1 2008: CW1 makes no allegations that State Street overcharged its clients at all (Compl. ¶¶ 62, 64); CW2 and CW5 left State Street by 2003 and, therefore, have nothing to say about FY 2007 and Q1 2008 (*id.* ¶¶ 63, 66); CW3 allegedly heard rumors almost two years before the June 2008 offering, alleging that he "first heard talk of shady practices in State Street's foreign exchange trading for CalPERS and CalSTRS in late 2006" (*id.* ¶ 64); and CW4 addresses only supposed "discrepancies" in the amounts recorded in an "accounting system" that do not relate to the indirect FX transactions at issue here, do not show that State Street overcharged clients, and do not establish that the discrepancies were in any way material (*id.* ¶ 65).  Plaintiffs even base their strained allegations of materiality on a decline in overall FX revenue from Q4 2008 to Q4 2009—*i.e.*, a period that post-dates the June 2008 offering by six months.  *Compare* Compl. ¶¶ 72-75 *with id.* ¶¶ 435-38.  As discussed above, these speculative allegations are insufficient to show materiality in any period.  Thus, the Complaint's allegations simply do not show that the offering materials contained any material misstatements regarding FX transactions.

In addition, the June 2008 offering materials fully disclosed the risk that State Street could have contractual disputes with customers—such as the dispute concerning CalPERS and CalSTRS that forms the basis of the AG Complaint—and that those disputes could affect State Street's operations.  For example, the offering documents stated:

- "From time to time, our customers may make claims and take legal action relating to our performance of fiduciary or contractual responsibilities.  If such claims and legal actions are not resolved in a manner favorable to us, such claims may result in financial liability to State Street and/or adversely affect the market perception of us and our products and services, and

could impact customer demand for our products and services."  Aff. Ex. 21 at S-18 (Prospectus Supplement).

- "In addition, adverse publicity and damage to our reputation arising from the failure or perceived failure to comply with legal, regulatory or contractual requirements could affect our ability to attract and retain customers or to maintain access to capital markets, or could result in enforcement actions, fines, penalties and lawsuits."  Id. at S-20.

These disclosures warned investors of the possibility of disputes about "State Street's contractual arrangements with its clients" like the dispute concerning CalPERS and CalSTRS (Compl. ¶ 433; AG Compl. ¶ 2), and also warned of the potential adverse impact of such a dispute on the demand for products like FX transactions (see Compl. ¶ 73).  Thus, there was no misstatement or omission.

## 2.  The Internal Control Allegations Do Not State a Claim.

Plaintiffs do not allege facts showing that the internal control disclosures in the June 2008 offering materials were false or misleading.  As discussed above, generalized allegations about the supposed inadequacy of State Street's internal controls, allegations which lack any factual basis, do not state a claim.  See supra at II.B.  Plaintiffs cannot plausibly allege that State Street's risk management policies and internal controls were inadequate because they did not uncover that State Street was charging CalPERS and CalSTRS more for certain types of FX trades than the AG would later claim was permitted by their contracts.  Compl. ¶¶ 76-82, 461.  Quite obviously, internal controls—even when they are adequate—do not detect all issues.  Rather, they are "intended to provide reasonable assurances regarding the reliability of financial reporting," just as State Street explicitly stated in its Form 10-K for FY 2007.  Id. ¶ 291 (emphasis added).  State Street's internal controls over financial reporting were audited by E&Y,

which expressed an unqualified opinion on them.[75]   Plaintiffs plead no facts to challenge E&Y's

audit of internal controls over financial reporting, and the anecdotal statements of two former

employees (as well as the opinion of a purported expert who apparently assumed the truth of the

allegations in complaints filed by others), *see* Compl. ¶¶ 76-82, in no way call the unqualified

opinion into question.  Plaintiffs' allegations that State Street lacked adequate internal controls in

any event are wholly derivative of the Complaint's defective FX allegations and, accordingly,

fail for the same reasons.  *See supra* at III.C.1.

Moreover, the June 2008 offering materials specifically warned about the extent of State

Street's internal controls and the risks associated with them.  For example, the offering

documents stated:

- "We seek to monitor and manage risk on a corporate basis and within specific business units. The types of risk that we monitor and seek to manage include, but are not limited to, operational risk, interest-rate risk, trading risk, fiduciary risk, legal and compliance risk, liquidity risk and credit risk.  We have adopted various policies, procedures and systems to monitor and manage risk.  There can be no assurance that those policies, procedures or systems are adequate to identify and mitigate all risks inherent in our various business."  Aff. Ex. 21 at S-21 (Prospectus Supplement).

As this disclosure makes clear, the June 2008 offering materials put investors on notice that State

Street's internal controls—including its controls over the trading risk, fiduciary risk, and legal

and compliance risk associated with FX transactions—could be inadequate to identify, mitigate,

and prevent those risks from coming to fruition.

---

[75]     *See* Aff. Ex. 14 at 76 (10-K filed Feb. 15, 2008) ("We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of State Street Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 14, 2008 expressed an unqualified opinion thereon.").

### 3.    The Conduit and Investment Portfolio Allegations Do Not State a Claim.

Plaintiffs do not allege facts showing that the offering materials included material misstatements about the conduits or State Street's investment portfolio.  As discussed above, the Complaint's allegations that Plaintiffs were misled by State Street's opinion that the conduit and portfolio assets were of "high quality," *see* Compl. ¶ 458, fail to state a claim because (1) State Street had a well-disclosed, accurate and reasonable basis for its opinions about the quality of those assets, which Plaintiffs do not allege was not honestly held, and (2) State Street made comprehensive disclosures about the quality of the portfolio assets, their declines in market value, and the risk of future losses due to a continuing global credit crisis.  *See supra* at II.C.

Plaintiffs' observations that, by the time of the offering, the real estate market collapse had caused *other* financial institutions to take significant write-downs on mortgage-backed securities, *other* investment vehicles to suffer losses, and *other* State Street investments to experience declines does nothing to support their Securities Act claims.  Compl. ¶¶ 441-42. None of these allegations has anything to do with the June 2008 offering materials, and none of them shows that any disclosures in the offering documents were false when made.[76]

Moreover, these allegations are inconsistent with the central thrust of Plaintiffs' complaint.  Plaintiffs' real challenge to conduit and portfolio disclosures turns on statements and events that post-date the June 2008 offering.  They emphasize that State Street made material misstatements in October and November 2008—five and six months *after* the June 2008 offering—when they allege that State Street "continued to insist that State Street's investment

---

[76]      Nor do the *post hoc* accusations of a former State Street employee alleging "that management was 'sick of hearing complaints about the quality of State Street's investments.'"  Compl. ¶¶ 162-63.  In fact, those accusations are directly contradicted by two other former employees, who stated that State Street was focused on the conduits and the impact of their potential consolidation on State Street's balance sheet  *Id.* ¶¶ 164-65.  That impact, as discussed above, was fully disclosed.  *See supra* at 8-13.

portfolio and Conduit program were 'high quality'. . . ."  Compl. ¶ 134 (emphasis omitted); *see also id.* ¶¶ 135-42.  Plaintiffs admit that the unprecedented financial turmoil of the real estate market collapse and global financial meltdown intensified *after* the June 2008 offering.  *Id.* ¶¶ 122-33.  Such hindsight assertions cannot plausibly form the basis for a Securities Act claim.  *See Yu v. State Street Corp.*, 686 F. Supp. 2d 369, 376-77 (S.D.N.Y. 2010) ("In hindsight, then, it could be alleged that investments that were viewed by defendants—and the marketplace—to be 'high-quality . . . investment grade instruments' in fact stood on shaky foundations.  But the accuracy of offering documents must be assessed in light of information available at the time they were published.").

In addition, the June 2008 offering materials fully disclosed the losses to the conduits and investment portfolio, the possibility of their consolidation with State Street, and the impact of potential consolidation on State Street's financial statements.  For example, the offering documents stated:

- "If circumstances change we may be required, under existing accounting standards, to consolidate some or all of the otherwise unconsolidated conduits onto our consolidated balance sheet.  In the event State Street were to consolidate the conduits, there may be a significant charge reflecting the difference between the book value and the market value of each of the conduit's portfolios."  Aff. Ex. 21 at S-13 (Prospectus Supplement).

- "Consolidation, or the purchase of the assets of the conduits pursuant to the contractual agreements described above, could affect the size of our consolidated balance sheet and related funding requirements, our financial and regulatory capital ratios and, if the conduit assets include unrealized losses, could require us to recognize those losses.  As of March 31, 2008, these unrealized losses amount to $1.49 billion after-tax."  *Id.*

- "As of March 31, 2008, in connection with management's measurements of fair value referenced above, there were $3.16 billion of pre-tax net unrealized losses associated with our investment securities portfolio."  *Id.* at S-12.

- "A significant market downturn may lead to a decline in the value of assets under management and custody . . . .  This market downturn could be accompanied by a widening of credit spreads or credit deterioration, which could reduce the value of securities we hold in our investment portfolio."  *Id.* at S-8.

In short, the June 2008 offering materials disclosed everything about the assets in the conduits and the investment portfolio that should have been disclosed.[77]

> ### D.     The Complaint Does Not Allege Scienter, As Required Because Plaintiffs' Claims Sound in Fraud.

Plaintiffs' claims sound in fraud—and therefore they must comply with Rule 9(b)—because express allegations of fraud underlie their allegations.  For example, Plaintiffs allege that State Street perpetrated an eight-year "*fraudulent* foreign exchange *scheme*," and that it "*intentionally*" understated "exposure to high risk investments" for the purpose of "artificially inflating" State Street's revenues.  Compl. ¶¶ 1, 50.[78]  Because fraud allegations form the basis of their Securities Act claims, to state a claim Plaintiffs must plead fraud with particularity under Rule 9(b).  *See Shaw*, 82 F.3d at 1223 ("[i]t is the allegation of fraud, not the 'title' of the claim," that determines whether Rule 9(b) applies); *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (Rule 9(b) applies to claims where "wording and imputations of the complaint are classically associated with fraud"); *In re Sonus Networks, Inc. Sec. Litig.*, No. 04-10294, 2006 WL 1308165, at *8 (D. Mass. May 10, 2006) (claim sound in fraud where complaint alleged defendants "*misled* public investors by disseminating a series of *materially false* and *misleading* statements" and that the defendant's "improper accounting practices were ongoing, pervasive and occurred with the *knowledge, acquiescence* and *direct participation*" of senior officers).

---

[77]     Plaintiffs assert in passing that the losses allegedly suffered by the conduits should have caused State Street to consolidate them "as required by GAAP."  Compl. ¶ 458.  Plaintiffs allege that GAAP required that State Street consolidate the conduits "no later than" September 30, 2008.  *Id.* ¶ 215.  Therefore, by Plaintiffs' own admission, State Street's decision not to consolidate the conduits on its financial statements for FY 2007 or Q1 2008—*i.e.*, the only financial statements incorporated by reference in the June 2008 offering materials—is not a GAAP violation, let alone a material misstatement.  Moreover, the offering materials included a "pro forma capital ratio presentation" that set forth State Street's capital ratios as of March 31, 2008, including the ratios as adjusted for the receipt of the net proceeds from the June 2008 offering *and conduit consolidation*.  Aff. Ex. 21 at S-6 (Prospectus Supplement).  There can be no dispute that the June 2008 offering materials fully disclosed the potential basis for conduit consolidation and the potential impact of consolidation.

[78]     Similarly, allegations of the "unconscionable fraud" of the FX business practice permeate the Complaint, as does the accusation that *all* Defendants "*concealed*" State Street's exposure to the conduits, even though they allegedly "*knew*" of the declining value of State Street's investments.  *Id.* ¶¶ 2-3 (emphasis added).

Although Plaintiffs attempt to disclaim the Complaint's fraud allegations for purposes of their Securities Act claims, they cannot escape Rule 9(b).  The Securities Act claims depend on the same or similar alleged misstatements as the Exchange Act claims, and Plaintiffs cannot disclaim away "scheme" allegations central to their narrative and at the core of their claims.  *See In re Brooks Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *14 (claims sounding in fraud subject to Rule 9(b) despite "disclaiming any intent to allege fraudulent conduct"); *Sonus*, 2006 WL 1308165, at *6-8 (same).[79]

Because Plaintiffs' Securities Act claims sound in fraud and are subject to Rule 9(b), the Complaint must "allege facts that give rise to a strong inference of fraudulent intent."  *See In re Brooks,* 2007 WL 4754051 at *15; *accord Sonus*, 2006 WL 1308165, at *8.  Otherwise, both their Exchange Act and Securities Act claims must be dismissed.  *Brooks*, 2007 WL 4754051, at *15 (dismissing Section 11 claims for failure to allege adequately that defendants "believed or knew, at the time the Merger Registration Statement was signed, that [the company's] financial statements contained material misstatements or otherwise failed to comport with GAAP"); *Sonus*, 2006 WL 1308165, at *12-22 (dismissing Section 11 claims based on allegations of misstated financial statements arising from deficient internal controls and an "improper revenue recognition scheme" for failure to plead with particularity facts supporting a strong inference of scienter).[80]  Plaintiffs do not allege that any defendant acted with scienter as part of the Securities Act claims, and indeed, there are no allegations anywhere in the Complaint that the Underwriters

---

[79]    *See also Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *12 (S.D.N.Y. Sept. 30, 2008) (repeated allegations of "fraudulent" and intentional "scheme" cannot be disclaimed away by Section 11 "allegations couched in terms of negligence," because "the underlying theory regarding the [] Defendants is . . . that they *knew* . . . and participated in an essentially fraudulent scheme to deceive investors").

[80]    *Accord In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *6 n.12 (S.D.N.Y. Apr. 18, 2006) ("When Section 11 and 12(a)(2) claims sound in fraud . . . the scienter requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (dismissing Section 11 claim for failure to plead scienter).

acted with scienter.  Moreover, the Complaint fails to plead facts supporting a strong inference of

scienter.  *See supra* at § II.E.  Thus, the Securities Act claims must be dismissed.

**E.      Plaintiffs Lack Standing to Bring a Section 12(a)(2) Claim against State Street or the Underwriters.**

The Complaint fails to state a Section 12(a)(2) claim against State Street or the

Underwriters because Plaintiffs lack statutory standing.[81]  To have statutory standing to bring a

Section 12(a)(2) claim, Plaintiffs must allege that they purchased State Street stock *both* (1)

directly in the June 2008 public offering (not in the aftermarket) *and* (2) from, or successfully

solicited by, each defendant.  *See Pinter v. Dahl*, 486 U.S. 622, 624, 646-47 (1988);[82]

*Maldonado*, 137 F.3d at 8; *Shaw*, 82 F.3d at 1214-15.  Therefore, Plaintiffs must—but do not—

allege the circumstances pursuant to which *each* defendant sold securities to *them* or solicited

*their* purchase of securities.  Thus, Plaintiffs' Section 12(a)(2) claim must be dismissed.

*First*, Plaintiffs lack statutory standing to bring a Section 12(a)(2) claim against State

Street or the Underwriters because they do not allege—as they must—that they purchased State

Street stock directly in the June 2008 public offering rather than in the aftermarket.  *See*

*Maldonado*, 137 F.3d at 8 ("[T]he Supreme Court conclusively decided that section 12(a)(2)

applies exclusively to 'initial public offerings.'").  The Complaint alleges only that, "[d]uring the

Class Period, MPERS purchased stock in State Street pursuant and/or traceable to the June 2008

Offering."  Compl. ¶ 27; *see also id.* ¶ 400.  This does not suffice.  Courts have repeatedly held

that allegations of purchases "pursuant and/or traceable to" offering materials—the exact

allegation made by Plaintiffs here—fail as a matter of law to establish statutory standing.

---

[81]      Plaintiffs do not advance claims under Section 12(a)(2) against the Individual Defendants.  *See* Compl. ¶¶ 475-81.

[82]      *Pinter* was brought under Section 12(a)(1) (formerly Section 12(1)); but the Supreme Court suggested, and the First Circuit later held, that the reasoning of *Pinter* applies equally to Section 12(a)(2) (formerly Section 12(2)).  *Pinter v. Dhal*, 486 U.S. 622, 642 n.20 (1988); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1214 (1st Cir. 1996).

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp.

2d 299, 305 (D. Mass. 2009).[83]  Thus, Plaintiffs' Section 12(a)(2) claim must be dismissed.

    *Second*, Plaintiffs lack statutory standing to bring a Section 12(a)(2) claim against the

Underwriters because they do not allege—as they must—that any Underwriter sold State Street

stock directly to them.  *See Shaw*, 82 F.3d at 1214-15.  Plaintiffs assert merely that "the

Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities issued in

the Offering pursuant to the Offering Materials," Compl. ¶ 477, and "through a public offering,

solicited and sold State Street common stock to members of the Class."  *Id.* at ¶ 478.  Nowhere

does the Complaint allege which Underwriter—much less that any of the Underwriters—sold

State Street stock to *Plaintiffs*.  As a result, Plaintiffs do not allege statutory standing under

Section 12(a)(2).  *See Plumbers' Union*, 658 F. Supp. 2d at 305 ("If plaintiffs did in fact

purchase the Certificates directly from the defendants, they should have said so.  An evasive

circumlocution does not suffice as a substitute.").

    This is not a matter of technical pleading, but rather is crucial to determining who is a

proper party to this suit.  For example, Plaintiffs may have purchased their stock from Lehman

Brothers Inc. ("Lehman"), which according to the Complaint sold more than 2 million shares for

---

[83]     *Accord Pub. Emps. Ret. Sys. of Miss.*, 2010 WL 2202295, at *6 (dismissing a Section 12(a)(2) claim for
lack of statutory standing where the complaint alleged that the "[p]laintiffs and other Class members purchased or
otherwise acquired Certificates pursuant and/or traceable to the defective Prospectus Supplements"); *In re Wells
Fargo Mortgage-backed Certificates Litig.*, ---- F. Supp. 2d ----, 2010 WL 1661534, at *6 (N.D. Cal. Apr. 22, 2010)
(dismissing a Section 12(a)(2) claim for lack of statutory standing where the "[p]laintiffs allege that they 'purchased
or otherwise acquired Certificates pursuant and/or traceable to the defective Prospectuses'" (emphasis omitted));
*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010)
(dismissing a Section 12(a)(2) claim for lack of statutory standing where "[t]he Complaint alleges only that Plaintiff
purchased Certificates 'pursuant and traceable to' the Offering Documents"); *In re Cosi, Inc. Sec. Litig.*, 379 F.
Supp. 2d 580, 589 (S.D.N.Y. 2005) (dismissing a Section 12(a)(2) claim for lack of statutory standing where the
plaintiffs allege only "that they bought their shares 'pursuant to or traceable to' the Prospectus"); *In re Sterling
Foster & Co. Sec. Litig.*, 222 F. Supp. 2d 216, 245-46 (E.D.N.Y. 2002) (dismissing a Section 12(a)(2) claim for lack
of statutory standing where the plaintiffs "allege that they purchased their securities 'pursuant to and traceable to'
the respective prospectus"); *In re WRT Energy Sec. Litig.*, 1997 WL 576023, at *5-6 (S.D.N.Y. Sept. 15, 1997)
(*vacated on other grounds*, 75 Fed. App'x 839 (2d Cir. 2003)) (dismissing a Section 12(a)(2) complaint for lack of
statutory standing where the plaintiffs allege that they purchased securities issued "pursuant to, or traceable to" the
registration statement).

a total of $144 million in the June 2008 offering.  Compl. at ¶ 419 n.9.  Lehman has not been

named as a defendant in this case because it has filed for Chapter 11 bankruptcy.  *Id.*  Because

Plaintiffs may recover under Section 12(a)(2) only from Underwriters that actually sold them

State Street stock, and because Plaintiffs do not allege which (if any) Underwriters did so, the

Court and the Underwriters are not able to determine which parties are properly defendants and

the claim against all Underwriters must be dismissed.  *See In re WebSecure, Inc. Sec. Litig.*, 182

F.R.D. 364, 369 (D. Mass. 1998) (dismissing a Section 12(a)(2) claim against an underwriter

where "[t]he amended complaint does not allege that *any* of the plaintiffs purchased shares

directly from [that underwriter]."[84]

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

Plaintiffs' claims for "control person" liability under Section 15 of the Securities Act and

Section 20 of the Exchange Act must be dismissed because Plaintiffs have not adequately

pleaded violations of those Acts.  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002)

("There must be a primary violation for liability under § 20(a). . . ."); *Cooperman*, 171 F.3d at 52

("A necessary element of a § 15 claim is a primary violation of § 11."

### CONCLUSION

For all of these reasons, the Complaint should be dismissed.

---

[84]    *Accord In re Citigroup Inc. Bond Litig.*, ---- F. Supp. 2d ----, 2010 WL 2772439, at *15 (S.D.N.Y. July 12, 2010) (dismissing a Section 12(a)(2) claim where the complaint and attached exhibits failed to identify clearly from whom the plaintiffs bought securities because, "[f]or a complaint to plausibly plead standing to raise a claim pursuant to Section 12, it must identify a particular purchase from a particular defendant pursuant to a particular prospectus that it contends contained a particular false or misleading statement"); *Dartley v. Ergobilt, Inc.*, 2001 WL 313964, at *2 (N.D. Tex. Mar. 29, 2001) (dismissing a Section 12(a)(2) claim against underwriters because "[n]one of the Plaintiffs allege that the Underwriters were statutory sellers of the securities the Plaintiffs purchased" (citing *WebSecure, Inc. Sec. Litig.*, 182 F.R.D. 364 (D. Mass. 1998)).

Respectfully submitted,


STATE STREET CORPORATION; RONALD E.
LOGUE; EDWARD J. RESCH; PAMELA D.
GORMLEY; KENNETH F. BURNES; PETER
COYM; NADER F. DAREHSHORI; AMELIA C.
FAWCETT; DAVID P. GRUBER; LINDA A.
HILL; CHARLES R. LAMANTIA; MAUREEN J.
MISKOVIC; RICHARD P. SERGEL; RONALD L.
SKATES; GREGORY L. SUMME; and ROBERT
E. WEISSMAN

By their attorneys,

_/s/ Jeffrey Rudman_____
Jeffrey B. Rudman (BBO No. 433380)
William H. Paine (BBO No. 550506)
John J. Butts (BBO No. 643201)
Timothy Perla (BBO No. 660447)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, Massachusetts, 02109
(617) 526-6000
jeffrey.rudman@wilmerhale.com


CREDIT SUISSE (USA) LLC; GOLDMAN,
SACHS & COMPANY; MORGAN STANLEY &
COMPANY INCORPORATED; UBS
SECURITIES LLC

By their attorneys,

/s/ Stephen D. Poss_____
Stephen D. Poss (BBO No. 551760)
Daniel P. Roeser (BBO No. 675223)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts, 02109
(617) 570-1000
sposs@goodwinprocter.com

Dated:  September 24, 2010

## CERTIFICATE OF SERVICE

I, Jeffrey B. Rudman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) dated September 24, 2010.

_Jeffrey B. Rudman_____
Jeffrey B. Rudman

**APPENDIX A**

**RELEVANT CLASS PERIOD RISK DISCLOSURES**

1.      *Selected Risk Disclosures Concerning State Street's Conduits and Investment Portfolio*

•       The credit quality of our on- and off-balance sheet exposures may be affected by many factors, such as economic and business conditions or deterioration in the financial condition of an individual counterparty or group of counterparties. In the event of poor economic conditions in a particular country or region, or the failure of a significant counterparty or group of counterparties, there is a greater likelihood that more of our customers or counterparties could become delinquent on their loans or other obligations to us, or that the special purpose entities we administer could experience deterioration in asset performance. This could result in higher levels of credit-related losses, which could adversely affect our earnings.  Aff. Ex. 3 at 9-10 (10-K filed Feb. 21, 2006).

•       As the third quarter of 2007 progressed and investors became increasingly concerned about the credit quality of the underlying assets generally held in asset-backed commercial paper conduits and similar vehicles, the resulting reduction in liquidity in the global fixed-income securities markets made the funding of the State Street-administered conduits more challenging than in normal market conditions, and the yields that issuers had to pay on asset-backed commercial paper increased. Consistent with the experience of other market participants, commercial paper was generally being placed by the State Street-administered conduits with shorter maturities and higher investor yields than historically experienced. This compressed the spread between the rate earned on the conduits' assets and the conduits' funding costs.  [ . . . . ]  Since the end of the third quarter of 2007, the asset-backed commercial paper market has modestly improved, but we remain cautious.  Aff. Ex. 11 at 33-34 (10-Q filed Nov. 2, 2007).

•       It is also possible that we would be required to consolidate one or more of the conduits' assets and liabilities onto our consolidated balance sheet. This would occur if we were determined to be the primary beneficiary of the conduits as defined in FASB Interpretation No. 46(R).  For example, if changes in market conditions require us to update the assumptions in our expected loss model, we may be required to increase the amount of first-loss notes in order for the investors in the first-loss notes to continue to be considered the primary beneficiaries of the conduits. If, for some reason, the conduits are not able to issue additional first-loss notes or take other actions, we may be determined to be the primary beneficiary of the conduits, and would be required to consolidate the conduits' assets and liabilities onto our consolidated balance sheet. Additional information about our use of an expected loss model and the third-party investors in first-loss notes is provided in note 8 to the consolidated financial statements in this Form 10-Q. Our accounting treatment of the conduits is reviewed at least quarterly, and more frequently if specific events warrant.  Aff. Ex. 11 at 34 (10-Q filed Nov. 2, 2007).

•       If consolidation were to occur because we were determined to be the primary beneficiary of the conduits as defined in FIN 46(R), we would consolidate the conduits' assets and

liabilities onto our consolidated balance sheet at fair value. We would recognize an extraordinary loss on the date of consolidation if the fair value of the conduits' liabilities exceeded the fair value of the conduits' assets, as they do currently. This loss would accrete back into income over the remaining lives of the assets, assuming that the assets were held to maturity and that we recovered the full principal amount of the securities.  Aff. Ex. 11 at 35 (10-Q filed Nov. 2, 2007).

- Purchasing or consolidating all or a significant portion of the assets of the conduits would affect the size and composition of our consolidated balance sheet and alter our financial and regulatory capital ratios, and may affect our earnings. [ . . . . ]  [A]s of September 30, 2007 . . . if the conduits' assets and liabilities were consolidated onto our consolidated balance sheet, we estimate that we would recognize an after-tax loss of approximately $215 million in our consolidated statement of income.  Aff. Ex. 11 at 35 (10-Q filed Nov. 2, 2007).

- If consolidation were to occur in the future . . ., the ultimate amount of loss will be based upon market conditions at the date such a determination is made, which could differ from the estimate provided above. If the assets were consolidated for accounting purposes pursuant to FIN 46(R), we expect that this loss would be recorded as an extraordinary loss, after income from continuing operations.  Aff. Ex. 11 at 35 (10-Q filed Nov. 2, 2007).

- If we were required to consolidate the conduits' assets and liabilities, our regulatory capital ratios would be negatively impacted for a period of time. With respect to regulatory capital, the consolidation of the conduits' assets and liabilities would cause only a modest reduction of our tier 1 and total risk-based capital ratios. The impact of consolidation on our tier 1 leverage ratio would be more significant, but the degree of impact would depend on how and when consolidation occurred, since this ratio is a function of our consolidated total average assets over an entire quarter. We currently estimate that if we consolidated the conduits' assets and liabilities, we would be able to continue to meet the regulatory capital threshold for "well capitalized."  Aff. Ex. 11 at 35-36 (10-Q filed Nov. 2, 2007).

- Forward-looking statements are subject to various risks and uncertainties . . . . Factors that could cause changes in the expectations or assumptions on which forward-looking statements are based include … the credit quality and credit agency ratings of the securities in our investment securities portfolio, a deterioration or downgrade of which could lead to other-than-temporary impairment of the respective securities and the recognition of an impairment loss.  Aff. Ex. 20 at 2-3 (8-K filed June 2, 2008).

- A significant market downturn . . . could be accompanied by a widening of credit spreads or credit deterioration, which could reduce the value of securities we hold in our investment portfolio.  The assets held by our asset-backed commercial paper conduits can be similarly affected.  Aff. Ex. 20 at 4-5 (8-K filed June 2, 2008).

- In a period of financial disruption, or if negative developments occurred with respect to State Street, the availability and cost of our funding sources could be adversely affected. In that event, our cost of funds may increase, thereby reducing our net interest revenue, or we may need to dispose of a portion of our investment portfolio, which, depending upon market

conditions, could result in our realizing a loss or experiencing other adverse accounting consequences upon those dispositions. Our efforts to monitor and manage liquidity risk may not be successful or sufficient to deal with dramatic or unanticipated changes in the global securities markets or other State Street or market event-driven reductions in liquidity.  Aff. Ex. 20 at 8 (8-K filed June 2, 2008).

- Our businesses are affected by global economic conditions, political uncertainties and volatility and other developments in the financial markets. Factors such as interest rates and commodities prices, regional and international rates of economic growth, inflation, political instability, the liquidity and volatility of fixed-income, equity, credit, currency, derivative and other financial markets, and investor confidence can significantly affect the businesses in which we and our customers are engaged. Such factors have affected, and may further unfavorably affect, both regional and worldwide economic growth, creating adverse effects on many companies, including us, in ways that are not predictable or that we may fail to anticipate.  Aff. Ex. 26 at 3 (8-K filed Oct. 15, 2008).

- As 2008 has progressed, there have been an increasing number of downgrades and credit watches imposed by ratings agencies on the securities in our investment portfolio. If all or a significant portion of this unrealized loss were determined to be other-than-temporary impairment, we would recognize a material charge to earnings in the quarter during which such determination was made, our capital ratios would be adversely impacted and a rating agency might downgrade our credit rating or put us on credit watch. A downgrade or a significant reduction in our capital ratios might adversely impact our ability to access the capital markets or might increase our cost of capital.  Aff. Ex. 26 at 10 (8-K filed Oct. 15, 2008).

- The fixed-income securities markets have continued to experience significant disruption and resulting illiquidity since mid-2007. This illiquidity is largely responsible for the significant pre-tax net unrealized loss on our aggregate investment portfolio . . . . Aff. Ex. 25 at 28 (10-Q filed Nov. 5, 2008).

- Management regularly reviews the investment securities portfolio to determine whether they expect any loss of principal or interest in light of current market and economic conditions and their expectations, and to determine if other-than-temporary impairment has occurred. This review includes such quantitative factors as current and expected future interest rates, the length of time the security's cost basis has exceeded its fair value and the severity of the impairment measured as the ratio of fair value to amortized cost, and the level and quality of collateral and the extent of subordination, as well as issuer-specific concerns regardless of quantitative factors. Where applicable, the review considers management expectations related to housing prices, expected borrower defaults and the security's overall capital structure. Extensive analysis was performed during the first nine months of 2008 in order to confirm that the declines in fair value did not reflect any instances where we believed we would not receive full principal and interest on individual securities. This analysis included detailed credit analysis at the portfolio, asset class, and individual security level. Analysis was also performed to support managements' assertion that they have the

ability to hold these securities until recovery in market value.  Aff. Ex. 25 at 28 (10-Q filed Nov. 5, 2008).

- In addition, management has both the ability and the intent to hold the securities until recovery in market value. The evaluation of declines in fair value and the determination of other-than-temporary impairment involve significant judgment and are based on a number of factors, including those described above. Given the continued disruption in the financial markets and the resulting illiquidity, as well as the severity and duration of the decline in fair values of securities and uncertainty with respect to the credit quality and performance of underlying collateral, the investment securities portfolio may incur additional other-than-temporary impairment in future periods.  Aff. Ex. 25 at 29 (10-Q filed Nov. 5, 2008).