# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY W. HILL, et al., )<br>    Plaintiffs, )<br> )<br>    v. )<br> )<br>STATE STREET CORPORATION, et al., )<br>    Defendants. ) | Master Docket No. 09cv12146-NG |

GERTNER, D.J.:

## TABLE OF CONTENTS

### MEMORANDUM AND ORDER RE:
### MOTIONS TO DISMISS SECURITIES ACTION AND ERISA ACTION
August 3, 2011

I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
      A.    FX Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
      B.    The Over-Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
      C.    Conduits & Investment Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
      D.    June Stock Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
      E.    Market Crash and State Street Losses . . . . . . . . . . . . . . . . . . . . . . . -10-
      F.    California Attorney General's Action and Press Release . . . . . . . . . . -12-
      G.    The State Street Corporation Salary Savings Plan & ERISA . . . . . . . -13-
      H.    Instant Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

II.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
      A.    Exchange Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
      B.    Heightened Pleading Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
      C.    Foreign Exchange (FX) Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
            1.    Plausible and Particularized Allegations of Fraud and False
                  and Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . -19-
                  a.    Contractual Obligation . . . . . . . . . . . . . . -20-
                  b.    Plausible Theory of Fraud . . . . . . . . . . -21-
                  c.    Evidentiary Sources . . . . . . . . . . . . . . . -24-
            2.    Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
      D.    Conduits and Investment Portfolios Fraud . . . . . . . . . . . . . . . . . . . . . -29-
            1.    False or Misleading Statement . . . . . . . . . . . . . . . . . . . . -30-
            2.    Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-
                  a.    Disclosures Specifics . . . . . . . . . . . . . . -33-
                  b.    Disclosures Were Insufficient . . . . . . . . -36-
            3.    "Honestly Held and Reasonably Based" Opinion &
                  Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
      E.    Securities Act Of 1933 ("Securities Act") . . . . . . . . . . . . . . . . . . . . . -44-
            1.    Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . -45-

        2.     Service of the Underwriters . . . . . . . . . . . . . . . . . . . . . -49-

        3.     Standing under § 12(a)(2) . . . . . . . . . . . . . . . . . . . . . . -50-

III.    ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -51-

    A.    Pleading Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -53-

    B.    Plausible Basis for Claim that State Street Stock Was an Imprudent Investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -56-

        1.     <u>Moench</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -57-

        2.     Allegation of Imprudence . . . . . . . . . . . . . . . . . . . . -60-

    C.    Disclosure Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -62-

    D.    Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-

        1.     Logue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -66-

        2.     Committee Defendants . . . . . . . . . . . . . . . . . . . . . . . -68-

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -69-

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **TIMOTHY W. HILL, et al.,** ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Master Docket No. 09cv12146-NG** |
| ) | |
| **STATE STREET CORPORATION, et al.,** ) | |
| **Defendants.** ) | |

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE:
## MOTIONS TO DISMISS SECURITIES ACTION AND ERISA ACTION
August 3, 2011

This case involves two separate but related class actions which have been consolidated: First, a federal securities action, alleging violations of both the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act") (collectively the "Securities Action"); and second, an Employee Retirement Income Security Act ("ERISA") action (the "ERISA Action"). Although the plaintiffs in these two cases are different, they have claims stemming from the same conduct by the main defendant in each case, State Street Corporation ("State Street").

Between October 17, 2006, and October 19, 2009 ("the Securities Action class period"), State Street allegedly deceived its investors in two separate ways. First, State Street impermissibly charged its clients a different exchange rate than the one the bank actually used to execute Foreign Exchange ("FX") trades requested by its clients. Second, State Street misled the market regarding State Street's exposure when it assured investors in the fall of 2008 that debt securities contained in its investment portfolio and in four specific off-balance-sheet commercial paper conduits -- collateralized in part by risky mortgage-backed securities -- were of high quality.

Lead Plaintiffs in the Securities Action -- two institutional investors, Public Employees' Retirement System of Mississippi ("MPERS") and Union Asset Management Holding AG ("Union") -- bring federal securities claims on behalf of themselves and all other similarly-situated State Street stock holders (collectively the "Securities Plaintiffs"), asserting violations of both the Exchange Act and the Securities Act.  With respect to the Exchange Act, Securities Plaintiffs claim that State Street and two of its executive officers (collectively the "Exchange Act Defendants") made false and misleading statements about both State Street's FX practice and its conduits/portfolio in violation of §§ 10(b) and 20(a) of the Exchange Act.  In addition, Securities Plaintiffs raise claims under §§ 11, 12, and 15 of the Securities Act, alleging that State Street, along with various high-ranking company officers, members of its board of directors, auditors, and underwriters (collectively the "Securities Act Defendants"), conducted an offering of State Street stock in June 2008 pursuant to a shelf registration statement and prospectus that contained allegedly untrue and misleading statements about State Street's FX trading practices and the assets in its portfolio and conduits.  As a result of the improper statements, those Securities Plaintiffs who purchased State Street stock pursuant and/or traceable to the June 2008 offering supposedly suffered substantial damages.

The ERISA Action also concerns State Street's FX practice.  Lead Plaintiff Casey J. Richard ("Richard"), a participant in the State Street Corporation Salary Savings Plan (the "Plan"), brings a class action on behalf of himself and all other similarly-situated participants in the Plan (collectively, the "ERISA Plaintiffs") against the fiduciaries of the Plan (collectively the "ERISA Defendants").  State Street common stock was one of the investment options offered to participants under the Plan.  Richard charges that ERISA Defendants breached their fiduciary

duties by, among other things, imprudently offering State Street stock as an investment option to Plan participants. Richard claims that offering State Street stock as an investment option was imprudent because the stock was artificially inflated and overvalued by reason of State Street's material misrepresentations and omissions concerning its FX trading practices and revenue. While Richard does not allege the date on which State Street stock began to be an imprudent investment, he does allege that the period at issue ended on October 20, 2009, when the California Attorney General ("AG") announced that he had intervened in a *qui tam* lawsuit over the rates at which State Street executed a certain type of FX for two California pension plans.

The Securities Act Defendants, the Exchange Act Defendants, and the ERISA Defendants all move to dismiss. For the following reasons, their motions (**documents #58, 67, 68, 71**) are **DENIED**.

## I.     BACKGROUND

Taking all well-plead allegations as true, the relevant facts are as follows:

### A.     FX Practice

One of the financial services that State Street offers its clients is foreign exchange ("FX") trading, which enables clients to exchange U.S. Dollars into foreign currency and vice-versa. State Street's clients typically use these services to trade foreign securities or to convert foreign currency held in their custodial accounts into U.S. Dollars. Securities Compl. ¶ 39 (document #51). All foreign exchange transactions are executed at a prevailing exchange rate, which determines how much one currency is worth in terms of another. The most commonly used exchange rate is the Interbank rate, which fluctuates throughout each day and is tracked and published by various industry sources. Id. ¶ 40.

State Street's revenue from FX trading services grew dramatically from 2005 through 2008, and comprised a significant percentage of the Company's overall revenue:

| Year-End | Foreign Exchange Revenue | Percent Increase from Prior Year | Percent of Total Revenue |
|----------|--------------------------|----------------------------------|--------------------------|
| 2005 | $468 million | 10% | 8.5% |
| 2006 | $611 million | 31% | 9.7% |
| 2007 | $802 million | 31% | 9.7% |
| 2008 | $1.08 billion | 25% | 10.1% |

Id. ¶ 44.

State Street regularly provided a break-out of its foreign exchange revenue in the Company's SEC filings and press releases, often touting the substantial revenue increases. Id. ¶ 45. For instance, in the Company's Form 10-K for the year ended 2006,[1] State Street told investors that "foreign exchange trading revenue increased 31%, to $611 million from $468 million in 2005, and benefitted from a strong first half of the year." Id. ¶ 45. Similarly, on a conference call held on October 16, 2007, State Street's CEO, Defendant Ronald E. Logue ("Logue") stated:

> [W]hile market conditions in the third quarter presented challenges . . . it also created more opportunities in foreign exchange and in securities finance than we usually expect in the third quarter . . . . Revenue from foreign exchange increased 98% from the year ago quarter, and 29% from the second quarter.

Id. In its annual and quarterly filings, the Company consistently attributed its growth in foreign exchange revenues to one of three factors: (1) "the volume and type of customer foreign

---

[1] "Year ended" is the phraseology used on the 10-K.

exchange transactions," (2) "currency volatility and trends," and (3) "the management of currency market risks."  Id. ¶ 48.

B.      The Over-Charge

Throughout the Securities Action class period, State Street executed two types of foreign exchange transactions for its clients.  First, some of State Street's clients would conduct "direct" foreign exchange trades.  In a direct trade, an institution would contact a State Street representative who would quote an exchange rate that the institution could accept or reject.  If State Street's rate was sufficiently competitive, the client would accept, and the trade would be executed at the agreed-upon exchange rate.  State Street would collect a fee for processing the trade and pass along the cost of the exchange rate to its client.  Id. ¶ 40.  Second, for more than 75% of its large custodial clients, State Street would conduct "indirect" foreign exchange trades. In an indirect trade, neither the institution nor its outside investment manager would be quoted an exchange rate.  Instead, the client would request a transaction involving a foreign exchange (such as a purchase of foreign securities), and State Street would execute the transaction pursuant to its contract with its client.  Id. ¶ 41.

Unbeknownst to the clients, an indirect trade during the Securities Action class period would occur as follows:  After a custodial client or its investment manager initiated an FX transaction by sending a request to the Securities Processing Unit of State Street through the Market Order Management System ("MOMS"), the request was then passed on to State Street FX trading desk.  Id. ¶ 54.  Upon receipt of a request from a client, typically early in the day, a State Street FX trader would execute the transaction at whatever the current exchange rate was (the "actual rate") using the Wall Street System ("WSS").  Id. ¶ 55.  Although the actual FX

transaction was then complete, the rate used by State Street was not the rate State Street ultimately charged the client for the transaction.  Id. ¶¶ 55-56.  Rather, throughout the day, the trader would observe the various exchange rates in effect and then select the rate that would be most beneficial for State Street to charge its clients (the "selected rate").  Id. ¶ 51.  This selected rate -- which allowed State Street to charge clients a higher rate for purchases or a lower rate for sales than had actually been used -- would then be entered into MOMS and sent to the custodial client for approval, without any record that the transaction had already been arranged or any notation of the actual rate that was applied.  Id. ¶¶ 56-57.  Once the client approved the information sent through MOMS, State Street would debit or credit its client's account according to the selected rate, not the actual rate.  Id. ¶ 54-56.  State Street would then provide its clients with monthly "FX Spot Purchase/Sale Activity Reports" that detailed the selected rates charged but never the actual rates used  Id. ¶ 58.  This practice of charging the selected rate was applied to State Street's custodial clients who conducted indirect trades -- i.e., pension funds that had "handed their foreign trading operations over,"  Id. ¶ 53 -- but not to clients requesting direct trades.  The latter clients -- often large hedge funds -- would be charged the actual rate.  Id.

### C.    Conduits & Investment Portfolio

In addition to its FX practice, during the Securities Action class period, State Street also managed a large portfolio of investment securities for its own benefit and four asset-backed commercial paper conduits.  Id. ¶ 85-86.  These conduits were off-balance sheet entities that raised money by issuing short-term commercial paper that State Street marketed and sold to its institutional clients.  The conduits would then buy debt securities -- such as mortgages -- with the money obtained from selling the commercial paper.  In other words, State Street was the

lender receiving principal and interest on the debt security assets, and also the borrower paying principal and interest on the commercial paper.[2]  State Street "earned revenue from the conduits by taking as profit the spread on the yield between the longer-term MBS [mortgage-backed securities] assets and the short-term commercial paper."  Id. ¶ 12.  According to State Street, the conduits sought to hold their debt security assets to maturity, not trade them, so that the cash flow from the assets would be sufficient to pay what was owed to the holders of the commercial paper.  See Butts Aff. Ex. 14, at 11, 48; Id. Ex. 29, at 58 (document #69).  In the event of default in payment on the debt security assets, State Street was obliged to provide liquidity support to the conduits.  Id. Ex. 13, at 11.

These conduits and the investment portfolio each held billions of dollars in mortgage-backed securities ("MBS").  MBS can be secured by three types of underlying mortgages:  "A-paper" mortgages (highest rated); "Alt-A" mortgages (from borrowers with lower credit scores), and subprime (issued to borrowers who have extremely low credit scores).  At all relevant times, the majority of the assets in State Street's conduits were MBS collateralized primarily by Alt-A loans.  Securities Compl. ¶ 88.  The investment portfolio also had a significant portion of its assets in MBS, including "not only a substantial amount of securities collateralized by Alt-A loans but also billions of dollars in . . . subprime mortgages."  Id. ¶ 90.  Indeed, between the third quarter of 2007 and the fourth quarter of 2008, State Street's investment portfolio contained between $5.5 billion and $6.6 billion in subprime mortgages.  Id.

---

[2] Judge Saris recently described conduits as "complex, non-transparent investment vehicles."  Kenney v. State Street Corp., 694 F. Supp. 2d 67, 75-76 (D. Mass. 2010).  The financial models "used to determine when and whether to consolidate their assets and liabilities onto State Street's balance sheet are not well explained," and it is "unclear whether the continued off-balance sheet treatment of conduits is an overly aggressive accounting gimmick or a prudent investment strategy."  Id. at 76.

As the real estate market declined during the class period,[3] the Securities Act Defendants made many comments about the portfolio and the conduits to the investing public. Indeed, by the spring of 2007, the risk to State Street became the subject of "intense investor concern." State Street was asked to regularly address these issues in its quarterly earnings and releases and on conference calls with investors, during which Defendants stated that the conduits and portfolio were subject to rigorous credit review processes. Id. ¶¶ 99-106. State Street, however, did not disclose the specific assets contained in these programs. Id. ¶ 103.

On January 3, 2008, State Street issued a Form 8-K and press release disclosing that it was taking a $618 million litigation reserve towards anticipated legal exposure relating to significant declines in subprime investments the Company had made in certain of its Fixed Income Funds. Id. ¶ 113.

### D. June Stock Offering

On June 3, 2008, State Street sold 40.5 million shares of its common stock at approximately $70 per share (the "June 2008 Offering"), which raised more than $2.8 billion from investors. Securities Compl. ¶¶ 4, 399. Among those who purchased stock in State Street pursuant and/or traceable to the June 2008 Offering was Lead Plaintiff MPERS. Id. ¶ 400. In

---

[3] By mid-2006, the signs of a severe housing downturn "were readily apparent." Securities Compl. ¶ 95. For instance, on July 13, 2006, the Dow Jones U.S. Home Construction Index was down 35% and DR Horton Inc., the nation's largest homebuilder, cut its full-year earning forecast by nearly 40%. Id. ¶ 96. By early 2007, market observers and research analysts were linking the declining housing prices, the drop-off in new home construction, rising interest rates, and increasing defaults directly to a weakening of the MBS markets. Id. ¶ 97. On October 5, 2007, Merrill Lynch announced that it was writing down $5.5 billion of its subprime exposure, a number that it increased to $8.4 billion three weeks later. Id. ¶ 108. On November 5, 2007, Citigroup disclosed that its subprime holdings were permanently impaired by $11 billion, including significant losses in so-called "high grade" (i.e., highly-rated) subprime mortgage-backed securities. Id. On November 9, 2007, Treasury Secretary Hank Paulson expressed alarm about the dangers posed by the deteriorating housing market, stating: "the housing decline is still unfolding and I view it as the most significant risk to our economy." Id. ¶ 109. On January 15, 2008, Lehman Brothers announced that it was laying off 1,300 employees in its domestic mortgage division. Id. ¶ 115. On May 22, 2008, the Financial Times reported that financial companies around the world had taken more than $300 billion in write downs related to mortgage-backed securities in the previous year. Id. ¶ 120.

addition, various underwriters of the Offering -- including Securities Act Defendants Goldman

Sachs & Co. ("Goldman"), Morgan Stanley & Co. Incorporated ("Morgan Stanley"), Credit

Suisse Securities (USA) LLC ("Credit Suisse"), and UBS Securities LLC ("UBS') -- purchased,

sold, and distributed 35,715,000 shares of State Street common stock.  Id. ¶¶ 419-24.

The June Offering was conducted pursuant to a shelf registration statement filed with the

Securities and Exchange Commission ("SEC") on Form S-3 on March 21, 2006 (the "Shelf

Registration Statement").  Id. ¶ 426.[4]  Incorporated by reference into the Offering was a Form

10-K that State Street filed with the SEC, reflecting State Street's Annual Reports for the year

ended December 31, 2007.[5]  Defendant Ernst & Young LLP ("Ernst & Young"), an Independent

Registered Public Accounting Firm, had audited State Street for the year ended December 31,

2007, and approved the financial statements that were filed with the Form 10-K.  Id. ¶ 429.  In

the Form 10-K for the year ended December 31, 2007, Ernst & Young discussed its audit of

State Street's "consolidated statement of condition of State Street Corporation as of December

31, 2007" and stated that "State Street Corporation maintained, in all material respects, effective

internal control over financial reporting as of December 31, 2007."  Id. ¶ 429.

As of March 31, 2008, State Street's Tangible Common Equity ("TCE") ratio -- a metric

for financial institutions -- had fallen to 2.9%., at a time when investors and Government

---

[4] The prospectus, dated June 2, 2008, was issued pursuant to the March 21, 2006, Shelf Registration Statement, as was a prospectus supplement, dated June 3, 2008, both of which became part of the Shelf Registration Statement pursuant to which the Offering was conducted.  Securities Compl. ¶ 427.  A shelf registration statement is a filing with the SEC to register a public offering.

[5] The Offering Materials also incorporated by incorporation numerous other State Street public filings, specifically: State Street's Annual Report on Form 10-K for the fiscal year ended December 31, 2007; the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008; and, State Street's Current Reports on Form 8-K filed on January 3, 2008, January 17, 2008, January 25, 2008, April 7, 2008, May 5, 2008 and June 2, 2008.

regulators considered a TCE of 3.0% to be the minimum acceptable level for bank safety.  Id. ¶ 431.  The influx of capital from the June 2008 Offering enabled State Street to bring its TCE ratio back above the 3.0% threshold.

E.      **Market Crash and State Street Losses**

By the fall of 2008, it was clear that the mortgage industry was in crisis.  On August 12, 2008, Bloomberg reported that losses related to the crisis in the mortgage industry had "crossed the $500 billion mark as writedowns spread to more asset types."  Id. ¶ 124.  Less than a month later on September 7, 2008, the US Treasury placed Fannie Mae and Freddie Mac into government conservatorship.  Id. ¶ 126.  Then, over the weekend of September 15, 2008, Lehman Brothers filed for bankruptcy.  The next day, Merrill Lynch was sold to Bank of America, as the Federal Reserve announced that it had loaned $85 billion to AIG.  Id. ¶¶ 128-29. And on September 25, 2008, Washington Mutual was seized by the FDIC, which sold its banking assets to JPMorganChase.  Id. ¶ 131.  October 6-10, 2008, "was the worst week for the United States' stock markets in 75 years."  Id. ¶ 132.  Soon thereafter, the United States federal government  implemented the TARP program to inject $250 billion into the US banking system. The money was distributed among nine banks, including $2 billion to State Street.  Id. ¶ 133.

Nonetheless, throughout October and November of 2008, State Street assured investors that the assets in the conduits and its portfolio were "high quality."  Id. ¶ 136.  For instance, on October 15, 2008, in a press release, Defendant Logue stated, "As we have said in the past, the asset quality of both our investment portfolio and the conduits remains high."  Id. ¶ 136.  On a conference call the same day, Logue again said that the assets "are of high quality."  Id. ¶ 137. An analyst asked Logue, "Is there any point where you would consider proactively consolidating

the conduit and just try to put it behind you?" Logue responded, "No, because I don't think that is the way to spend the shareholders' money. We think this is money good [sic]." Id. at ¶ 140. On the same conference call, Executive Vice President and Chief Financial Officer ("CFO") Edward J. Resch ("Resch") said: "Due to the high quality of the assets and their performance, we do not currently believe we need to consolidate the conduits." Id. ¶139[6]

Similarly, on November 10, 2008, State Street filed a Form 8-K with the SEC that attached a presentation on State Street's conduits and investment portfolio, which Logue and Resch discussed at an investment banking conference the following day. The Form 8-K "repeated many of the same statements made . . . on October 15, 2008, including describing the Conduits as having 'strong overall asset quality.'" Id. ¶¶ 141-42. It also stated that the "investment Portfolio remains of high quality and well diversified." Id.

Then, on January 16, 2009, after the close of the markets and at the start of the Martin Luther King, Jr. holiday weekend, State Street filed a 31-page Form 8-K "updating" the Company's risk factors. Id. ¶ 143. These included, among other things, representations that (a) the conduits "expose us to liquidity and interest-rate risk"; (b) if it took a permanent writedown on its investment portfolio "we would recognize a material charge to our earnings"; and (c) the "current worldwide recession is likely to adversely affect our business." Id. Four days later, on January 20, 2009, State Street announced that the net unrealized losses in its four conduits and the portfolio had in fact already increased in the previous two months from $5.4 billion to $9.9 billion, and further disclosed that it had to purchase $8.9 billion of the conduits' commercial

---

[6] To "consolidate the conduits" means to include the losses or gains from the conduits on State Street's balance sheet.

paper in order to supply the conduits with liquidity.  Id. ¶ 144.  In the wake of this news, State

Street's stock fell 60% in a single trading day.

F.     **California Attorney General's Action and Press Release**

Several months later, on October 20, 2009, California Attorney General ("AG") Edmund

G. Brown, Jr., announced that, after an 18-month investigation, he had filed suit against State

Street for committing an "unconscionable fraud" against California's two largest pension funds --

California Public Employees'  Retirement System ("CalPERS") and California State Teachers'

Retirement System ("CalSTRS") -- by overcharging CalPERS and CalSTRS for the costs of

executing FX trades since 2001.  ERISA Compl. ¶ 5.

The California Attorney General's complaint is based upon a *qui tam* action, filed under

seal, apparently by whistleblowing company insiders, in April, 2008.  Id. ¶ 75.  The *qui tam*

plaintiffs alleged that they had "personal knowledge of the false records, statements and/or

claims that Defendants presented to their customers," and explained "in detail how the foreign

exchange trading scheme worked."  Id. ¶ 75 (quoting *Qui Tam* Complaint ¶¶ 18-35).

Furthermore, according to the California AG, several other sealed *qui tam* cases pending in other

states also alleged claims arising from State Street's FX trading scheme.  ERISA Compl. ¶ 5.

The California AG's October 20, 2009, press release, entitled "Brown Sues State Street

Bank for Massive Fraud Against CalPERS and CalSTRS," stated, in relevant part:

> Seeking to recover more than $200 million in illegal overcharges
> and penalties, Attorney General Edmund G. Brown Jr. today
> announced that he has filed suit against State Street Bank and
> Trust -- one of the world's leading providers of financial services
> to institutional investors -- for committing "unconscionable fraud"
> against California's two largest pension funds -- CalPERS and
> CalSTRS. . . . "Over a period of eight years, State Street bankers
> committed unconscionable fraud by misappropriating millions of

> dollars that rightfully belonged to California's public pension
> funds," Brown said. "This is just the latest example of how clever
> financial traders violate laws and rip off the public trust." . . . State
> Street concealed the fraud by deliberately failing to include time
> stamp data in its reports, so that the pension funds could not
> determine the true execution costs by verifying when State Street
> actually executed the trades. Commenting on this deception, one
> State Street senior vice president said to another executive that "if
> providing execution costs will give [CalPERS] any insight into
> how much we make off of FX transactions, I will be shocked if
> [State Street] or anyone would agree to reveal the information."

Id. ¶ 68. Upon this news, shares of State Street declined $4.41 per share, or 8.44%, to close at

$47.84 per share on October 20, 2009. Id. ¶ 70. Two days later, State Street announced the

retirement of CEO Logue effective March 1, 2010. Securities Compl. ¶ 69.

Following the AG's announcement, State Street's FX trading revenue decreased 56%

from the fourth quarter of 2008 ($330 million) to the fourth quarter of 2009 ($144 million). Id. ¶

72. State Street later addressed the California AG's action in its 2009 Form 10-K:

> In light of the action commenced by the California Attorney
> General, we are providing customers with greater transparency
> into the pricing of this product and other alternatives offered by us
> for addressing their foreign exchange requirements. Although we
> believe such disclosures will address customer interests for
> increased transparency, over time such action may result in
> pressure on our pricing of this product or result in clients electing
> other foreign exchange execution options, which would have an
> adverse impact on the revenue from, and profitability of, this
> product for us.

Id. ¶ 73.

## G. The State Street Corporation Salary Savings Plan & ERISA

Among those affected by State Street's actions with respect to its FX practice and its

conduits and portfolio were the participants in the State Street Corporation Salary Savings

Program (the "Plan"), an employee benefit plan within the meaning of ERISA §§ 3(3) and

3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A), and a "defined contribution" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). During the relevant period, the Plan provided a number of different options for investment of the Plan's assets, including the opportunity to invest in State Street stock through an investment option known as the Employee Stock Ownership Plan ("ESOP" or "State Street Stock Fund"). Id. ¶ 2. However, nothing in the design of the Plan required the plan fiduciaries to offer the Company Stock Fund as an investment option. Id. ¶¶ 2, 37-39. When the plan fiduciaries invested in the State Street Stock Fund, the ERISA Plaintiffs, including Richard, were affected by the stock's decline in the wake of the AG's announcement.

Various entities and fiduciaries had discretionary control over the Plan, which included the power to choose the investment options available to the Plan participants. According to the Summary Plan Description ("SPD"), State Street, acting through its committees, was the Plan Administrator and a fiduciary of the Plan. Id. ¶13. In addition, Defendant North America Regional Benefits Committee of State Street Corporation (the "Benefits Committee"), through its members, managed and administered the Plan and had discretionary authority over its assets. According to the SPD, the Benefits Committee was the Plan Administrator and was a fiduciary of the Plan. Id. ¶ 15. Furthermore, Defendant Investment Committee of State Street Corporation (the "Investment Committee"), through its members, managed and administered the Plan and had discretionary authority over the investment of the assets of the Plan. According to the SPD, the Investment Committee was also a fiduciary of the Plan. Id. ¶ 16. The appointment and removal of members of the Benefit Committee and the Investment Committee fell within the discretion of the Executive Committee, of which Logue was a member. Id. ¶ 57.

### H.  Instant Litigation

On December 18, 2009, about two months after the California AG announced his lawsuit, Plaintiff Timothy Hill ("Hill") filed a federal class action on behalf of purchasers of State Street's securities between October 17, 2006, and October 19, 2009, claiming that State Street and certain high-ranking employees had violated the Exchange Act by making false and misleading statements in relation to its FX practice.  On January 15, 2010, Marilyn Demory ("Demory") filed a class action raising, among other things, similar Exchange Act claims (based on both State's FX practice and its conduits/investment portfolio), along with alleged Securities Act violations.  Finally, on February 5, 2010, Casey Richard ("Richard"), a participant in the Plan, brought a class action raising various ERISA claims stemming from State Street's FX practice. Soon thereafter, the <u>Hill</u>, <u>Demory</u>, and <u>Richard</u> actions were consolidated as related actions, and MPERS and Union were appointed as the Lead Plaintiffs for the Securities Action.

On June 25, 2010, the Securities Action Plaintiffs submitted a consolidated amended class action complaint, which fleshed out both the FX and conduit/portfolio elements of the Exchange Act claims and the Securities Act claims.  Around the same time, Richard also submitted an amended complaint in the ERISA action.  A few months later, all of the Defendants moved to dismiss.

## II.  DISCUSSION

### A.  Exchange Act

Under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2009), which was promulgated pursuant to § 10(b), it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  The Securities Action Plaintiffs (referred to as the "Plaintiffs" in the remainder of Part I) allege that State Street; its Chairman of the Board of Directors and CEO during the class period, Logue; and its Executive Vice President and CFO during the claim period, Resch (collectively the "Exchange Act Defendants" but referred to as the "Defendants" in the remainder of Part I) violated the Exchange Act by making false and misleading statements concerning both their FX trading business and the debt securities contained in State Street's investment portfolio and four asset-backed commercial paper conduits.  In so doing, Plaintiffs claim, Defendants also violated generally accepted accounting principles ("GAAP").

A claim for securities fraud under section 10(b) and Rule 10b-5 must contain six elements: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008). Defendants argue that Plaintiffs cannot satisfy all of these elements with either its allegations of FX fraud or conduit/portfolio fraud and, thus, fail to state a claim for an Exchange Act violation. For the reasons stated below, I disagree.

### B.    Heightened Pleading Requirements

Since Plaintiffs' FX and conduit/portfolio claims allege frauds that implicate securities law, both Rule 8 and Rule 9 of the Federal Rules of Civil Procedure along with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 109 Stat. 737, govern Plaintiffs' pleading requirements.  Under Rule 8 as it has been interpreted in Bell Atlantic Corp. v. Twombly, Plaintiffs must plead facts sufficient to make their alleged conclusions "plausible."  550 U.S.

544, 570 (2008).  In addition, Rule 9(b) mandates that Plaintiffs "must state with particularity the circumstances constituting fraud or mistake."  Rule 9 does make clear that, "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  In addition, under the PSLRA, whenever Plaintiffs allege that Defendants "made an untrue statement of a material fact" or "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading," their complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Finally, the PSLRA demands that Plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. at § 78u-4(b)(2).  To quality as "strong," the inference "must be more than merely plausible or reasonable -- [it] must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).[7]

As described below, Plaintiffs have satisfied this heightened pleading standard for both the FX and conduit/portfolio aspects of their Exchange Act claims.

### C.    Foreign Exchange (FX) Practice

Plaintiffs allege that Defendants violated the Exchange Act by misstating both the FX revenue it had earned and the reasons for the dramatic increase in FX revenue between 2005 and

---

[7] As the First Circuit said in Aldride v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002), to plead fraud in accordance with the PSLRA and Rule 9(b), a complaint must "specify each allegedly misleading statement or omission including its time, place and content" and provide facts showing "why the statements or omissions were misleading."  (citing Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999)).

2008.  First, Plaintiffs claim that Defendants deceived the investing public when it reported that its FX revenue increased as follows:

| Year-End | Foreign Exchange Revenue |
| --- | --- |
| 2005 | $468 million |
| 2006 | $611 million |
| 2007 | $802 million |
| 2008 | $1.08 billion |

Securities Compl. ¶¶ 44, 49.  Second, Plaintiffs assert that Defendants misled and lied to the investing public when it consistently attributed the FX growth to one of three factors:  (1) "the volume and type of customer foreign exchange transactions," (2) "currency volatility and trends," and (3) "the management of currency market risks."  Id. ¶ 48.  These statements about the amount of and the explanations for Defendants' FX revenue, Plaintiffs claim, were false and misleading because they concealed the fact that these increases in revenue were due in large part to Defendants' "long-running fraudulent scheme to overcharge State Street's largest institutional customers for foreign exchange trades," id. ¶ 49.

Defendants respond that the Exchange Act claim as it relates to State Street's FX practice should be dismissed for two reasons.  First, Plaintiffs  have failed to supply particularized facts sufficient to support a plausible inference that State Street perpetrated a fraud and, thus, that the

statements at issue were false and misleading.[8]  Second, even if State Street made false or misleading statements, the statements were immaterial.

I disagree on both prongs.  Taking into account the heightened pleading standards, I find that Plaintiffs' allegations are both stated with particularity and plausible.  It is plausible that State Street impermissibly overcharged clients for indirect FX trades, thereby enabling the bank to fraudulently inflate its foreign exchange revenue by a material amount.  At this point -- the pleading stage -- I cannot ignore that Plaintiffs' complaint is buttressed by, among other things, allegations made by six confidential sources and the booty from an 18-month investigation by the California AG.  To require more from Plaintiffs at this stage would be to improperly declare that a plaintiff must produce a smoking gun in order to survive a motion to dismiss a fraud securities case, a burden too heavy to bear at the pleading stage.  See, e.g. Tellabs, Inc., 551 U.S. at 324 (quoting Fidel v. Farley, 392 F.3d 220, 227 (6th Cir. 2004)) ("The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or ever the 'most plausible of competing inferences.'").  Thus, Plaintiffs have provided sufficiently particularized facts supporting their allegations of an Exchange Act violation with respect to the FX practice to survive Defendants' motion to dismiss.

1.    **Plausible and Particularized Allegations of Fraud and False and Misleading Statements**

Plaintiffs' complaint is replete with detailed and well-plead facts alleging a fraudulent foreign exchange scheme that resulted in Defendants' making false and misleading statements. Plaintiffs' factual allegations, which are based on what Plaintiffs learned from their own

---

[8] Defendants address the issue of scienter separately, but it is subsumed under the general discussion of whether Plaintiffs have sufficiently pled fraud under the heightened standards.

investigation, the allegations made in the California *qui tam* action, the California AG's independent investigation, internal State Street documents, and six State Street confidential witnesses, satisfy not only Rule 8 but also Rule 9(b) and the PLSRA.

Defendants admit that they charged their custodial clients a different rate from the one actually used to effectuate the FX trades. Mot. Hr'g Tr. 22:16-18, Feb. 16, 2011 (document #94) ("We knew we were charging a markup, I'm not suggesting we didn't, nor did we go to any pains to conceal it."). Nonetheless, they assert across three fronts that Plaintiffs have failed to plead sufficient facts to support their allegation that this practice was fraud. First, they suggest that the rate State Street charged their custodial clients was legitimate under the governing contracts with its clients. Second, they claim that plaintiffs have not plead sufficiently particularized facts to support a plausible inference of fraud. Finally, they attack the evidentiary sources upon which plaintiffs rely.

### a.    Contractual Obligation

A typical contract between State Street and a custodial client imposed the following with respect to the exchange rate charged:

> All trades are priced *based on the interbank rate at the time the trade is executed*. As all trades are priced based on the prevailing interbank rate at the time of the trade, we guarantee that we provide competitive pricing for all foreign exchange transactions. . . . Clients executing foreign exchange transactions with State Street . . . are guaranteed to receive the most competitive rates available for all FX transactions . . . because all trades are based on the interbank rates at the time the trade is executed.

Securities Compl. ¶ 42 (emphasis added). According to Defendants, the fact that they imposed a "mark-up" on their custodial client by charging the selected rate, rather than the actual rate, did not violate State Street's contractual obligations because the selected rate was "based on the

interbank rate at the time the trade [was] executed."  Plaintiffs interpret the contract differently and argue that State Street was supposed to provide its clients the same exchange rate that State Street actually used to make the trade.

The resolution to this contract dispute turns, at least in part, on the meaning of "based on."  Given the information provided by the parties to date, this issue is not properly resolved at the pleading stage.  The parties have offered no evidence for evaluating the meaning of the disputed term,[9] and since, on a motion to dismiss, I must take all well-plead allegations as true, I am obliged to accept that, as plaintiffs allege, "State Street was obligated to provide its clients the same exchange rate that State Street actually used to make the trade."  Id. ¶ 41.

Even if State Street did breach its contract, however, whether State Street's practice amounted to fraud is another question.

### b.       Plausible Theory of Fraud

Defendants further claim that the fraud plaintiffs allege is not plausible for two reasons: (1) Plaintiffs have not sufficiently alleged a plan among high ranking State Street officials; and, (2) plaintiffs have not sufficiently alleged scienter.  I disagree.

First, Plaintiffs complaint describes State Street's FX practice as an institutional scheme designed to deceive the clients in order to reap higher profits.  According to Plaintiffs' complaint, State Street's FX trading procedures for its custodial client was "promoted and institutionalized at annual off-site conferences for high-ranking executives."  Securities Compl. ¶ 62.  Not only did State Street executives know that custodial clients were being charged the selected rate, but

---

[9] Defendants did not raise this issue in its current form until oral argument.  Rather, in their pre-hearing briefing, Defendant argued only that the California AG's complaint provided no basis for this case since it was based on an alleged breach of contract rather than fraud.

they also "knew that they needed to conceal these practices from their clients." Id. ¶ 60. While managers "tried to keep very 'hushed' about the nature of the" mark-up, "the practice was well-known around the company, prompting some to articulate concerns." Id. ¶¶ 62-65. However, employees who raised their concerns with their managers were simply "waved off." Id. ¶ 65.

Second, Plaintiffs have provided sufficient evidence to support an inference of Defendants' intent to "deceive, manipulate, or defraud" its FX clients. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976); see Boston Scientific, 523 F.3d at 85. Scienter can be demonstrated by establishing either that defendants "consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge, 284 F.3d at 82; see Boston Scientific, 523 F.3d at 85.

Under the PSLRA and Rule 9, at the pleading stage, a complaint must, "with respect to each act or omission . . . , state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); see also Pearce v. Duchensneau Group, Inc., 392 F. Supp. 2d 63, 72 (D. Mass. 2005) (explaining that Rule 9(b) is satisfied by an averment of "who, what, where, and when of the allegedly false or fraudulent representation," while "other elements of fraud, such as intent and knowledge" may be averred "in general terms"). In Tellabs, the Supreme Court provided some shape to the previously amorphous "strong inference standard," explaining that on a motion to dismiss, a court should determine whether all of the factual allegations "taken collectively" give rise to a "strong inference of scienter," not whether any individual allegation, scrutinized in isolation, meets that standard. Tellabs, Inc., 551 U.S. at 322-23. A court should do so by considering "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from

the facts alleged." Id. at 314. "[W]hen there are equally compelling inferences for and against scienter," a complaint survives. Boston Scientific, 523 F.3d at 86; see also ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008). Scienter can be proven by inference derived from circumstantial evidence. Greebel v. FTP Software, Inc., 194 F.3d 185, 195 (1st Cir. 1999). Relevant evidence may include, for example, "divergence between internal reports and external statements[,] . . . closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information[,] . . . bribery by a top company official[], . . . [or] quick settlement" by a company of an ancillary lawsuit charging fraud. Id. at 196.

It is plausible that the company's FX practice resulted from Defendants' intent to defraud their custodial clients and, by extension, the investing public. First, Plaintiffs have alleged specific examples of Defendants' overtly withholding information from their clients about the mark-up. For instance, a State Street senior vice president said in an email to another executive: "[I]f providing execution costs will give [our client] any insight into how much we make off of FX transactions, I will be shocked if [a State Street V.P.] or anyone would agree to reveal the information." Securities Compl. ¶ 60. Similarly, when asked by a client for more "transparency" into State Street's FX practice, a different State Street executive, in an internal email, asked for help, noting "[t]he FX question is touchy and if we can't provide any further information, we have to somehow get [the client] comfortable with that." Id. State Street's executives allegedly went to great pains to ensure that its clients remained ignorant, holding off-site meetings to discuss the FX practice and repressing questions and concerns raised by its employees. This may not be what appearances suggest, but that is an issue for litigation.

Second, Plaintiffs allege that the company "deliberately designed its system to foster fraudulent practices," imposing only "lax internal controls and non-existent risk management practices." Id. ¶ 77; see Crowell v. Ionic, Inc., 343 F. Supp. 2d 1, 19-20 (D. Mass. 2004) (noting that choosing "not to implement adequate internal controls reinforces the inference that [a company] was intentionally engaged in [a] fraudulent course of conduct").

Third, in the months following the AG's disclosure, State Street's FX trading revenue suffered a steep decline. Id. ¶ 72. While some of this drop could be attributed to lower customer volumes and a decrease in currency volatility, it is reasonable to assume given the size of revenue decreases at other times, that State Street's reported FX revenue plummeted because the company realized it could no longer charge its clients a markup. Finally, two days after the California AG publically announced its case against State Street for its FX practice, Logue retired as CEO. Id. ¶ 69. Other than arguing that their actions were authorized by contract, Defendants offer no competing narrative. Accordingly, Plaintiffs' allegation of a fraudulent scheme is sufficient at this stage. See Tellabs, 551 U.S. at 322-23.

### c.    Evidentiary Sources

Finally, Defendants suggest that I should not accept Plaintiffs' factual allegation given their sources. Again, I disagree.

In constructing their complaint, Plaintiffs relied upon the California AG's 18-month investigation and complaint, the *qui tam* action that prompted the AG's case, this case's Lead Plaintiffs' independent investigation, and six State Street confidential witnesses ("CWs"). Defendants claim that I should accord "no weight" to allegations stemming from the AG's investigation and complaint, ignore the California *qui tam* action Relator's complaint, dismiss the

CWs' statements as inconsequential, and recognize that the Lead Plaintiffs' investigation adds "nothing." The fact is that Plaintiffs appropriately utilized what the California AG learned during his lengthy investigation, regardless of whether the California case concerned a fraud or a contract dispute. See, e.g., S.E.C. v. Lee, 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010). The CWs' statements are more than just water cooler hearsay; they offer important reenforcement for inferences reasonably drawn from other allegations. Defendants offer no compelling reason to distrust the Lead Plaintiffs' investigation, so it too offers credible information. Finally, for each of these sources, Plaintiffs have provided "enough detail . . . to determine whether the plaintiff has 'an adequate basis for believing'" its allegations. In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 592 (S.D.N.Y. 2007) (quoting Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)).

In effect, Defendants are asking this Court to consider each of the Plaintiffs' allegations individually, scrutinizing each assertion's evidentiary sources in isolation. Such tunnel vision blocks the full picture. Plaintiffs' evidentiary sources strengthen one another and collectively paint a plausible picture of a company defrauding its clients. Multiple types of evidence from multiple sources reinforce the same narrative. Without discovery, it is next to impossible for Plaintiffs to produce any more.

Finally, placing the source of each individual allegation under a microscope distorts Plaintiffs' obligations under Rule 9 and the PSLRA. First, nothing about Rule 9 and the PSLRA changes the fundamental principles undergirding a motion to dismiss -- that a court must accept all factual allegations in the complaint as true unless they are implausible. Tellabs, 551 U.S. at 322. Moreover, as the First Circuit has repeatedly declared, the rigorous pleading standards for

securities fraud claims "do not require a plaintiff to plead evidence." In re Cabletron Sys., Inc., 311 F.3d 11, 33 (1st Cir. 2002) (citing Cooperman v. Individual Inc., 171 F.3d 43, 48-49 (1st Cir. 1999)); see Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1225, (1st Cir. 1996), *abrogated on other grounds by* 15 U.S.C. § 78u–4(b)(2) ("[W]e cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence."). Thus, the court is obliged to "collectively" consider all of the facts alleged and draw reasonable inferences. Tellabs, 551 U.S. at 323; see also In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 479 (S.D.N.Y 2004) (instructing the court to consider the totality of the allegations, including "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia").

Accordingly, I hold that Plaintiffs have offered sufficient, particularized facts to support a reasonable inference that State Street defrauded its clients through its FX practice, thereby rendering its statements about the FX revenue false and misleading.

## 2. Materiality

It is not enough that Defendants' statements may be false and misleading. Under Rule 10b-5, the statements must also be material. See 17 C.F.R. § 240.10b-5(b) (2009) (explaining that, under Rule 10b-5, it is unlawful to "make any untrue statement of a *material* fact or to omit to state a *material* fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading") (emphasis added). To "fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total

mix" of information made available.'" <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988)

(quoting <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976)).

A court may find that, as a matter of law, a statement was not materially false "only if a

jury could not reasonably find falsity or materiality on the evidence presented." <u>In re Stone &</u>

<u>Webster, Inc. Sec. Litig.</u>, 414 F.3d 187, 209 (1st Cir. 2005). Thus, as the Second Circuit

explained in <u>Ganino</u>, a plaintiff "satisfies the materiality requirement of Rule 10b-5 by alleging a

statement or omission that a reasonable investor would have considered significant in making

investment decisions." <u>Ganino v. Citizen Utils. Co.</u>, 228 F.3d 154, 161 (2d Cir. 2000).

Making all reasonable inferences in Plaintiffs' favor, I cannot hold that a reasonable jury

would find that State Street allegedly inflated its FX revenue by only an immaterial amount or

that the explanations provided to the investing public for the FX revenue growth were

immaterial. The California AG alleged that State Street overcharged CalSTRs and CalPERS

alone $56 million over eight years. Averaging $7 million per year, this overcharge for only two

clients comprised approximately 0.11% of State Street's annual revenue. But, as Plaintiffs

allege, the mark-up was not limited to these two clients, since State Street offered the same FX

trading services "to a broad range of custody clients in the U.S. and internationally." Securities

Compl. ¶ 43. While discovery is necessary to determine the number of clients charged this

mark-up, it is not unreasonable to extrapolate from these two clients and estimate that a

substantial proportion of State Street's annual trading revenue was reaped from the practice.[10]

---

[10] Indeed, on May 9, 2011, State Street announced that the Securities and Exchange Commission ("SEC") had joined multiple other state and federal regulators in investigating whether State Street wrongfully overcharged all of its investment clients for foreign exchange services. <u>See</u> State Street Corp.'s Form 10-Q for the period ending March 31, 2011, <u>available at</u> www.sec.gov.

Further buttressing the materiality of State Street's statements concerning the FX revenue is how the market reacted when the California AG announced in a press release on October 20, 2009, that the State of California had filed a complaint against State Street for inflating the income. Upon this news, shares of State Street declined $4.41 per share, or 8.44%, to close at $47.84 per share on October 20, 2009. ERISA Compl. ¶ 70. Obviously, other factors may have contributed to this decline. For instance, just before the California AG published his press release, State Street "put [independent,] very disappointing guidance into the market." Mot. Hr'g Tr. 28:9-10 Feb. 16, 2011. But it is also reasonable to attribute at least a portion of this drastic drop to the AG's news.

The materiality of the misstatements concerning State Street's foreign exchange fraud also must be considered in light of their impact on State Street's reputation, "wholly apart from their statistical impact on [State Street's] reported earnings" and the impact on the Company's stock price. See S.E.C. v. Patel, No. 07-cv-39-SM, 2008 WL 781912, at *11 (D.N.H. Mar. 24, 2008); see also in re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 411 (S.D.N.Y. 1998). Throughout the Class Period, State Street repeatedly told investors that its customer relationships "were predicated upon our reputation as a fiduciary and a service provider that adheres to the highest standards of ethics, service quality and regulatory compliance." Securities Compl. ¶ 5. As State Street acknowledged, its reputation was material to its financial success. In other words, if clients were to lose trust in State Street, the financial impact on the company could be significantly greater than the total amount of the markup.

In sum, making reasonable inferences in favor of the Plaintiffs and recognizing that a fact-intensive inquiry like the issue of materiality is best left for a jury, I hold that Plaintiffs'

allegation of fraud meets the materiality requirement.  Accordingly, Defendants' Motion to

Dismiss the Exchange Act claims concerning State Street's FX practice is **DENIED**.  See also

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011) (affirming the denial of motions to

dismiss a securities class action asserted under the PSLRA).

      **D.**      **Conduits and Investment Portfolios Fraud**

Plaintiffs further allege that State Street violated the Exchange Act in October and

November 2008 by misleading the market about its exposure to billions of dollar of losses in

mortgage-backed securities ("MBS") held in the company's four conduits and investment

portfolio.  State Street repeatedly assured investors during those two months following the

announcement of Lehman's bankruptcy that the assets backing its conduits and portfolio were

"high quality."  For instance, on October 15, 2008, State Street disclosed its third quarter

financial results for 2008 in a Form 8-K.  In the accompanying press release, defendant Logue

stated, "[A]s we have said in the past, the asset quality of both our investment portfolio and the

conduits remains high."  Securities Compl. ¶ 136.  During an investor conference call that day,

Logue assured investors that the conduits' and portfolio's assets "are of high quality."  Id. ¶ 137.

Defendant Resch also assured investors during the same conference call that the conduit's assets

were "high quality."  Likewise, on November 10, 2008, State Street filed a Form 8-K with the

SEC that attached a presentation on State Street's conduits and investment portfolio.  The Form

8-K repeated similar assurances about the "high quality" of the assets.  Id. ¶¶ 141-42.

Defendants respond with three alternative reasons why Plaintiffs have failed to state a

claim:  First, State Street correctly characterized the assets as "high quality," since that

description addressed only the credit quality of the assets -- i.e., the likelihood of payment

default.  Second, even if the "high quality" comment could reasonably have been understood to encompass more than credit quality, the statements cannot be considered misleading because they were accompanied by ample disclosures.  Third, regardless of the accuracy of the "high quality" statements, the statements are not actionable as a matter of law because they were honestly held and reasonably based opinions.  I will address each in turn.

### 1. False or Misleading Statement

According to Defendants, none of the assets backings its conduits or portfolio defaulted prior to January 20, 2009, and only a handful have defaulted since.  When they say that none (or few) of the assets defaulted, Defendants mean that none (or few) of the mortgage holders had defaulted in repayment.  Since, Defendants claim, their statements about the "high quality" of the assets referred only to the credit quality of the assets, their October and November statements were true.

Plaintiffs assert that "high quality" referred to much more.  The meaning of the phrase "high quality" must be evaluated in the context in which Defendants used that term.  State Street's statements on October 15, 2008, provide that context.  For instance, during the October 15, 2008, earnings conference call, Logue opened by saying:

> I'm going to talk about the asset-backed commercial paper program and the investment portfolio.  As we said in the past . . . the assets in our investment portfolio and asset-backed commercial paper program are of high quality.  Very few have been downgraded and none are in default.  We continue to believe that the prices are not reflective of the underlying value of these securities if held to term, but reflect a continuing lack of liquidity in the market.

Butts Aff. Ex. 27, at 3.  In the 8-K filed the same day, State Street included a press release in which Logue said:

> Due to unprecedented market illiquidity in the third quarter, the unrealized after-tax mark-to-market losses at quarter-end on State Street's investment portfolio have increased to $3.3 billion and in the asset-backed commercial paper conduits to $2.1 billion. However, as we have said in the past, the asset quality of both our investment portfolio and the conduit program remains high.

Id. Ex. 26, at Ex. 99.1 at 2.

While there are other pertinent October and November statements, these two above excerpts are illustrative because they demonstrate the ambiguous use of "high quality." While Logue first said during the October 15 conference call that "very few [assets] have been downgraded and none are in default" -- arguably suggesting that he was referring to the risk of nonpayment -- he followed up by saying that State Street continues to "believe that the prices are not reflective of the underlying value of these securities if held to term, but reflect a continuing lack of liquidity in the market" -- suggesting a different meaning of "high quality." Similarly, that day's press release speaks about "high quality" assets in the same paragraph as market illiquidity and mark-to-market losses, not just credit. Thus, the phrase "high quality" could well have been interpreted by investors to refer to more than the likelihood of default, rather than the assets' invincibility to market illiquidity, the extent to which the mark-to-market losses associated with these assets would increase, or the relative safety of investing in State Street stock.

Judge Saris recently reached the same conclusion about the phrase "high quality" in Kenney, 694 F. Supp. 2d at 67, with respect to the October 15 statements. In Kenney, a former State Street employee sued the bank for breaching its fiduciary duty under Section 502(a) of the Employee Retirement Income Security Act ("ERISA") on behalf of himself and a class of similarly-situated participants in the State Street Salary Savings Plan ("the Plan") who chose to

invest their retirement savings in State Street's Employee Stock Ownership Plan ("ESOP").  At the core of the case was the same issue before this Court -- whether the defendants had exposed State Street to over $9 billion in potential losses through high-risk assets in the same investment portfolio and four conduits at issue here.  Specifically, the plaintiff alleged, among other things, that State Street's SEC filing during a class period running from January 3, 2008, to January 20, 2009, "were materially false and misleading in that they misrepresented the truth about the Company, and misleadingly concealed material adverse information."  Id. at 76.  State Street moved to dismiss on the grounds that it made full and truthful disclosures regarding the status of the company and the riskiness of its assets.

In evaluating State Street's motion, Judge Saris looked at various statements the company had made between January 3, 2008, and January 20, 2009, including the October 15, 2008, Form 8-K and the October 15, 2008, press release in which Logue reported that the "asset quality of both our investment portfolio and the conduit program remains high."  Id. at 78.  Although Judge Saris dismissed the claims associated with State Street's statements in January, April, and July 2008, she denied the motion to dismiss with respect to the October 15 statements.  Of particular significance, she held that one could "reasonably" have understood Logue's statements as "a pat-on-the-back assurance that, despite the unrealized losses in the third quarter, no further significant losses were foreseeable and there was no reason not to continue investing in the stock."  Id. at 79.

Like Judge Saris, I cannot say that, as a matter of law when drawing all reasonable inferences in Plaintiffs' favor, that the "high quality" phrase meant only that the assets backing

the conduits and portfolio were not likely to be subject to default.  An investor could reasonably have heard this "high quality" phrasing as promising much more.

### 2. Disclosures

I must next determine whether Defendants' statements could be considered misleading given the other disclosures State Street made and the cautionary language it employed.  See, e.g., Shaw, 82 F.3d at 1213; Glassman v. Computervision Corp., 90 F.3d 617, 635 (1st Cir. 1996). Under the "bespeaks caution" doctrine, "if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law."  Shaw, 82 F.3d at 1213.  This doctrine does not, however,  universally immunize a party that sprinkles its statements with some cautionary language.  Rather, it simply instructs that a statement or omission be considered in context.  Id.

### a. Disclosures Specifics

State Street did make some important disclosures -- albeit buried within the company's voluminous and turgid securities filings -- concerning: 1) the composition of the assets backing the conduits and the portfolio; 2) the increasing illiquidity in the market and the spiking unrealized losses associated with the assets; and, 3) the fact that State Street might have to consolidate the conduits' assets and liabilities onto its balance sheets.

Beginning in the third quarter of 2007, State Street made quarterly presentations concerning the conduits and their assets.  These presentations disclosed:  (1) the number and principal amount of the medium- or long-term debt securities owned by the conduits; (2) the

third-party credit ratings of the debt securities held (e.g., FICO scores);[11] (3) the geographic origin of the assets backing the securities by country by percentage; (4) the kinds of assets backing the securities held (e.g., pools of credit cards receivables, U.S. residential mortgages, foreign mortgages); and (5) the absence of any payment defaults. State Street Defs.' Mem. Supp. Mot. Dismiss 8-9 (document #73). With respect to the U.S. residential mortgage-backed securities ("US RMBS") backing the conduits, State Street provided additional details. For instance, in the slide presentation pertaining to State Street's conduits program as of September 30, 2008 -- which State Street included with its October 15, 2008, 8-K filing -- State Street noted: (1) 14% of the assets in the conduits were U.S. RMBS, Butts Aff. Ex. 26, at Ex. 99.4 at 12; (2) the "[c]ollateral pools are comprised of mostly floating rate, Alt-A loans and Home Equity Lines of credit," id. at 15; (3) the US RMBS had a FICO score at origination of 713, id. at 12; (4) the current market value of the US RMBS was $3.6 billion, id. at 20; (5) the market value of the US RMBS had declined $800,000 million in the previous year, id.; and (6) that "[e]xposure to US RMBS totals $3.6 billion, consisting entirely of senior position in the capital structure," id. at 15.

In addition, State Street highlighted the general illiquidity in the market and the resulting unrealized losses of the assets in the conduits and portfolio. On October 15, 2008, the company revealed in the press release quoted above that "[d]ue to unprecedented market illiquidity in the third quarter, the unrealized after-tax mark-to-market losses at quarter-end on State Street's investment portfolio have increased to $3.3 billion and in the asset-backed commercial paper conduits to $2.1 billion." Id. Ex. 26, at Ex. 99.1 at 2. On November 5, 2008, State Street filed a

---

[11] The FICO score is a commonly used credit score model.

10-Q reporting that the total unrealized losses of the conduits and portfolio had climbed to $5.42 billion. In fact, since at least 2006, State Street had been reporting quarterly that the size of the unrealized losses of the conduits and the investment portfolio was steadily increasing as follows:

| Quarter | Unrealized Losses of Investment Portfolio (after taxes) | Unrealized Losses of Conduits (after taxes) | Total Unrealized Losses |
|---|---|---|---|
| Q4 2006 | $227 million | -- | $227 million |
| Q1 2007 | $159 million | -- | $159 million |
| Q2 2007 | $324 million | -- | $324 million |
| Q3 2007 | $474 million | $215 million | $689 million |
| Q4 2007 | $678 million | $530 million | $1.208 billion |
| Q1 2008 | $1.94 billion | $1.49 billion | $3.43 billion |
| Q2 2008 | $2.01 billion | $1.63 billion | $ 3.64 billion |
| **Q3 2008 (reported in the Nov. 15, 2008 10-Q)** | **$3.28 billion** | **$2.14 billion** | **$5.42 billion** |

Butts Aff. Ex. 8, at 43; <u>id.</u> Ex. 9, at 37; <u>id.</u> Ex. 10, at 41; <u>id.</u> Ex. 11, at 35, 52; <u>id.</u> Ex. 14, at 48; <u>id.</u> Ex. 17, at 19, 34-35; <u>id.</u> Ex. 22, at 21, 38; <u>id.</u> Ex. 25, at 28, 45.

Finally, State Street warned that the company might have to consolidate the conduits' assets and liabilities onto its balance sheet. For instance, on November 3, 2006, State Street said in its quarterly report:

> Assets performance deterioration or certain other factors may shift the asset risk from the commercial paper investors to us as the liquidity or credit enhancement provider. In addition, the conduits may need to draw upon the backup liquidity lines of credit to repay maturing commercial paper. In these instances, we would either acquire the assets of the conduits or make loans to the conduits secured by the conduits' assets.

Id. Ex. 7 at 34.  Similarly, in its 10-Q filed on November 2, 2007, the company reported:

> If consolidation were to occur because we were determined to be the primary beneficiary of the conduits as defined in FIN 46(R), we would consolidate the conduits' assets and liabilities onto our consolidated balance sheet at fair value.  We would recognize an extraordinary loss on the date of consolidation if the fair value of the conduits' liabilities exceeded the fair value of the conduits' assets, as they do currently.  This loss would accrete back into the income over the remaining lives of the assets, assuming that the assets were held to maturity and that we recovered the full principal amount of the securities.
>
> Purchasing or consolidating all or a significant portion of the assets of the conduits would affect the size and composition of our consolidated balance sheet and alter our financial and regulatory capital ratios, and may affect our earnings.  In light of our continued ability to manage the liquidity of the commercial paper, we do not currently anticipate that this action will be become necessary.

Butts Aff. Ex. 11 at 35.

### b.      Disclosures Were Insufficient

State Street certainly made numerous disclosures in October and November of 2008, but they were not enough, as shown by how the market reacted to news that came soon after the October and November disclosures.  On January 16, 2009, mere months after State Street had assured investors that the portfolio and conduits' assets were high quality, the company reported that due to "significant liquidity issues," it had to purchase $8.9 billion of the conduits' commercial paper.  Securities Compl. ¶ 144.  At the same time, State Street disclosed that, due to "deteriorating market conditions, " the aggregate unrealized losses in the conduits and portfolio had increased from $5.4 billion on October 15, 2008, to $9.1 billion (a few days later, State Street disclosed that the new unrealized losses were actually $9.9 billion).  Id.  The breakdown of these skyrocketing unrealized losses was as follows:

| Quarter | Unrealized Losses of Investment Portfolio (after taxes) | Unrealized Losses of Conduits (after taxes) | Total Unrealized Losses |
|---|---|---|---|
| Q3 2008 (reported in the Nov. 15, 2008 10-Q) | $3.28 billion | $2.14 billion | **$5.42 billion** |
| Q4 2008 (reported in the Jan. 20, 2009 8-K) | $6.32 billion | $3.56 billion | **$9.9 billion** |

Butts Aff. Ex. 25, at 28, 45; <u>id.</u> Ex. 30, at 8.  (A few months later, State Street disclosed that it had officially consolidated the conduits as of May 2009.  Securities Compl. ¶ 149.)  Along with this data, State Street released a 31-page Form 8-K on January 16, 2009, chronicling the risks the company faced.  <u>Id.</u> ¶ 143.  These risks included: (a) the conduits "expose [the company] to liquidity and interest-rate risk;" (b) if it took a permanent write-down on its investment portfolio, the company "would recognize a material change to [its] earnings;" and (c) the "current worldwide recession is likely to adversely affect our business."  <u>Id.</u>

The market immediately reacted to these January 16 confessions about the skyrocketing unrealized losses and State Street's purchase of billions of dollars of the conduits' commercial papers with a massive sell-off of State Street's stock, which plummeted almost 60% in a single trading day.  <u>Id.</u> ¶ 148.  Every major credit rating agency downgraded State Street.  <u>Id.</u>  An experienced banking analyst publicly chastised State Street for not having been more forthcoming: "[I]t is chastening to read this 31 page document which relates all of the fashions in which this company can lose its investors' money. . . For two years now investors have argued that State Street must consolidate its off-balance sheet conduits . . . . The company has always taken the position that this development is not expected."  <u>Id.</u> ¶ 145.

At this stage in the litigation, it is premature to unravel all of the factors that triggered the market's reaction. But, given that such a drastic drop (60%) occurred immediately after the January 16 announcement and that investors felt blind-sided by State Street's January 16 news, it is clear that some of the State Street disclosures simply failed to provide sufficient warning or detail, while others actually obscured as much as they revealed. It is certainly plausible that the post-January 16 sell-off was a reflection of facts that reasonable investors had not anticipated, despite State Street's previous disclosures, namely, that 1) conduits and a portfolio with "high quality" assets could double their unrealized losses in a month, and 2) State Street would be forced to purchase billions of dollars of "high quality" conduit commercial paper and, eventually, consolidate the "high quality" conduits on its books. See, e.g., Kenney, 694 F. Supp. 2d at 79 (noting that State Street's January filings prompted a massive decline in stock);[12] Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 236 (S.D.N.Y 2006) (ruling that, in a case where "investors were . . . being fed reassuring statements by Goldman," the fact that Goldman stock suffered "a sizable drop in value when the state and federal investigations into investment bank practices were announced to the investing public" suggested that previous disclosure had

---

[12] When evaluating State Street's motion to dismiss in Kenney, Judge Saris held that, despite State Street's various disclosures, its "sanguine statement that the asset quality 'remained high' [was] misleading." She explained:

> While there were lengthy, turgid disclosures in the SEC filings, they did not clearly explain the risks posed by "first loss" notes, "monoline insurance," the "financial models," or the "off balance sheet" assets. A Plan beneficiary could reasonably have read Logue's statement to be a pat-on-the-back assurance that, despite the unrealized losses in the third quarter, no further significant losses were foreseeable and there was no reason not to continue investing in the stock. While State Street insists the assets' quality did remain high and the unrealized losses were just an analytical accounting requirement that reflected no true loss in value, this record does not allow the Court to resolve that disputed fact. As such, with all reasonable inferences drawn in plaintiff's favor, he has stated a claim that State Street negligently misrepresented the quality and riskiness of its conduits and investment portfolio assets in the October 15 statement.

Kenney, 694 F. Supp. 2d at 79.

not been sufficient); <u>In re Vivendi Universal, S.A. Sec. Litig.</u>, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) ("[D]efendants' claim that the market knew or should have known of [the company's problems] is belied by the precipitous drop in . . . securities prices that followed immediately after . . . information of [the company's] actual financial condition started to emerge.").

While discovery is necessary to determine whether the State Street disclosures at issue were misleading and whether they were responsible for the massive drop in stock price, Plaintiffs' allegations offer several plausible reasons linking one to the other.

First, it is important to remember what occurred in the weeks leading up to the October and November statements. On September 7, 2008, Fannie Mae and Freddie Mac were put into government conservatorship. Over the weekend of September 15, 2008, Lehman Brothers filed for bankruptcy. The next day, Merrill Lynch was sold to Bank of America, and the Federal Reserve announced that it had loaned $85 billion to AIG. On September 25, 2008, Washington Mutual was seized by the FDIC, which sold its banking assets to JPMorganChase. October 6-10, 2008, "was the worst week for the United States' stock markets in 75 years." <u>Id.</u> ¶ 132. By the time that State Street announced on October 15, 2008, that the portfolio and conduits' assets were high quality, investors were likely desperate to find a secure institution in which to invest money. It was predictable that a person would understand "high quality" assets at that point in time to mean that the assets would not trigger massive losses for the company.

Second, revealing the extent of the unrealized losses of the investment portfolio and conduits was not enough. As Defendants emphasize, State Street repeatedly said that it intended to keep the assets through maturity. Thus, State Street implied that it did not matter that the

assets were not liquid.  Yet, on the same day that State Street revealed that the unrealized losses had reached the unprecedented level of $9.1 billion, the company also announced that it had to purchase $8.9 billion of the conduits' commercial paper.  In fact, by May 2009, State Street actually had to consolidate the conduits onto its books.  It is plausible that there was a connection between unrealized losses and State Street's finances that the disclosures concerning the unrealized loses before Q3 2008 did not illuminate.

Finally, while State Street did consistently report that the unrealized losses of the investment portfolio and conduits were steadily mounting between February 2006 and November 2008, it is possible that a reasonable investor who paid attention and analyzed these disclosures would not anticipate that the unrealized losses would double from $5.4 billion to $9.9 billion in just two months.  The size of the jump itself was unprecedented and statistically anomalous.  More important, State Street had just assured its investors in November 2008 -- at which point the mortgage crisis was on most investors' minds -- that its assets were of "high quality."  By November, it should have been clear to the company, regardless of whether it intended to keep its assets until maturity, that 1) the illiquidity of US MBS would be increasing, and 2) holding illiquid assets was problematic.  Thus, it is plausible that the "high quality" descriptor should have taken these factors into consideration.  Had the investors known more details about the US MBS in the portfolios and conduits, they may have been able to consider the meaning of "high quality" with a more discerning ear.  Instead, as State Street itself admits, the company limited its disclosures about the composition of the conduits to vague details like: 1) 14% of the conduits' assets were US RMBS and 2) "the collateral pools [were] comprised of mostly floating rate, Alta-A loans."  See Butts Aff. Ex. 26 at Ex. 99.4 at 12, 15.

Accordingly, I cannot find at this stage that Defendants' statements adequately forewarned that the unrealized losses associated with the conduits and portfolios might reach as high and unprecedented a level as they did or that the skyrocketing illiquidity of those assets that the bank planned to hold to maturity could have such a devastating effect on the company.

### 3.    "Honestly Held and Reasonably Based" Opinion & Scienter

Finally, Defendants claim that State Street's statements should be considered honestly held and reasonably based opinions that are not actionable as a matter of law under the Supreme Court's decision in <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. 1083 (1991), and the First Circuit's recent decision in <u>Plumbers Union Local No. 12 v. Nomura Asset Acceptance Corp.</u>, 632 F.3d 762 (1st Cir. 2011). Defendants misplace their reliance on these two cases.

In <u>Virginia Bankshares</u>, the Supreme Court held that "a statement couched in conclusory or qualitative terms purporting to explain directors' reasons for recommending certain corporate action" is actionable if it includes knowingly false statements. 501 U.S. at 1087.[13] Defendants attempt to read into <u>Virginia Bankshare</u> an inverse holding, namely that a conclusory statement cannot be actionable if it was not *knowingly* false. This is an unsupportable account of the

---

[13] In <u>Virginia Bankshares</u>, First American Bankshares, Inc. ("FABI"), a bank holding company, began a "freeze-out" merger, in which the First American Bank eventually merged into Virginia Bankshares, Inc. <u>Virginia Bankshares</u>, 501 U.S. at 1087. In the process, FABI hired an investment banking firm to give its opinion on the appropriate price for the minority holders' shares. <u>Id.</u> at 1088. FABI's board of directors ultimately approved the merger at the price the investment firm proposed. The directors then solicited proxies for voting on the proposal at the annual meeting. <u>Id.</u> In their solicitation, "the directors urged the proposal's adoption and stated they had approved the plan because of its opportunity for the minority shareholders to achieve a 'high' value, which they elsewhere described as a 'fair' price for their stock." <u>Id.</u> A minority shareholder later sued based on the directors' statements, claiming that the "directors had not believed that the price offered was high or that the terms of the merger were fair, but had recommended the merger only because they believed they had no alternative if they wished to remain on the board." <u>Id.</u> at 1089.

case.[14]  While the Court did hold that a purported opinion can be actionable if the speaker knew his claim to be false, that does not mean that a speaker must always know that his opinion is false in order for the statement to be actionable.

In Nomura, the First Circuit said that defendants are not liable under securities law if "their opinions, or those they reported, were honestly held when formed but simply turned out later to be inaccurate; nor are they liable only because they could have formed 'better' opinions." Nomura, 632 F.3d at 775.  At issue in Nomura was a financial statement that included ratings that Standard & Poor's Rating Services, Inc. and Moody's Investor Services, Inc. had assigned to certain certificates.  The plaintiffs claimed that these rating were misleading, primarily because they were based on outdated models, lowered rating criteria, and inaccurate loan information. Id.  Characterizing these ratings as "opinions purportedly expressing the agencies' professional judgment about the value and prospects of the certificates," the First Circuit said that the opinions were "honestly held when formed but simply turn[ed] out later to be inaccurate" and thus, the defendants were not liable.  Id.  At the same time, the court emphasized that an "opinion may still be misleading if it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement."  Id.

---

[14] The Court declined to hold that statements of reasons, opinion or belief are per se inactionable.  In so doing, the Court said, "[A] statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it, can take on . . . importance. . . . [D]irectors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest."  Virginia Bankshares, 501 U.S. at 1090-91.  Furthermore, the Court noted that opinions couched in conclusory terms like "high value" and "fair" were also actionable because "such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justified them as accurate, the absence of which renders them misleading."  Id. at 1093.  The Court further stated that an opinion that the speaker himself did not believe is not actionable if the statement was truthful or not misleading.  Id. at 1095-96.

Nomura does not help Defendants at this stage, for two reasons. First, Defendants' "high quality" descriptions are not necessarily "opinions." In Nomura, the defendants included third-party ratings in their prospectus. Ratings purport to be nothing more than opinions and are perceived as such. In this case, given the context in which Defendants used the phrase "high quality," it is entirely plausible that the public would reasonably understand the statement to be a factual declaration. Interpreting the term "opinion" more broadly -- as Defendants advocate -- would allow financial institutions to immunize themselves from the consequences of their use of descriptive language. Second, Plaintiffs have persuasively alleged that Defendants knew that the assets were not high quality. For instance, Plaintiffs claim that Logue and Resch had "extensive knowledge" about the true condition of the assets in the conduits and the portfolio, "two of the most significant components of State Street's business." Securities Compl. ¶ 152.

As the market events of 2007 sparked intense interest in the conduits and portfolio, Defendants were regularly asked questions about these investments on conference calls. Id. ¶ 153. Logue and Resch boasted that they had "a rigorous credit review process," which included a "dedicated surveillance team responsible for monthly monitoring of asset performance," a "robust liability management oversight that included weekly management meetings," and a "long-established conservative risk compliance and credit capability." Id. Further, Plaintiffs allege, Logue and Rogue were motivated "to conceal significant losses" in the third quarter of 2008 in order to help State Street survive the financial turmoil and uncertainty following Lehman's bankruptcy. Id. ¶ 157.

Ultimately, the issue of whether State Street's "high quality" statements were false and misleading is a factual question. At this stage, Plaintiffs have plead enough. Accordingly,

Defendants' motion to dismiss the Exchange Act claims concerning the conduits and portfolio is **DENIED.**

### E.  Securities Act Of 1933 ("Securities Act")

The Securities Action Plaintiffs (referred to as the "Plaintiffs" in the remainder of Part II) also bring claims pursuant to the Securities Act.  Section 11 of the Securities Act imposes liability if a registration statement for a public offering of stock: (1) contained an untrue statement of material fact, (2) omitted to state a material fact required to be stated therein, or (3) omitted to state a material fact necessary to make the statements therein not misleading.  Shaw, 82 F.3d at 1204 (citing 15 U.S.C. § 77k(a)).  Generally, Section 11 imposes a "stringent standard of liability."  Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).  To establish a Section 11 claim, "the default rule is that a plaintiff who purchased a security issued pursuant to a registration statement . . . need only show a material misstatement or omission to establish his prima facie case," and "'liability against the issuer of a security is virtually absolute, even for innocent misstatements.'"  In re Sonus Networks, Inc. Sec. Litig., 2006 WL 1308165, at *11 (D. Mass. May 10, 2006) (quoting Huddleston, 459 U.S. at 382).

Plaintiffs allege that the June 2008 Offering was conducted pursuant to a registration statement and prospectus that contained untrue and misleading statements of material fact in violation of Sections 11, 12(a)(2), and 15 of the Securities Act.  Specifically, Plaintiffs sued State Street; Logue; Resch; Pamela D. Gormely ("Gormley"), the Executive VP and Corporate Controller until December 2006[15]; various Members of the Board of Directors; Goldman Sachs, Morgan Stanley, Credit Suisse Securities, and UBS Securities, four of the underwriters for this

---

[15] Defendant Gormley was Executive Vice President and Corporate Controller until December 21, 2006, and thereafter, Executive Vice President and head of corporate systems and operations.  Securities Compl. ¶ 405.

offering; and Ernst & Young, State Street's independent accountant (collectively the "Securities Action Defendants," hereinafter referred to in Part II as the Defendants).

At issue are statements made in two documents pursuant to which the June 2008 offering was conducted:  1) the Shelf Registration Statement, which was filed with the SEC on Form S-3 on March 21, 2006; and 2) a prospectus dated June 2, 2008 (collectively, the "Offering Materials."  These Offering Materials referred to (and thus incorporate) numerous other State Street public filings, including State Street's Annual Report on Form 10-K for the fiscal year ended December 31, 2007,[16] the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, and State Street's Form 8-Ks filed between January 3, 2008, and June 2, 2008.

Plaintiffs allege that these documents contained untrue statements of material fact and material omissions regarding the same aspects of State Street's FX practice and the conduits/portfolio that animate their Exchange Act claims.  In other words, the Securities Act claims are derivative of the fraud allegations made pursuant to the Exchange Act.  Defendants offer three additional reasons why the Securities Action claims should be dismissed:  (1) Plaintiffs' claims are time-barred; (2) Plaintiffs lack standing; and (3) the underwriters were not timely served.  I will address each in turn.

### 1.      Statute of Limitations

Under Sections 11 and 12(a)(2) of the Exchange Act, a plaintiff must bring a claim "within one year after the discovery of the untrue statement" upon which the claim is premised.

---

[16] On the Form 10-K for the year ended December 31, 2007, Ernst & Young stated that its audit of the "consolidated statement of condition of State Street" revealed that "State Street Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007."  Securities Compl. ¶ 429.

15 U.S.C. § 77m.  Plaintiffs supposedly learned the "truth" about the purported misstatements in the materials issued in connection with the June 2008 offering of State Street common stock on January 16, 2009.  However, Lead Plaintiffs MPERS and Union did not file the consolidated class action complaint at issue on this motion until June 25, 2010.  Therefore, Plaintiffs' Securities Act Sections 11 and 12(a)(2) claims are time-barred unless the statute of limitations was tolled by one of the earlier-filed class actions that was eventually consolidated into the instant class action.[17]  See American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 552-56 (1974).

The only one of these earlier class actions to have raised Securities Act claims was the one Demory filed on January 15, 2010, the last day of the statute of limitations period.  Alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act, Demory brought her action "on behalf of all those who purchased or otherwise acquired State Street's publicly traded securities between October 17, 2006 and October 19, 2009 . . . and persons who purchased or otherwise acquired State Street's common stock pursuant and/or traceable to a registered public offering conducted on or about June 3, 2008."  Demory Compl. ¶ 1, Demory v. State Street et al., No. 10-10064 (D. Mass. filed Jan. 15, 2010) (emphasis added).  With respect to the Exchange Act, she alleged misstatements concerning State Street's FX practice, the off-balance sheet conduits, and State Street's portfolio.  As to the Securities Act, Demory alleged that she and members of the class purchased State Street common stock at prices that were artificially inflated by material misstatements contained

_____

[17] Hill filed the first class action on December 18, 2009, raising only Exchange Act claims.  Hill Compl., Hill v. State Street et al. No. 09-12146 filed Dec. 18, 2009 (document #1).  On January 15, 2010, Demory filed the second complaint, alleging both Securities Act and Exchange Action claims.  Demory Compl., Demory v. State Street et al., No. 10-10064 filed Jan. 15, 2010 (document #1).  Finally, on February 5, 2010, Richard filed his complaint, asserting ERISA claims.  Richard Compl., Richard v. State Street et all, No 10-10184 filed Feb. 5, 2010 (document #1).  In May 7, 2010, this Court ordered that the Demory, Richard, and Hill complaints be consolidated and that MPERS and Union be appointed as Lead Plaintiffs.

in SEC filings, conference calls, press releases, and other materials issued in connection with the June 2008 offering of State Street common stock.

Generally, under American Pipe, the commencement of an original class suit may toll the running of the statute of limitations for the members of the putative class. 414 U.S. at 552-56. This rule "is in no way inconsistent with the functional operation of a state of limitations," since "statutory limitations periods are 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" Id. at 554 (quoting Order of R.R. Telegraphers v. Ry. Express Agency, 321 U.S. 342, 348-49 (1944)). Fairness is achieved when "a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." American Pipe, 414 U.S. at 554-55.

American Pipe involved an attempt to intervene in an action after class certification had been denied because of failure to demonstrate numerosity. Id. at 552-53. In holding that the commencement of the original class suit tolled the running of the statute, the Court noted that the rule applied "at least" in cases in which certification was denied for lack of numerosity. Id. at 552-53. The Court noted, however, that it was not considering a situation in which class certification was denied "for lack of standing of the representative." Id. at 553.

Demory personally had standing to bring her Exchange Act claims, but lacked standing with respect to the Securities Act claims.[18] However, the Securities Act claims Demory raised on behalf of the class were not unrelated to the Exchange Act claims for which she had standing. Quite the contrary; the Securities Act claims derive from the same allegations about State Street's FX practice and conduits/portfolio that animated the Exchange Act claims. As a result, the filing of the Demory complaint tolled the statute of limitations under American Pipe. See, e.g., Nomura, 632 at 770 (noting that a § 10 Exchange Act claim "necessarily establishes" a counterpart § 11 claims Securities Act claim); Harris v. White, 479 F. Supp. 996, 1009 (D. Mass. 1979) ("Even though a plaintiff has not met standing requirements with respect to all [her] claims, [she] may still seek class-wide relief . . . provided [she] has personal standing with respect to at least one substantial claim."); In re WorldCom Sec. Litig., 496 F.3d 245, 255 (2d Cir. 2007) ("Because members of the asserted class are treated for limitations purposes as having instituted their own actions, at least so long as they continue to be members of the class, the limitations period does not run against them during that time."); see also McDonald v. Sec'y of Health & Human Servs., 834 F.2d 1085, 1091 (1st Cir. 1987) (noting that the "Supreme Court has held that the existence of even a meritless class action tolls the running of the statute of limitations otherwise applicable to all class members in their individual capacities") (citing Crown Cork & Seal Co. v. Parket, 462 U.S. 345 (1983)); Rose v. Arkansas Valley Envtl. & Util. Auth., 562 F. Supp. 1180, 1193 (W.D. Mo. 1983) (concluding that "the fact that a class action is

---

[18] According to the PSLRA certification that Demory filed with her complaint, Demory purchased her State Street stock on July 3, 2007, eleven months before the June 2008 offering. Demory Compl. Certification, Demory v. State Street et al., No. 10-10064 (document #1-2). As a result, she lacked standing to bring a Securities Act claim relating to the June 2008 offering of State Street common stock. See 15 U.S.C. § 77k(a) (limiting Section 11 liability to "any person acquiring such security"); id. § 77l(a) (limiting Section 12 liability to "the person purchasing such security").

disallowed because the class representative lacks 'standing' does not, *per se*, prevent application of the American Pipe tolling rule," and reasoning that an action in which certification was denied for lack of standing may often be more likely to give defendants actual notice of the claim against them than an action in which denial was based on lack of typicality or commonality).[19]

## 2. Service of the Underwriters

Plaintiffs filed the Demory complaint on January 15, 2010, but did not serve it on the Underwriters until over six months later, more than 60 days after the 120-day deadline imposed by Rule 4(m) of the Federal Rule of Civil Procedure. Thus, the Underwriter Defendants assert that Securities Act claims against them should be dismissed for lack of timely service. Pursuant to Rule 4(m), I may extend the time for service if Plaintiff shows good cause for failing to timely serve the Underwriter Defendants. Indeed, I may extend the time for service in my discretion even in the absence of good cause. See e.g., Aly v. Mohegan Council-Boy Scouts of Am., No. 08-40099-FDS, 2009 WL 3299951, at *3 (D. Mass. Apr. 20, 2009) ("Even if plaintiff's missteps do not amount to good cause such that the Court *must* grant plaintiff an extension of time, the Court nonetheless has discretion under Rule 4(m), even absent a showing of good cause, to extend the time for service.") (citing Oyama v. Sheehan, 253 F.3d 507, 513 (9th Cir. 2001)); see also Riverdale Mills Corp. v. U.S. Dept. of Transp. FAA, 225 F.R.D. 393, 395 (D. Mass. 2005) ("If good cause is not shown, a court may still, in its discretion, extend the time for service of process.") (citing Coleman v. Milwaukee Bd. of Sch. Dirs., 290 F.3d 932, 933-34 (7th Cir.

---

[19] The court's holding in In re Elscint, Ltd. Sec. Litig., 674 F. Supp. 374, 379 (D. Mass. 1987), does not indicate otherwise, since the original plaintiffs in Elscint "would not even be members of the class which the intervenors would be certified to represent." In Elscint, the concern was that "it would be improper to allow the filing of a class action by nominal plaintiffs who are wholly inadequate to represent the asserted class to have the effect of tolling limitation to permit the otherwise untimely intervention of proper class representatives." Id. at 378. In the instant case, Demory is far from "wholly inadequate to represent" the class, as she had standing to bring the Exchange Act claims, which are intertwined with the Securities Act claims.

2002)).  In exercising my discretion, I must weigh three factors: "whether (a) the party to be served received actual notice of the lawsuit; (b) the defendant would suffer . . . prejudice; and (c) plaintiff would be severely prejudiced if his complaint were dismissed."  See United States v. Tobins, 483 F. Supp. 2d 68, 80-81 (D. Mass. 2007) (internal citations and quotations omitted).

Plaintiffs offer no good cause for their failure to timely serve the Underwriter Defendants.  Nonetheless, applying and weighing the three factors I must consider, I find that justice is best served by extending the deadline for service.  Most important, as I have said about other class actions, this case is a massive class action that "serves the substantive goal of 'vindicat[ing] . . . the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'"  See Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 8 (D. Mass. 2010) (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 617 (1997)).  Moreover, by timely serving State Street, Plaintiffs provided constructive notice of the Securities Action to the Underwriter Defendants, who have not shown that they were remotely prejudiced by the delay.

### 3.    Standing under § 12(a)(2)

Finally, the Securities Act Defendants claim that the Securities Action complaint does not allege sufficient facts to prove that Plaintiffs have standing to bring a Section 12(a)(2) claim.  To have standing to assert claims under § 12(a)(2), a plaintiff must allege that he or she purchased securities in a public offering pursuant to a false or misleading prospectus.  15 U.S.C. § 77l(a)(2); see Gustafson v. Alloyd Co., 513 U.S. 561, 577-78 (1995).  Plaintiffs' complaint alleges just that.  Their complaint asserts that "[d]uring the Class Period, MPERS purchased stock in State Street pursuant and/or traceable to the June 2008 Offering and suffered substantial

damages as a result of the violations of the securities laws alleged herein."  Securities Compl. ¶ 400.  MPERS followed up by filing a certification on February 17, 2010, that listed all of their transactions with State Street.  This Certification shows that on June 3-4, 2008, MPERS purchased 16,700 shares of State Street stock pursuant to the June 3, 2008 Offering.  <u>See</u> Mem. Opp'n Defs.' Mot. Dismiss, Ex. A, at 4 (document #5-2).  At this stage, that is enough.[20]

## III.    ERISA

The Employee Retirement Income Security Act (ERISA) subjects fiduciaries to strict obligations, requiring that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  The duty of prudence requires ERISA fiduciaries to "diversify [] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  <u>Id.</u> § 1104(a)(1)(C).

Rather than enumerating all of the duties of a fiduciary, "Congress invoked the common law of trusts to define the general scope of their authority and responsibility."  <u>Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Trans., Inc.</u>, 472 U.S. 559, 570 (1985).  "The fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are those of trustees of an express trust -- the highest known to the law."  <u>Donovan v. Bierwirth</u>, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  Congress did not intend, however, for the law of trusts to define the full extent of fiduciary responsibilities; rather, the law of trusts serves only as a baseline.  As the

---

[20] Similarly, at this stage, Plaintiffs do not have to identify which Underwriter Defendants sold State Street stock to them.  <u>See, e.g.</u>, <u>In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.</u>, 259 F.R.D. 490, 508 (W.D. Wash. 2009) (quoting <u>In re DDi Corp. Sec. Litig.</u>, 2005 WL 3090882, at *19-20 (C.D. Cal. July 21, 2005)).

Supreme Court explained in <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 497 (1996): "We also recognize, however, that trust law does not tell the entire story.  After all, ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection."

Accordingly, even with respect to ERISA's trust-like fiduciary standards, Congress "expect[ed] that the courts will interpret this prudent man rule (and the other fiduciary standards) bearing in mind the special nature and purpose of employee benefits plans," as they develop a "federal common law of rights and obligations under ERISA-regulated plans."  <u>Id.</u>

Pursuant to ERISA, Plaintiff Richard, a participant in the Plan, brings this class action on behalf of the Plan participants (collectively the "ERISA Plaintiffs," but referred to as just Plaintiffs for the rest of Part III) against the Plan's fiduciaries (collectively the "ERISA Defendants," but referred to as just Defendants for the rest of Part III).  Specifically, Plaintiffs allege that Defendants breached their fiduciary duties to the Plan by offering State Street common stock as an investment option under the Plan.  They claim that State Street stock was an imprudent investment option because it was artificially inflated and overvalued as a result of State Street's practice of fraudulently overcharging its indirect FX trades clients.  Plaintiffs allege:  (1) Breach of Fiduciary Duty by all Defendants - Failure to Manage the Plan Assets Prudently and Loyally (Count I); (2) Breach of Fiduciary Duty by State Street & Logue - Failure to Monitor Other Fiduciaries (Count II); (3) Breach of Fiduciary Duty against All Defendants - Failure to Provide Complete and Accurate Information to Plan Participants and Beneficiaries

(Count III); and (4) Breach of Fiduciary Duty Against All Individual Defendants - Breach of Duty to Avoid Conflicts of Interest (Count IV).[21]

Defendants move to dismiss on four grounds: (1) The entire complaint is premised on factually unsupported allegations of a widespread fraud; (2) Plaintiffs have not plead a plausible basis for their claim that State Street's stock was an imprudent investment; (3) Count III fails because it does not allege detrimental reliance, because the challenged SEC filings were not fiduciary communications, and because Plaintiffs have not identified any actionable misstatements; and (4) Plaintiffs have not plead viable prudence or disclosure claims against the individual Defendants.

### A.    Pleading Standard

The parties disagree about whether Plaintiffs' ERISA claims must comply with the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure. According to Defendants, Rule 9(b) applies because the ERISA claims are grounded in a "fraudulent [FX] scheme." In other words, the claim "sounds in fraud." Plaintiffs respond that a claim brought under ERISA is subject only to the simplified pleading standard of Rule 8, even if it shares a common constellation of facts with a securities fraud action.

The parties' disagreement reflects an uncertainty in the law. Indeed, the District of Massachusetts is split on the issue of whether to apply Rule 9(b) when an allegation of fraud is embedded within an ERISA claim; the First Circuit has not yet spoken. In In re Boston Scientific Corp. ERISA Litig., the plaintiffs asserted that defendants breached their fiduciary

---

[21] The Individual Defendants are Defendants Logue, Charles Cutrell, Stephen DeSalvo, Jayne Donahue, Gormley, David Gutschenritter, Kathryn Horgan, Lee Jones, Jacques Longerstaey, James Malerba, Ross McClellan, David O'Leary, Alison Quirk, Doreen Rigby and Anne Tangen. ERISA Compl. ¶¶ 17-31.

duty to a retirement plan's participants by imprudently selecting company stock as an investment, despite knowledge that the stock price was artificially inflated. 506 F. Supp. 2d 73, 74 (D. Mass. 2007). As here, the defendants argued that the claim "sound[ed] in fraud" and, therefore, must meet the heightened pleading standard. Id. at 76. Judge Tauro disagreed because an ERISA action concerns claims of breach of fiduciary duty. In support, Judge Tauro cited to In re AEP ERISA Litig., 327 F. Supp. 2d 812, 821 (S.D. Ohio 2004) ("Although this ERISA action and the securities case have commonalities, in that some of the same conduct is alleged in both complaints, the Court has reviewed no compelling authority that convinces it to require Plaintiffs, in this case, to meet the pleading requirements of Federal Rules of Civil Procedure 9(b)."). In re Boston Scientific Corp. ERISA Litig., 506 F. Supp. 2d at 76-77; see also In re AOL Time Warner, Inc. Sec. & ERISA Litig., 2005 WL 563166, *3 (S.D.N.Y. Mar. 10, 2005) ("Unlike claims of fraud . . . claims brought under ERISA are subject only to the simplified pleading standard of Fed. R. Civ. P. 8.").

Similarly, in Stein v. Smith, Judge Lindsay applied only Rule 8's pleading standard to an ERISA claim in which the plaintiffs alleged that the defendant fiduciaries knew or should have known of liquidity problems with their company stock. 270 F. Supp. 2d 157, 166-67 (D. Mass. 2003). Conversely, in Torchetti v. Int'l Bus. Mach. Corp., Judge Saris applied the heightened pleading standard to an ERISA claim "of fraud or of a breach of fiduciary duty stemming from fraud." 986 F. Supp. 49, 51 (D. Mass 1997). In Torchetti, however, the plaintiffs did not object to the applicability of Rule 9(b). Id.; see also Brown v. Medtronic, Inc., 628 F.3d 451, 459-60 (8th Cir. 2010).

In this case, as in <u>Boston Scientific</u> and <u>Stein</u>, Rule 9(b) is not applicable for two reasons. First, while Plaintiffs allege that State Street's FX practice was fraudulent, the fraud is simply additional proof that State Street stock was an imprudent investment, not a necessary element of the ERISA claim. Plaintiffs might ultimately be unable to prove fraud but nonetheless have a meritorious claim that Defendants imprudently offered State Street stock as an option in the Plan. <u>See</u> <u>Stein</u>, 270 F. Supp. 2d at 166 ("Much of this dispute is characterized by unnecessary rebarbativeness by all involved, and the dispute on the whole is beside the point because the many pages of factual recitations relating to financial chicanery lend no necessary weight to a claim for breach of fiduciary duty."). Second, it would be unfair to further encumber an ERISA plaintiff at the pleading stage simply because the fiduciary defendant is also the party allegedly responsible for making the investment imprudent. If Bank A, rather than State Street, were the fiduciary of the Plan and responsible for offering State Street stock as an investment option, then Plaintiffs clearly would not be responsible for satisfying Rule 9(b), because the success of the ERISA claim would not depend on whether Bank A was involved in State Street's fraud. State Street's status as both the fiduciary and the allegedly fraudulent actor should not, therefore, shift a heavier pleading burden onto the Plaintiffs.

That said, even if Rule 9(b)'s heightened standard applied here, the Plaintiffs in the ERISA action have sufficiently alleged that Defendants furthered a fraudulent scheme through their FX practice, for the same reasons I concluded that the Securities Action Plaintiffs satisfied their Rule 9(b) obligations.

## B. Plausible Basis for Claim that State Street Stock Was an Imprudent Investment

Defendants make two primary arguments in support of their contention that Plaintiffs have failed to provide a plausible basis for their claim that State Street stock was an imprudent investment. First, this Court should follow the lead of the Third Circuit in Moench v. Robertson, 62 F.3d 553 (3d Cir. 1995), and adopt the presumption that State Street was a prudent investment, a presumption, according to the Defendants, that Plaintiffs cannot overcome. Second, even without the presumption of prudence, Plaintiffs' claim of imprudence fails under Twombly and Iqbal.[22] Plaintiffs respond that the Moench presumption does not apply, and, even if it did, they have provided sufficient allegations of imprudence to rebut the presumption. As described below, I agree.

_____

[22] Defendants also argue that, because the State Street stock was offered to Plan participants through an ESOP fund, Plaintiffs' prudence claim offends public policy because it undermines Congress's intent in creating ESOPs, namely, "to give employees . . . a larger stake in the company's fortunes." Mem. Supp. Defs.' Mot. Dismiss 9 (document #72) (quoting Summers v. State St. Bank & Trust Co., 453 F.3d 404, 410 (7th Cir. 2006)). Plaintiffs respond that the Plan itself was not an ESOP, but rather a 401(k). The State Street ESOP fund was simply one of the investment options in the Plan. Plaintiffs' rebuttal does not get to the heart of the issue. The more persuasive rejoinder is that nothing about Plaintiffs' ERISA claim offends the public policy underlying ESOPs. The ERISA action stems from the alleged imprudence of investing in an overvalued and inflated stock; prudence claims of this sort can be lodged against ESOP fiduciaries. Congress created ESOPs in part "to give employees . . . a larger stake in the company's fortunes, in hopes of broadening ownership of capital within a capitalist system." Summers v. State Street Bank & Trust Co., 453 F.3d 404, 410 (7th Cir. 2006); see Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1590 (1976) (stating that ESOPs are intended to "strengthen[] the free private enterprise system [and] . . . solve the dual problems of securing capital funds for necessary capital growth and of bringing about stock ownership by all corporate employees"). To advance that goal, Congress enacted a series of laws "designed to encourage employers to set up [ESOPs]." Moench, 62 F.3d at 568. For instance, ERISA allows an exemption from the general fiduciary duty to diversify for ESOP fiduciaries. 29 U.S.C. § 1104 (a)(1)(C); see id. § 1107(d)(3). Aside from certain exceptions, however, ESOP fiduciaries remain subject to ERISA's strict fiduciary duties. LaLonde v. Textron, 369 F.3d 1, 7, n.7 (1st Cir. 2004) ("ESOPs are governed by ERISA's requirements for fiduciaries. . . . Consequently, ESOP fiduciaries are in the unique situation of having to facilitate the ESOP goal of employee ownership, while at the same time being bound by ERISA's rigorous fiduciary obligations."); see Donovan v. Cunningham, 716 F.2d 1455, 1466 (5th Cir. 1983) (comparing Congressional policies to "encourage the formation of ESOPs" with the "equally forceful" policy of "safeguarding the interests of participants . . . by vigorously enforcing standards of fiduciary responsibility"); In re Ford Motor Co. ERISA Litig., 590 F. Supp. 2d 883, 888 (E.D. Mich. 2008) ("Courts, therefore, are in the difficult position of attempting to pass on the 'prudence' of these sorts of funds without considering what would normally be regarded as their severe underdiversification.").

1.      **Moench**

In <u>Moench</u>, the Third Circuit held that an ESOP fiduciary who invests the assets in employer stock is entitled to a rebuttable presumption that it acted consistently with ERISA by virtue of that decision, a presumption that can be overcome by establishing that the fiduciary abused its discretion by investing in employer securities. 62 F.3d at 571. While some circuits have adopted the <u>Moench</u> presumption, the First Circuit has not, though it had the opportunity to do so in <u>LaLonde</u>, 369 F.3d at 3. In <u>LaLonde</u>, the First Circuit reversed a decision granting a motion to dismiss an ERISA prudence action in which plaintiffs claimed that, by investing so much of their funds in an ESOP, defendants violated duties of loyalty and acted in an unlawfully self-aggrandizing manner because defendants knew or had reason to know that the company faced problems that were certain to cause a significant decline in the value of its stock. <u>Id.</u> at 3. In dismissing the complaint, the district court had applied a presumption of prudence drawn from <u>Moench</u>. <u>Id.</u> at 3-4. In reversing the district court's dismissal, the court did not explicitly rule on the applicability of the <u>Moench</u> presumption, instead expressing concern about applying such a presumption, particularly on a motion to dismiss:

As an initial matter, we share the parties' concerns about the court's distillation of the breach of fiduciary standard into the more specific decisional principle extracted from <u>Moench</u> . . . and applied to the plaintiffs' pleading. Because the important and complex area of law implicated by plaintiffs' claims is neither mature nor uniform. . . we believe that we would run a very high risk of error were we to lay down a hard-and-fast rule (or to endorse the district court's rule) based only on the statute's text and history, the sparse pleadings, and the few and discordant

judicial decisions discussing the issue we face.  Under the circumstances, further record development -- and particularly input from those with expertise in the arcane area of law where ERISA's ESOP provisions intersect with its fiduciary duty requirements -- seems to us essential to a reasonable elaboration of that which constitutes a breach of fiduciary duty in this context. Id. at 6.  And since LaLonde, the First Circuit has remained in the same equivocal position with respect to the applicability of the Moench presumption.[23]

Defendants argue in favor of applying the Moench presumption in this case because the State Street stock at issue was offered to Plaintiffs through an ESOP fund.  I disagree.  At this stage, Defendants have not shown that the presumption of prudence is necessary to further Congress' goal with respect to ESOPs.  Applying the presumption without such a finding would unfairly encumber the Plaintiffs at the pleading stage.  This case is not like Moench, where the fiduciary was "not absolutely required to invest in employer securities but [was] more than simply permitted to make such investments."  Moench, 62 F.3d at 571.  Put otherwise, in Moench, "the fiduciary presumptively [was] required to invest in employer securities," subject to the qualification that "there may come a time when such investments no longer serve the purpose of the trust, or the settlor's intent."  Id.  Indeed, it was this pressure on the ESOP fiduciaries to

---

[23] Both parties' contentions notwithstanding, the First Circuit's more recent encounter with the Moench presumption in Bunch v. W.R. Grace & Co., 555 F.3d 1 (1st Cir. 2009), provides little guidance on the First Circuit's view of the presumption's applicability.  In Bunch, the First Circuit confronted an appeal from the district court's grant of summary judgment, in which the Moench presumption was not applied.  The plaintiffs, who contested the fiduciaries' choice to divest the plan of employer stock in a failing economy, asked the court to apply the Moench presumption, which is afforded fiduciaries when they decide to retain an employer's stock in falling markets, against the fiduciaries in this case because they had sold company stock.  Id. at 10.  The court first noted that the plaintiffs' request was an unconventional application of the Moench presumption, explaining that the "presumption favoring retention in a 'stock drop ' case serves as a shield for a prudent fiduciary," and if "applied verbatim in a case such as our own, the purpose of the presumption is controverted and the standard transforms into a sword to be used against the prudent fiduciary."  Id.  The court then declined to apply the presumption, explaining simply that it "would effectively lead us to judge a fiduciary's actions in hindsight . . . [and] that is not the lens by which we view a fiduciary's actions under ERISA."  Id.

invest in employer securities that persuaded the Third Circuit to hold that ESOP fiduciaries "should not be immune from judicial inquiry, as a directed trustee essentially is, but also should not be subject to the strict scrutiny that would be exercised over a trustee only authorized to make a particular investment." Id. As the court rhetorically asked: "[W]hy would an employer establish an ESOP if its compliance with the purpose and terms of the plan could subject it to strict judicial second-guessing?" Id. at 570.

In this case, the State Street ESOP fund was only one of several investment options offered to the Plan participants. Defendants could have removed it from the list of available options. Thus, it seems likely that the Defendants did not face the same tension between plan compliance and prudent investing that the Moench fiduciaries confronted. Given the First Circuit's resistance to categorical rules here and without knowing more about the specifics of the Plan in this case, it is not appropriate to apply a presumption that may not be necessary in this case to further Congress' goal of encouraging ESOPs. See, e.g., In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig., No. 08-1919, 2009 WL 3246994, *6-7 (W.D. Wash. Oct. 5, 2009) (refusing to apply presumption of prudence on a motion to dismiss where the plan investment committee had discretion to "review, select or remove, and monitor investment funds and fund managers"); see also In re Regions Morgan Keegan ERISA Litig., 692 F. Supp. 2d 944, 953 (W.D. Tenn. 2010) ("It is improper, on a motion to dismiss, for the Court to apply evidentiary presumptions."); In re Diebold ERISA Litig., 2008 WL 2225712, *8 (S.D. Ohio May 28, 2008) ("[T]he Defendants are not entitled to a presumption of reasonableness at this stage in the litigation.").[24] Rather, like in LaLonde, further record development, including input from those

---

[24] Indeed, "[t]hose courts that have adopted Moench have disagreed as to the propriety of applying it at the pleadings stage." Kenney v. State Street Corp., 694 F. Supp. 2d 67, 75 n.6 (D. Mass. 2010).

with expertise in the area of law where ERISA's ESOP provisions intersect with its fiduciary duty requirements, is essential to a reasonable elaboration of the obligations and pressures on the fiduciaries of the Plan and that which constitutes a breach of fiduciary duty in this context.

### 2. Allegation of Imprudence

Without the <u>Moench</u> presumption shielding Defendants, Plaintiffs have sufficiently alleged that State Street was not a prudent investment for the Plan. The "prudence" required by ERISA "is measured according to the objective prudent person standard developed in the common law of trusts." <u>Chao v. Merino</u>, 452 F.3d 174, 182 (2d Cir. 2006); <u>see also</u> <u>Bunch</u>, 555 F.3d at 6. A court must review an ERISA fiduciary's conduct in light of "the totality of the circumstances involved in the particular transaction." <u>Bunch</u>, 555 F.3d at 6. Plaintiffs' allegations support a plausible claim that the objective prudent person who knew what Defendants knew would have ceased to invest in State Street stock before October 2009.

To be sure, State Street's revenue grew from $4.4 billion in 2002 to nearly $10.7 billion in 2008, with a net income in excess of $1 billion each year between 2006 and 2008. ERISA Compl. ¶¶ 92, 99; Butts Aff. Ex. 38, at 31. Moreover, from 2004 through 2009, the company's stock performed about as well as the S&P 500 and better than the S&P financial index. <u>See</u> Butts Aff. Ex. 38, at 30. In fact, in the nine months prior to the AG's announcement on October 20, 2009, State Street's stock price increased by $35 per share, several times the S&P 500's growth during the same period.

These numbers, however, do not tell the whole story. They were inflated by the FX revenue State Street reaped from clients who executed indirect trades.[25] Whether or not State Street's contract with its indirect trade clients permitted these overcharges (as mentioned earlier, State Street relies in part on a contractual defense for its FX practice), reported revenue that incorporates profit made through deception conceals a bank's vulnerability. And whether or not a bank's practice is legal, damage to its reputation and plummeting of its stock are readily foreseeable consequences of the disclosure that the bank has been deceiving its clients. Indeed, that is arguably what happened here. On October 20, 2009, the California AG announced his intervention in a *qui tam* lawsuit filed in California state court over the rates at which State Street executed its FX trades. That day, the market price of State Street stock declined $4.41 per share, or 8.44%. ERISA Compl. ¶ 70. Following the disclosure, the bank saw a steep decline in its FX trading revenue, which suffered a 56% drop from the fourth quarter of 2008 (revenue of $330 million) to the fourth quarter of 2009 (revenue of $144 million). Securities Compl. ¶ 72. In fact, in 2009, State Street reported an overall net loss of $2.04 billion. Butts Aff. Ex. 38, at 35.[26]

Plaintiffs persuasively allege, based on confidential witnesses, internal documents, and the California AG's investigation, that high level State Street officials likely knew about the difference between the rates that the bank charged its clients for indirect FX trades and the rates as which the trades actually occurred. See ERISA Compl. ¶¶ 122-134. As in LaLonde, 369 F.3d

---

[25] At this stage, Plaintiffs do not know the exact amount that State Street overstated its FX revenue, but they offer a logical rationale for calculating that about 30% of State Street's reported FX revenue in the years before October 2009 was comprised of the supposedly fraudulent overcharge.

[26] As Defendants point out, some of the drop in State Street's stock after the October 2009 announcement may have reflected other news. For instance, on the same day as the California AG's announcement, State Street reduced its earning expectations. But it is more than plausible that a large portion of the drop in stock price and revenue can be attributed to the public's learning about State Street's FX practice.

at 3, where plaintiffs alleged that the company artificially inflated the price of its stock by concealing internal problems that led to lost earnings, it is plausible that Defendants acted imprudently by offering State Street stock as an investment option to Plaintiffs.

## C.    Disclosure Claims

A fiduciary's duty of loyalty to plan participants encompasses a duty of disclosure.  This duty includes a prohibition against lying, Varity Corp. v. Howe, 516 U.S. at 506, but it also requires the disclosure of "any material information that could adversely affect a participant's interests." Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 644 (8th Cir. 2007); see Ervast v. Flexible Prods. Co., 346 F.3d 1007, 1016 n.10 (11th Cir. 2003) ("[A]n ERISA participant has a right to information and . . . a failure-to-inform claim may lie against an ERISA administrator."); Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 548-51 (6th Cir. 1999) (holding that an ERISA fiduciary with knowledge of a beneficiary's status and situation has an affirmative duty to communicate material facts to the beneficiary that will allow for an informed decision); Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300-01 (3rd Cir. 1993) (stating that an ERISA fiduciary's duty to provide "complete and accurate material information to its beneficiaries" "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful").  Indeed, as I have said:

> While ERISA imposes on fiduciaries no explicit disclosure requirements, it does incorporate the standards of the common law of trusts. . . . One of a fiduciary's duties is thus to disclose "material facts affecting the interest of the beneficiary which [the fiduciary] knows the beneficiary does not know and which the beneficiary needs to know for his protection."

Bendaoud v. Hodgson, 578 F. Supp. 2d 257, 278 (D. Mass. 2008) (quoting Restatement (Second) of Trusts § 173, cmt. d (1959)) (citing Varity, 516 U.S. at 506) (citing Watson v. Deaconess

Waltham Hosp., 298 F.3d 102, 114, 118 (1st Cir. 2002) (noting that "[m]any of our sister circuits have held that, in certain circumstances, a fiduciary has an obligation to accurately convey material information to beneficiaries, including material information that the beneficiary did not specifically request," but not explicitly endorsing the holdings)).

In Count III, Plaintiffs allege that Defendants breached their fiduciary duty by failing to provide complete and accurate information to plan participants and beneficiaries. Specifically, Plaintiffs assert that Defendants breached their duty by "conveying inaccurate information regarding State Street's revenues and by failing to provide complete and accurate information regarding State Street, the soundness of State Street stock and the prudence of investing retirement contributions in the stock." ERISA Compl. ¶ 183. Plaintiffs further allege that Defendants "knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding State Street, despite knowing of their breaches." Id. ¶ 185. Among the examples of the alleged affirmative misstatements are excepts from annual reports and quarterly filings in which State Street reported its FX revenue, described its FX business as lucrative, and identified the factors that contributed to the growth in the FX revenue. Id. ¶¶ 87-121.

Defendants do not dispute that they have a duty of disclosure. Rather, they argue that Plaintiff's disclosure claim fails for three reasons: (1) Plaintiffs have not alleged detrimental reliance; (2) the challenged SEC filings were not fiduciary communications; and (3) Plaintiffs have not identified any actionable misstatements.

Plaintiffs' complaint belies Defendants' first argument. Plaintiffs plead detrimental reliance in several ways. For instance, Plaintiffs alleged that "[h]ad Defendants not reinforced

the safety, stability and prudence of investment in State Street stock, Plan participants could have divested their holdings of Company stock in the Plan or at least diversified such holdings, thereby mitigating the Plan's losses to that extent." <u>Id.</u> ¶ 184. Plaintiffs further state that "in making and maintaining investments in State Street stock, [they] relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of Defendants." <u>Id.</u> ¶ 187.[27] At the pleading stage, these allegations are sufficient.

Defendants' second argument overlooks the fact that the essence of Plaintiffs' claim is the *omission* of material information about State Street's FX practices. <u>See</u> <u>Bendaoud</u>, 578 F. Supp. 2d at 278; <u>see also</u> <u>In re Tyco Intern., Ltd.</u>, 2006 WL 2349338, *6 & n.7 (D.N.H. Aug. 15, 2006) (holding that a fiduciary has a duty to disclose material facts if "'there was some particular reason that the fiduciary should have known that his failure to convey the information would be harmful'") (quoting <u>Watson</u>, 298 F.3d at 114-15). Thus, regardless of whether the SEC filings

---

[27] Plaintiffs further alleged:

> Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of Defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in State Street stock in the Plan, and were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement assets in State Street. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants. . . . The Plan suffered a loss, and Plaintiff and the other Class members suffered losses, by the above-described conduct of Defendants because that conduct fundamentally deceived Plaintiff and the other Class members about the prudence of making and maintaining retirement investments in State Street stock, and that, in making and maintaining investments in State Street stock, Plaintiff and the other Class members relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of Defendants.

ERISA Compl. ¶¶ 186-87.

were fiduciary communications, Plaintiffs still have a claim that the fiduciary communications --
whatever they were -- failed to include the necessary disclosures.

Finally, Defendants' third argument -- that the misstatements were material -- is not
appropriate for a motion to dismiss here.  In the ERISA context, a misrepresentation or an
omission "is 'material' if there was a substantial likelihood that it would have misled a reasonable
participant in making an adequately informed decision about whether to place or maintain
monies in the [plan]."  In re Unisys Sav. Plan Litig., 74 F.3d 420, 442 (3d Cir. 1996).  This
standard is similar to the "materiality" standard under the securities laws.  Cf. Basic Inc. v.
Levinson, 485 U.S. 224, 231-32 (1988) ("[T]here must be a substantial likelihood that the
disclosure of the omitted fact would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made available.") (quoting TSC Indus., Inc. v.
Northway, Inc., 426 U.S. 438, 449 (1976)).  As explained above, the falsity of a statement and
the materiality of a misstatement or omission are generally questions for a jury.  See In re Stone
& Webster, Inc. Sec. Litig., 414 F.3d 187, 209 (1st Cir. 2005); see also Ganino v. Citizen Utils.
Co., 228 F.3d 154, 162 (2d Cir. 2000).

### D.    Individual Defendants

The Defendants argue that most of the individual defendants named in the suit are not
ERISA fiduciaries and, therefore, are not proper defendants to this suit.  Under ERISA:

> [A] person is a fiduciary with respect to a plan to the extent (I) he
> exercises any discretionary authority or discretionary control
> respecting management of such plan or exercises any authority or
> control respecting management or disposition of its assets, … or
> (iii) he has any discretionary authority or discretionary
> responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). In addition, anyone explicitly named as a fiduciary in the Plan is also a fiduciary. Id. In other words, "[a]n individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary." In re Polaroid ERISA Litig., 362 F. Supp. 2d 461, 472 (S.D.N.Y. 2005).

Defendants argue that Plaintiffs have not adequately alleged that Defendant Logue is a fiduciary with regard to investment selection (Count I prudence claim) or plan communications (Count III disclosure claim). Defendants further claim that the Committee Defendants should be dismissed from Counts I and III, because Plaintiffs have not alleged facts plausibly showing that the Committee Defendants knew or should have known about the alleged FX scheme. I will address these arguments in turn, bearing in mind, as I said in Bendaoud, that the issue of whether a party is an ERISA fiduciary is "a functional, fact-bound question" of whether the person had "sufficient responsibility" to meet the statutory definition of a fiduciary. 578 F. Supp. 2d at 275 (citing 29 U.S.C. § 1002(21)(A); Briscoe v. Fine, 444 F.3d 478, 486 (6th Cir. 2006)).

### 1. Logue

Plaintiffs allege that Logue was a fiduciary because he "exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plan," ERISA Compl. ¶ 58. Specifically, Plaintiffs highlight that Logue "was a member of the Executive Committee" that "was delegated with discretion and authority to appoint and remove members of the Benefits Committee and the Investment Committee, and a fiduciary of the Plan," id. ¶¶ 32, 56; was Chairman and Chief Executive

Officer of State Street, served on the Executive Committee of the State Street Board of Directors, and was a member of State Street's Operating Group, id. ¶ 32; and directly supervised Defendant O'Leary, an Executive Vice President at State Street and the head of State Street's Global Human Resources, id. ¶ 27, who executed the Plan document on behalf of the Company, id.; Butts Aff. Ex. 41, at 53. In addition, the Complaint alleges that Logue was fully aware of the FX trading practices that are the subject of this action and personally signed all of the documents containing the misrepresentations at issue in this case. Id. ¶¶ 101, 104, 106, 109, 111, 114, 116, 119, 122-34. Defendants respond that Logue's designated fiduciary responsibilities were limited to appointing and monitoring the Benefits Committee and, thus, he was not involved in managing the Plan's investment options.

Fundamentally, Plaintiff and Defendants disagree about whether Logue 1) exercised discretionary authority or control respecting management of the Plan; 2) exercised discretionary authority or control respecting management or disposition of assets; and 3) had discretionary authority or responsibility in the administration of the Plan. This factual dispute is not appropriately resolved on a motion to dismiss. See Bendaoud, 578 F. Supp. 2d at 275; Kenney, 694 F. Supp. 2d at 79; see also In re Cardinal Health, Inc. ERISA Litig., 424 F. Supp. 2d 1002, 1030 (N.D. Ohio 2006) ("[F]iduciary status is a 'fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss.'" (quoting AEP, 327 F. Supp. at 827). Plaintiffs have generally alleged that Logue was a powerful official involved with the Plan and specifically alleged that Logue was a functional fiduciary in that he exercised final decision-making authority regarding the Plan. At this stage, that is sufficient. See, e.g., Polaroid, 362 F.Supp.2d at 473; In re Pfizer, Inc. ERISA Litig., 2009 WL 749545 at *8-9 (S.D.N.Y. Mar. 20, 2009)

(denying motion to dismiss as to board member defendants whose primary duty was appointing and overseeing other fiduciaries); In re WorldCom, Inc., 263 F. Supp. 2d 745, 759 (S.D.N.Y. 2003) (upholding claims against President and CEO who was alleged to have had and to have exercised discretionary authority and discretionary control over the administration and management of the plan).

### 2. Committee Defendants

Plaintiffs assert that the Committee Defendants "knew or should have known" that, because of State Street's FX trading practices, the Company's stock was artificially inflated and rendered an imprudent investment, and that the disclosure made to the plan participants was inaccurate. ERISA Compl. ¶ 141, 162, 174. With regards to certain individuals -- DeSalvo, Gutschenritter, Horgan, Jones, Longerstaey, McLellan, Rigby, and Tangen -- Plaintiffs offer no more specifics. Defendants respond that, in the wake of Twombly and Iqbal, such a conclusory allegation is insufficient to state a claim -- rather, Plaintiffs must either have a basis to assert that the individuals had actual knowledge or show the existence of a "red flag."

Defendants place too high a burden on Plaintiffs at this stage. The Benefits Committee "managed and administered the Plan" and "had discretionary authority over the assets of the plan." Id. ¶ 15. Similarly, the Investment Committee "managed and administered the Plan" and "had discretionary authority over the investment of the assets of the Plan." Id. ¶ 16. These facts provide a sufficient basis for Plaintiffs to plead that the members of these committees "knew or should have known" about State Street's FX practice. See, e.g., In re Gen. Growth Prop., Inc. ERISA Litig., 2010 WL 1840245, at *6-7 (N.D. Ill. May 6, 2010); In re Regions Morgan Keegan ERISA Litig., 692 F. Supp. 2d 944, 962-63 (W.D. Tenn. 2010); In re Morgan Stanley ERISA

Litig., 696 F. Supp. 2d 345, 365 (S.D.N.Y. 2009). To boot, Plaintiffs offer evidentiary support for their allegation that knowledge about the FX practice was widespread, especially among senior management. Id. ¶¶ 122-34. For instance, Plaintiffs allege that the FX trading practices were "promoted and institutionalized at annual off-site conferences for high-ranking executives," and that senior management was "aware of and actively promote[d] the fraudulent FX scheme" by issuing "verbal instructions to FX traders to utilize market volatility to manipulate the rate charged as much as possible without causing the client to notice." Id. ¶¶ 124-25.

Accordingly, the ERISA claims against the individual Committee Defendants should not be dismissed at this time.[28]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss the Securities Action (**documents  #58, 67, 68**) are **DENIED**, and Defendants' Motion to Dismiss the ERISA Action (**document #71**) is also **DENIED**.

**SO ORDERED.**

Date:  **August 3, 2011**          */s / Nancy Gertner*
                              **NANCY GERTNER, U.S.D.J.**

---

[28] Defendants make perfunctory arguments that (1) the claims against State Street and Logue for breaching the duty to monitor (Count II) should be dismissed because Plaintiffs have not plead facts plausibly showing that the Defendants had a conflict of interest and that the Defendants harmed an ERISA plan through some form of self-dealing; and (2) the claims against the individual defendants for failing to avoid conflicts of interest (Count IV) should be dismissed because the duty to monitor is satisfied when a defendant appoints well-qualified people to positions of fiduciary responsibility and then periodically conducts reasonable performance reviews and takes appropriate actions if necessary. Plaintiffs' complaint belies Defendants' argument about Count II, see, e.g., ERISA Compl. ¶¶ 167-77, and the issues Defendants raise concerning Count IV are factual matters not properly analyzed at this stage.