WILMERHALE

May 18, 2012

James W. Prendergast

+1 617 526 6181 (t)
+1 617 526 5000 (f)
james.prendergast@wilmerhale.com

**By ECF**

The Honorable Judith G. Dein
United States District Court
District of Massachusetts
John Joseph Moakley United States Courthouse
1 Courthouse Way - Suite 6420
Boston, MA 02210

Re: *Hill v. State Street Corp.*, Master Docket No. 09-cv-12146-GAO

Dear Judge Dein:

        I write on behalf of the State Street Defendants in anticipation of the June 6, 2012 conference in the above-referenced action.  On January 27, 2012, State Street served its First Set of Requests For Production.  Plaintiffs responded on March 21, 2012, objecting to producing many categories of relevant documents.[1]  Because the parties' have been unable to resolve their disputes with respect to the requests, State Street now seeks the Court's assistance in compelling the production of relevant and responsive documents.[2]  State Street will be prepared to further address this matter during the June 6 conference.

## I.      Documents Concerning Plaintiffs' Knowledge and Understanding of "High Quality" (Request No. 42)

        One of Plaintiffs' core allegations is that State Street misled investors by stating that assets in its conduits and investment portfolio were of "high quality." *See, e.g.*, Hill Am. Compl. ¶¶ 17, 18, 84, 104-06, 134, 137, 179.  According to Plaintiffs, that description misled them concerning the extent of exposure such assets had to unrealized losses caused by turbulence in the mortgage-backed securities markets. *Id.* ¶ 18.

        As a result, the meaning of the term "high quality"—and, perhaps even more importantly, Plaintiffs' *understanding* of this term as applied to investments—is at the very heart of Plaintiffs' claims of misrepresentation.  State Street's disclosures during the class period made clear that State Street used the term "high quality" to mean "credit quality."  State Street had many times expressed its opinion that the assets in the investment portfolio were of high quality, each time while disclosing that the market value of these debt securities had declined significantly due to

---

[1]     The requests and responses are attached hereto as Exhibit A.

[2]     State Street's request is based on the positions currently held by Plaintiffs, as expressed during meet and confer discussions on May 8 and 18, 2012.  Plaintiffs' counsel have represented that they will speak to their clients about the outstanding issues, and will alert State Street if their positions change.  State Street will promptly advise the Court of any resolution between the parties regarding the documents for which State Street currently seeks the Court's relief.

WilmerHale

The Honorable Judith G. Dein
May 18, 2012
Page 2

the unprecedented global credit crisis.  *See* State Street Defs.' Motion to Dismiss Mem. (Dkt. No. 70) at 2-3.  In these same disclosures, State Street in fact warned of future market declines, and stated that the changes in market value of these assets did not cause cash flow problems for the conduits or the portfolio because the assets had not experienced payment defaults during the relevant period.  *See id.*  In the context of all of these disclosures, State Street stated its opinion on multiple occasions that the quality of the assets held by the conduits was high.  These opinions plainly addressed the *credit quality* of the assets (*i.e.*, the likelihood of payment default).  *See also* Order on Motion to Dismiss (Dkt. No. 108) at 29-30 ("Defendants respond with three alternative reasons why Plaintiffs have failed to state a claim:  First, State Street correctly characterized the assets as 'high quality,' since that description addressed only the credit quality of the assets – *i.e.*, the likelihood of payment default. . . .").  Plaintiffs contend that high quality means something more.

For plaintiff investors to maintain that they were misled by the use of the term "high quality," they must likewise produce those documents that indicate the meaning of that term.  Otherwise, Plaintiffs' production would exclude, for instance, a report in Plaintiffs' possession demonstrating that "high quality" in the industry of asset-backed securities indicates credit quality alone.  Such a document would be highly relevant to how Plaintiffs understood State Street's use of the term during the Class Period—and thus relevant to whether in fact State Street used the term in a misleading way.  The Court should order Plaintiffs to produce responsive documents, and not limited to those documents that pertain to State Street securities only, but rather to the use of the term as applied to any asset.

**II.      Documents Concerning Plaintiffs' Knowledge and Understanding of Other Matters Raised in the Complaint (Request Nos. 35-37, 43, 61-63, 67, 69, and 71)**

State Street also propounded numerous document requests calling for documents concerning subject matters addressed in the Complaints, including State Street's conduits, State Street's investment portfolio, TCE ratios, FX rates, FX transactions, State Street's fixed-income bond funds, and State Street's June 2008 offering.  State Street also propounded requests calling for documents concerning matters that Plaintiffs claim are relevant to State Street's evaluation of its assets—problems with SIVs, mortgage-backed securities, subprime mortgages, fixed-income bond funds, rating agencies, and securities involving Washington Mutual, Countrywide, IndyMac, and New Century.

The Complaint asserts that these matters are relevant to State Street's alleged wrongdoing and state of mind, either directly or as bases for alleged knowledge from which the State Street Defendants purportedly should have drawn certain negative understandings about the conduits and the investment portfolio.  For example, at paragraph 441 of the Consolidated Amended

WILMERHALE

The Honorable Judith G. Dein
May 18, 2012
Page 3

Complaint in the *Hill* Action, Plaintiffs lay out the bases of the State Street Defendants alleged understandings about the assets in the conduits and portfolio:

441.  Before State Street completed the June 2008 Offering, the collapse of the real estate markets had turned into a global financial meltdown. Indeed, by the time of the June 2008 Offering, numerous financial institutions had taken significant write-downs on MBS collateralized by Alt-A and subprime mortgages, a number of SIVs similar to State Street's conduits had collapsed and investment banking giant Bear Stearns had been forced into a fire sale due to its exposure to subprime assets. Facts demonstrating that defendants' statements regarding the Conduits and investment portfolios were negligently untrue or misleading by the time of the June 2008 Offering include the following:

- Between May 2007 and May 2008, financial companies around the world had taken more than $300 billion in writedowns relating to Alt-A and subprime mortgage backed securities.
- By June 2008, the collapse of the real estate and financial markets had led to the collapse of some of the largest financial institutions in the world, including Bear Stearns, Ambac and others.
- Defendants knew that there were significant problems with Alt-A and subprime loans as the real estate markets collapsed. Indeed, it was clear to industry participants by March 2007 that Alt-A loans were no different from subprime loans in terms of their underwriting and performance.
- Concerns regarding the quality and value of the MBS assets in the Conduits and investment portfolio had been raised with State Street's senior management by a number of State Street employees.
- Lead Plaintiffs' investigation has revealed that the Conduits and investment portfolio contained MBS assets issued by some of the most notorious failures of the mortgage crises, including Washington Mutual, Inc., Countrywide Financial Corp. (which was sold in a fire sale in January 2008), IndyMac Mortgage Services (which was seized by the FDIC), and New Century Financial Corp. (which filed for bankruptcy on April 2, 2007.
- Before June 2008, more than thirteen SIVs, which were substantially similar to State Street's Conduits had suffered enormous losses and had either collapsed, been consolidated, or been bailed out by their financial sponsors.  These included more than $100 billion in bail outs made by large financial institutions such as Citigroup and HSBC when they consolidated SIVs onto their balance sheet in November 2007 and December 2007.
- Prior to the June 2008 Offering, State Street had suffered hundreds of millions of dollars in losses on nearly identical subprime and Alt-A MBS investments in its fixed income bond funds and securities lending business.

But, if the foregoing is accurate, it is a two way street:  documents in Plaintiffs' possession are relevant if they speak to the Plaintiffs' knowledge (or lack thereof) of the matters about which

WILMERHALE

The Honorable Judith G. Dein
May 18, 2012
Page 4

they claim to have been misled, or about Plaintiffs' knowledge of matters that they assert put State Street on notice of looming difficulties with the portfolios and conduits.  These are the sorts of documents State Street seeks.

In particular, State Street's requests call for documents pertaining to Complaint issues including:

- Plaintiffs' knowledge of the reliability of rating agencies with respect to the ratings given to asset-backed securities; *compare* Hill Am. Compl. ¶ 181 ("In addition to the collapse of highly-rated SIVs containing similar assets as State Street's conduits and investment portfolio, by October 2008 it was readily apparent to defendants that the MBS ratings assigned by the three primary rating agencies – Fitch, Moody's and S&P – were highly suspect and artificially inflated.");

- the negative information alleged in the complaints regarding Washington Mutual, Countrywide, IndyMac, New Century, the SIVs identified in ¶¶ 174 through 177 of the Hill Complaint, the issuers sponsoring those SIVs, the SIVs sponsored by HSBC Holdings Plc ("HSBC") or Citigroup, and those SIVs identified in ¶ 177 of the Hill Complaint;

- the status, condition, or risks of investments in issuers engaged in, or having an interest in, securities lending, FX transactions, fixed-income bonds, conduits, SIVs, MBSs, or subprime investments; and

- the methods by which banks calculate the rates and in fact charge their clients for FX transactions.

Plaintiffs' knowledge and understanding of the practices, investments, and securities vehicles that they have put in issue in this case—and which they claim affected the price of State Street's stock—is at the core of what must be proven here.  *E.g.*, *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24, 43-44 (2d Cir. 2006) (a 10(b) claimant "must allege and prove" that the claimant traded "in ignorance of the fact that the price was affected by the alleged manipulation," and section 11 claimant must also demonstrate lack of knowledge); *New Jersey Carpenters Health Fund v. Residential Capital*, 272 F.R.D. 160, 168 (S.D.N.Y. 2011) (sophistication of several members of the class gave "rise to a reasonably reliable inference that they possessed at least some knowledge of underwriting practices").  Yet Plaintiffs' proposed production would exclude documents in their possession that identify and articulate the very risks Plaintiffs complain of that attend asset-backed securities held by special interest vehicles, or documents that express alarm that Moody's and S&P ratings had become unreliable—all of which would be highly relevant to Plaintiffs' assertion that they were misled by statements concerning the quality of assets in the conduits and portfolio.

WILMERHALE

The Honorable Judith G. Dein
May 18, 2012
Page 5


Likewise, Plaintiffs assert that the State Street Defendants did or should have drawn relevant knowledge about the conduits and the investment portfolio from events and circumstances during the class period with regard to, among others things, rating agencies, Washington Mutual, Countrywide, IndyMac, and New Century. *See* Hill Compl. ¶¶ 167-73 (alleging that State Street invested in "notoriously troubled" companies). If that is so (*i.e.*, State Street should have been concerned about its conduits because conduits at other banks had difficulties), such a contention applies equally to the Plaintiffs. Their knowledge in these regards is equally relevant to Defendants' affirmative defenses. *E.g.*, *In re Superior Offshore International Inc. Securities Litigation*, 2010 WL 2305742 (S.D. Tex. June 8, 2010) ("as more information became available during the proposed class period, it became more likely that an individual purchaser of [IPO shares] had knowledge that would support the affirmative defense asserted by Defendants."). If, for instance, Plaintiffs—themselves sophisticated investors and market participants—failed to detect the very market conditions that they claim should have been obvious to State Street, that would be relevant. Conversely, if Plaintiffs did detect these market conditions (*e.g.*, Plaintiffs did not trust ratings issued by the major ratings agencies), that would call into question whether or to what extent Plaintiffs were actually misled concerning State Street's assets.

For these reasons, the Court should compel Plaintiffs to produce responsive documents.[3]

* * *

State Street furthermore supports the arguments made by Ernst & Young in its Motion to Compel Lead Plaintiffs to Respond to Requests for Admission and Interrogatories, which, for

---

[3]     State Street also propounded document requests calling for documents concerning Plaintiffs' trading of investments in State Street. *See* Doc. Request No. 27. In part, Plaintiffs dispute the relevance of documents concerning any "'security issued by State Street, or derivative thereof' other than State Street common stock." Pls.' Response and Objections at 30. In addition, for those State Street securities other than common stock, Plaintiffs have expressed reluctance to produce documents other than the trading records related to those securities.

Plaintiffs' trading patterns before, during, and after the class period with respect to State Street securities, in *addition* to common stock, is potentially relevant to an assessment of Plaintiffs' alleged damages, causation, and, not least of all, Plaintiffs' knowledge about State Street and its financial circumstances that cuts across all investments of the issuer, not just the common stock. While Plaintiffs have indicated a possible willingness to produce a broader scope of documents if provided with a list of State Street securities in addition to common stock, the parties have not yet reached an agreement on this issue, and State Street reserves the right to request the production of (1) documents identifying those State Street securities traded by Plaintiffs, and (2) documents related to Plaintiffs' trades in those securities, including but not limited to trading records.

WilmerHale

The Honorable Judith G. Dein
May 18, 2012
Page 6


brevity, State Street joins and incorporates by reference.[4]  State Street relies on the arguments made in Ernst & Young's Motion to support State Street's own contentions that Plaintiffs are obligated to produce documents in response to Requests Nos. 5-10, which relate to Plaintiffs' appreciation of the *Demory* action, and how that appreciation affects Plaintiffs' right to rely on the pendency of that action in filing an untimely claim under the Securities Act.

Very truly yours,



/s/ James W. Prendergast
James W. Prendergast

Encl.
cc: Counsel of record (via ECF)

---

[4]    State Street and Plaintiffs have an ongoing disagreement regarding whether Plaintiffs are obligated to obtain responsive documents from third parties that acted as their financial advisors, investment managers, or custodians.  During the meet and confer on May 18, 2012, Plaintiffs agreed to produce copies of Plaintiffs' contracts with such third parties in order to determine Plaintiffs' legal rights to obtain documents from their agents.  State Street is working with Plaintiffs to resolve any disagreement with respect to documents in the control of third parties, but State Street reserves the right to raise the issue at a later date if Plaintiffs fail to produce their contracts with relevant third parties, or fails to produce those documents in the control of third parties that Plaintiffs have a legal right to obtain.