UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HILL v. STATE STREET CORPORATION | ) | |
| | ) | MASTER DOCKET |
| THIS DOCUMENT RELATES | ) | NO. 09-12146-GAO |
| TO ALL CLASS ACTIONS | ) | |
| and | ) | |
| | ) | |
| THOMAS U. KENNEY, on Behalf of | ) | |
| Himself and a Class of Persons | ) | |
| Similarly Situated, | ) | CIVIL ACTION |
| | ) | NO. 09-10750-DJC |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| STATE STREET CORPORATION, et al., | ) | (filed concurrently in both actions) |
| | ) | |
| Defendants. | ) | |

## ORDER ON THE RICHARD/HILL PLAINTIFFS' MOTION TO COMPEL FX-SPECIFIC DISCOVERY RE INSTITUTIONAL CUSTODIAL CLIENTS

November 21, 2012

DEIN, U.S.M.J.

### I. INTRODUCTION

On November 14, 2012, this court held a status conference pursuant to Fed. R. Civ. P. 16(a) and a hearing to consider oral argument on the parties' motions to compel. At the conclusion of that hearing, this court took under advisement the Richard and Hill Plaintiffs' motion to compel documents responsive to Document Request Nos. 38 and 40 of the Plaintiff's First Request for Production of Documents and to compel discovery

regarding all of State Street's institutional custodial clients for whom State Street conducted foreign exchange transactions during the relevant time period **(Docket No. 212 in C.A. No. 09-12146-GAO)**.[1] That motion squarely raises the issue whether Hill's Consolidated Amended Class Action Complaint (Docket No. 51) ("Complaint") is limited to claims that "State Street's reported FX revenue was artificially inflated by revenue it generated from a *specific* type of custodial relationship it had with clients[,]" as State Street contends (Docket No. 219), or whether the plaintiffs have alleged that State Street "engaged in a widespread scheme to artificially inflate State Street's foreign exchange revenues by improperly charging all of its institutional custodial clients hidden fees for FX transactions[,]" as the plaintiffs contend (Docket No. 212).[2]

After a careful review of the complaint and Judge Gertner's Memorandum and Order on the Motions to Dismiss (Docket No. 108), this court concludes that the plaintiffs are correct and that their claims are <u>not</u> limited to alleged fraud in a specific type of

---

[1] All citations to the parties' pleadings cite only to the redacted versions of those pleadings.

[2] It appears to this court that, at least at the motion to dismiss stage, State Street took the position that its FX pricing was authorized by its contracts rather than its current position that the plaintiffs' fraud claims are based only on FX revenue generated from a specific type of custodial relationship. Therefore, initially it was in State Street's interest for the contracts to be considered similar. For their part, the plaintiffs were of the impression, based on statements made in the California action, that the contracts for all custodial clients were, in fact, similar. However, when she denied the motion to dismiss, Judge Gertner rejected the argument that compliance with contractual obligations shielded State Street from, at a minimum, the fraud and imprudence claims. Since Judge Gertner rejected State Street's defense based on the contract language, the "typicality" of the contracts has become a significant issue, and State Street is now arguing that only a few of the custodial agreements are substantially similar to those it has with the California pension funds.

custodial relationship. Therefore, the plaintiffs are entitled to broader discovery than documents relating to the seven custodial clients that State Street has identified as having contracts with language similar to the California pension funds. Nevertheless, this court recognizes that this ruling will greatly expand State Street's discovery obligations beyond that in which it is presently engaged. Therefore, the parties are ordered to meet and confer, and be prepared to discuss any appropriate limitations on specific discovery requests at the hearing on December 10, 2012 at 2:00 p.m.

## II.  DISCUSSION

### The Contract Allegations

While the plaintiffs have alleged in the Consolidated Amended Complaint that the pricing of FX transactions violated State Street's contractual obligations, the plaintiffs also have alleged widespread fraudulent misrepresentations and omissions, as well as the manipulation of internal State Street reports, which affected numerous custodial clients regardless of the language of their contracts. Contrary to State Street's contention, plaintiffs' claims are not limited to "an alleged fraud perpetrated against (i) CalPERS, (ii) CalSTRS, and (iii) other clients whose contracts and RFP responses are 'typical' (Plaintiffs' word) of CalPERS or CalSTRS."  (Docket No. 219). There is no basis for limiting the defendants' discovery responses to such clients.

A fair reading of the complaint establishes that the plaintiffs have asserted (1) that State Street represented to all of its custodial clients engaged in indirect trades that it had made foreign exchange trades at a certain rate when, in fact, it had made the trade at a

different rate that was more favorable to State Street, but less favorable to the client,[3] (2) that charging the clients a different amount than State Street had actually paid violated its agreements with its customers,[4] in particular the "typical" custodial agreements with the California Pension Funds,[5] and (3) that in order to conceal the fact that a different rate was being charged, State Street manipulated its internal systems, issued false reports and failed to disclose relevant information to its custodial clients.[6]  Because the complaint alleges fraudulent conduct that is not dependent on specific contract language, and which affects all custodial clients engaged in indirect trades, the plaintiffs are entitled to broader discovery than being offered by State Street.

## Motion to Dismiss

State Street argues that the plaintiffs' reading of the Complaint would not withstand the pleading requirements of the PSLRA.  Contrary to State Street's position,

---

[3] See, e.g., Complaint at ¶ 8 ("State Street would 'cherry-pick' a rate that was more beneficial to State Street, and tell its clients that the trade had occurred at this other, false, rate.").

[4] See, e.g., Complaint ¶ 41: ("[u]nder the terms of State Street's custodial arrangements, State Street was obligated to provide its clients the same exchange rate that State Street actually used to make the trade.  This arrangement was supposed to be beneficial to State Street's clients because, among other things, they would not have to incur the expense and time of identifying and choosing the most competitive exchange rate.").

[5] See, e.g., Complaint ¶¶ 42-43: (State Street's contracts with California's public pension funds are "typical" of its agreements with custodial clients, but the same services were offered "to a broad range of custody clients in the U.S. and internationally.").

[6] See, e.g., Complaint ¶ 58: ("State Street deliberately falsified its internal and external reports to conceal the fraud" and created reports and databases that did "not reflect the true exchange rate at which State Street had executed the transaction earlier in the day.").

however, Judge Gertner in fact ruled that the plaintiffs' claims of fraud were not limited to specific contract language, and that these broader claims survived the motion to dismiss. As a general statement, Judge Gertner ruled that, "[w]hether or not State Street's contract with its indirect trade clients permitted these overcharges" for FX transactions, the bank could be found to have "been deceiving its clients." (See Docket No. 108 at 61). This broader claim controls the appropriate discovery.

     As Judge Gertner recognized, the plaintiffs alleged in the Complaint that State Street engaged in indirect foreign exchange trades for more than 75% of its large custodial clients. (Id. at 5). The fraudulent scheme was alleged to be "an institutional scheme designed to deceive the clients in order to reap higher profits." (Id. at 21 (emphasis added)). It was wide-spread and "well-known around the company[.]" (Id. at 22). Judge Gertner expressly acknowledged that the plaintiffs' claims of wrongdoing were not limited to the two California funds, "since State Street offered the same FX trading services 'to a broad range of custody clients in the U.S. and internationally.'" (Id. at 27 (quoting Complaint at ¶ 43)). It was because of the widespread application of the allegedly fraudulent pricing scheme, that Judge Gertner rejected State Street's contention that any misrepresentation was immaterial. (Id. at 27 ("While discovery is necessary to determine the number of clients charged this mark-up, it is not unreasonable to extrapolate from these two [California pension fund] clients and estimate that a substantial proportion of State Street's annual trading revenue was reaped from the practice.")).

Judge Gertner did not rule that the fraud was allegedly perpetrated only on the custodial clients with "typical" contract provisions.

In support of its contention that the Plaintiffs have only alleged fraud in connection with the custodial accounts that contained the "typical" language found in the California pension fund agreements, State Street argues that, "in allowing the Plaintiffs to proceed with this claim, Judge Gertner specified that resolution of this dispute turns [on] the meaning of 'based on' as contained in this typical contractual language." (Docket No. 219 at 5). Thus, State Street argues, "[t]his was the FX claim that survived a PSLRA motion to dismiss, and it is the only one that can serve as a basis for discovery." (Id.). This argument, however, takes Judge Gertner's statement out of context, and ignores critical language of her decision.

In connection with the motion to dismiss, State Street admitted that custodial clients were charged a different rate "from the one actually used to effectuate the FX trades[,]" but justified the practice as being acceptable under the governing contracts. (Docket No. 108 at 20). Thus, contrary to its present position, State Street apparently agreed that the California pension fund contracts were typical, and argued that the contracts authorized the challenged pricing practice when they provided that the trades "are priced *based on the interbank rate* at the time the trade is executed." (Id. at 20 (emphasis added)). The plaintiffs, however, argued for a different interpretation of the same contract language. (Id. at 21). It was in this context that Judge Gertner ruled, using the language on which State Street now relies, that "[t]he resolution of this contract

dispute turns, at least in part, on the meaning of 'based on.'" (Id. at 21 (emphasis added)). Judge Gertner did not rule, however, that plaintiffs' fraud claims were limited to contracts which contained this language.

Judge Gertner clearly acknowledged that the breach of contract claim and fraud claims were distinct. (See, e.g., id. at 21 ("Even if State Street did breach its contract, however, whether State Street's practice amounted to fraud is another question."); id. at 24 ("Other than arguing that their actions were authorized by contract, Defendants offer no competing narrative. Accordingly, Plaintiffs' allegation of a fraudulent scheme is sufficient at this stage."); id. at 25 ("The fact is that Plaintiffs appropriately utilized what the California AG learned during his lengthy investigation, regardless of whether the California case concerned a fraud or a contract dispute.")). According to Judge Gertner, "Plaintiffs have provided sufficient evidence to support an inference of Defendants' intent to 'deceive, manipulate, or defraud' its FX clients." (Id. at 22). This ruling was not limited to certain clients with certain contracts.

### June 26, 2012 Hearing

State Street contends that the issues raised herein were previously decided by this court in connection with its rulings on motions to compel heard on June 26, 2012. While it is true that the issues were raised previously, it was in a different context and the scope of appropriate discovery was not finally resolved.

The June 26, 2012 hearing involved a motion to compel the production of documents previously produced in the California action. Accordingly, the question at issue

was whether the plaintiffs were entitled to the same production that State Street had made in California, including all RFPs and contracts with custodial clients. State Street not only denied that it had produced such documents in the California action, but also argued that they were not relevant in the instant case. Thus, in response to the plaintiffs' argument that the widespread fraudulent scheme entitled them to the production of all the RFPs and contracts, State Street argued that the plaintiffs' claims were limited to an alleged fraud perpetrated against the California pension funds and other clients with such "typical" contracts. (See Docket No. 157 at 6-7; No. 167 at 3-4).

The issue whether all RFPs and contracts were relevant was not fully addressed or decided. As of the time of the June 26, 2012 hearing, State Street had not produced any RFPs or contracts, whether deemed typical or not. (See Docket No. 157 at 6). In addition, the plaintiffs were hampered by the fact that State Street had "refused to provide samples of custody contracts and RFPs it deems to be non-typical" and had refused to list the contracts on a non-production log. (Id.). Therefore, the court had no sense of what type of contracts State Street believed were "typical" and/or how many contracts State Street believed were typical or not. As a result, it was impossible to judge whether the discovery dispute would significantly affect the scope of discovery.

In order for the parties to obtain relevant information, the court ordered State Street to produce custodial contracts and RFPs that had been produced in the California action and which were responsive to plaintiffs' discovery requests in this case, as well as 25 randomly selected exemplars of FX pricing provisions that State Street contended

were not typical of the FX pricing provisions contained in the California pension fund contracts. (Docket No. 172 at 4). The significance of any findings that might be revealed from this production was left to another day. The plaintiffs have appropriately raised the issue again now that the facts are known.

Since this court's initial ruling on the contracts and RFPs, State Street has taken the position that there are seven custodial clients who had "typical" contracts, including the two California pension funds. (Docket 212 at 3). State Street argues further that the 25 exemplars it produced are not typical because they do not contain language to the effect that the client was "guaranteed to receive the most competitive rates" or that trades were "priced based on the interbank rates." (Docket No. 219 at 4). Leaving aside the issue whether these are the critical phrases which make a contract "typical" or not, none of the 25 exemplars dated prior to October 20, 2009, when the California action was unsealed, affirmatively disclosed the method of FX pricing actually used by State Street. (See Docket No. 212 at 5). Since a fundamental claim by the plaintiffs is that State Street fraudulently failed to disclose its FX pricing methodology, State Street has not established that its arrangements under "non-typical" contracts take those clients outside the scope of the alleged fraud.

### III.  ORDER

The plaintiffs have alleged a fraudulent scheme that affected all custodial clients that engaged in indirect trades, regardless of the language used in their contractual arrangements. The parties shall meet and confer prior to the hearing on December 10,

2012 to determine if they can resolve their discovery dispute based on this interpretation of the Complaint. Any claim of undue burden with respect to specific requests will be addressed further at the hearing.

                                                                    / s / Judith Gail Dein
                                                                    Judith Gail Dein
                                                                    United States Magistrate Judge