IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HILL v. STATE STREET CORPORATION ) <br> ) <br> ) <br> ) | Master Docket No. 1:09-cv-12146 |
| THIS DOCUMENT RELATES TO ) <br> ALL CLASS ACTIONS ) <br> ) <br> DOCKET NO. 09-12146-GAO ) <br> ) |  |

**STATE STREET'S [PROPOSED] REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER CONCERNING
<u>DOCUMENTS SUBJECT TO LUXEMBOURG BANK SECRECY LAWS</u>**

Plaintiffs' opposition attempts misdirection at almost every turn: from the relief State Street has requested, to the record that led to this motion, to the law that should guide the Court's decision. For clarity, State Street is seeking to (i) replace State Street Luxembourg's customers with other State Street customers in a *sampling* protocol that calls for the production of 117 customers' contracts, requests for proposal, and RFP responses; and (ii) withhold revenue information concerning a handful of State Street Luxembourg customers from reports that detail revenue estimates and trading data for State Street's approximately 1,500 worldwide customers.

Good cause exists for this protective order because State Street's ***unrebutted*** expert testimony establishes that this information is subject to Luxembourg's strict bank secrecy laws, and that production of the above information to Plaintiffs would open State Street to the prospect of criminal liability—something the Supreme Court has recognized "constitutes a weighty excuse for non-production." *Société Internationale Pour Participations Industrielles et Commercialles, S.A. v. Rogers*, 357 U.S. 197, 211 (1958). Moreover, the information at issue has no unique relevance to this litigation, and Plaintiffs will not be prejudiced in trying to prove

1

the existence of a fraudulent scheme that supposedly affected "all" of State Street's custody FX clients if other customers are substituted into the sample. If an enterprise-wide scheme ever existed at State Street (and it did not), Plaintiffs should be able to discover it without the customers of State Street Luxembourg.

## BACKGROUND

A. **Contrary to Plaintiffs' Assertions, the Specific Clients in the Contract Sample Were Not "Heavily Negotiated."**

Although Plaintiffs attempt to create the impression that they "heavily negotiated" and "carefully chose[]" the specific customers in the sample group, Opp. at 4-5, the truth is that there was hardly any negotiation of individual clients, and the parties' agreement specifically contemplated the prospect of future *substitutions*. More specifically, instead of individual customers, let alone the twelve issue in this motion, the parties' discussions focused on (i) the trading volume associated with the sample group as a whole, and (ii) the burdens of collection due to the fact that these documents are not centrally located.

The sampling protocol crystalized on February 11, 2013 when State Street reported that it had been able to locate a number of (but not necessarily all) contract materials for 117 of its top 150 clients by trading volume and that those 117 collectively represented approximately 73% of the overall volume. *See* Email from James Prendergast dated Feb. 8, 2012, attached to the Declaration of John Browne as Ex. G. Plaintiffs accepted that group, with the caveat that State Street would continue to look for documents relating to 7 higher volume clients for which State Street had not been able to locate contract materials. *See id.* (email string and attachment (last page)). If they were located later, those clients would be *substituted* for the 7 lowest volume clients in the group. *See id.* (attachment ¶ (b)). Plaintiffs also reserved the ability to later request contract materials for another 30 clients. *See id.* (attachment ¶ (d)).

Third party confidentiality, although not specifically Luxembourg's bank secrecy laws, was always part of the parties' discussions. For example, State Street reserved the right to redact documents as necessary "to comply with a third party confidentiality obligation." *See id.* ¶ (f). In the event Plaintiffs had questions about those redactions, the parties agreed to meet and confer, and absent a resolution, State Street agreed to move for a protective order. *Id.*

**B.     State Street's Good Faith Efforts to Balance Its Compliance With Competing Legal Obligations Have Not Caused A Meaningful Delay in this Case.**

Since the very beginning of discovery, State Street has devoted an extraordinary amount of time, resources, and expense toward Plaintiffs' insatiable appetite for documents. At the outset of the case, Plaintiffs served 230 individual requests for a breathtaking range of documents, many of which purported to cover more than a twelve-year period. The extended negotiations over the appropriate scope of discovery that followed have been a function of Plaintiffs' unreasonable starting point. Nevertheless, while those negotiations were underway, State Street embarked on the review and production of documents encompassed by areas of agreement. To date, State Street has made twenty rolling productions that have totaled nearly *7 million* pages and it expects to produce another 300,000 pages later this week. State Street has the equivalent of more than 75 lawyers devoted to full-time document review, and it reached agreement with Plaintiffs last week on a search term protocol for further FX discovery that captured nearly *1.6 million* additional documents (likely in excess of *10 million pages*) that now must be assessed for responsiveness.

The contract sample and revenue reports at issue in this motion represent a tiny part of that overall discovery. And contrary to Plaintiffs' assertions, State Street's efforts to comply with foreign laws to which it is subject have not delayed the case. State Street has produced approximately 6,000 contract related documents, and the parties recognized at the outset that

3

additional collection would be ongoing. Before State Street volunteered to the Court to produce the documents it had collected that it determined would not be subject to a motion by March 20, there was no agreed-upon date of production.

And, contrary to Plaintiffs' claims, there was no firmly agreed upon date for production of the revenue reports either. On February 22, State Street told Plaintiffs that it "*expect[ed]*" to produce those reports by the end of the following week (March 1) and also that State Street believed that "around 10 clients'" names "*will be redacted*" due to confidentiality issues. Letter from James Prendergast, dated Feb. 22, 2013 at 5 (emphasis added) (attached as Butts Aff. Ex. A). Although State Street needed an additional 19 days to evaluate bank secrecy laws, it was able to produce revenue reports with only four clients redacted.

**C.    The Documents and Information State Street Has Withheld Are Far Narrower Than Plaintiffs Claim.**

Plaintiffs' opposition significantly distorts the documents and information State Street has withheld. The only documents State Street has withheld are customer contracts (including related documents such as amendments and schedules) with State Street Luxembourg. The twelve customers at issue in this motion sponsor many different funds, which are each separately incorporated.[1] Ten of the twelve customers sponsored entities that contracted with multiple State Street entities. State Street withheld only the sponsored entities' contracts with State Street Luxembourg, and produced their contracts with other State Street entities.

State Street redacted even less information from the revenue reports. Because of the way in which the revenue reports aggregate data for all of a fund sponsors' entities, it was only necessary for State Street to redact data for *four* of those sponsors to comply with Luxembourg's

---

[1]    Plaintiffs wrongly focus in their opposition on the location of the fund sponsors' headquarters. Those sponsors are all large financial institutions with many different offices, and the sponsored funds with which State Street contracted were incorporated around the globe.

4

secrecy laws. Plaintiffs' assertion that State Street redacted information for "far more than the 12" fund sponsors at issue is simply false.[2] Opp. at 1.

**D.     Plaintiffs' Refusal to Meaningfully Meet and Confer.**

Since apparently perceiving an opportunity for a litigation advantage at the last hearing, Plaintiffs have been more interested in posturing for motion practice than in negotiating in good faith toward reaching a practical solution. For example, it was only after State Street detailed Plaintiffs' complete refusal to compromise, *see* State Street Br. at 6, that Plaintiffs made a window-dressing proposal they knew State Street could never accept.

Although that proposal replaced the twelve customers of State Street Luxembourg, it put State Street in a *worse* position with respect to complying with Luxembourg law or any other legal restrictions that may come up with regard to its approximate 1,400 other customers around the world who are not in the sample group but may be involved in future discovery.[3] More particularly, under Plaintiffs' proposal, the Court would enter any order prohibiting State Street from withholding or redacting anything due to bank secrecy laws or contractual obligations aside from the limited documents and information at issue in this motion. So, for example, if Plaintiffs selected another customer of State Street Luxembourg to replace one of the twelve that are now at issue, State Street would have to produce that customers' contract information in violation of Luxembourg law. And, if data relating to the twelve customers at issue or any other customer of State Street Luxembourg is contained somewhere in the approximate 1.6 million documents that

---

[2]     Plaintiffs have greatly inflated the number of redacted rows in the revenue spreadsheets by aggregating the redacted information contained in annual reports for four different years as well as double counting redactions in a consolidated worksheet and numerous other worksheets that roll up into the consolidated tab. Moreover, each row in the report does not represent trading for separate and distinct customers, but rather a series of trades instructed by an investment manager on behalf of a given client.

[3]     State Street is not expecting any other issues aside from Luxembourg's bank secrecy laws, but it is unable to say so for sure given the breadth of its business and the uncertainties as to what may be captured in other aspects of discovery.

are captured in the recently agreed-to search term protocol, State Street would have to produce it in violation of Luxembourg law.[4]

On Monday, April 1, State Street's counsel explained these and other shortcomings to Plaintiffs' counsel, who asked State Street to draft a proposed stipulation that would serve as the basis for further discussion. State Street made a proposal a few hours later, the foundation of which was removing State Street Luxembourg's customers from the revenue reports and the contract sample, and giving Plaintiffs twelve replacement selections of their choice which State Street could only refuse if (i) the selected replacement was also a customer of State Street Luxembourg or (ii) State Street believed in good faith that it is legally barred from producing by operation of law or contract. *See* Butts Aff. Ex. B ¶ 2.[5] State Street also made a proposal to address yet unknown documents (*e.g.*, the 1.6 million electronic documents captured by the new search term protocol) that may be discovered in the future, and are not part of this motion. It offered to provide a log of any documents that are withheld on bank secrecy grounds. *Id.* ¶ 4. And if the document could be produced in redacted form, State Street would identify bank secrecy as the reason for the redaction to enable the parties to meet and confer about any questions. *Id.*

---

[4]     Plaintiffs attempt to portray their proposal as reasonable by taking statements out of context from State Street's opening brief and asserting that State Street reported that it had resolved "'all third party confidentiality issues'" aside from Luxembourg's bank secrecy laws. *See* Opp. at 4 (quoting, and adding emphasis, State Street Br. at 6). In context, it is clear that State Street was referring only to third party confidentiality issues with regard to the revenue reports and the 117 customer contract sample and not all possible issues associated with its global enterprise and the millions of documents that may be subject to discovery.

[5]     Plaintiffs' (mis)characterization of State Street's position as "ever shifting" is empty rhetoric. Before filing its motion for a protective order, State Street offered to increase the number of replacements to match the same trading volume represented by the twelve customers at issue. It did so because it was then proposing, for administrative ease, to fully replace the twelve customers rather than sifting through their contracts and making production decisions based on whether the individual agreements were with State Street Luxembourg. When Plaintiffs decided not to compromise by March 20, State Street went through that exercise and it ultimately produced the lion's share of contracts for those customers' funds which were with State Street entities other than State Street Luxembourg. If the number of replacements is increased as if State Street had not produced anything for the 12 customers at issue, the sample will cover *more* trading volume than the parties originally agreed. Although State Street does not believe that would be appropriate, it never considered this issue as something that should stand in the way of a practical resolution.

Although Plaintiffs promised to respond "no later than [Tuesday] morning" so the parties could continue their discussions in an attempt to narrow or resolve this dispute, they never responded. Email from John Browne dated April 1, 2013 (Butts Aff. Ex. C)

**ARGUMENT**

A. **State Street's <u>Unrebutted</u> Expert Testimony Establishes That Luxembourg Law Prohibits State Street's Production of the Documents at Issue.**

There should not be any real dispute that State Street is precluded from producing the documents at issue by Article 41(1) of Luxembourg's law of 5 April 1993 relating to the financial sector, which requires Luxembourg banks to "keep secret *any* information confided to them in the context of their professional activities." State Street provided the Court with an affidavit from an expert in Luxembourg banking law—Alfred François Brausch, a partner in Linklaters LLP's Luxembourg office—which explained that obligation further and applied it to the discovery at issue. As Mr. Brausch attested in his first affidavit and in a reply affidavit submitted with this brief:

- Article 41 broadly requires banks to keep secret all information confided to them in the course of their professional duties. Brausch Aff. ¶ 6. The term "confided" as used in the statute does not have "special meaning such that it applies only to information that is otherwise secret." Brausch Reply Aff. ¶ 8. The obligation applies even where a customer may itself have disclosed the information to others. Brausch Aff. ¶ 6.

- The duty squarely applies to the customer-related information at issue here: (i) contracts for custodial banking relationships which necessarily reflect the commercial terms of the relationship; (ii) requests for proposal for such relationships and responses thereto; and (iii) revenue estimates reflecting customer trading data such as trading volume and pricing information. Brausch Aff. ¶ 10; Brausch Reply Aff. ¶¶ 6-8. State Street's Head of Client Service Operations, Fabrice Fagnart, likewise attested that in the ordinary course of its business, State Street Luxembourg treats such documents as subject to the duty of secrecy. Fagnart Aff. ¶¶ 6-7.

- Violations of Article 41 are treated as criminal offenses, and the penalties can be severe. Brausch Aff. ¶ 8. Penalties can be more severe in the case of repeat offenses. Brausch Reply Aff. ¶ 10(b).

Tellingly, for all their pronouncements that Luxembourg law does not prohibit production of the documents at issue, *Plaintiffs were unable to find an expert in Luxembourg law (or any other authority) who disagreed with Mr. Brausch.*

Instead of submitting a competing affidavit, and without any training or expertise in Luxembourg law, Plaintiffs' counsel made up their own interpretation of two parts of Article 41 and then cavalierly asserted that any "concerns about criminal prosecution would evaporate" if the Court first issues an order compelling production. Opp. at 13-14. As Mr. Brausch makes clear in his reply affidavit, that is simply not so. The provisions Plaintiffs cite—Article 41(2), which provides an exception for disclosures made pursuant to a "legislative provision," and Article 41(7), which provides a safe harbor against criminal liability for those who "lawfully disclose" information subject to the obligation of secrecy—refer to disclosures authorized under *Luxembourg* law, not foreign laws. Brausch Reply Aff. ¶ 9. Thus, an order from this Court would not remove the risk of criminal prosecution in Luxembourg.

Plaintiffs fare no better in their attempt to transform the fact that State Street has previously produced some—but not all—of the documents at issue to "the SEC and other regulators" into a new exception to Article 41's secrecy obligations that is not found in the statute. Opp. at 9.[6] Those productions should not have any bearing on this motion. As Mr. Brausch attests, Luxembourg law allows production of such materials to the SEC. Reply Aff. ¶ 10(a) (discussing Article 41(3) which allows information to be confidentially disclosed to a foreign authority charged with the prudential supervision of the financial sector). Luxembourg's laws do not, however, allow the same information to be later disclosed to private plaintiffs, let alone information that has never been shared with a regulator. *Id*. Furthermore, even if State

---

[6] For the Court's information, just under half of the withheld documents were previously produced to the SEC, and fewer than ten of the same documents were also produced to the U.S. Attorney for the District of Massachusetts. In both cases, the productions were accompanied by a request for confidential treatment under FOIA.

Street's production of very few of those documents to regulators other than the SEC falls outside Article 41(3), it would not enable follow-on production to the Plaintiffs. *Id.* ¶ 10(b). If anything, producing those documents to Plaintiffs would only subject State Street to the risk of additional liability. *Id.* (discussing enhanced penalties for repeat offenses).

Unable to put forward competing expert testimony, Plaintiffs also resort to claiming that Mr. Brausch's affidavit is not detailed enough. But the cases Plaintiffs cite only serve to confirm that the opposite is true. For example, in *West v. Bell Helicopter Textron*, 2013 WL 7583456, *2 (D.N.H. Feb. 27, 2013), the court denied a defendant's request to mark certain documents as confidential because the defendant's descriptions of the documents at issue (e.g., memoranda "outlining a particular hazard, potential solutions and their risks and benefits") were too vague for the Court to tell whether the documents actually contained trade secrets or other proprietary information. Here, State Street and Mr. Brausch have clearly described the narrow categories of documents and information at issue in this motion: (i) customer contracts with State Street Luxembourg; (ii) requests for proposal to State Street Luxembourg and any responses; and (iii) estimates of FX revenue that identify State Street Bank Luxembourg's clients and client trading data. Brausch Aff. ¶9; State Street Br. at 4-5 & 15.

The same is true with regard to the harm from production of these documents. Mr. Brausch and State Street have clearly articulated that the harm to State Street is the prospect of criminal liability in Luxembourg. Brausch Aff. ¶¶ 8-9; State Street Br. at 1. In the cases Plaintiffs cite, the movant was unable to articulate any specific harm. For example, in *U.S. v. Delaney*, 2010 WL 2817190, *3 (D. Mass. July 15, 2010), this Court denied a third party's motion to stop the government from turning over *Brady* material to a criminal defendant because the movant did not explain how the disclosure of six-year old information would harm it

commercially. Similarly, in *Contratto v. Ethicon, Inc.*, 227 F.R.D. 304, 308-09 (N.D. Cal. 2005), the Court ordered the removal of a confidential designation from certain documents because the defendant provided an affidavit from its litigation counsel that did not explain the business harm his client would face if the public was given access to the documents at issue.

**B.      The Balancing Factors Weigh Decidedly in State Street's Favor.**

Plaintiffs are simply incorrect that "U.S. courts routinely reject" motions like this. Opp. at 3.[7] To the contrary, the Supreme Court has clearly instructed trial courts that when it comes to international comity, nothing should be considered routine. Courts must carefully consider the demands of international comity and pay "due respect" to the "special problem" of competing sovereign interests. *Société Nationale Industrielle Aérospatiale*, 482 U.S. at 546; *see also In re Anschuetz & Co GmbH*, 754 F.2d 602, 614 (5th Cir. 1985) ("Particularly in the realm of international discovery, we believe the exercise of judicial power should be tempered by a healthy respect for the principles of comity.").

Nothing in Plaintiffs' opposition detracts from the fact that the considerations that go into the Court's analysis weigh in favor of a protective order, both individually and collectively.

   *1.      The Documents for State Street Luxembourg's Customers in the Contract Sample Are Not Uniquely Important to the Litigation.*

Plaintiffs' own opposition confirms that the documents and information at issue here are *not* uniquely important to the litigation. More particularly, they describe their theory as an alleged "fraudulent scheme that affected <u>all custodial clients</u> that engaged in indirect trades." Opp. at 4 (emphasis in original). But the discovery here does not delve into "all" custody

---

[7] The cases Plaintiffs' cite for the proposition that this is a "routine" issue primarily dealt with information belonging to a party to the litigation, not (like here) third party information held by a defendant. *See, e.g., Gucci Am. Inc. v. Weixing LI*, 2011 WL 6156936, at *12 (S.D.N.Y. Aug. 23, 2011) (compelling third party Chinese bank to produce information related to bank accounts of defendants); *Gucci Am. Inc. v. Cerveal Fashion*, 2010 WL 808639, at *8 (S.D.N.Y. Mar. 8, 2010) (compelling third party Malaysian bank to produce documents relating to Defendants' bank accounts).

10

contracts. Recognizing the practical impossibility of such discovery for State Street's approximately 1,500 clients worldwide, Plaintiffs accepted a sample of materials for 117 customers. Given the scope of Plaintiffs' claim that "all" clients were supposedly defrauded, the make-up of the sample group should not matter. Plaintiffs tellingly never explain how or why any individual customer out of State Street's approximately 1,500 clients can be considered critical in their attempt to show an enterprise-wide scheme. If such a scheme existed (and it did not), Plaintiffs should be able to discover it without State Street Luxembourg's customers.

The fact that Plaintiffs can have the same sized sample without Luxembourg customers weighs powerfully in favor of a protective order. As the Ninth Circuit explained, "[w]here the outcome of litigation 'does not stand or fall on the [discovery at issue],' . . . courts have generally been unwilling to override foreign secrecy laws." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) (quoting *In re Westinghouse Elec. Corp. Uranium Contracts Litig.,* 563 F.2d 992, 999 (10th Cir. 1977)); *see, e.g., Trade Dev. Bank v. Continental Ins., Co.*, 469 F.3d 35, 40-41 (2d Cir. 1972) (affirming denial of motion to compel information protected by Swiss law where other information was "adequate" to allow the parties to "prepare for trial"); *In re Unranium Antitrust Litig.*, 480 F. Supp. 1138 1146, 1154-55 (N.D. Ill. 1979) (considering "whether the requested documents are *crucial to the resolution of a key issue*) (emphasis added). The outcome of this case will not turn on State Street Luxembourg's customers.

All of the cases Plaintiffs cite in support of their argument that State Street Luxembourg's customers are somehow "uniquely important" are inapposite because *none relate to a sampling procedure* in which the sample can be easily changed. If anything, the cases Plaintiffs cite confirm that a protective order is appropriate because, unlike documents in this sample group,

the documents in those cases were *critical* to the outcome of the case. For example, in *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 440 (E.D.N.Y. 2008), the court summarized its foundational finding in a subheading entitled, ***"The Requested Information is Crucial to the Litigation."*** (emphasis in original). In *Reino de Espana v. Am. Bureau of Shipping*, 2005 WL 1813017, *7 (S.D.N.Y. Aug. 1, 2005), the Court ordered a plaintiff to produce documents that were privileged under Spanish law (but not U.S. law) because the documents were "*vital* to Defendants' ability to mount a fair defense" (emphasis added). And in *Milliken & Co. v. Bank of China*, 758 F. Supp.2d 238, 245 (S.D.N.Y. 2010), the court ordered the defendant to produce of the "very documents that [it] would use to support" a central affirmative defense (a claimed superior security interest over the property at issue).

Plaintiffs also miss the mark in their attempt to portray documents at issue as uniquely important by citing to other documents relating to two of the twelve fund sponsors. *See* Opp. at 15.[8] To begin with, State Street is not seeking to withhold all documents relating to the client referenced in Ex. C to the Browne declaration. It is only seeking to withhold documents for its entities that contracted with State Street Luxembourg. Thus, Plaintiffs will remain able to explore the rate question identified in their opposition. The email string attached as Ex. B to the Browne declaration also does not affect the analysis. Putting aside the fact that Plaintiffs took a single email out of context from discussions that continued over a period of several months, no individual client can be considered critical given the scope of what Plaintiffs have pled—a purported fraudulent scheme that allegedly affected "all" of State Street's custody foreign exchange customers. If Plaintiffs' theory has merit (and it does not), they will be able to test it with the many millions of pages of documents State Street has produced relating to customers of State Street entities other than State Street Luxembourg.

---

[8] State Street refers to those clients by general reference to avoid the need to file this brief under seal.

> 2. *Luxembourg's Specific Interest in Banking Secrecy is Much Greater Than Any Possible Interest the United States Could Have in Keeping State Street Luxembourg's Customers in the Sample Group.*

Plaintiffs' rhetorical challenges to whether Luxembourg has a significant interest in bank secrecy and the issues at play here all ring hollow. There can be no dispute that Luxembourg's legislature (i) passed a law codifying its policy choice for banking secrecy, and (ii) established *criminal* penalties for violations of that law. *See* Brausch Aff. ¶ 4 (discussing policy considerations behind Article 41); Brausch Reply Aff. ¶ 13 ("Bank secrecy is an issue that remains very much a focus of Luxembourg regulators and the professionals in the financial realm."); Itai Grinberg, *The Battle Over Taxing Offshore Accounts*, 60 UCLA L. Rev. 304, 328 n.76 (2012) (reporting Luxembourg's Prime Minister's and Finance Minister's recent statements that "there would be blood on the table" unless other EU countries stopped pushing Luxembourg to weaken its bank secrecy laws).

Although Plaintiffs attempt to muddy the comparison of sovereign interests by setting up a false choice between Luxembourg's interest in bank secrecy and the United States' interest in securities laws or ERISA, the real issue for the Court to consider is whether the United States' "general interest" in providing a means for discovery in civil cases, *see Reinsurance Co. of Am., Inc. v. Admnistratia Asigurarilor de Stat*, 902 F.2d 1275, 1280 (7th Cir. 1990), trumps Luxembourg's specific interest in bank secrecy. That analysis should begin and end with the fact that the discovery at issue is *a sample*. If the Court adopts the practical solution State Street suggested, Plaintiffs will still be able to test the same sized sample, and the United States' general interest in discovery will be unaffected.

In that respect, the circumstances at issue here are again dramatically different from those in the cases Plaintiffs cite. For example, in *SEC v. Euro Sec. Fund*, 1999 WL 182598, *4 (S.D.N.Y. Apr. 2, 1999), the court doubted that Swiss secrecy laws even applied, but also noted

that any analysis of the comity interests would include the fact that the "SEC's ability to proceed [would be] *crippled*" without the documents at issue (emphasis added). *See also Alfadda v. Fenn*, 149 F.R.D 28, 34-35 (S.D.N.Y. 1993) (expressing significant reservations about whether the documents at issue were subject to Swiss bank secrecy laws and characterizing the information at issue as "critical"). Here, Plaintiffs would not be hampered.

       3.     *State Street Has Acted in Good Faith to Balance Appropriate Discovery and Compliance with its Obligations Under Other Laws.*

State Street's good faith throughout this litigation is evident from its production of roughly seven million pages of documents, the fact that it raised foreign bank secrecy laws immediately after recognizing their effect on the discovery at issue here, and its repeated efforts to reach a practical solution to avoid the necessity of this motion. And, contrary to Plaintiffs' assertions, this issue has not lead to a delay in the ultimate resolution of the litigation. In fact, the parties last week settled on a search term protocol which captured nearly 1.6 million documents that now must be assessed for responsiveness and production. This issue can be resolved well before that Herculean task is completed.

Plaintiffs' assertion that State Street has acted in bad faith by selectively choosing when to apply foreign secrecy laws based on its own advantage is nonsense. Putting aside the fact that State Street's production to the SEC is allowed under Luxembourg law, *see* Brausch Reply Aff. ¶ 10(a), Plaintiffs have offered nothing to support a reasonable inference that State Street previously produced these documents to gain an advantage or that State Street produced them knowing they were subject to Luxembourg's secrecy laws. In that respect, the circumstances here are once again completely different from those at issue in the cases Plaintiffs cite. *See, e.g., Remington Prods., Inc. v. N. Am. Phillips Corp.*, 107 F.R.D. 642, 654-55 (D. Conn. 1985) (defendant "provided discovery in another anti-trust case in which it was a party, when it was

14

apparently in [defendants'] interest" to do so); *Milliken*, 758 F. Supp.2d at 245 (defendant cannot withhold on foreign secrecy grounds "the very documents that it would use to support its case and then unveil [them] at trial or in response to a dispositive motion").

Nor can Plaintiffs support their assertions of bad faith by faulting State Street for not making a specific objection based on Luxembourg's bank secrecy laws in its response to Plaintiffs' document requests. To begin with, Plaintiffs' assertions ignore the fact that State Street broadly objected to producing documents covered by a privilege or "any other . . . protection" from discovery and made clear that any inadvertent production of such documents should not be construed as a waiver. *See* General Objection No. 2. Also, State Street asserted a variety of objections at the outset of this case that would have prevented discovery of State Street Luxembourg's clients. For example, it was not until last November when the Court resolved issues relating to the scope of discovery and State Street's objection to discovery of customers whose contracts did not have the same pricing language as CalPERS and CalSTRS (which Plaintiffs alleged was "typical" and the foundation of the purported pricing scheme) that the parties even began the discussions that led to this sampling protocol. *See* Dkt. No. 232 at 2-3, 9.

Plaintiffs also miss the mark in their attempt to fault State Street for not seeking client consent to disclosure. As Mr. Brausch has attested, the possibility of obtaining client consent to assist the bank in meeting its disclosure obligations is a debated question in Luxembourg. Brausch Reply Aff. ¶ 11. Because no Luxembourg court has ever ruled on this issue, State Street would still be at some risk of liability even if it obtained consent. *Id.*

**D.    Plaintiffs' Improper Expansion of the Court's March 11 Order.**

Although it is not entirely clear, it appears that Plaintiffs are attempting to distort the Court's March 11 order which directed State Street to file a motion for a protective order as to "the FX related documents" discussed at the March 11 hearing (*i.e.*, the contract sample and

revenue reports) into an order requiring State Street to file a motion as to "any and all" foreign exchange related issues. Opp. at 5-6. State Street did not understand that to be the Court's intent, and in any event, had no ability to make such a motion now given the substantial uncertainties as to what else may come up in the course of FX discovery. For example, it remains to be seen how many, if any at all, documents related to State Street Luxembourg's clients are contained in the approximately 1.6 million documents captured in the recently agreed-to search protocol, or if Plaintiffs will seek contract-related materials directed to other customers of State Street Luxembourg. *See supra* at 2 (noting Plaintiffs' ability to seek up to 30 additional customers in the contract sample).[9]

If any confidentiality issues arise in the future, State Street will, as it believes the Court directed, discuss them with Plaintiffs and, if necessary, move for a protective order.

**CONCLUSION**

For the foregoing reasons as well as those in State Street's opening brief, State Street respectfully requests that the Court enter an order excluding from production (i) contract materials, (ii) requests for proposal and responses thereto, and (iii) revenue estimates relating to customers of State Street Luxembourg.

    Respectfully submitted:

    STATE STREET DEFENDANTS

    By their attorneys,

    */s/ John J. Butts*
    Jeffrey B. Rudman (BBO No. 433380)
    William H. Paine (BBO No. 550506)
    James W. Prendergast (BBO No. 553073)
    John J. Butts (BBO No. 643201)

---

[9] Any argument by Plaintiffs that State Street should somehow have described what might be in those 1.6 million documents would be ironic in light of their current argument that State Street's description of three narrow categories of documents is not specific enough.

|  |  |
|---|---|
|  | Wilmer Cutler Pickering<br>   Hale and Dorr LLP<br>60 State Street<br>Boston, Massachusetts 02109<br>Telephone: (617) 526-6000<br>jeffrey.rudman@wilmerhale.com<br>william.paine@wilmerhale.com<br>james.prendergast@wilmerhale.com |
| Dated: April 8, 2013 | john.butts@wilmerhale.com |

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that a copy of the foregoing was served via email to counsel to the registered participants of the ECF system in the above captioned matter on April 8, 2013.

                                             */s/ John J. Butts*
                                             John J. Butts